Jahan C. Sagafi (State Bar No. 224887)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com

Adam T. Klein*
Michael Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: atk@outtengolden.com
Email: mlitrownik@outtengolden.com

Jason R. Flanders (State Bar No. 238007)
AQUA TERRA AERIS LAW GROUP
490 43rd Street
Oakland CA 94609
Phone: (916) 202-3018
Email: jrf@atalawgroup.com

* pro hac vice application forthcoming

Peter Romer-Friedman*
Pooja Shethji*
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Suite 200W
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: prf@outtengolden.com
Email: pshethji@outtengolden.com

William Most (State Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Phone: (504) 509-5023
Email: williammost@gmail.com

Matthew K. Handley*
Rachel Nadas*
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Phone: (202) 559-2411
Email: mhandley@hfajustice.com

*Attorneys for Plaintiff and Proposed Class Members*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEUHTAH OPIOTENNIONE, on behalf of herself and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., <br><br> Defendant. | CASE NO. _____ <br><br> **COMPLAINT FOR** <br> **VIOLATIONS OF STATE LAWS** <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

## SUMMARY OF CLAIMS

Plaintiff respectfully submits the following Class Action Complaint against Facebook, Inc. on behalf of herself and a proposed nationwide class of older and female Facebook users (defined below) who were denied the opportunity to receive advertising and information about financial services opportunities within Facebook's business establishment in violation of the California Unruh Civil Rights Act, Cal. Civ. Code §§ 51, 51.5 and 52 ("Unruh Act").

1.      Plaintiff and the proposed class members have been denied the opportunity to learn about and obtain financial services, such as mortgages, personal loans, bank accounts, insurance, investment opportunities, and financial consulting services over the past three years (or longer) due to Facebook's discriminatory advertising and business practices and its aiding and abetting of financial services companies' discriminatory advertising and business practices.

2.      Facebook's discriminatory practices are straight-forward.  Over the past three years, Facebook required all users to tell Facebook their age and gender as a condition of using Facebook's services.  Then, Facebook segregated and classified all of its users based on their genders and ages, so that advertisers could send their ads only to people of specific genders or ages.  And Facebook encouraged its advertisers, including financial services companies, to send advertisements that excluded Facebook users from receiving the ads based on their ages or genders.  Then, advertisers and Facebook followed this direction by routinely placing financial services advertisements on Facebook that excluded older persons and women.

3.      Due to Facebook's discriminatory practices, millions of older and female Facebook users have been denied the opportunity to receive valuable advertisements about financial services opportunities that advertisers sent to younger persons and men, and to pursue those financial services opportunities within and outside of Facebook.  As a result, Facebook intentionally denied its own users the full and equal accommodations, advantages, facilities, and services of Facebook, and it aided and abetted numerous financial services companies in denying Facebook's users the full and equal accommodations, advantages, facilities, and services of those financial services companies.

4.      For at least three years, Facebook has been on notice that its discriminatory advertising and business practices for financial services opportunities classify and segregate Facebook users based

on protected characteristics and deny them equal treatment in Facebook's business establishment based on protected characteristics such as age and gender. Nonetheless, Facebook has not changed its practices with respect to financial services opportunities and advertising (other than certain changes that Facebook made with respect to credit-related opportunities and advertising in September 2019).

5. In September 2019, Facebook took meaningful steps to bar advertisers from placing advertisements for credit-related opportunities that discriminated against users based on age or gender. However, upon information and belief, Facebook has continued to deny equal opportunity to older persons and women regarding all other financial services opportunities aside from credit opportunities. Thus, both before and after September 2019, Facebook has routinely placed advertisements for financial services opportunities other than credit that excluded older persons and women.

6. There is no lawful or legitimate basis to exclude older persons or women from receiving the full and equal accommodations, advantages, facilities, and services of Facebook and the financial services companies that advertise financial services opportunities via Facebook.

7. Every time that Facebook and a financial services company together and intentionally have excluded an older person or a woman from receiving information about financial services opportunities on Facebook based on age or gender, Facebook violated the Unruh Act and aided and abetted those financial services companies in their own violations of the Unruh Act.

8. Plaintiff brings this action on behalf of older and female Facebook users who have been denied full and equal accommodations, advantages, facilities, and services of Facebook and the financial service companies advertising on Facebook due to their age or gender, as defined in Paragraph 60 below. In this action, Plaintiff seeks a declaration that Facebook has violated the Unruh Act in its own business establishment and aided and abetted financial services companies who have done the same in their own business establishments; an injunction to stop Facebook from continuing to engage in such violations; and statutory penalties for each instance of exclusion on Facebook from the ability to receive advertisements for financial services opportunities.

**JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(d)(2), as the matter in controversy exceeds the sum or value of $5 million, exclusive of

interest and costs, and it is a class action in which Plaintiff and members of the proposed class are citizens of different states than Facebook.

10. This Court has personal jurisdiction over Facebook. There is general jurisdiction over Facebook, as Facebook's corporate headquarters are located in this District in Menlo Park, California, Facebook conducts substantial business throughout this District and in the State of California, and Facebook employs thousands of workers in the State.  Facebook has consented to this Court asserting personal jurisdiction over Facebook, as Facebook's Terms of Service require its users to resolve any disputes in the Northern District of California or a state court located in San Mateo County and require its users to "submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claims."  Facebook, Terms of Service, https://www.facebook.com/terms.php.

11. Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and 2202.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), as the sole Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper because Facebook's Terms of Service require its users to resolve any disputes in the Northern District of California or a state court located in San Mateo County.  The same Terms of Service provide that "the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions."  Facebook, Terms of Service, https://www.facebook.com/terms.php.

## INTRADISTRICT ASSIGNMENT

13. Pursuant to N.D. Cal. Local Rules 3-2(c) and (d), intradistrict assignment to the San Francisco Division is proper because a substantial part of the events that gave rise to the claims asserted herein occurred in San Mateo County.

## THE PARTIES

14. Plaintiff Neutah Opiotennione is a 54-year-old woman who lives in Washington, D.C. Over the past three years, Ms. Opiotennione has regularly used Facebook.  As part of her regular use of Facebook, she has been interested in receiving advertising and other information about financial services opportunities in Facebook advertisements.  Like other members of the proposed Class, Ms.

Opiotennione has routinely been denied advertisements and information about financial services opportunities on Facebook due to her age and gender over the past three years.

15.    Defendant Facebook, Inc. is a publicly traded corporation, headquartered at 1601 Willow Road, Menlo Park, California, 94025, incorporated under the laws of the State of Delaware. Facebook owns and operates an online social networking web site that allows its users to communicate with each other through the sharing of text, photograph, and video, and allows financial services companies to advertise financial services opportunities to hundreds of millions of Facebook users in the United States.  In December 2018, Facebook had 1.52 billion daily active users globally and in 2018 the company earned $55.85 billion in revenue, substantially all of which was generated from selling advertising placements to marketers.  Facebook 2018 Annual Report, https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.

## FACTUAL ALLEGATIONS

16.    Facebook is one of the most popular business establishment on the internet with which Americans interact.  According to its 2018 Annual Report, in 2018 Facebook had 1.52 billion daily active users and 2.32 billion monthly active users.  *Id.* at 35.  A daily active user is "a registered Facebook user who logged in and visited Facebook through [its] website or a mobile device, or used [its] Messenger application (and is also a registered Facebook user), on a given day."  *Id.* at 36.  A monthly active user is "a registered Facebook user who logged in and visited Facebook through [its] website or a mobile device, or used our Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement."  *Id.* at 37.

17.    According to Facebook's annual report, "Facebook enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers. There are a number of different ways to engage with people on Facebook, including News Feed which displays an algorithmically-ranked series of stories and advertisements individualized for each person."  *Id.* at 5. Instagram is a similar social media platform for "for sharing photos, videos, and messages."  *Id.*  In addition, Messenger is a messaging application that Facebook provides to its customers to engage in messaging with each other.  *Id.*

CLASS ACTION COMPLAINT

18.     Facebook sells advertising to companies who pay Facebook to place their advertisements on users' News Feeds on Facebook, as well as on Instagram and Messenger.

19.     According to Facebook's 2018 Annual Report, Facebook's "ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites." *Id.*

20.     Facebook knows the age and gender of each of its users because Facebook requires users to tell Facebook their birth date and gender as a condition of joining Facebook and continuing to use Facebook's services.

21.     After Facebook users join Facebook, the age and gender information they are required to provide Facebook is used by Facebook to segregate, classify, and categorize users based on age and gender.  The primary purpose of this segregation, classification, and categorization of users based on age and gender is to make it easy for and to encourage advertisers to target their advertisements to Facebook users based on their age or gender.

