ROSEMARIE T. RING (SBN 220769)
rose.ring@mto.com
JONATHAN H. BLAVIN (SBN 230269)
jonathan.blavin@mto.com
ELIZABETH A. KIM (SBN 295277)
elizabeth.kim@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| NEUTAH OPIOTENNIONE,<br><br>            Plaintiff,<br><br>      vs.<br><br>FACEBOOK, INC.,<br><br>            Defendant. | Case No. 3:19-cv-07185-JSC<br><br>**DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS THE COMPLAINT**<br><br>Judge:  Hon. Jacqueline S. Corley<br>Date:     April 23, 2020<br>Time:   1:30 PM |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................3

III.   ARGUMENT ....................................................................................................5

    A.     Plaintiff Lacks Article III and Statutory Standing ................................5

        1.     Plaintiff Fails to Plead Article III Standing ................................5

        2.     Plaintiff Fails to Plead Statutory Standing ................................6

    B.     Plaintiff's Claims Must be Dismissed Because Neither the Unruh Act nor Section 51.5 Apply Extraterritorially ................................7

    C.     Plaintiff's Claims Are Barred by Section 230 of the CDA ....................8

        1.     Facebook Is an Interactive Computer Service Provider ............10

        2.     Plaintiff's Claims Treat Facebook as a Publisher or Speaker ....................10

        3.     Plaintiff's Claims Are Based on Allegedly Discriminatory Ads Created by Third-Party Advertisers ................................12

            (a)     Neutral Ad-Targeting Tools Are Protected by the CDA................12

            (b)     Plaintiff's Conclusory Assertion that Facebook "Wants" and "Encourages" Advertisers to Unlawfully Target Ads Does Not Defeat CDA Immunity ................................15

    D.     Plaintiff Cannot State a Claim under the Unruh Act or Cal. Civil Code § 51.5 ................................16

        1.     Plaintiff Fails to Plead Facts Demonstrating the Requisite Intent to Discriminate by Facebook ................................16

        2.     Plaintiff Has Not and Cannot Plead that Facebook Engaged in Any Conduct Prohibited by the Unruh Act or Section 51.5 ................................22

IV.    CONCLUSION ................................................................................................24

# **TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ...........................................................................................15

*Barnes v. Yahoo!, Inc.*,
 570 F.3d 1096 (9th Cir. 2009)..........................................................................9, 10

*Batzel v. Smith*,
 333 F.3d 1018 (9th Cir. 2003).................................................................................8

*Bennett v. Spear*,
 520 U.S. 154 (1997) .................................................................................................6

*Caraccioli v. Facebook, Inc.*,
 167 F. Supp. 3d 1056 (N.D. Cal. 2016) ..................................................................9

*Carafano v. Metrosplash.com Inc.*,
 339 F.3d 1119 (9th Cir. 2003).....................................................................9, 13, 14

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
 519 F.3d 666 (7th Cir. 2008).................................................................................10

*Cohen v. Facebook*,
 252 F. Supp. 3d 140 (E.D.N.Y. 2017)...............................................................10, 11

*Earll v. eBay Inc.*
 2012 WL 3255605 (N.D. Cal. Aug. 8, 2012) .........................................................20

*Ebeid v. Facebook, Inc.*,
 2019 WL 2059662 (N.D. Cal. May 9, 2019) ................................................ passim

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
 521 F.3d 1157 (9th Cir. 2008)............................................................... passim

*Fair Hous. Council of Suburban Phila. v. Main Line Times*,
 141 F.3d 439 (3d Cir. 1998)....................................................................................5

*Force v. Facebook, Inc.*,
 934 F.3d 53 (2d Cir. 2019)................................................................................9, 11

*Goddard v. Google, Inc.*,
 640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...............................................9, 11, 14, 15

*Gonzalez v. Google, Inc.*,
 282 F. Supp. 3d 1150 (N.D. Cal. 2017) ..................................................................14

**TABLE OF AUTHORITIES**
(Continued)

Page

*Greater L.A. Ag. on Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014)..................................................................................16, 20

*Herrick v. Grindr, LLC*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018), aff'd 765 F. App'x 586 (2d Cir. March
  27, 2019)..................................................................................................................9, 10

*Jane Doe No. 1 v. Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016), cert. denied, 137 S. Ct. 622 (2017)...............................11

*Jones v. Dirty World Entm't Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014)...........................................................................13, 14, 15

*Jurin v. Google Inc.*,
  695 F. Supp. 2d 1117 (E.D. Cal. 2010) ........................................................................14

*Kimzey v. Yelp! Inc.*,
  836 F.3d 1263 (9th Cir. 2016).........................................................................9, 13, 15

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ....................................................................................9

*La Park La Brea A LLC v. Airbnb, Inc.*,
  285 F. Supp. 3d 1097 (C.D. Cal. 2017)..............................................................13, 15

*Levine v. Vilsack*,
  587 F.3d 986 (9th Cir. 2009)........................................................................................6

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003).......................................................................................5

*Long v. Playboy Enters. Int'l, Inc.*,
  565 F. App'x 646 (9th Cir. 2014).................................................................................16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................4, 6

*Moore v. Greyhound Bus Lines*, Inc.,
  2018 WL 3361395, at *2 (S.D. Cal. July 10, 2018), *appeal dismissed*, No. 18-
  56140, 2018 WL 6133396 (9th Cir. Sept. 18, 2018)....................................................7

*Morsa v. Facebook, Inc.*,
  77 F. Supp. 3d 1007 (2014)..........................................................................................22

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*,
  591 F.3d 250 (4th Cir. 2009)........................................................................................9

**TABLE OF AUTHORITIES**
(Continued)

Page

*OpenTV, Inc. v. Netflix Inc.*,
    76 F. Supp. 3d 886 (N.D. Cal. Dec. 16, 2014) .......................................................................22

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ....................................................................................15

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) .............................................................................8, 10

*Pence v. Andrus*,
    586 F.2d 733 (9th Cir. 1978)..................................................................................................5

*Pennie v. Twitter, Inc., et al.*,
    281 F. Supp. 3d 874 (N.D. Cal. 2017) ....................................................................................9

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ..............................................................................................4, 5, 6

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ..................................................................................................20

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015) ...................................................................................7

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997)..............................................................................................8, 11

**STATE CASES**

*Angelucci v. Century Supper Club*
    41 Cal. 4th 160 (2007) .......................................................................................................6, 7

*Archibald v. Cinerama Hawaiian Hotels, Inc.*,
    73 Cal. App. 3d 152 (1977) ....................................................................................................7

*Bergstein v. Stroock & Stroock & Lavan LLP*,
    236 Cal. App. 4th 793 (2015)................................................................................................21

*Casey v. U.S. Bank Nat. Assn.*,
    127 Cal. App. 4th 1138 (2005)..............................................................................................21

*Cross v. Facebook, Inc.*,
    14 Cal. App. 5th 190, 206 (2017)............................................................................................9

*Emery v. Visa Intl. Serv. Assn.*,
    95 Cal. App. 4th 952 (2002)..................................................................................................21

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Fiol v. Doellstedt*,
    50 Cal. App. 4th 1318 (1996) ..................................................................................21

*Hill v. StubHub, Inc.*,
    727 S.E. 2d 550 (N.C. Ct. App. 2012) ...................................................................14

*Javorsky v. W. Athletic Clubs, Inc.*,
    242 Cal. App. 4th 1386 (2015) ...........................................................................21, 22

*Koebke v. Bernardo Heights Country Club*,
    36 Cal. 4th 824 (2005) ...........................................................................16, 17, 19, 23