22.     Upon information and belief, Facebook's Chief Operating Officer Sheryl Sandberg has called age and gender targeting of advertisements part of Facebook's "special sauce."  That is, having the ability to target ads based on the age and/or gender of Facebook users makes it possible for advertisers to send their advertisements only to specific desired audiences and thereby reduce the cost for advertisers to reach customers in these specific targeted audiences and enhance interactions by potential customers in the specific desired audiences with companies' advertisements and business establishments.

23.     When an advertiser seeks to create, purchase, and send a paid advertisement to Facebook users on Facebook, Instagram, or Messenger, it must select the audience of Facebook users who will be eligible to receive the advertisement ("audience selection").   Once the audience selection is completed, the advertiser determines the image and text of the ad, identifies the Facebook page or other web page to which the ad will link, and purchases a certain number of impressions or clicks.  (An impression occurs every time a Facebook user is shown an ad on Facebook.  A click occurs every time a Facebook user clicks on an ad on Facebook).  Then Facebook sends the advertisement to the

Facebook users within the audience selection that the advertiser chose.  Any Facebook user who is not within the audience selection will not have the opportunity to receive that specific paid advertisement.

24.     Every time that Facebook sends an advertisement to Facebook users within an audience selection that excludes persons from receiving ads based on a protected status such as age or gender, Facebook knows that and intends for the ad only to be sent to the persons within the audience selection and it knows that and intends for the ad to be denied to persons who are excluded from the audience selection, including but not limited to ads for financial services opportunities.

25.     When an advertiser determines the audience selection, it is required to make three selections that establish the basic parameters of the audience selection: (1) age; (2) gender; and (3) location.  These audience selection tools are presented to advertisers through drop down menus that make clear to advertisers that they can include or exclude persons with certain ages and/or genders from their audience selections.  These tools classify, categorize, and segregate Facebook users based on their age and/or gender.  And Facebook users cannot opt out of telling their age or gender to Facebook, and cannot opt out of audience selection exclusions that advertisers and Facebook make. The audience selection tools related to age, gender, and location look like this:



26.     Facebook requires advertisers to select the age of the Facebook users who will receive the ad.  The default setting for Facebook ads is 18 to 65+, which means that anyone who is 18-years-old or older would receive the ad. But Facebook strongly encourages advertisers to narrow the age range of the individuals who will receive their ads to make them more effective.

CLASS ACTION COMPLAINT

27.     Facebook requires the advertiser to select the gender of the Facebook users who will receive the ad.  The default setting is all genders.  But Facebook strongly encourages advertisers to narrow the gender of the individuals who will receive their ads to make them more effective, including by excluding women from audience selections.

28.     Unlike the prior image that shows an audience selection of persons who are 18 or older of all genders, the following image shows an audience selection restricted to men who are 18 to 40.



29.     Upon information and belief, Facebook encourages, facilitates, expects, knows, and wants advertisers to routinely exclude older persons and women from their audience selections so that older persons and women will not receive advertisements on Facebook, including advertisements for financial services opportunities.  Facebook encourages, facilitates, enables, and executes on the exclusion of older persons and women from receiving information and advertisements, because such age- and gender-based exclusions are central to Facebook's business model, including because Facebook wants ads to be as "relevant" as possible to its users so that users will spend more time on Facebook and allow Facebook to sell and place more paid advertisements on Facebook.

30.     In a training program for advertisers, Facebook strongly encourages advertisers to exclude users based on age and gender in its "Facebook Blueprint" course, which describes "How to Find Your Customers on Facebook."  It states that "When you advertise on Facebook, you have the ability to create an audience.  It's one of the most important and powerful things you can do here. When thinking about your audience and how to build it, consider the types of people who are most

likely to be interested in what you're sharing." Facebook, How to Find Your Customers on Facebook, https://www.facebook.com/business/learn/lessons/facebook-ad-audience-considerations

31. In Facebook Blueprint, Facebook describes how to set an audience, "That's where you can get specific about who you want to reach. In other words, the audience for your ad." *Id.* The first example that Facebook provides on how to set an audience encourages advertisers to send ads to only men or only women: "Let's start with gender. If you want, you can choose to reach out to only men or only women. If you have a bridal dress shop, women might be a better audience for you. But if you have a shaving and beard grooming business, maybe you'll want to reach out to men." It proceeds to describe how ads can be targeted to people based on age. Nowhere in this section of the training does Facebook state that financial services advertisements should not be restricted by age or gender.