*Koire v. Metro Car Wash*,
    40 Cal. 3d 24 (1985) ..............................................................................................22

*Marina Point, Ltd. v. Wolfson*,
    30 Cal. 3d 721 (1982) ............................................................................................22

*Osborne v. Yasmeh*,
    1 Cal. App. 5th 1118 (2016) ....................................................................................6

*Sargoy v. Resolution Trust Corp.*,
    8 Cal. App. 4th 1039 (1992) ...................................................................................22

*Schulz v. Neovi Data Corp.*,
    152 Cal. App. 4th 86 (2007) ...................................................................................21

*Semler v. Gen. Elec. Capital Corp.*,
    196 Cal. App. 4th 1380 (2011) ...............................................................................16

*Sunrise Country Club Ass'n v. Proud*,
    190 Cal. App. 3d 377 (1987) ...........................................................................21, 22, 23

*Turner v. Ass'n of Am. Med. Colls.*,
    167 Cal. App. 4th 1401 (2008) ...............................................................................19

*White v. Square*,
    7 Cal. 5th 1019 (2019) .............................................................................................6

**CASES - OTHER**

*Harris*,
    52 Cal. 3d at 1172 ............................................................................................17, 23

**FEDERAL STATUTES**

47 U.S.C. § 230(b)(1)-(2) ...............................................................................................8

# TABLE OF AUTHORITIES
### (Continued)

**Page**

47 U.S.C. § 230(c)(1) .................................................................................................2, 8, 12

47 U.S.C. § 230(f)(2) ..........................................................................................................9

**STATE STATUTES**

Cal. Civil Code § 51(b) .......................................................................................................7

Cal. Civil Code § 51.5 ................................................................................................ passim

Cal. Civil Code § 52(a) ................................................................................................16, 17

Cal. Gov't Code § 12940(d) ..............................................................................................23

## I.      **<u>INTRODUCTION</u>**

Defendant Facebook, Inc. ("Facebook") operates an online platform that enables users to connect and share with friends and family through mobile devices and computers.  Using Facebook's platform, users can learn about what is going on in the world around them and share their opinions, photos, videos, and other activities with audiences ranging from their closest friends to the public at large.  Facebook is free of charge to users and is supported primarily through ads placed on Facebook by third-party advertisers.

Advertising, whether in print, television, or online, is about reaching people who are most likely to be interested in the product or service being offered.  Advertisers have long used targeted advertising to accomplish this goal—for example, by running ads for women's clothing in Vogue or during Oprah, for men's athletic shoes in Sports Illustrated or during the Super Bowl, for children's toys on Cartoon Network, or for retirees in AARP Magazine or during the nightly news.

Advertisers on Facebook similarly can use audience selection tools that allow, but do not require, them to target ads by age, gender, and thousands of other categories that correspond to user interests as expressed through their activities on Facebook.  Facebook provides guidelines about what type of ad content is allowed on its ad platform and makes clear that discrimination, including through use of audience selection tools, is strictly prohibited.  Last year, Facebook also made industry-leading changes to its ad platform to help prevent the potential misuse of audience selection tools by advertisers placing certain types of ads—housing, employment, and credit—as part of the settlement of another action brought in this District by Plaintiff's counsel.

In that action, Plaintiff's counsel argued that, simply by offering audience selection tools that *some* advertisers might use to target housing, employment, or credit ads in a discriminatory way, Facebook is liable for any such third-party conduct, even though the tools are available to *all* advertisers placing ads for *all* types of products and services.  Facebook filed a motion to dismiss and Judge Davila stayed discovery.  The parties then settled the case last year with Facebook agreeing, among other things, to significantly restrict the targeting options available for placing housing, employment, and credit ads by removing certain audience selection tools, including the age and gender tools at issue here.  Complaint ("Compl.") ¶ 51.

In this new action, Plaintiff's counsel is pursuing the same theory of liability, except they have shifted their focus from housing, employment, and credit ads, to ads for "financial services, such as mortgages, personal loans, bank accounts, insurance, investment opportunities, and financial consulting services," and now challenge only the age- and gender-targeting tools. But that theory is flawed for several reasons. As an initial matter, and as counsel for Plaintiff knows, advertisers cannot currently target ads for mortgages or personal loans by age or gender; those categories of ads are subject to the targeting restrictions Facebook implemented last year. More fundamentally, the new action suffers from the same fatal defect as the first action: Facebook's provision of these tools to *all* advertisers placing ads for *all* types of products and services does not make *Facebook* liable for the actions of some *advertisers* who might choose to misuse them for certain types of ads.

*First*, Plaintiff fails to allege facts establishing Article III standing and statutory standing under the Unruh Act and section 51.5. Plaintiff alleges that, despite Facebook's clear policies prohibiting discrimination on its ad platform, some third-party advertisers may choose to use audience selection tools to publish discriminatory ads on Facebook. But this does not establish an injury in fact, let alone one that is fairly traceable to any wrongdoing *by Facebook*.

*Second*, the federal Communications Decency Act ("CDA") bars Plaintiff's claims because they are based on Facebook's publication of allegedly discriminatory ads created and targeted by third-party advertisers, and therefore seek to hold Facebook liable "as the publisher or speaker" of third-party content in violation of the CDA. 47 U.S.C. § 230(c)(1). As Plaintiff admits, Facebook provides age and gender audience selection tools with "default setting[s]" that include *all* ages and *all* genders. Complaint ("Compl.") ¶¶ 25-26. According to Plaintiff, advertisers may adjust these default settings to exclude older persons and women from their selected audience. *Id.* ¶¶ 26, 29. But Facebook's provision of neutral tools that, according to Plaintiff, some third-party *advertisers* may choose to use for an improper purpose falls squarely within the scope of CDA immunity.

*Third*, Plaintiff's claims should be dismissed as beyond the territorial jurisdiction of the Unruh Act and section 51.5. Plaintiff is a resident of Washington, D.C. and does not allege that she suffered any discriminatory harm in California. That alone requires dismissal.

*Finally*, Plaintiff fails to state a claim under the Unruh Act or section 51.5.  Plaintiff has not and cannot allege any discriminatory intent *by Facebook*—an essential element of any claim under both statutes—or any discriminatory *conduct* by Facebook.

## II.    BACKGROUND

Facebook operates an online social networking website that gives people the power to build community and bring the world closer together.  *See* Compl. ¶ 15.  In 2018, Facebook had over 2 billion monthly active users.  *Id.* ¶ 16.  These 2 billion monthly active users receive ads along with other content in their individual News Feed.  *Id.* ¶ 53.

Third-party advertisers use Facebook's ad platform to publish ads for all types of products and services.  *See* Compl. ¶¶ 18, 19, 43-46.  "When an advertiser seeks to create, purchase, and send a paid advertisement to Facebook users [], it must select the audience of Facebook users who will be eligible to receive the advertisement."  *Id.* ¶ 23.  Advertisers select the audience for their ads using tools corresponding to various parameters, including age and gender for which Plaintiff admits the default settings are *all* ages and *all* genders.  *Id.* ¶¶ 25-27.  According to Plaintiff, because some advertisers place ads on Facebook for "financial services, such as mortgages, personal loans, bank accounts, insurance, investment opportunities, and financial consulting services," and can use the age and gender audience selection tools to exclude women or older persons, Facebook has "intentionally denied its own users … and [] aided and abetted numerous financial services companies in denying Facebook's users[,] the full and equal accommodations, advantages, facilities, and services of those financial services companies."  *Id*. ¶¶ 1, 3.