32. In the next section of the training, "How to Choose an Audience for Your Facebook Ad," Facebook states that "To get started creating your audience, think about your business's best customers. Are they often of a certain age or gender? . . . Reach out to these kinds of people first." *Id.* In other words, Facebook encourages its advertisers to determine who they think their best customers are based on age or gender and then send their ads only to those people, thereby excluding people who do not fit the age or gender profile of their best customers.

33. In addition, on Facebook Business, the web site where Facebook instructs and directs advertisers on how to use its audience selection tools to create advertisements, Facebook states that "Our powerful audience selection tools let you show ads to the people who are exactly right for your business." Facebook Business, Find Your Audience, https://www.facebook.com/business/ads/ad-targeting. It explains that "Facebook Core Audiences helps you select the right recipients for your ad in just a few clicks. Whether you want your ad to be shown to people based on age, location, hobbies, or something else—we can help you connect to people who are likely to be interested in what you offer." *Id.*

34. One of the chief examples of how to "Reach your core target audience" is "Demographics." Facebook states that advertisers should "Select an audience based on age, gender, education, relationship status, job title and more." *Id.* In a prior version of the same Facebook

Business page, Facebook provided an illustration of how to reach a core target audience with a box that showed an ad targeting selection to send the ad only to people who were 18 to 34 years old.

35.   In the same Facebook Business center, Facebook provides "4 Tips for Selecting Your Ad Audience," and states that "Audiences can be built based on locations, interests, demographics and other characteristics.  When you create an audience, you'll want to think about the characteristics of people most likely to be interested in your product, service or business and how broad or narrow your audience is."  Facebook Business, 4 Tips for Selecting Your Audience, https://www.facebook.com/business/learn/lessons/facebook-ad-audience-reach-tips.  (The same four tips are reiterated on Facebook Blueprint's How to Find Your Customers on Facebook guide.)

36.   The first tip Facebook provides is to "Consider your current customer base" and "Think about what they like, how old they are and the interests they have.  This can help you identify audience options that will help you reach people like them on Facebook."  *Id.* (emphasis added).  The first example that Facebook provides for this tip is "If the majority of your current customers are women, it might be a good idea to set your audience to reach women and exclude men."  *Id.*

37.   Another tip that Facebook offers is to "Watch the audience meter to see whether your audience is too specific or too broad."  *Id.*  When an advertiser is determining its audience selection, a red, green, and yellow "audience meter" tells the advertiser whether its audience is too specific (RED), too broad (YELLOW), or just right (GREEN).  The audience meter looks like this.



38.   When advertisers determine their audience selections, Facebook's audience meter tells the advertiser when the ad is too broad or too narrow.  For example, if all ages and genders are included in an audience selection, the audience meter may tell the advertiser that the audience selection is too broad and point towards the yellow "Broad" area.  However, when the advertiser eliminates persons who are older than 40 from the audience selection or eliminates women from the audience

selection, Facebook's audience meter may change from pointing to yellow to pointing to green.  As a result, Facebook's audience meter encourages advertisers to exclude Facebook users based on age and gender from their audience selections.

39.     Even after an advertiser has selected an audience and purchased advertisements on Facebook, Facebook continues to encourage and prod advertisers to exclude persons from advertisers' audience selections based on age and gender.  On a real-time basis, Facebook provides advertisers with information on the age and gender of persons who are clicking on their ads, so that advertisers can see the demographics of persons who seem to be most interested in clicking on and engaging their ads.  Upon information and belief, in turn, advertisers routinely receive this information and further refine their audience selections in ongoing and new ad campaigns to exclude older persons or women, because Facebook has told them that older persons or women are less interested in their advertisements than younger persons or men.  For example, if an advertiser sees that 90% of the people who click on their ads are 44-years-old or younger, the advertiser may decide not to send ads to persons older than 44.

40.     This is not an incidental by-product of Facebook providing such information.  The primary reason why Facebook provides this information is that Facebook wants and encourages advertisers to exclude persons from their audience selections based on age and/or gender.

41.     Over the past three years, Facebook has routinely excluded older persons and/or women from its business services by intentionally, knowingly, and purposefully excluding older persons and women from audience selections for thousands of advertisements related to financial services opportunities.

42.     The following advertisements are examples of where Facebook and financial services companies selected and executed upon age- or gender-restricted audience selections that denied older persons and/or women, including Plaintiff, the full and equal accommodations, advantages, facilities, and services, within the past three years.

43.     In the past year, AAFMAA sent the following advertisement regarding loans only to "**people ages 24 to 40** who live in the United States," thereby excluding all Facebook users older than 40 in the United States from receiving this advertisement.