But Plaintiff does not and cannot allege that Facebook *requires* advertisers to change the *all ages* and *all genders* default settings to publish an ad.  Indeed, as Plaintiff admits, the age and gender settings are only changed if advertisers decide to change them using drop down menus.  *Id.* ¶¶ 25-27.  Unable to allege that Facebook "requires" the challenged conduct, Plaintiff alleges instead, upon "information and belief" and numerous misleading quotes from materials on Facebook's website that are discussed below, that "Facebook encourages, facilitates, expects, knows, and wants advertisers to exclude older persons and women from their audience selections."  *Id.* ¶ 29.

Plaintiff also does not, and cannot, allege that age and gender audience selection tools have no lawful purpose, and therefore must admit they are "neutral" tools. For example, advertisers may lawfully target ads for video games and extreme sports to a younger audience, while AARP may targets ads for its programs and publications to an older audience. Likewise, advertisers may target ads for women's clothing and cosmetics to women, and ads for men's shoes and antiperspirant to men. The same is true for "financial services" in "parallel advertising" on Facebook and across media. For example, a bank may advertise a new savings product in publications and other media focused on women and at Women's Marches across the country, and run ads for the same product on Facebook targeted to men to avoid duplication. Similarly, an insurance company might run ads in AARP Magazine and other media focused on senior citizens and run ads for the same insurance products on Facebook targeted to exclude users age 55 and above because they have been more specifically targeted elsewhere.

Finally, Plaintiff does not, and cannot, allege any discriminatory conduct *by Facebook*. Instead, Plaintiff makes the conclusory allegation that Facebook intentionally discriminated against users and "aided and abetted" third-party advertisers in intentionally discriminating against users by offering audience selection tools that some advertisers may choose to use in an allegedly discriminatory way, and in violation of Facebook's explicit policies prohibiting such discrimination. Compl. ¶ 77. But these are neutral tools and, as Plaintiffs repeatedly allege, it is advertisers—not Facebook—who decide whether and how to use them. *Id.* ¶¶ . To the extent advertisers *may* use them for unlawful or discriminatory purposes, Facebook explicitly prohibits advertisers from engaging in such conduct, and requires all advertisers to certify that they are complying with its policies and all applicable antidiscrimination laws. Declaration of Rosemarie T. Ring in Support of Facebook's Motion to Dismiss ("Ring Decl."), Exhibits A and B (advertising policies).[1]

---

[1] The exhibits attached to the Ring Decl. may be considered for the reasons explained in Facebook's Request for Incorporation by Reference, filed concurrently herewith.

1   III.   **ARGUMENT**

2      A.   **Plaintiff Lacks Article III and Statutory Standing**

3         1.   **Plaintiff Fails to Plead Article III Standing**

4      The "'irreducible constitutional minimum' of [Article III] standing consists of three

5   elements":  (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the

6   defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.*

7   *Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-

8   61 (1992)).  Plaintiff does not meet this standard.

9      *First*, Plaintiff does not allege an injury in fact.  To show injury, a plaintiff must allege

10   facts showing that she has "suffered 'an invasion of a legally protected interest' that is 'concrete

11   and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct.

12   at 1548.  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist" and must be

13   "'real'" rather than "'abstract.'"  *Id.*  For an injury to be "particularized," as required for Article III

14   standing, it "must affect the plaintiff in a personal and individual way."  *Id.*  "[I]n class actions, the

15   named representatives must allege and show that they personally have been injured, not that injury

16   has been suffered by other, unidentified members of the class to which they belong and which they

17   purport to represent."  *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir.

18   2003) (quoting *Pence v. Andrus*, 586 F.2d 733, 736-37 (9th Cir. 1978)); *see also Spoke*o, 136 S.Ct.

19   at 1547 (adding that injury suffered by other unidentified members of the class to which named

20   plaintiffs belong is not enough to meet Article III standing).

21      Plaintiff's theory of liability is that some advertisers of financial services used the age and

22   gender audience selection tools in ways that excluded older people and women from the audience

23   for those ads.  But Plaintiff does not plead any facts demonstrating that such alleged conduct

24   affects her "in a personal and individual way."  *Spokeo*, 136 S. Ct. at 1548.  Plaintiff points to four

25   ads that she alleges are for "financial services" and were targeted by advertisers to exclude older

26   people and women from the audience based on the "Why am I seeing this ad?" information that

27   accompanies all ads on Facebook.  Compl. ¶¶ 43-46.  Even assuming the "Why am I seeing this

28   ad?" messages can be interpreted in this way, these allegations do not demonstrate that *Plaintiff*

*herself* would have seen these ads on Facebook if the advertisers had not targeted them in this way, given the millions of active ads on Facebook and the limited space in Plaintiff's News Feed. Indeed, Plaintiff does not, and cannot, allege that, as a result of this alleged conduct, she received fewer ads, less desirable ads, or even less relevant financial services ads. *See* Compl. ¶¶ 14, 57. Plaintiff's speculation that she would have received the financial services ads she cites in the Complaint if the advertisers had not excluded older people and women from the audience, and that she was deprived of receiving ads for those financial services because she did not receive them on Facebook, does not plausibly establish any injury to her, let alone injury sufficient to establish Article III standing. *See Fair Hous. Council of Suburban Phila. v. Main Line Times*, 141 F.3d 439, 434-44 (3d Cir. 1998) ("general … adverse effect" "of discriminatory advertising" insufficient).

   *Second*, even if these generalized and speculative allegations could demonstrate an injury to Plaintiff, she does not, and cannot, allege any injury that is "fairly traceable" *to Facebook*. *Spokeo*, 136 S. Ct. at 1547.  To establish traceability, a plaintiff must show that her injury results from "the challenged action of the defendant," and not from "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.  Only if the defendant's actions had a "determinative or coercive effect" on the third party's actions can a plaintiff establish standing. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009). Facebook's provision of neutral age and gender audience selection tools on a general use ad platform does not have a "determinative or coercive effect" upon third-party *advertisers* who, according to Plaintiff, may use them to target ads for financial services on Facebook.  *See supra* Part II.  Indeed, as Plaintiff admits, the default settings of the challenged tools are all ages and all genders which only change if the advertiser makes an affirmative decision to change them. Because Plaintiff fails to link any particular injury to any specific conduct *by Facebook*, Plaintiff fails to satisfy the fair traceability requirement.  *See Lujan*, 504 U.S. at 560

### 2.  Plaintiff Fails to Plead Statutory Standing

   Both the Unruh Act and section 51.5 requires that Plaintiff demonstrate statutory standing to bring a claim.  *Osborne v. Yasmeh*, 1 Cal. App. 5th 1118, 1126-27 (2016).  In the context of

1   online businesses, "mere awareness of a business's discriminatory policy or practices is not

2   enough.."  *White v. Square*, 7 Cal. 5th 1019, 1023, 1032 (2019).  This is because "a plaintiff

3   cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct."

4   *Angelucci v. Century Supper Club* 41 Cal.4th 160, 165 (2007) .

5          Here, Plaintiff alleges that she was shown some ads, but not others—which, given the

6   volume of ads on Facebook, is inevitable—and then *speculates* that she may not have seen some

7   financial services ads because advertisers targeted them to exclude older people and women.

8   Plaintiff's theories do not even rise to the level of "mere awareness" of discriminatory practices or

9   conduct, which in itself would be insufficient.  Plaintiff also cannot rely on the conclusory

10  allegation that financial services advertisers "routinely" exclude women and older people.  As

11  discussed *supra*, Plaintiff pleads no facts in support of such conduct, much less that she herself

12  was deprived of seeing any particular ad for financial services on Facebook.  Accordingly,

13  Plaintiff has not pled and cannot plead that she has "actually suffer[ed] discriminatory conduct."

14  *Angelucci*, 41 Cal.4th at 165.