44.     In the past year, Webull sent the following advertisement regarding stock trading services only to "**men ages 20 and older** who live in the United States," thereby excluding all female Facebook users in the United States from receiving this advertisement.




45.     In the past year, Partbnb sent the following advertisement regarding investment in Airbnb properties only to "**men ages 30 to 50** who live or were recently in the United States," thereby excluding all female Facebook users and all persons older than 50 in the United States from receiving this advertisement.




46.     In the past year, Ladder sent the following advertisement regarding life insurance only to "**people ages 25 to 45** who live in the United States," thereby excluding all Facebook users older than 45 in the United States from receiving this advertisement.




47.     For at least the past three years, Facebook has known that it was denying these and other types of financial services opportunities to older persons and women on its platform.  Every time Facebook and an advertiser published a financial services advertisement to Facebook users that excluded older persons or women from receiving the ads, Facebook and the advertiser knew, intended,

and wanted those persons to be excluded from or discriminated against in Facebook's business establishment and those of the third-party advertisers.

48.     In addition to having knowledge that its own advertising and business services were being provided in a discriminatory way towards older persons and women with respect to financial services opportunities, Facebook has long been on specific notice that Facebook and financial services companies were discriminating in providing advertising and business services relating to financial services to older persons and women.

49.     In early 2017, Facebook created a "classifiers" program that identifies which ads are likely to be credit, housing, or employment related.  Facebook initially created the classifiers program to block advertisers from excluding Facebook users based on their perceived race using Facebook's "Ethnic Affinity" categories.  Facebook created this classifiers program to prevent the exclusion of Facebook users in certain "Ethnic Affinity" categories in response to an October 2016 ProPublica report that demonstrated that Facebook users who Facebook had identified as having the "Ethnic Affinity" of African American, Hispanic, or Asian American could be "illegal[ly]" and "blatant[ly]" excluded from housing-related advertisements in violation of the federal Fair Housing Act.  Julia Angwin & Terry Parris Jr., Facebook Lets Advertisers Exclude Users by Race, ProPublica (Oct. 28, 2016).

50.     As a result, since early 2017 Facebook has specifically known every time that financial services companies were likely seeking to purchase credit-related advertisements, including when such advertisements would exclude Facebook users based on age or gender.  Upon information and belief, prior to September 2019, Facebook knowingly and intentionally approved, sold, and sent numerous credit-related advertisements in which older persons and women were excluded, and Facebook took no action to stop this practice in spite of its knowledge that these ads might violation various federal, state, and/or local laws.

51.     In September 2019, pursuant to a settlement of several separate civil rights actions, Facebook adopted new rules designed to prevent advertisers from using age, gender, and other protected statuses to exclude Facebook users from receiving credit, housing, and employment related advertisements.  As a result, advertisers who want to advertise credit opportunities will have to create

those advertisements in a special portal that does not allow age or gender targeting, and an enhanced classifiers program will attempt to block credit ads that are created outside of the portal and use age or gender restrictions.  (Because Facebook's classifiers system is both underinclusive and overinclusive in identifying credit-related advertisements, it is still possible that credit-related advertisements that exclude users based on age or gender are being and will be published on Facebook in the future).

52.     The new changes that Facebook began to implement in September 2019 only apply to credit, housing, and employment advertising, and therefore they do not apply to financial services advertisements that are not credit-related—such as bank accounts, insurance, financial services consulting, and investments.  As a result, at least until September 2019, Facebook did nothing to stop its own denial of all types of financial services advertisements and information to older persons and women within Facebook's business establishments or those of its financial services advertisers, and since September 2019 Facebook has done nothing to stop its own denial of non-credit-related financial services advertisements and information to older persons and women.

53.     One of the primary benefits that Facebook users receive from Facebook is the opportunity to receive advertising and information about economic opportunities, especially financial services opportunities.  Facebook users receive this benefit by having Facebook place paid advertisements (*i.e.*, sponsored posts) on Facebook users' "News Feeds" and other places where each Facebook user interacts with Facebook's applications.  When Facebook users are provided these advertisements, they learn about opportunities, including financial services opportunities, that they otherwise would not have learned about, and then can pursue those opportunities by clicking on the advertisements and interacting with the advertisers' online and offline business establishments. Financial services companies place advertisements on Facebook users' pages because they believe that it is an effective form of advertising that will cause many Facebook users to click on their ads and interact with their online and offline business establishments to do business with them.