15     **B.      Plaintiff's Claims Must be Dismissed Because Neither the Unruh Act nor
               Section 51.5 Apply Extraterritorially**

16

17         Plaintiff is outside the statutory jurisdiction of the Unruh Act and section 51.5, because she

18  is a resident of Washington, D.C. and fails to allege that she suffered discrimination within the

19  geographic boundaries of California.  This alone requires dismissal of Plaintiff's claims.

20         Where, as here, an out-of-state plaintiff accesses a website or service out-of-state and

21  allegedly suffers discrimination, the Unruh Act and section 51.5 cannot apply because they do not

22  have extraterritorial reach.  *See, e.g.*, *Ebeid v. Facebook, Inc.,* No. 18-CV-07030-PJH, 2019 WL

23  2059662, at *7 (N.D. Cal. May 9, 2019) (dismissing Arizona resident's Unruh Act claim based on

24  apparent out-of-state access to Facebook); *Warner v. Tinder Inc*., 105 F. Supp. 3d 1083, 1099

25  (C.D. Cal. 2015) (dismissing Florida resident's Unruh Act claim based on out-of-state access to

26  allegedly discriminatory services).  This is because the plain language of these statutory provisions

27  limit their scope to discrimination that occurs within the state of California.  *See* Cal. Civil Code §

28  51(b); *Archibald v. Cinerama Hawaiian Hotels, Inc.,* 73 Cal.App.3d 152, 159 (1977) ("[The

Unruh Act] by its express language applies only within California."); *Moore v. Greyhound Bus Lines*, Inc., No. 15-CV-1186-CAB (MDD), 2018 WL 3361395, at *2 (S.D. Cal. July 10, 2018), *appeal dismissed*, No. 18-56140, 2018 WL 6133396 (9th Cir. Sept. 18, 2018) ("Thus, through its own language UNRUH has limited geographical scope and only applies to discrimination that takes place within California.").

As Plaintiff is not a California resident and fails to allege any facts demonstrating that she suffered discrimination within the geographic boundaries of California, her Unruh Act claims must be dismissed.

**C.     Plaintiff's Claims Are Barred by Section 230 of the CDA**

Plaintiff's claims are separately barred by the CDA, which prohibits Plaintiff from seeking to impose liability on Facebook for publishing third-party content she alleges is discriminatory.

Plaintiff seeks to hold Facebook liable for financial services ads she alleges *may* have been targeted on Facebook in a discriminatory manner because third-party advertisers *may* have used optional, self-serve age and gender audience selection tools to narrow the audience for those ads. But Plaintiff cannot escape the fact that there can be no alleged violation of the Unruh Act or section 51.5 without *publication of a discriminatory ad*, and there can be no publication of a discriminatory ad unless a *third-party advertiser* chooses to use the age and gender targeting tools in a way that, according to Plaintiff, results in publication of a discriminatory ad. Accordingly, the "content" relevant to Plaintiff's claim are ads for financial services that third parties create and target to (allegedly) exclude gender or certain age groups, not the age and gender audience selection tools themselves. Because Plaintiff is seeking to hold Facebook liable for the publication of allegedly discriminatory ads, the CDA bars such claims.

Under Section 230 of the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The law bars liability "under any State or local law that is inconsistent with this section," *id*. § 230(e)(3). Through Section 230, Congress sought to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003);

*see* 47 U.S.C. § 230(b)(1)-(2).  "Congress recognized the threat that tort-based lawsuits pose" to websites that publish third-party content, *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1044 (N.D. Cal. 2004), and sought to prevent such lawsuits "from shutting down websites and other services on the Internet." *Batzel*, 333 F.3d at 1028.  "None of this means, of course, that the original culpable party who posts [unlawful content] would escape accountability," but "Congress made a policy choice" to preempt "tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.'" *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997).  Accordingly, the "CDA has been interpreted to provide a 'robust' immunity" for "websites." *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (quoting *Carafano v. Metrosplash.com Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).

Courts "aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)).  Thus, courts routinely apply the CDA on the pleadings in dismissing complaints.  *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting plaintiff's "effort to circumvent the CDA's protections through 'creative' pleading"); *Goddard*, 640 F. Supp. 2d at 1202; *Gonzales v. Google, Inc.*, 282 F.Supp.3d 1150 (N.D. Cal. 2017) (granting motion to dismiss on CDA grounds) *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 586-87 (S.D.N.Y. 2018), *aff'd* 765 F. App'x 586 (2d Cir. March 27, 2019), *cert. denied*, 140 S. Ct. 221 (2019); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) (affirming dismissal of complaint based on CDA immunity).

CDA immunity attaches when (1) the defendant is "a provider or user of an interactive computer service," (2) "whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker," (3) "of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  Applying this standard, courts repeatedly have held that Facebook is protected by CDA immunity for claims related to third-party content.  *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Caraccioli v.*

*Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065-66 (N.D. Cal. 2016); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 206 (2017); *Pennie v. Twitter, Inc., et al.*, 281 F. Supp. 3d 874, 891-92 (N.D. Cal. 2017). The same result is warranted here.

### 1.      Facebook Is an Interactive Computer Service Provider

It is beyond dispute that Facebook, a social networking platform and website, is a provider of an interactive computer service.  *See, e.g.*, *Klayman*, 753 F.3d at 1357 ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access ... to a computer server,' 47 U.S.C. § 230(f)(2)"); *Caraccioli*, 167 F. Supp. 3d at 1065 (same).  Plaintiff does not allege otherwise.

### 2.      Plaintiff's Claims Treat Facebook as a Publisher or Speaker

Plaintiff's allegations demonstrate that she is attempting to impose liability on Facebook as a publisher of third-party content.  Plaintiff seeks to impose liability on Facebook for allowing "*advertisers* [to] determine[] the audience" for ads.  Compl. ¶ 25 (emphasis added).  Plaintiff acknowledges Facebook's role as a publisher, asserting that "Facebook sells advertising to companies who pay Facebook to place their advertisements on users' News Feeds...," Compl. ¶ 18, that "Facebook sends the ad[] to the Facebook users within the audience selection *that the advertiser chose*," *id.* ¶ 23 (emphasis added), and that "Facebook ... assisted the companies in their violations by providing [the challenged targeting] tools ... and *publishing* the financial services [a]ds," *id.* ¶ 59 (emphasis added).  Allowing third-party advertisers to choose the audience for their ads is a classic publishing activity protected by the CDA.

Courts have recognized that a lawsuit treats a defendant as a publisher or speaker when it seeks to "hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Optinrealbig.com*, 323 F. Supp. 2d at 1044 (internal quotation marks omitted).  "A provider of information services might get sued for violating anti-discrimination laws ... or even for negligent publication of advertisements that cause harm to third parties. ... [W]hat matters is not the name of the cause of action," but "whether the duty that the plaintiff alleges the defendant violated

derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009); *accord Herrick*, 306 F. Supp. 3d at 590 (noting that "[c]ourts have interpreted 'publication' capaciously to reach claims that, although pleaded to avoid the CDA, 'implicitly require recourse to that content [posted by a third party] to establish liability or implicate a defendant's role'" (quoting *Cohen v. Facebook*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017)).