54.     Each Facebook user receives a unique set of paid advertisements that Facebook, in conjunction with advertisers, decides to place on Facebook users' own Facebook pages.  When Facebook, in conjunction with advertisers, decides to deny older persons and/or women paid

advertisements about valuable financial services opportunities, Facebook users are denied one of the primary benefits or advantages of Facebook's accommodations, facilities, and services.

55. In addition, when Facebook encourages advertisers to deny their valuable financial services ads to older persons and women, gives financial services companies the ability to exclude older persons and women from receiving their ads, and knowingly places ads for financial services opportunities that exclude older persons and women, Facebook aids and abets financial services companies in denying older persons and women the full and equal accommodations, advantages, facilities, and services of their business establishments.

56. Most financial services companies that advertise on Facebook and discriminate against older persons and/or women have business establishments both online and in the real world. Every financial services company that advertises on Facebook has an online business establishment, because each company either has its own Facebook page within Facebook's domain or has its own web page outside of Facebook's domain to which the company's ads link and encourage Facebook users to interact with in order to transact business.

57. Ms. Opiotennione has searched for housing and financial services opportunities on Facebook periodically during the past year. In doing so, Ms. Opiotennione was interested in receiving advertising and information about loans and insurance from Facebook via advertisements on her News Feed. She would have clicked on advertisements for mortgages, insurance, and/or other financial services opportunities had she received such advertisements on her News Feed. However, Facebook and various financial services companies that have routinely used Facebook's audience selection tools to exclude older persons and women from receiving their advertisements for financial services opportunities have regularly denied Ms. Opiotennione advertisements and information about financial services opportunities by screening her from receiving Facebook advertisements about those opportunities. Upon information and belief, by being denied information and advertising about financial services opportunities on Facebook, Ms. Opiotennione and the members of the putative class were denied the full and equal accommodations, advantages, facilities, and services of Facebook and the financial services companies that denied her valuable advertising and information.

58.     Facebook aided and abetted financial services companies in denying older persons and women the full and equal accommodations, advantages, facilities, and services of their business establishments based on age or gender, and in discriminating against, boycotting, and refusing to provide services to older persons and women based on age or gender, in violation of California's Unruh Civil Rights Act, Cal. Civ. Code. §§ 51(b), 51.5(a), and 52(a).

59.     Each time that Facebook and a company excluded older persons or women from receiving financial services advertisements and information on Facebook, Facebook:  (1) knew the identity of the violating company; (2) knew that the company was violating the Unruh Act by classifying, categorizing, and segregating its customers based on age or gender and/or by excluding persons based on age and gender from their business establishments located in and outside of Facebook's domain; (3) assisted the companies in their violations by providing discriminatory tools for the segregation and exclusions to occur, expressly approving of the age or gender exclusions, and publishing the financial services advertisements with the express goal of excluding older persons and women; and (4) encouraged each company to use such age and gender exclusions, including through its educational materials on how to advertise to the right audience and its audience meter.

## CLASS ALLEGATIONS

60.     Plaintiff Opiotennione brings each of her claims set forth herein pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed class:

> All Facebook users in the United States who in the past three years through the date of judgment in this action (1) were women of any age or or people who were at least 40 years old; (2) did not inform Facebook that they were uninterested in receiving advertisements about financial services opportunities; and (3) were excluded or will be excluded from the audience selection of one or more advertisements related to financial services opportunities, including bank accounts, insurance, financial services consulting, investments, and credit.

61.     Not included in the Class are the following individuals and/or entities: Facebook's officers and directors and all judges assigned to hear any aspect of this litigation, as well as their staffs and immediate family members.

62. **Numerosity.** The class is so numerous that joinder of all members is impracticable. The exact size of the class is not known. Upon information and belief, the class consists of millions of Facebook users, and those users are geographically dispersed throughout the United States.

63. **Commonality.** There are numerous questions of law or fact that are common to the class members. Upon information and belief, the class members were subjected to and injured by the same pattern, practice, or policy of denying older persons and/or women the full and equal accommodations, advantages, facilities, and services by Facebook and by Facebook's aiding and abetting financial services companies in doing the same, including by classifying, categorizing, and segregating them based on age and/or sex for the purpose of denying them equal opportunities and/or denying older persons and women advertisements and information about financial services opportunities based on their age and/or sex.