Applying these principles, numerous cases recognize that the publication of third-party ads falls squarely within the realm of traditional publisher functions protected by the CDA, even if the ads are discriminatory or otherwise unlawful under federal or state law. *See, e.g.*, *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008) (CDA barred claim against Craigslist for publishing allegedly discriminatory ads in violation of federal FHA); *Goddard*, 640 F. Supp. 2d at 1195-96 (CDA barred claim premised on "allegedly fraudulent web-based advertisements" published by Google); *Zeran*, 129 F.3d at 329 (CDA barred claim premised on allegedly fraudulent third-party ads).

Facebook's provision of neutral age and gender audience selection tools that facilitate such publications is a traditional publisher function protected by the CDA.  Publishers routinely allow advertisers to target ads and assist them in doing so.  For instance, newspapers sell advertising space to sporting goods stores in the sports section and broadcast networks sell airtime to advertisers on different channels during different shows depending on what audience the advertiser is trying to reach with a particular ad.  The publication of ads entails more than displaying them.  It also entails allowing advertisers the ability to reach their target audience.

That is the same type of service Facebook and other online publishers protected by the CDA offer to advertisers. Courts consistently have held that online ad targeting is a traditional publisher function protected by the CDA, including with respect to Facebook. *See, e.g.*, <u>*Force*</u>, 934 F.3d at 65–66 (holding that Facebook's "allow[ing] advertisers to target ads to its users who are likely most interested in those ads" is a protected publisher function under CDA); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) (tools allowing ad buyers to "target their advertisements" based on geography would be

protected); *Roommates*, 521 F.3d at 1169 (tools allowing users "to specify whether they will or will not receive emails" from others "by means of *user-defined* criteria" would be protected, even though such tools "might help some users exclude email from other users of a particular race or sex").  All of Plaintiff's claims are based on the potential use of targeting tools by advertisers to publish discriminatory ads. "Facebook's role in publishing that content is thus an essential causal element of [Plaintiff's] claims," *Cohen*, 252 F. Supp. 3d at 158.  Accordingly, Plaintiff's claims attempt to treat Facebook as the publisher of unlawful content and are barred by the CDA.

### 3.   Plaintiff's Claims Are Based on Allegedly Discriminatory Ads Created by Third-Party Advertisers

As alleged in the Complaint, it is advertisers, and not Facebook, that make the decisions about (1) what to advertise (financial services, credit-related or otherwise); and (2) whether and how to target those ads (based on age, gender, or otherwise).  Plaintiff's claims are therefore based on information "provided by another information content provider." 47 U.S.C. § 230(c)(1). Plaintiff's allegations concerning Facebook's creation of the age and gender audience selection tools are simply irrelevant to determining CDA immunity.  It is not enough to "provide a framework that *could be* utilized for proper and improper purposes."  *Roommates*, 521 F.3d at 1172 (emphasis added). What matters is whether, with respect to the content upon which Plaintiffs' claims are based—allegedly discriminatory ads that may have been published on Facebook's ad platform—Facebook has "materially contribut[ed] to [their] alleged unlawfulness." *Id*. at 1168.  Facebook has done no such thing.

### (a)   Neutral Ad-Targeting Tools Are Protected by the CDA

The gravamen of Plaintiff's claim is that *Facebook* created age and gender audience selection tools and third-party *advertisers* used them to target ads for financial services in violation of the Unruh Act and section 51.5.  As Plaintiff repeatedly alleges, any purported discriminatory ads are created by such advertisers. *See, e.g.*, Compl. ¶ 23 ("When an *advertiser* seeks to create, purchase, and send a paid advertisement to Facebook users") (emphasis added); *id*. ¶ 25 ("When an *advertiser* determines the audience selection") (emphasis added); *id*. ¶ 38 ("[W]hen the *advertiser* eliminates persons who are older than 40 from the audience selection or

eliminates women from the audience") (emphasis added).  And Plaintiff does not (and cannot) allege that *Facebook* decides whether or how the age and gender audience selection tools are used by advertisers.  In fact, Plaintiff concedes that these options default to targeting all ages and genders unless an advertiser decides to change the selection to narrow their audience.  Compl. ¶¶ 25-27.

Facebook's alleged role in creating these age and gender audience selection tools does not strip it of CDA immunity.  The age and gender audience selection tools challenged by Plaintiff are exactly the type of "neutral tool[]" protected by the CDA.  *Roommates*, 521 F.3d at 1171.  Courts uniformly have held that such neutral tools, which facilitate the publication of third-party content and that third parties may use for either "proper or improper purposes," do not "contribute[] materially to the alleged illegality" of third-party content.  *Id.* at 1168, 1172.  They are thus protected by CDA immunity "even if the users committed their misconduct using" such "tools." *Id.* at 1169 n.24; *see Kimzey*, 836 F.3d at 1270 (a "'neutral tool' operating on 'voluntary inputs' ... [does] not amount to content development or creation").  Importantly, such neutral tools are protected *even if* they are alleged to "encourage[] facilitate[]" or "enable[]" third parties in engaging in unlawful conduct.  *See La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1107 (C.D. Cal. 2017) (holding that website "must have done more than merely encourage[d] the creation of the challenged conduct" to lose CDA immunity).

A website retains immunity so long as it does not materially contribute to the creation of "the particular information at issue" in the case. *Carafano*, 339 F.3d at 1123-25. "A material contribution to the alleged illegality of the content does not mean merely taking action … necessary to the display of allegedly illegal content. Rather, it means being responsible *for what makes the displayed content allegedly unlawful*." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) (emphasis added).  Here, "what makes the displayed content allegedly unlawful," *id.*, is a combination of the ad content and how it is targeted, both of which are provided by advertisers, not Facebook.

The age and gender tools are no different than numerous other neutral tools held to be protected by the CDA.  For example, in *Carafano*, a dating website provided its users with a

"detailed questionnaire" that included multiple-choice questions where "members select[ed] answers ... from menus providing between four and nineteen options" in creating their profiles. 339 F.3d at 1121.  The plaintiff argued that these menus included "sexually suggestive" phrases that facilitated the creation of a defamatory impersonated profile.  *Id*.  The Ninth Circuit held that "[d]oubtless, the questionnaire facilitated the expression of information by individual users," but the "selection of the content was left exclusively to the user."  The court therefore concluded that the defendant "cannot be considered an 'information content provider'" because "no profile has any content until a user actively creates it."  *Id*. at 1124

Similarly, in *Goddard*, the plaintiff challenged Google's provision of a "Keyword Tool" that "suggest[ed] the phrase 'free ringtone' to advertisers, claiming that "the suggestion of the word 'free,' when combined with Google's knowledge 'of the mobile content industry's unauthorized charge problems,' makes the Keyword Tool 'neither innocuous nor neutral.'" 640 F. Supp. 2d at 1197. The court rejected this argument, holding that "[l]ike the menus in *Carafano*, Google's Keyword Tool is a neutral tool. It does nothing more than provide options that advertisers may adopt or reject at their discretion."  *Id*. at 1198; *see also, e.g.*, *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (same); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1168 (N.D. Cal. 2017) (holding that "Google's targeted ad algorithm" was protected by the CDA as a "neutral tool[]"); *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. Ct. App. 2012) (pricing tool for tickets that suggested prices above that allowed by law was "a prototypically 'neutral tool'").