64. The questions of law or fact that are common to the class members include:

a. Did Facebook on a nationwide basis require users to identify their ages and genders, and allow advertisers to exclude persons from their audience selections based on age or gender?

b. Were Plaintiff and other members of the Class classified, categorized, and segregated by Facebook based on their age or gender?

c. Did Plaintiff and other members of the Class inform Facebook that they were uninterested in receiving advertisements about financial services opportunities?

d. Were Plaintiff and other members of the Class excluded from receiving advertising and information about financial services opportunities because of their age or gender in violation of the Unruh Act?

e. Did Facebook aid and abet financial services companies in denying Plaintiff and the members of the Class their right to full and equal accommodations, advantages, facilities, and services of those companies in violation of the Unruh Act?

f. What types of injunctive and/or declaratory relief should be ordered with respect to Facebook's past and ongoing pattern, practice, and/or policy, and what damages should be awarded to Plaintiff and the members of the Proposed Class?

65.   **Typicality.**  The claims of the Named Plaintiff are typical of the claims of the Plaintiff class she seeks to represent. The claims of the Named Plaintiff arise from the same pattern or practice and rely upon the same legal theories that the challenged pattern or practice violates California's Unruh Civil Rights Act.

66.   **Adequacy.** The Named Plaintiff will adequately represent the members of the Class, does not have any conflicts with the other class members, and is represented by experienced counsel who have substantial experience in civil rights and class action litigation and who will vigorously prosecute the action on behalf of the class.

67.   **Predominance.**  The questions of law and fact common to the members of the class predominate over questions affecting individual class members, and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

68.   **Superiority.**  By resolving the common issues described above in a single class proceeding, each member of the proposed class will receive a determination of whether Facebook engaged in a pattern, practice, or policy of denying older persons and women the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment and aided and abetted financial services companies in doing the same with respect to their business establishments.  Concentration of the litigation in this forum is desirable, as this action challenges a company-wide practice, it will benefit the class members to have all of the class members' claims adjudicated in a single proceeding, and Facebook's Terms of Service requires all Facebook users to file suit in this District and bring all of their state law claims under California law.  This class action can be managed without undue difficulty.

## COUNTS

### FIRST CLAIM FOR RELIEF
### Age and Sex Discrimination
### (Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a))

69.   Plaintiff realleges and incorporates by reference all other paragraphs as alleged above.

70.   The Unruh Act provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary

language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).

71.     The list of protected classes in the Unruh Act is not exclusive and extends beyond the protected classes enumerated in the law.  Accordingly, California appellate courts have held that "the Unruh Act proscribes arbitrary discrimination based on an individual's age—a personal characteristic similar to the classifications enumerated in the Act."  *Candelore v. Tinder, Inc*., 19 Cal. App. 5th 1138, 1145 (Ct. App. 2018).

72.     "The purpose of the [Unruh] Act is to create and preserve a nondiscriminatory environment in California business establishments by banishing or eradicating the arbitrary, invidious discrimination by such establishments. The Act stands as a bulwark protecting each person's inherent right to full and equal access to all business establishments.  In enforcing the act, courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses. The act must be construed liberally in order to carry out its purpose."  *White v. Square, Inc*., 7 Cal. 5th 1019, 1025 (2019).

73.     Facebook is a business establishment under the Unruh Act, because it has a fixed location of business in California; it has an online place of business that sells good and services to consumers throughout California; its primary purpose and goal in operating Facebook is to conduct business, generate revenue, and earn profit; and it earns billions of dollars in revenues from its business activities in California.

74.     The Unruh Act applies to business transactions and services that are conducted via the internet, as well as internet-related conduct that is related to the activities of traditional brick-and-mortar establishments that have fixed, traditional presences.

75.     Plaintiff and the putative Class Members, older and female Facebook users located throughout the United States, bring this claim under the Unruh Act, because Facebook's Terms of Service require all of them to enforce any disputes related to Facebook's products under California law, including the Unruh Act, in this federal district court.

76.     As described above, Facebook has intentionally, knowingly, and purposefully engaged in a number of discriminatory practices that deny older persons and women the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment, including but not limited to classifying, categorizing, and segregating its users by age and gender; encouraging and enabling Facebook's advertisements to exclude older persons and women from receiving advertisements and information about valuable financial services opportunities; and excluding older persons and women from receiving such advertisements and information.

77.     In addition, as described above, Facebook has aided and abetted financial services companies in violating Cal. Civ. Code § 51(b).  Thus, Facebook is liable for the violations alleged in this Complaint for discrimination in its own business services, and Facebook is liable for aiding and abetting the violations of financial services companies, pursuant to Cal. Civ. Code § 52(a).