This same principal applies here.  Even accepting Plaintiff's speculative and conclusory allegations about how Facebook created its age and gender audience selection tools, these allegations do not subject Facebook to liability in this case.  *See, e.g.*, Compl. ¶ 21 (alleging that Facebook "segregate[]s, classif[ies], and categorize[s] users based on age and gender" "to make it easy for and to encourage advertisers to target their ad[s].").  As demonstrated throughout the Complaint, Plaintiff has no claim without the publication of a "discriminatory" financial services ad, and there is no allegedly discriminatory ad unless and until an advertiser creates a financial services ad and uses the age and gender audience selection tools to target that ad in ways that

1   Plaintiff contends are discriminatory.  In other words, "what makes the displayed [ads] allegedly

2   unlawful," *Jones*, 755 F.3d at 410, is not Facebook's *creation* of neutral tools available for use

3   with all types of ads, but the actual *use* of those tools by advertisers to place certain types of ads in

4   ways Plaintiff claims violate the Unruh Act and section 51.5.

5                   **(b)      Plaintiff's Conclusory Assertion that Facebook "Wants" and
                              "Encourages" Advertisers to Unlawfully Target Ads Does Not
6                              Defeat CDA Immunity**

7          Plaintiff alleges, without any factual basis, that Facebook "encourages" and "wants"

8   advertisers to use the age and gender audience selection tools in ways that Plaintiff asserts are

9   unlawful.  *See, e.g.*, Compl. ¶ 29.  As discussed in greater detail *infra* at Part III.D.1, Plaintiff's

10  allegations demonstrate nothing more than Facebook's creation of neutral tools that *all* advertisers

11  can use to target ads for all types of products and services and, concurrently, has created generic

12  help-center material that explains to advertisers *generally* how these tools *may* be used.  On a

13  motion to dismiss, Plaintiff's conclusory allegations that "Facebook wants and encourages"

14  unlawful conduct cannot and should not be credited.  *Iqbal*, 556 U.S. at 678.

15         Indeed, the Ninth Circuit has explicitly rejected attempts to "circumvent" the CDA by way

16  of "creative pleading" that lacks any *factual* basis.  *Kimzey*, 836 F.3d at 1266.  "[T]hreadbare

17  allegations" of a website's authorship of content "are implausible on their face and are insufficient

18  to avoid immunity under the CDA."  *Id.* at 1268.  "Were it otherwise, CDA immunity could be

19  avoided simply by reciting a common line that user-generated statements are not what they say

20  they are."  *Id.* at 1268-69.  Applying this rule in *Goddard*, for example, the court rejected

21  conclusory allegations that the defendant had contributed to a third-party's creation of unlawful

22  content.  The plaintiff "allege[d] in conclusory fashion that Google *assisted its AdWords*

23  *customers in drafting their advertisements*," but "offered no allegations to support this claim" and

24  "fail[ed] to explain how Google 'controlled' or 'collaborated' with" advertisers "in the creation of

25  any allegedly fraudulent advertisement." 640 F. Supp. 2d at 1202 (emphasis added).  Plaintiff's

26  allegations here are equally deficient.

27         Moreover, even if Plaintiff *had* actually alleged facts showing that Facebook

28  "encourage[d]" advertisers to use the age and gender audience selection tools to target their

financial services ads in certain ways—which, to be clear, Plaintiff does not—that still would not defeat CDA immunity. *See, e.g.*, *Jones*, 755 F.3d at 414 (citing *Roommates* and expressly declining to adopt "encouragement test of immunity under the CDA"). Rather, Plaintiff would need to allege that Facebook *required* such discriminatory targeting. *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 986-87 (N.D. Cal. 2015) (recognizing that *Jones* "adopted the Ninth Circuit's reasoning in *Roommates.com*" that to forfeit CDA immunity, a website "must have done more than merely 'encourage' the creation of the challenged conduct," but "must have *required* another to create that content" (emphasis added)); *Airbnb*, 285 F. Supp. 3d at 1107 (same). Here, Plaintiff does not and cannot allege that Facebook *requires* financial services advertisers (or any advertiser) to use the age and gender audience selection tools at all, much less use them to target their ads in a discriminatory manner. Indeed, Plaintiff admits that the *default settings* of the tools includes *all* ages and *all* genders. Compl. ¶¶ 25-27. Because Plaintiff cannot plead facts demonstrating that Facebook *requires* (or even encourages) advertisers to target their financial services ads in a discriminatory manner, Plaintiff's claims are barred in their entirety by the CDA.

**D.**     **Plaintiff Cannot State a Claim under the Unruh Act or Cal. Civil Code § 51.5**

   **1.**     **Plaintiff Fails to Plead Facts Demonstrating the Requisite Intent to Discriminate by Facebook**

Plaintiff's claims against Facebook fail at the outset because "a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination." *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 854 (2005). Section 51.5 claims, which for liability purposes are substantively identical to Unruh Act claims, likewise require intentional discrimination. *Long v. Playboy Enters. Int'l, Inc.*, 565 F. App'x 646, 647-48 (9th Cir. 2014).[2] Discriminatory intent requires that a defendant have acted *for the purpose* of achieving discrimination. *Koebke*, 36 Cal. 4th at 854 (finding no evidence that defendant "adopted its [challenged] policy to *accomplish* discrimination on the basis of [a protected characteristic]")

---

[2] Although the section 51.5 is not formally a part of the Unruh Act, California courts have held that the liability analysis is the same. *See Semler v. Gen. Elec. Capital Corp.*, 196 Cal. App. 4th 1380, 1404 (2011) ("[T]he analysis under Civil Code section 51.5 is the same as the analysis we have already set forth for purposes of the [Unruh Civil Rights] Act.").

1   (emphasis added).  As explained below, nowhere in the Complaint are there any facts alleged to

2   demonstrate that *Facebook* ever acted with the requisite *intent* to discriminate.

3        As the Ninth Circuit has explained, "intentional discrimination" under the Unruh Act and

4   section 51.5 requires *more than* mere "knowledge that a protected right is substantially likely to be

5   infringed upon, and a failure to act upon that knowledge."  *Greater L.A. Ag. on Deafness, Inc. v.*

6   *Cable News Network, Inc.*, 742 F.3d 414, 427 (9th Cir. 2014) (rejecting deliberate indifference

7   standard in light of *Koebke*).  The California Supreme Court has held that the statutory text, and in

8   particular its reference to "'aiding'" and "'inciting'" discrimination (Cal. Civ. Code § 52(a)),

9   "imply willful, affirmative misconduct on the part of those who violate the Act."  *Koebke*, 36

10  Cal.4th at 853.  Indeed, the Unruh Act and section 51.5 contain a "damages provision allowing for

11  an exemplary award of up to treble the actual damages suffered," as well as a $4,000 statutory-

12  damages provision for *every* violation.  *Harris*, 52 Cal. 3d at 1172; *see* Cal. Civ. Code § 52(a).

13  These damages provisions "'reveal[] a desire to punish *intentional and morally offensive*

14  conduct.'"  *Koebke*, 36 Cal. 4th at 853 (quoting *Harris*, 52 Cal.3d 1172 (emphasis added)).

15       Plaintiff alleges no facts whatsoever, nor could she, showing that Facebook willfully or

16  affirmatively discriminated against users.  The only conduct *by Facebook* that Plaintiff alleges is

17  the provision of neutral age and gender audience selection tools to all advertisers on a general use,

18  self-serve ad platform.  Indeed, the Complaint demonstrates that the "default setting[s]" of all of

19  the challenged audience selection tools—that is, the setting that Facebook controls—is completely

20  *inclusive,* i.e., it does not exclude any users from receiving ads on the basis of age or gender.