78.     Facebook is liable to Plaintiff and the members of the Plaintiff Class for statutory damages pursuant to section 52(a) of the California Civil Code for each and every offense, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

79.     Plaintiff is further entitled to all other legal and equitable relief available, including injunctive relief on behalf of herself and the Plaintiff Class.

### SECOND CLAIM FOR RELIEF
### Age and Sex Discrimination
### (Cal. Civil Code §§ 51.5, 52(a))

80.     Plaintiff realleges and incorporates by reference all other paragraphs as alleged above.

81.     Section 51.5 of the California Civil Code provides that "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 . . . because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."

82.     Through the actions described above, Facebook has intentionally discriminated against, boycotted, and/or refused to provide services to older persons and women based on their age and/or

CLASS ACTION COMPLAINT

sex, including by denying older persons and women advertisements and information about financial services opportunities.

83.     In addition, through the actions described above, Facebook has aided and abetted financial services companies in violating Cal. Civ. Code § 51.5.  Thus, Facebook is liable for the violations alleged in this Complaint for discrimination in its own business services, and Facebook is liable for aiding and abetting the violations of financial services companies, pursuant to Cal. Civ. Code § 52(a).

84.     Facebook is liable to Plaintiff and the members of the Plaintiff Class for statutory damages pursuant to section 52(a) of the California Civil Code for each and every offense, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

85.     Plaintiff is further entitled to all other legal and equitable relief available, including injunctive relief on behalf of herself and the Plaintiff Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Facebook on all claims and respectfully request that this Court award the following relief:

(a)     Certify the case as a class action on behalf of the proposed Class;

(b)     Designate Plaintiff as representative of the Class;

(c)     Designate Plaintiff's counsel of record as Class Counsel;

(d)     Declare that the practices complained of herein are unlawful;

(e)     Enter an order permanently enjoining Facebook and its partners, officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from continuing to engage in acts that violate the Unruh Act;

(f)     Require Facebook to pay Plaintiff and members of the Plaintiff Class any disgorgement of Facebook profits from its unlawful and/or unfair business practices, restitution, penalties, liquidated damages, exemplary damages, punitive damages, and pre-judgment and post-judgment interest as provided by law, that may be owed;

(g)     Require Facebook to pay Plaintiffs' attorneys' fees and costs;

(h)     Appoint a monitor to ensure that Facebook complies with the injunction provisions of any decree that the Court orders;

(i)     Enter an order retaining jurisdiction over this action to ensure that Facebook complies with such a decree; and

(j)     Grant such other and further relief as the Court deems proper, appropriate, just, or equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: October 31, 2019                            Respectfully Submitted,

                                                   By:   _/s/ Jahan C. Sagafi_
                                                           Jahan C. Sagafi

Peter Romer-Friedman*                              Jahan C. Sagafi (State Bar No. 224887)
Pooja Shethji*                                     OUTTEN & GOLDEN LLP
OUTTEN & GOLDEN LLP                                One California Street, 12th Floor
601 Massachusetts Ave. NW                          San Francisco, CA 94111
Suite 200W                                         Telephone: (415) 638-8800
Washington, DC 20001                               Facsimile: (415) 638-8810
Telephone: (202) 847-4400                          Email: jsagafi@outtengolden.com
Facsimile: (646) 952-9114
Email: prf@outtengolden.com                        Matthew K. Handley*
Email: pshethji@outtengolden.com                   Rachel Nadas*
                                                   HANDLEY FARAH & ANDERSON PLLC
Adam T. Klein*                                     777 6th Street, NW
Michael Litrownik*                                 Eleventh Floor
OUTTEN & GOLDEN LLP                                Washington, DC 20001
685 Third Avenue, 25th Floor                       Phone: (202) 559-2411
New York, NY 10017                                 Email: mhandley@hfajustice.com
Telephone: (212) 245-1000
Facsimile: (646) 509-2060                           Jason R. Flanders (State Bar No. 238007)
Email: atk@outtengolden.com                        AQUA TERRA AERIS LAW GROUP
Email:  mlitrownik@outtengolden.com                490 43rd Street
                                                   Oakland CA 94609
                                                   Phone: (916) 202-3018
                                                   Email: jrf@atalawgroup.com

William Most (State Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Phone: (504) 509-5023
Email: williammost@gmail.com

* *pro hac vice* application forthcoming

*Attorneys for Plaintiff and Proposed Class*

CLASS ACTION COMPLAINT