21  Compl. ¶¶ 25-27.  The conclusory assertion that Facebook "encourages, facilitates, expects,

22  knows, and wants advertisers to routinely exclude older persons and women … so that older

23  persons and women will not receive" ads is both baseless and nonsensical.  *Id.* ¶ 29.  If, as Plaintiff

24  asserts, Facebook "wants ads to be as 'relevant' as possible to its users so that users will spend

25  more time on Facebook and allow Facebook to sell and place more paid advertisements on

26  Facebook," then Facebook would have *no* incentive to exclude women and older users from

27  receiving ads that they might find relevant.  *Id.*  Instead, Facebook would have every incentive to

28  *maximize* the number of "relevant" ads available to *all* users, regardless of age and gender.

1    Plaintiff has not alleged facts even remotely suggesting that *Facebook* intended for age and gender

2    audience selection tools to be used in a discriminatory manner by third parties, much less that

3    Facebook *itself* acted with discriminatory intent.

4          Plaintiff has not alleged a single fact demonstrating or even suggesting that Facebook

5    willfully or affirmatively discriminated against users based on a protected characteristic under the

6    Unruh Act.  Plaintiff's allegations speak only to whether *advertisers* may have engaged in

7    allegedly discriminatory conduct.  These allegations fail to state a claim against Facebook because

8    they do not show discriminatory intent by Facebook and for good reason—Facebook expressly

9    prohibits advertisers from engaging in discrimination, including through the use of targeting tools.

10   Ring Decl., Exhibit A at 2; Exhibit B at 6, 11.

11         Nor does Plaintiff's selective quotations from materials on Facebook's website

12   demonstrate the type of "willful" or "morally offensive conduct" required to show intent.  These

13   materials simply describe a range of neutral, self-serve, and optional tools that advertisers can use

14   in a variety of contexts.  For example, the "Blueprint" materials quoted by Plaintiff explains to

15   advertisers, "*If you want, you can choose* to reach out to only men or only women," for products

16   like bridal dress shops and beard grooming businesses.  Compl. ¶ 31 (emphasis added).  It then

17   states that a winemaker might use age targeting because "there might be a minimum age for

18   people you reach out to."  Ring Decl., Exhibit C at 21.

19         As these allegations make clear, the video is simply telling advertisers that they may, if

20   they "choose," target all kinds of ads for non-discriminatory purposes on the basis of age or

21   gender.   Plaintiff incredulously asserts this video demonstrates Facebook's intent to discriminate

22   because the video does not also tell advertisers that they should *not* use the tools to restrict

23   audiences by age and gender for "non-credit-related financial services" ads.  Nonsense.  First of

24   all, Facebook does, in fact, explicitly prohibit discriminatory targeting of ads and requires

25   advertisers to agree to those policies as a condition of using Facebook.  Ring Decl., Exhibit A at 2;

26   Exhibit B at 6, 11.  That Facebook also did not remind advertisers of that prohibition in this

27   particular video does not of course demonstrate intentional discrimination.  In any event, the video

28   merely provides examples of how advertisers for different products and services *might use* various

-18-

audience selection tools.

Plaintiff's reliance on other inapposite materials is likewise misleading and unavailing. The selected quotes from the video entitled "How to Choose an Audience for Your Facebook Ad," *Id.*, Exhibit C at 16-19, also provides *examples* of how *any* advertiser might use audience selection tools to audiences for *any* product or service.  Plaintiff quotes language asking advertisers if their customers are "often of a certain age or gender," but omits the question immediately following asking whether customers "tend to live somewhere specific or have interest or hobbies in common."  In fact, the majority of this video focuses on two different examples of targeting,[3] neither of which involves age or gender targeting, much less targeting of ads for "non-credit-related financial services."  Compl. ¶ 32; Ring Decl., Exhibit C at 18.

Plaintiff's reliance on the "4 Tips for Selecting Your Ad Audience" likewise underscores Plaintiff's inability to plead a single fact demonstrating any discriminatory intent by Facebook. This general help-center material informs advertisers that (1) they should "[c]onsider your current customer base (if you have one)"; (2) that "[a]udiences can be specific or broad.  There can be pros and cons to both … If it gets too broad, add additional audience options.  If it's too narrow, try removing some"; (3) they should "[w]atch the audience meter to see whether your audience is too specific or too broad"; and (4) they should "[t]est and iterate: There's no one-size-fits-all solution to building audiences."  Ring Decl., Exhibit C at 23-24.  None of these general "tips" that apply to all types of ads demonstrates any intent by Facebook to exclude users based on age or gender for "non-credit-related financial services."  Indeed, they say nothing about such advertising at all.

Plaintiff also claims that the "audience meter may change from pointing to yellow to pointing to green" if an advertiser "eliminates persons who are older than 40 from the audience" or

_____

[3] The video focuses on two examples, the first of which is an organic fruit market targeting ads to local customers who are interested in health and fitness and like to cook.  The second is a surf shop and the video explains that someone who lives 1000 miles from your surf shop will find it less relevant, but someone who lives near your shop and has active hobbies or names surfing as an interest will find it more relevant. The only "encouragement" Facebook is providing here is for advertisers to consider their customers holistically.

"eliminates women."  Compl. ¶ 38.  But Plaintiff's reliance on the audience meter is likewise misleading, since it is a metric relating to the size and reach of an audience, not whether users in the selected audience are interested in the ad.  Ring Decl., Exhibit C at 23-24.  In other words, the audience meter may also change from yellow to green when advertisers eliminate users in California or users who are interested in dogs.  Facebook's provision of a metric gauging audience size that is available to *all* advertisers for *all* types of ads does not show that Facebook encouraged third-party advertisers to exclude users based on age and gender from audiences for "non-credit-related financial services" ads.  *Koebke*, 36 Cal. 4th at p. 854; *Turner v. Ass'n of Am. Med. Colls.*, 167 Cal. App. 4th 1401, 1409-1410 (2008) ("[T]he Unruh Act does not extend to practices and policies that apply equally to all persons."); *see also Earll v. eBay Inc.* (N.D. Cal. Aug. 8, 2012) 2012 WL 3255605, at *5 (dismissing Unruh Act claim where "allegations describe a facially neutral policy" and thus did not "demonstrate intentional discrimination").

Plaintiff also perversely asserts that Facebook's efforts to combat discrimination through its recent development of "classifiers" designed to identify ads that are "likely to be credit, housing, or employment related" means that Facebook "has specifically known every time" an advertiser *might* have created a credit-related ad.  Compl. ¶¶ 49-50.  Plaintiff further asserts, with no factual basis, that Facebook "knew" how these ads were targeted and "took no action to stop this practice in spite of its knowledge that these ads *might violat[e]* various … laws."  *Id.* ¶ 50.  These conclusory assertions do not demonstrate that Facebook "knew" that allegedly discriminatory advertising was occurring, and certainly do not demonstrate that Facebook *intended* for advertisers to engage in any discriminatory advertising.  Facebook's implementation of additional technical measures that attempt to *prevent* the misuse of audience selection tools in connection with housing, employment, and credit ads does not demonstrate that Facebook *intends* for advertisers to use those tools to unlawfully discriminate with respect to all other types of ads.[4]

Indeed, Plaintiff's baseless assertions boil down to an argument that Facebook *should* have

---

[4] Moreover, as explained above, Facebook is only one of many different online and offline channels for advertising and advertisers commonly choose to target different audiences via different channels, in perfectly lawful ways.

also included financial services ads in the new ad creation flow, and that Facebook's "failure" to do so somehow demonstrates intent. But as the Ninth Circuit has held, "knowledge" that unlawful conduct is "substantially likely" to occur "and a failure to act upon that knowledge" is insufficient to demonstrate intentional discrimination as a matter of law. *Cable News Network*, 742 F.3d at 426.

Plaintiff's aiding-and-abetting claims also fail for the same reason. As an initial matter, any aiding-and-abetting claim fails because, as explained above, Plaintiff has not alleged an independent primary violation by any third-party advertiser. *See, e.g.*, *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) ("failure to allege an independent, primary" violation "moots" claims for "aiding and abetting".)[5] But even if Plaintiff could allege a primary violation, Plaintiff's claims would still fail. To prevail on an aiding-and-abetting theory, a plaintiff must show that a defendant gave "'substantial assistance or encouragement'" to the primary violator, and also that the defendant "'acted *with the intent of facilitating the commission of that tort*.'" *Casey v. U.S. Bank Nat. Assn.*, 127 Cal.App.4th 1138, 1144, 1146 (2005); *see also Bergstein v. Stroock & Stroock & Lavan LLP*, 236 Cal.App.4th 793, 810 (2015) (same). Plaintiff does not come close to meeting that standard. Facebook has "do[ne] no more than provid[e its] usual, legitimate service" advertisers; that some may misuse the service does not amount to substantial assistance or encouragement. *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86, 94 (2007); *see also Emery v. Visa Intl. Serv. Assn.*, 95 Cal. App. 4th 952, 963-966 (2002). Plaintiff's failure to plead any specific intent to discriminate on the part of Facebook dooms any claim, whether direct or indirect, under the Unruh Act and section 51.5

---

[5] Because the Unruh Act provides for liability for anyone who "aids or incites" unlawful discrimination but does not define that term (Civil Code, § 52, subd. (a)), it must be interpreted in light of the "common law definition of aiding and abetting." *See Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325 (1996).

1

       **2.**      **Plaintiff Has Not and Cannot Plead that Facebook Engaged in Any Conduct Prohibited by the Unruh Act or Section 51.5**

2

3         Nor has Plaintiff alleged that Facebook's provision of age and gender audience selection

4 tools constitutes unreasonable, arbitrary, or invidious discrimination, as required by the Unruh Act

and section 51.5.

5

6         The Unruh Act and section 51.5 "prohibit[] only unreasonable, arbitrary, or invidious

discrimination, not differential treatment based on actual characteristic differences or differences

7 in needs of users." *Sunrise Country Club Assn.*, 190 Cal. App. 3d at 380-81.  "Invidious

8 discrimination is the treatment of individuals in a manner that is malicious, hostile, or damaging."

9 *Javorsky v. W. Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386, 1404 (2015).  They do not prohibit

10 discriminatory policies that "do[] not perpetuate any invidious stereotypes," *id.* at 1401, or policies

11 based on "actual characteristic differences or differences in needs of users." *Sunrise Country

12 Club*, 190 Cal. App. 3d at 380-81.   This is because the "fundamental purpose of the Unruh Civil

13 Rights Act is the elimination of anti-social discriminatory practices—not the elimination of

14 socially beneficial ones."  *Sargoy v. Resolution Trust Corp.,* 8 Cal. App. 4th 1039, 1049 (1992).

15         Thus, for instance, the Unruh Act and section 51.5 forbid facially discriminatory pricing

16 policies based on unfair and harmful stereotypes, *Koire v. Metro Car Wash,* 40 Cal. 3d 24, 34

17 (1985) ("[ladies'] discounts"), as well as class-based treatment based on alleged "undesirable

18 propensities" of the class, *Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 725-726 (1982)

19 (landlord's exclusion of families).  But the law does not prohibit discriminatory pricing policies

20 that "do[] not perpetuate any invidious stereotypes," *Javorsky*, 242 Cal. App. 4th at 1401

21 (discounted young adult gym memberships), or policies based on "actual characteristic differences

22 or differences in needs of users," *Sunrise Country Club Assn.*, 190 Cal. App. 3d at 380-81

23 (separate "adult" and "family" sections of condo development).

24         Here, Plaintiff does not, and cannot, allege that Facebook has engaged in any

25 unreasonable, arbitrary, or invidious discrimination.  Instead, Plaintiff alleges that Facebook

26 provides age and gender audience selection tools that "enable[]" *advertisers* to target specific

27 audiences for their ads.  Compl. ¶¶ 23-29.  But providing audience selection tools to all advertisers

28

for use with ads for all types of products and services does not amount to conduct constituting "unreasonable, arbitrary, or invidious discrimination."  As discussed above, *supra* at pp. 3-4, the optional age and gender audience selection tools can be used by advertisers—including financial services advertisers—to engage in a broad range of targeted advertising that does not rest on unfair or harmful stereotypes or the "undesirable propensities" of a class.  *Cf. Javorsky*, 242 Cal. App. 4th at 1395 (differential treatment "may be reasonable, and not arbitrary, in light of the nature of the enterprise or its facilities, legitimate business interests … and public policy"); *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d 1007, 1013 (2014) ("targeted advertising" "has been practiced as long as markets have been in operation"); *see also OpenTV, Inc. v. Netflix Inc*., 76 F. Supp. 3d 886, 893 (N.D. Cal. Dec. 16, 2014) ("The concept of gathering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience.'").

For example, these very same age and gender audience selection tools can be used to target ads for college savings accounts for children, loans for women-owned small businesses, and financial education programs targeted to soon-to-be retirees.  There is nothing "unreasonable, arbitrary, or invidious" about allowing advertisers to target ads for lawful products and services to the very populations for which those products and services are intended.  Providing a tool for targeting advertising—even if it is used *by some unspecified advertisers* to engage in unlawful discrimination in violation of Facebook's policies prohibiting such use—does not constitute "unreasonable, arbitrary, or invidious discrimination" *by Facebook*.

Moreover, although Plaintiff's claim here is limited to financial services ads targeted to exclude women and older people, Plaintiff's underlying legal theory cannot be so neatly cabined and sweeps far more broadly.  Plaintiff would have the Unruh Act and section 51.5 prohibit any and all targeted advertising on the basis on any protected characteristic.  Advertisers could be sued for choosing to place ads for retirement communities in AARP or women's exercise apparel in Women's Health.  Plaintiff's overbroad theory is neither supported by the text of the Unruh Act and section 51.5, nor is it consistent with their purpose.  Unlike comparable statutory schemes where the California legislature explicitly addressed advertising and the potential for

discrimination in advertising, e.g., the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940(d) (employment "publication[s]"), and 12955(c) (housing "advertisements"), the Unruh Act and section 51.5 have no such comparable provisions.  Instead, both the Unruh Act and section 51.5 prohibit only "unreasonable, arbitrary, or invidious discrimination" that is intentional and "morally offensive."  *See Koebke*, 36 Cal.4th at 853 (quoting *Harris*, 52 Cal. 3d 1172).  It cannot be the case that the Unruh Act and section 51.5 would allow businesses to have policies and practices "based on "actual characteristic differences or differences in needs of users," but prohibit advertising based on those same differences.  *See Sunrise Country Club Assn.*, 190 Cal. App. 3d at 380-81.

        In sum, Plaintiff fails to plead facts demonstrating that Facebook has engaged in any conduct that violates the Unruh Act or section 51.5 by developing and offering the age and gender audience selection tools on its Ad Platform.

## IV.    <u>CONCLUSION</u>

        For these reasons, the Court should dismiss Plaintiff's Complaint with prejudice.


DATED:  February 19, 2020                    MUNGER, TOLLES & OLSON LLP


                                             By:  ___/s/ Rosemarie T. Ring___
                                                  ROSEMARIE T. RING
                                                  Attorneys for Defendant Facebook, Inc.