Jahan C. Sagafi (State Bar No. 224887)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com

Adam T. Klein*
Michael Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: atk@outtengolden.com
Email: mlitrownik@outtengolden.com

Pooja Shethji*
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Suite 200W
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: pshethji@outtengolden.com

* pro hac vice

Peter Romer-Friedman*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
Telephone: (202) 888-1741
Email: peter@guptawessler.com

Jason R. Flanders (State Bar No. 238007)
AQUA TERRA AERIS LAW GROUP
490 43rd Street
Oakland, CA 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Matthew K. Handley*
Rachel Nadas*
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2411
Email: mhandley@hfajustice.com
Email: rnadas@hfajustice.com

William Most (State Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com

*Attorneys for Plaintiff and Proposed Class Members*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

NEUHTAH OPIOTENNIONE, on behalf of herself and others similarly situated,

Plaintiff,

v.

FACEBOOK, INC.,

Defendant.

CASE NO. 3:19-cv-07185-JSC

**AMENDED COMPLAINT FOR VIOLATIONS OF STATE LAWS**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

## SUMMARY OF CLAIMS

Plaintiff Neuhtah Opiotennione ("Plaintiff") respectfully submits the following Amended Class Action Complaint against Facebook, Inc. on behalf of herself and a proposed nationwide class of older and female Facebook users who were denied the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment in violation of the California Unruh Civil Rights Act, Cal. Civ. Code §§ 51, 52 ("Unruh Act") and section 51.5 of the California Civil Code, or in the alternative on behalf of herself and a proposed District of Columbia class of older and female Facebook users (defined below) who were denied the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment in violation of the D.C. Human Rights Act ("DCHRA") and D.C. Consumer Protection and Procedures Act ("DC CPPA"), including because they were denied the opportunity to receive advertising and information about financial services opportunities on Facebook due to their age and/or gender.

1.     Plaintiff and the proposed National Class members have been denied the opportunity to learn about and obtain financial services, such as mortgages, personal loans, bank accounts, insurance, investment opportunities, and financial consulting services, from at least three years prior to the date of the original complaint through the present due to Facebook's discriminatory advertising and business practices and its aiding and abetting of financial services companies' discriminatory advertising and business practices.

2.     Facebook's discriminatory practices are straight-forward.  From three years prior to the date of the original complaint through the present, Facebook required all of its users to tell Facebook their age and gender as a condition of using Facebook's services.  Then, Facebook segregated and classified all of its users based on their genders and ages, so that advertisers could send their ads only to people of specific genders or ages.  And Facebook encouraged its advertisers, including financial services companies, to send advertisements that excluded Facebook users from receiving the ads based on their ages or genders.  Then, advertisers and Facebook followed this direction by routinely placing financial services advertisements on Facebook that excluded older persons and women. Moreover, when advertisers of financial services opportunities routinely used Facebook's "Lookalike Audiences" tool, Facebook expressly used age and gender to determine which users Facebook believed should be

in the audience that would be eligible to receive the advertisements.  And whenever Facebook published financial services advertisements, Facebook applied its own age- and gender-biased ad delivery algorithm to determine which Facebook users would actually receive the advertisements.

3.     Due to Facebook's discriminatory practices, millions of older and female Facebook users have been denied the opportunity to receive valuable advertisements about financial services opportunities that advertisers sent to similarly situated younger persons and men, and to pursue those financial services opportunities within and outside of Facebook.  As a result, Facebook intentionally denied its own users the full and equal accommodations, advantages, facilities, and services of Facebook, and it aided and abetted numerous financial services companies in denying Facebook's users the full and equal accommodations, advantages, facilities, and services of those financial services companies.

4.     For at least three years prior to the filing of the original complaint through the present, Facebook has been on notice that its discriminatory advertising and business practices for financial services opportunities classify and segregate Facebook users based on protected characteristics and deny them equal treatment in Facebook's business establishment based on protected characteristics, such as age and gender.  Nonetheless, Facebook has not changed its practices with respect to financial services opportunities and advertising (other than certain changes that Facebook made with respect to credit-related opportunities and advertising in September 2019).

5.     In September 2019, Facebook took meaningful steps to bar advertisers from placing advertisements for credit-related opportunities that discriminated against users based on age or gender.  However, Facebook has continued to deny equal opportunity to older persons and women regarding all other financial services opportunities aside from credit opportunities.  Thus, both before and after September 2019, Facebook has routinely placed advertisements for financial services opportunities other than credit that excluded older persons and women.

6.     There is no lawful or legitimate basis to exclude older persons or women from receiving the full and equal accommodations, advantages, facilities, and services of Facebook or the financial services companies that advertise financial services opportunities via Facebook.

7.      Every time that Facebook and a financial services company together and intentionally have excluded an older person or a woman from receiving information about financial services opportunities on Facebook based on age or gender, Facebook violated California law and District of Columbia law and Facebook aided and abetted those financial services companies in their own violations of California law and District of Columbia law.

8.      Plaintiff brings this action on behalf of older and female Facebook users nationwide who have been denied the full and equal accommodations, advantages, facilities, and services of Facebook and the financial service companies advertising on Facebook due to their age or gender, as defined in the Class Allegations below.

9.      In this action, Plaintiff seeks a declaration that Facebook has violated the Unruh Act and section 51.5 of the California Civil Code in its own business establishment and has aided and abetted financial services companies who have done the same in their own business establishments; an injunction to stop Facebook from continuing to engage in such violations; and statutory penalties for each instance of discriminatory exclusion on Facebook from the ability to receive advertisements for financial services opportunities.  If the Court concludes that California law does not apply to Plaintiff and the other non-California Residents in this action, Plaintiff brings Counts III and IV in the alternative under District of Columbia law on behalf of a District of Columbia Class.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(d)(2), as the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and it is a class action in which Plaintiff and members of the proposed National Class are citizens of different states than Facebook.

11.     This Court has personal jurisdiction over Facebook.  There is general jurisdiction over Facebook, as Facebook's corporate headquarters are located in this District in Menlo Park, California, Facebook conducts substantial business throughout this District and in the State of California, and Facebook employs thousands of workers in the State.  Facebook has consented to this Court asserting personal jurisdiction over Facebook, as Facebook's Terms of Service require its users to resolve any disputes in the Northern District of California or a state court located in San Mateo County and require

its users to "submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claims." *Terms of Service*, Facebook, https://www.facebook.com/terms.php (last modified July 31, 2019).

12.     Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), as the sole Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper because Facebook's Terms of Service require its users to resolve any disputes in the Northern District of California or a state court located in San Mateo County.  The same Terms of Service provide that "the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions." *Terms of Service*, *supra*.

## INTRADISTRICT ASSIGNMENT

14.     Pursuant to Local Rule 3-2(c) and (d), intradistrict assignment to the San Francisco Division is proper because a substantial part of the events that gave rise to the claims asserted herein occurred in San Mateo County.

## THE PARTIES

15.     Plaintiff Neuhtah Opiotennione is a 54-year-old woman who lives in Washington, D.C. From three years prior to the date of the original complaint through the present, Ms. Opiotennione has regularly used Facebook.  As part of her regular use of Facebook, she has been interested in receiving advertising and other information about financial services opportunities in Facebook advertisements, and otherwise being treated equally to other Facebook users in all aspects of her use of and the benefits that she receives from Facebook.  Like other members of the proposed National and District of Columbia Classes, Ms. Opiotennione has routinely been denied advertisements and information about financial services opportunities on Facebook due to her age and gender from three years prior to the original complaint through the present.

16.     Defendant Facebook, Inc. is a publicly traded corporation, headquartered at 1601 Willow Road, Menlo Park, California 94025 and incorporated under the laws of the State of Delaware. Facebook owns and operates an online social networking web site that allows its users to communicate with each other through the sharing of text, photograph, and video, and allows financial services companies to advertise financial services opportunities to hundreds of millions of Facebook users in the United States.  In December 2019, Facebook had 1.66 billion daily active users globally and in 2019 the company earned $70.70 billion in revenue, substantially all of which was generated from selling advertising placements to marketers.  Facebook 2019 Annual Report at 44, http://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/45290cc0-656d-4a88-a2f3-147c8de86506.pdf.

**FACTUAL ALLEGATIONS**

17.     Facebook is one of the most popular business establishment on the internet with which Americans interact.  According to its 2019 Annual Report, in 2019 Facebook had 1.66 billion daily active users and 2.50 billion monthly active users.  *Id.*  A daily active user is "registered and logged-in Facebook user who visited Facebook through [its] website or a mobile device, or used [its] Messenger application (and is also a registered Facebook user), on a given day."  *Id.* at 45.  A monthly active user is "registered and logged-in Facebook user who visited Facebook through [its] website or a mobile device, or used [its] Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement."  *Id.* at 46.

18.     According to Facebook's annual report, "Facebook enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers.  There are a number of different ways to engage with people on Facebook, including News Feed, Stories, Marketplace, and Watch."  *Id.* at 7.  Instagram is a similar social media platform "where people can express themselves through photos, videos, and private messaging, including through Instagram Feed and Stories, and explore their interests in businesses, creators and niche communities."  *Id.*  In addition, Messenger is a messaging application that Facebook provides to its customers to engage in messaging with each other.  *Id.*

19.     Facebook sells advertising to companies who pay Facebook to place their advertisements on users' News Feeds on Facebook, as well as on Instagram and Messenger.  Facebook earns nearly all of its total revenue from selling to marketers. According to Facebook's 2019 Annual Report, 98.5% of its revenue came from selling advertisements to marketers ($69.66 billion in advertising revenue out of a total revenue of $70.70 billion).  From 2016 to 2019, Facebook's advertising revenue grew and total revenue each grew by more than 150% (from $26.8 billion in advertising revenues in 2016 to $69.66 billion in 2019, and from $27.6 billion in overall revenue in 2016 to $70.70 billion in 2019).

20.     Facebook regularly updates its "News Feed ranking algorithm to optimize the user experience," which affects the frequency and placement of ads in a user's News Feed.  *Id.* at 16.

21.     According to Facebook's 2019 Annual Report, Facebook's "ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."  *Id.* at 7.

22.     Discrimination based on age and gender is a central feature of Facebook's business model and has helped Facebook to dominate the market for paid advertising in the United States.  For many years, Facebook's paid advertising platform—the source of nearly all of its revenue—and the places where Facebook shows paid advertisements to its users have heavily relied on discriminating against users based on their age and/or gender.  And Facebook has knowingly and greatly profited from this discrimination.

23.     Facebook has long considered and still considers the ability to target advertisements to users based on their age or gender one of the most critical aspects of Facebook's business.  Facebook believes that age and gender are two of the most important characteristics that determine whether an advertisement is "relevant" to any specific Facebook user, and Facebook believes that advertisers share the same view.

24.     Facebook's Chief Operating Officer Sheryl Sandberg has called age and gender targeting of advertisements part of Facebook's "special sauce."  That is, having the ability to target advertisements based on the age and/or gender of Facebook users makes it possible for Facebook and

advertisers to send advertisements only to specific desired audiences and thereby reduce the cost for advertisers to reach customers in these specific targeted audiences and enhance interactions by potential customers in the specific desired audiences with companies' advertisements and business establishments.  These features, which are part and parcel of Facebook's discrimination against older persons and women, have increased the number and volume of financial services advertisements and other types of advertisements that have been purchased and placed on Facebook, and thus have significantly increased Facebook's revenues and profits.

25.     In its 2017, 2018, and 2019 annual reports, Facebook emphasized the importance of making its advertisements "more relevant" to users, stating in its 2018 and 2019 annual reports that one of its two "main revenue growth priorities" is "making our ads more relevant and effective," Facebook's 2019 Annual Report, *supra*, at 44; Facebook's 2018 Annual Report at 35, http://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/a109a501-ed16-4962-a3af-9cd16521806a.pdf, and stating in its 2017 annual report that one of its three main growth priorities is "making our ads more relevant and effective through our targeting capabilities and outcome-based measurement," Facebook's 2017 Annual Report at 34, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/FB_AR_2017_FINAL.pdf.

26.     Although Facebook has repeatedly and misleadingly told the media that "There is no place for discrimination on Facebook," Facebook simultaneously, previously, and subsequently engaged in millions of discrete acts of discrimination in which Facebook denied its older and female users the full and equal accommodations, advantages, facilities, and services of Facebook solely because of their age and/or gender, including the thousands (and possibly hundreds of thousands or millions) of financial services advertisements that Facebook intentionally, knowingly, and purposefully denied to older and female users of Facebook because of their age or gender.

27.     In addition, the notion that there has been no place for discrimination on Facebook is contradicted by the specific statements and directions that Facebook provided to its advertisers about how to properly use age and gender to discriminate against Facebook's users, and the specific actions that Facebook took to mandate that its users provide Facebook with their respective ages and genders, to give advertisers information on the ages and genders of its users so that they and Facebook could

discriminate against Facebook's users, to structure its platforms so that advertisers and Facebook could collectively discriminate against and deny valuable financial services advertisements and other advertisements to older persons and women, and to affirmatively approve, accept payment for, and send such advertisements that discriminated against Facebook's users based on age and/or gender. Ordinary persons who read or heard the statements of Facebook's executives that there is no place for discrimination on Facebook would not reasonably believe that Facebook had previously and intended to subsequently earn substantial portions of its revenues from discrimination based on age or gender (whether lawful or unlawful).

28.     Facebook knows the age and gender of each of its users, because Facebook requires all users to tell Facebook their birth date and gender as a condition of joining Facebook and continuing to use Facebook's services.

29.     After Facebook users join Facebook, the age and gender information that they are required to provide to Facebook is used by Facebook to segregate, classify, categorize, and discriminate against users based on age and gender.

30.     Classifying and segregating Facebook users by age and gender is integral to Facebook's advertising platform, which requires advertisers to use age and gender to define the audience who will be eligible to receive advertisements, and to Facebook's ad delivery algorithm, which, upon information and belief, uses age and gender to determine which Facebook users will actually receive advertisements within any audience selection.  Age and gender classifications and segregation are also integral to Facebook's Lookalike Audiences feature, in which Facebook uses age and gender, among other factors, to create an audience selection that looks like an advertiser's customers.

31.     The primary purpose of Facebook's segregation, classification, and categorization of users based on age and gender is so that Facebook can intentionally, knowingly, and purposefully discriminate against older persons and women in Facebook's accommodations, advantages, facilities, and services, including by making it possible and easy for advertisers and Facebook to target advertisers' financial services advertisements and other types of advertisements to Facebook users based on their age or gender.

32.     As described below, Facebook has several types of tools that it uses to exclude women and older people from receiving advertisements, including financial services advertisements: (1) audience selections that exclude Facebook users from receiving advertisements based on age or sex; (2) Lookalike Audiences in which Facebook determines the audience selection based on Facebook's analysis of a seed audience provided by the advertiser; and (3) Facebook's ad delivery algorithm that determines which users within an audience selection will actually receive the advertisement.  Upon information and belief, all of these tools rely upon segregating, classifying, and discriminating against users— including older persons and women—based on age or sex.

33.     When an advertiser seeks to advertise to Facebook users on Facebook, Instagram, or Messenger, the advertiser is required by Facebook to specify the parameters of the target audience of Facebook users who will be eligible to receive the advertisement ("audience selection").  Once the audience selection is completed, the advertiser determines the image and text of the ad, identifies the Facebook page or other web page to which the ad will link, and purchases a certain number of impressions or clicks.  (An impression occurs every time a Facebook user is shown an ad on Facebook. A click occurs every time a Facebook user clicks on an ad on Facebook.)  Then Facebook sends the advertisement to the Facebook users within the audience selection that the advertiser chose, and, as described below, in doing so Facebook uses an ad delivery algorithm to determine which users will actually receive the advertisement.  Any Facebook user who is not within the relevant audience selection will not have the opportunity to receive that specific paid advertisement.  For example, an audience selection that is targeted to men who are 18 to 40 will never be shown to a woman or a person older than 40.

34.     Every time that Facebook sends an advertisement to Facebook users within an audience selection that excludes persons from receiving advertisements based on a protected status such as age or gender, including the financial services advertisements at issue in this case, Facebook knows that, wants, and intends for the advertisement only to be sent to the persons within the audience selection and Facebook knows that, wants, and intends for the advertisement to be denied to persons who are excluded from the audience selection, including but not limited to advertisements for financial services opportunities.  For example, when an advertiser selects an audience selection of men who are 18 to 40

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

and Facebook places that advertisement, Facebook knows, wants, and intends for the advertisement to only be shown to men who are 18 to 40, and knows, wants, and intends for all women and people older than 40 to not be shown the advertisement.

35.     Once the advertiser tells Facebook the desired audience selection for its ad, Facebook has the complete right, discretion, and ability to not approve or send the advertisement that includes age- or sex-based restrictions, such as the age-restricted and gender-restricted financial services advertisements at issue in this case.  As a result, whenever Facebook approves and sends or publishes an advertisement that is age- or gender-restricted, Facebook is intentionally, knowingly, and purposefully sending or publishing an advertisement that discriminates based on age or gender and that will deny older persons and women the full and equal accommodations, advantages, facilities, and services of Facebook.

36.     When an advertiser determines the audience selection, it is required to make three selections that establish the basic parameters of the audience selection: (1) age; (2) gender; and (3) location.  These audience selection tools are presented to advertisers through drop down menus that make clear to advertisers that they can include or exclude persons with certain ages and/or genders from their audience selections.  These tools classify, categorize, and segregate Facebook users based on their age and/or gender.  Advertisers do not create any of the age, gender, or location tools or information that are available through these drop-down menus.  Facebook solely creates and provides all of this information to the advertisers, first by requiring its users to give this information to Facebook as an explicit condition of signing up for, using, and receiving Facebook's services, and then by arranging the information in Facebook's databases and advertising platform so that advertisers can easily choose to exclude Facebook users from their audience selections based on age or gender.

37.     Facebook users cannot opt out of telling their age or gender to Facebook, and Facebook users cannot opt out of audience selection exclusions that advertisers and Facebook make.  In other words, Facebook users cannot ask Facebook to treat them equally and/or send them advertisements in which the user's age or gender has been excluded by the audience selection.  Nor can Facebook users ask Facebook to treat them equally in terms of age or gender with respect to the creation of Lookalike Audiences or Facebook's ad delivery algorithm.

38.     The audience selection tools on Facebook's advertising platform related to age, gender, and location look like this:



39.     Facebook requires advertisers to select the age of the Facebook users who will receive the advertisement.  The default setting for Facebook ads is 18 to 65+, which means that anyone who is 18-years-old or older would receive the advertisement.  But Facebook strongly encourages advertisers to narrow the age range of the individuals who will receive their advertisements to make them more effective.

40.     Facebook requires the advertiser to select the gender of the Facebook users who will receive the advertisement.  The default setting is all genders.  But Facebook strongly encourages advertisers to narrow the gender of the individuals who will receive their advertisements to make them more effective, including by excluding women from audience selections.

41.     Unlike the prior image that shows an audience selection of persons who are 18 or older of all genders, the following image shows an audience selection restricted to men who are 18 to 40.



AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

42.     In describing how its "detailed targeting" function works for choosing an audience selection, Facebook gives advertisers step-by-step instructions on how to click through the various, pre-populated menus to "include" certain types of people and "exclude" other types of people.

43.     Upon information and belief, Facebook encourages, facilitates, expects, knows, and wants advertisers to routinely exclude older persons and women from their audience selections so that older persons and women will not receive advertisements on Facebook, including advertisements for financial services opportunities.  Facebook encourages, facilitates, enables, approves, and executes on the exclusion of older persons and women from receiving information and advertisements, because such age- and gender-based exclusions are central to Facebook's business model, including because Facebook wants advertisements to be as "relevant" as possible to its users so that users will spend more time on Facebook and allow Facebook to sell and place more paid advertisements on Facebook.

44.     In a training program for advertisers, Facebook strongly encourages advertisers to exclude users based on age and gender in its "Facebook Blueprint" course, which describes "How to Find Your Customers on Facebook."  It states that "When you advertise on Facebook, you have the ability to create an audience.  It's one of the most important and powerful things you can do here. When thinking about your audience and how to build it, consider the types of people who are most likely to be interested in what you're sharing."  *How to Find Your Customers on Facebook*, Facebook, https://www.facebook.com/business/learn/lessons/facebook-ad-audience-considerations.

45.     In Facebook Blueprint, Facebook describes how to set an audience, "That's where you can get specific about who you want to reach.  In other words, the audience for your ad."  *Id.*  The first example that Facebook provides on how to set an audience encourages advertisers to send ads to only men or only women: "Let's start with gender.  If you want, you can choose to reach out to only men or only women.  If you have a bridal dress shop, women might be a better audience for you.  But if you have a shaving and beard grooming business, maybe you'll want to reach out to men."  It proceeds to describe how ads can be targeted to people based on age.  Nowhere in this section of the training does Facebook state that financial services advertisements should not be restricted by age or gender.

46.     In the next section of the training, "How to Choose an Audience for Your Facebook Ad," Facebook states that "To get started creating your audience, think about your business's best

customers.  Are they often of a certain age or gender? . . .  Reach out to these kinds of people first." *Id.* In other words, Facebook encourages its advertisers to determine who they think their best customers are based on age or gender and then send their ads only to those people, thereby excluding people who do not fit the age or gender profile of their best customers.

47.   In addition, on Facebook Business, the website where Facebook instructs and directs advertisers on how to use its audience selection tools to create advertisements, Facebook states that "Our powerful audience selection tools let you show ads to the people who are exactly right for your business." *Find Your Audience*, Facebook, https://www.facebook.com/business/ads/ad-targeting.  It explains that "Facebook Core Audiences helps you select the right recipients for your ad in just a few clicks. Whether you want your ad to be shown to people based on age, location, hobbies, or something else—we can help you connect to people who are likely to be interested in what you offer." *Id.*

48.   One of the chief examples of how to "Reach your core target audience" is "Demographics."  Facebook states that advertisers should "Select an audience based on age, gender, education, relationship status, job title and more." *Id.*  In a prior version of the same Facebook Business page, Facebook provided an illustration of how to reach a core target audience with a box that showed an ad targeting selection to send the ad only to people who were 18 to 34 years old.

49.   In the same Facebook Business center, Facebook provides "4 Tips for Selecting Your Ad Audience," and states that "Audiences can be built based on locations, interests, demographics and other characteristics.  When you create an audience, you'll want to think about the characteristics of people most likely to be interested in your product, service or business and how broad or narrow your audience is." *4 Tips for Selecting Your Audience*, Facebook, https://www.facebook.com/business/learn/lessons/facebook-ad-audience-reach-tips.  (The same four tips are reiterated on Facebook Blueprint's How to Find Your Customers on Facebook guide.)

50.   The first tip Facebook provides is to "Consider your current customer base" and "Think about what they like, how old they are and the interests they have.  This can help you identify audience options that will help you reach people like them on Facebook." *Id.* (emphasis added).  The first example that Facebook provides for this tip is "If the majority of your current customers are women, it might be a good idea to set your audience to reach women and exclude men." *Id.*

51.     Another tip that Facebook offers is to "Watch the audience meter to see whether your audience is too specific or too broad."  *Id.*  When an advertiser is determining its audience selection, a red, green, and yellow "audience meter" tells the advertiser whether its audience is too specific (RED), too broad (YELLOW), or just right (GREEN).  The audience meter looks like this.



52.     When advertisers determine their audience selections, Facebook's audience meter tells the advertiser when the ad is too broad or too narrow.  For example, if all ages and genders are included in an audience selection, the audience meter may tell the advertiser that the audience selection is too broad and point towards the yellow "Broad" area.  However, when the advertiser eliminates persons who are older than 40 from the audience selection or eliminates women from the audience selection, Facebook's audience meter may change from pointing to yellow to pointing to green.  As a result, Facebook's audience meter encourages advertisers to exclude Facebook users based on age and gender from their audience selections.

53.     Even after an advertiser has selected an audience and purchased advertisements on Facebook, Facebook continues to encourage and prod advertisers to exclude persons from advertisers' audience selections based on age and gender.  On a real-time basis, Facebook provides advertisers with information on the age and gender of persons who are clicking on their ads, so that advertisers can see the demographics of persons who seem to be most interested in clicking on and engaging their ads.  Upon information and belief, in turn, advertisers routinely receive this information and further refine their audience selections in ongoing and new ad campaigns to exclude older persons or women, because Facebook has told them that older persons or women are less interested in their advertisements than younger persons or men.  For example, if an advertiser sees that 90% of the people who click on their ads are 44-years-old or younger, the advertiser may decide not to send ads to persons older than 44.

54.     This is not an incidental by-product of Facebook providing such information to advertisers.  The primary reason why Facebook provides this information to advertisers is that Facebook wants and strongly encourages advertisers to exclude persons from their audience selections based on age and/or gender.

55.     There are two additional ways in which Facebook plays a direct role in discriminating against its users based on age and gender.

56.     First, Facebook has created and applied a "Lookalike Audiences" tool in which Facebook determines which users will be in the audience selection for the advertisement.  Under this feature, advertisers provide Facebook with a list of Facebook users whom they believe are the type of customers they want to reach (*i.e.*, the seed audience), and then Facebook applies its own analysis and algorithm to identify a larger audience that resembles the seed audience (*i.e.*, the Lookalike Audience). The Lookalike Audience that Facebook creates is then used as the audience selection of Facebook users who will be eligible to receive the relevant advertisement.

57.     As Facebook itself explains, "[a] Lookalike Audience is a way to reach new people who are likely to be interested in your business because they're similar to your best existing customers. . . We [Facebook] identify the common qualities of the people in it (for example, demographic information or interests). Then, we [Facebook] deliver your ad to an audience of people who are similar to (or 'look like') them."  *Advertising Help Center*, Facebook, https://www.facebook.com/business/help/164749007013531 (last visited March 11, 2020).

58.     Age and gender are two critical pieces of information that Facebook uses to determine which Facebook users resemble the advertiser's seed audience and will, in turn, be included in the Lookalike Audience that Facebook creates based on its own analysis and algorithm.  Because age and gender directly influence which Facebook users will be included in a Lookalike Audience, when an advertiser provides a seed audience that is disproportionately male or younger, it means that the Lookalike Audience that Facebook creates to determine the audience selection will likewise be disproportionately male or younger.  The age and gender data that Facebook uses to build Lookalike Audiences is the same age and gender data that Facebook requires users to provide as a condition of joining Facebook. (Since September 2019, pursuant to a settlement with civil rights and labor groups,

Facebook has removed age and gender from tool that creates Lookalike Audiences *for credit-related advertisements*. But Facebook has not removed age or gender form its tool that creates Lookalike Audience for *other types of financial services advertisements*.

59.     Other than providing the seed audience to Facebook, the advertisers play no role whatsoever in determining which Facebook users will be included in the Lookalike Audience. Facebook exclusively determines which Facebook users resemble the seed audience and will be included in the Lookalike Audience.  Thus, after the advertiser provides Facebook with a list of the Facebook users in its seed audience, the rest of the work to create the Lookalike Audience is done entirely by Facebook.

60.     For example, when an advertiser provides Facebook a list of 1,000 Facebook users in a seed audience, all that the advertiser does is provide that list of 1,000 users to Facebook, and then Facebook does the rest of the work to determine which of the billions of Facebook users most resemble the seed audience of 1,000 users and then create a Lookalike Audience of, say, 100,000 Facebook users who are similar to the users in the seed audience.

61.     A Lookalike Audience can be used as the entire audience selection for an advertisement without any other restrictions or exclusions, or it can be used in conjunction with age or gender exclusions so that the audience selection for the relevant advertisement is the Lookalike Audience narrowed by age, gender, or other targeting options.

62.     When the audience selection for an advertisement has been created with a Lookalike Audience, Facebook's "Why am I seeing this ad" statement will inform the reader of the advertisement that he or she received the advertisement because the advertiser "wants to reach people who may be similar to their customers" or a similar statement.  Upon information and belief, Facebook has created and used thousands of Lookalike Audiences for financial services advertisements, some of which contained an additional layer of age and/or gender exclusions and some of which contained no age or gender exclusions.

63.     Second, Facebook uses, and has used since at least three years prior to the filing of the original complaint through the present, an algorithm to determine which users within a particular audience selection will receive advertisements, including financial services advertisements.

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

64.     For example, if an advertiser chooses an audience selection of 500,000 but only purchases 50,000 impressions to be sent to Facebook users within that audience selection, Facebook must determine which of the 500,000 Facebook users will actually receive the advertisement.  To determine which users with actually receive the advertisement, Facebook applies its "ad delivery algorithm."  That algorithm uses many types of data, including data on the past performance of certain types of advertisements and the ongoing performance of certain advertisements, to determine which users will receive any given advertisement, including financial services advertisements.  The purpose of this algorithm is to optimize an advertisement's audience and the advertiser's goals by showing the advertisement preferentially to the users Facebook believes will maximize Awareness, Consideration, or Conversion scores for the advertisement.  (Awareness is the maximum advertisement views; Consideration is clicks and engagement with the ads; and Conversion is the sales generated by clicks on the advertisement.)

65.     Upon information and belief, Facebook's ad delivery algorithm directly relies upon both the age and gender of Facebook users to determine which users will actually receive any given advertisement, and Facebook uses both the age and gender of its users to determine who will actually receive advertisements *regardless* of whether the advertiser directs Facebook to limit the age or gender of its audience selection.  This means that even when advertisers do not want to discriminate based on age or gender in their ad delivery of financial services advertisements, Facebook itself decides to discriminate and does discriminate based on age and gender, and it does so on behalf of the advertisers, who directly rely on Facebook's ad delivery algorithm for their ad distribution on Facebook.

66.     Moreover, upon information and belief, even when an advertiser expressly limits the age or gender of its audience selection, Facebook's age- and gender-biased ad delivery algorithm still operates in the same way, and will routinely compound the discrimination that the advertiser and Facebook have already approved through explicit age limitations to the audience selection; thus, for example, if an advertisement's audience section is 18 to 55, and thereby excludes all people who are older than 55 from receiving the advertisement, Facebook's ad delivery algorithm will often compound this discrimination by delivering a disproportionate portion of the ad impressions to people who are younger than people who are older within the 18-55 audience selection.  (If an advertiser excludes all

women from its audience selection, the ad delivery algorithm cannot compound the level of gender discrimination, because all women will automatically be excluded from receiving that ad.)

67.     Accordingly, Facebook is not passively or neutrally displaying the content of third parties or even merely following the directions of advertisers on whether to send advertisements to Facebook users based on their age or gender.  Instead, Facebook uses *its own* internal data and analysis to determine which specific people Facebook wants to receive advertisements and which people will actually receive such advertisements.  In this way, Facebook's ad delivery algorithm makes substantive edits, changes, and modifications to the audience selections that advertisers select, and that algorithm develops, integrates, and deploys information about the optimal audience to preferentially send advertisements based on protected characteristics like age and gender, even when the advertiser has not requested preferences based on age or gender for either audience selection or ad delivery. (There is no way for an advertiser to request or direct that Facebook deliver ads in a non-discriminatory manner with respect to age or gender.)

68.     Every time that Facebook utilizes its ad delivery algorithm to determine which users will actually receive advertisements, including financial services advertisements, based on age or gender, Facebook causes, knows that, wants, and intends for the advertisement only to be sent disproportionately to persons who fall into the age or gender demographic profile that Facebook's algorithm believes is the most relevant audience for the advertisement.

69.     Research has revealed that Facebook's ad delivery algorithm results in the type of bias that Plaintiff alleges in this complaint.

70.     In April 2019, an inter-disciplinary team of researchers from Northeastern University, the University of Southern California, and Upturn published the results of a series of experiments they ran using Facebook's ad platform. Muhammad Ali, et al., *Discrimination Through Optimization: How Facebook's Ad Delivery Can Lead to Skewed Outcomes*, 3 Proceedings of the ACM on Human-Computer Interaction, No. CSCW, November 2019, https://www.ccs.neu.edu/home/amislove/publications/FacebookDelivery-CSCW.pdf.  The researchers "observe[d] significant skew in delivery along gender . . .  despite neutral targeting parameters." *Id.* at 199:1.  They found that bias is not the result of the ad buyer's choices, nor the decisions of individual Facebook users.  Instead, it is the result

of Facebook's ad platform making choices about which users Facebook should show the advertisements.  The researchers concluded that "[t]aken together, [the] results paint a distressing picture of heretofore unmeasured and unaddressed skew that can occur in online advertising systems, which have significant implications for discrimination in targeted advertising." *Id* at 199:4.

71.     Over the past three years before the date of the original complaint through the present time, Facebook has routinely and systematically excluded older persons and/or women from its business services by intentionally, knowingly, and purposefully excluding older persons and women from audience selections for thousands of advertisements related to financial services opportunities, and, accordingly denying older persons and women such financial services advertisements because of their age and/or gender.

72.     The following advertisements are examples of where Facebook and financial services companies selected and executed upon age- or gender-restricted audience selections that denied older persons and/or women, including Plaintiff, the full and equal accommodations, advantages, facilities, and services of Facebook and those companies, from three years prior to the date of the original complaint to the present.

73.     In the past year, Webull sent the following advertisement regarding stock trading services only to "**men ages 20 and older** who live in the United States," thereby excluding all female Facebook users in the United States from receiving this advertisement.  This advertisement relied upon Facebook's age-and gender-biased ad delivery algorithm described above.  Ms. Opiotennione was excluded from receiving this advertisement because of her gender.




AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

74.     In the past year, Partbnb sent the following advertisement regarding investment in Airbnb properties only to "**men ages 30 to 50** who live or were recently in the United States," thereby excluding all female Facebook users and all persons older than 50 in the United States from receiving this advertisement.  In addition to the advertiser's audience selection of "men ages 30 to 50," the audience selection of this advertisement was based on a Lookalike Audience that Facebook created for the advertiser who purchased this advertisement.  And this advertisement relied upon Facebook's age- and gender-biased ad delivery algorithm described above.  Ms. Opiotennione was excluded from receiving this advertisement because of her gender and her age.

 

75.     In the past year, Ladder sent the following advertisement regarding life insurance only to "**people ages 25 to 45** who live in the United States," thereby excluding all Facebook users older than 45 in the United States from receiving this advertisement.  In addition to the advertiser's audience selection of "people ages 25 to 45," the audience selection of this advertisement was based on a Lookalike Audience that Facebook created for the advertiser who purchased this advertisement.  And this advertisement relied upon Facebook's age-and gender-biased ad delivery algorithm described above.  Ms. Opiotennione was excluded from receiving this advertisement because of her age.

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC




76.     In the past year, AAFMAA sent the following advertisement regarding personal loans only to "**people ages 24 to 40** who live in the United States," thereby excluding all Facebook users older than 40 in the United States from receiving this advertisement.  This advertisement relied upon Facebook's age-and gender-biased ad delivery algorithm described above.  Ms. Opiotennione was excluded from receiving this advertisement because of her age.




77.     All examples of the advertisements above were published within the last twelve months.

78.     When Facebook displays an advertisement on a Facebook user's News Feed or other page on behalf of an advertiser, Facebook informs the Facebook user why the person has been selected to receive that particular advertisement, in a portion of the advertisement called "Why am I seeing this ad."  For example, in the images above, the "Why am I seeing this ad" portion of the advertisement tells the Facebook user that the person has received the advertisement because the advertiser wants to

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

reach "men" to the exclusion of women, or wants to reach people in a certain age range that necessarily excludes older persons (such as 25-45). Although advertisers may in some cases know that Facebook is making such an age- or gender-based statement to Facebook's users in the "Why am I seeing this ad" portion of the advertisement, this statement is created, developed, and made by Facebook, and Facebook has complete discretion on whether to make the "Why am I seeing this ad" statement and on the relevant content and images in the statement.

79.     These age-based and gender-based statements are calculated and intended by Facebook to encourage individuals in a younger age range or men to click on the advertisement and apply for the services offered. They are calculated and intended to discourage older individuals outside the desired age range and women to apply for the services offered. In fact, research shows that people who click on the "Why am I seeing this" portion of paid advertisements on Facebook are more likely to engage with and click on advertisements when they are told that they are seeing the advertisements because of information they have provided to Facebook, such as age or gender. Moreover, these advertisements have the effect of encouraging only certain younger individuals and men to pursue these opportunities.

80.     For at least the past three years before the original complaint was filed through the present, Facebook has known that it was denying these and other types of financial services opportunities to tens of millions of older persons and women on its platform, and Facebook intended and wanted to discriminate against older persons and women in denying such opportunities on Facebook. Every time Facebook and an advertiser published a financial services advertisement to Facebook users that excluded older persons or women from receiving the advertisements, Facebook and the advertiser knew, intended, and wanted those persons to be excluded from or discriminated against in Facebook's business establishment and those of the third-party advertisers. In doing so, Facebook knew, intended, and wanted older persons and women to not receive the full and equal enjoyment of Facebook's services and instead to receive inferior treatment vis-à-vis younger persons and men.

81.     In addition to knowing for years that its own advertising and business services were being provided in a discriminatory way towards older persons and women with respect to financial services opportunities, Facebook has long been on specific notice that Facebook and financial services

companies were discriminating in providing advertising and business services relating to financial services to older persons and women.

82.     In early 2017, Facebook created a "classifiers" program that identifies which ads are likely to be credit, housing, or employment related.  Facebook initially created the classifiers program to block advertisers from excluding Facebook users based on their perceived race using Facebook's "Ethnic Affinity" categories.  Facebook created this classifiers program to prevent the exclusion of Facebook users in certain "Ethnic Affinity" categories in response to an October 2016 ProPublica report that demonstrated that Facebook users whom Facebook had identified as having the "Ethnic Affinity" of African American, Hispanic, or Asian American could be "illegal[ly]" and "blatant[ly]" excluded from housing-related advertisements in violation of the federal Fair Housing Act.  Julia Angwin & Terry Parris Jr., *Facebook Lets Advertisers Exclude Users by Race*, ProPublica (Oct. 28, 2016), https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race.

83.     As a result, since early 2017 Facebook has specifically known every time that financial services companies were seeking to purchase credit-related advertisements, including when such advertisements would exclude Facebook users based on age or gender.  Upon information and belief, prior to September 2019, Facebook knowingly and intentionally approved, sold, and sent thousands of credit-related advertisements in which older persons and women were excluded, and Facebook took no action to stop this practice in spite of its knowledge that these advertisements might violation various federal, state, and/or local laws.

84.     In September 2019, pursuant to a settlement of several separate civil rights actions, Facebook adopted new rules designed to prevent advertisers from using age, gender, and other protected statuses to exclude Facebook users from receiving credit, housing, and employment related advertisements.  As a result, since September 2019 advertisers who wanted to advertise credit-related opportunities have been required to create those advertisements in a special portal that does not allow age or gender targeting, and an enhanced classifiers program has attempted to block credit advertisements that were created outside of the portal and use age or gender restrictions.  (Because Facebook's classifiers system is both underinclusive and overinclusive in identifying credit-related

advertisements, it is possible that credit-related advertisements that exclude users based on age or gender have been, are still being, and will be published on Facebook in the future.)

85.     The new changes that Facebook began to implement in September 2019 only apply to credit, housing, and employment advertising, and they do not apply to financial services advertisements that are not credit-related—such as bank accounts, insurance, financial services consulting, and investments.  As a result, at least until September 2019, Facebook did nothing to stop its own denial of all types of financial services advertisements and information to older persons and women within Facebook's business establishments or those of its financial services advertisers, and since September 2019 Facebook has done nothing to stop its own denial of non-credit-related financial services advertisements and information to older persons and women.

86.     The prior settlement and Facebook's actions to implement the settlement demonstrate that Facebook has always had the capacity to provide full and equal services to its users and to not discriminate against its users based on age or gender. But Facebook has intentionally, knowingly, and purposefully denied equal opportunity to older people and women with respect to Facebook's services, especially with respect to the service of financial services opportunities and advertisements.

87.     One of the primary benefits that Facebook users receive from Facebook is the opportunity to receive advertising and information about economic opportunities, especially financial services opportunities.  Facebook users receive this benefit by having Facebook place paid advertisements (*i.e.*, sponsored posts) on Facebook users' "News Feeds" and other places where each Facebook user interacts with Facebook's applications.  When Facebook users are provided these advertisements, they learn about opportunities, including financial services opportunities, that they otherwise would not have learned about, and then can pursue those opportunities by clicking on the advertisements and interacting with the advertisers' online and offline business establishments. Financial services companies place advertisements on Facebook users' pages because they believe that it is an effective form of advertising that will cause many Facebook users to click on their advertisements and interact with their online and offline business establishments to do business with them.

88.     Each Facebook user receives a unique set of paid advertisements that Facebook, in conjunction with advertisers, decides to place on Facebook users' own Facebook pages.  When Facebook, in conjunction with advertisers, decides to deny older persons and/or women paid advertisements about valuable financial services opportunities, Facebook users are denied one of the primary benefits or advantages of Facebook's accommodations, facilities, and services.

89.     In addition, when Facebook encourages advertisers to deny their valuable financial services advertisements to older persons and women, gives financial services companies the ability to exclude older persons and women from receiving their advertisements, and knowingly places advertisements for financial services opportunities that exclude older persons and women, Facebook aids and abets financial services companies in denying older persons and women the full and equal accommodations, advantages, facilities, and services of their own business establishments.

90.     Most financial services companies that advertise on Facebook and discriminate against older persons and/or women have business establishments both online and in the real world.  Every financial services company that advertises on Facebook has an online business establishment, because each company either has its own Facebook page within Facebook's domain or has its own web page outside of Facebook's domain to which the company's advertisements link and encourage Facebook users to interact with in order to transact business.

91.     Ms. Opiotennione has searched for housing/or and financial services opportunities during the three years prior to the date of the original complaint through the present, including by using Facebook.  In doing so, Ms. Opiotennione was interested in receiving advertising and information about loans, insurance, bank accounts, and other financial services opportunities via advertisements on her News Feed on Facebook.  She would have clicked on advertisements for mortgages, personal loans, insurance (including car insurance), bank accounts, and/or other financial services opportunities with beneficial terms had she received such advertisements on her News Feed.  However, Facebook and various financial services companies have routinely used Facebook's audience selection tools, Facebook's Lookalike Audiences, and Facebook's ad delivery algorithm to exclude older persons and women from receiving advertisements for financial services opportunities and have regularly denied Ms. Opiotennione advertisements and information about financial services opportunities by excluding

her from receiving Facebook advertisements about those opportunities, including the types of financial services advertisements she would have clicked on and pursued, such as mortgages, personal loans, insurance, bank accounts.  Upon information and belief, by being denied information and advertising about financial services opportunities on Facebook, Ms. Opiotennione and the members of the putative class were denied the full and equal accommodations, advantages, facilities, and services of Facebook and the financial services companies that denied her valuable advertising and information.

92.     In addition to delivering financial services advertisements that are entirely denied to older persons of certain ages and women, Facebook has taken further actions, wholly separate from the requests made by Facebook's advertisers, that are designed to and do further discriminate based on age and gender in delivering financial services advertisements it its users.

93.     First, upon information and belief, Facebook has created thousands (if not tens or hundreds of thousands) of Lookalike Audiences for financial services advertisements and in doing so Facebook directly used age and gender to determine which Facebook users were in the Lookalike Audiences; and, in many of these cases, the Lookalike Audiences skewed the composition of the Lookalike Audiences so that younger and male Facebook users were a far larger and disproportionate percentage of the audience selection than older and female Facebook users.  This resulted in Plaintiff and other older and female members of the proposed National or District of Columbia Class being less likely to receive financial services advertisements that were sent to a Lookalike Audience, and thus being denied financial services advertisements based on their age and/or gender.  Had they received such advertisements, Plaintiff and members of the proposed National or District of Columbia Class would have clicked on them and pursued such opportunities.

94.     Second, upon information and belief, from three years prior to the date of the original complaint through the present, Facebook has applied its age- and gender-biased ad delivery algorithm to deny millions of financial services ad impressions to older and female Facebook users based on their age and/or gender, in many cases when advertisers did not tell Facebook they wanted to discriminate against Facebook users based on age or gender, and in the rest of the cases where advertisers *did* direct Facebook to exclude Facebook users from their audience selections based on age and/or gender.

95.     Just as the explicit exclusions of Facebook users from receiving ads based on age and/or gender, Facebook's age- and gender-biased ad delivery algorithm relies upon, analyzes, and applies the age and gender information that Facebook mandates that its users provide to Facebook.  Likewise, the algorithm relies upon segregating, classifying, and discriminating against its users based on age and/or gender.  It would not be possible for Facebook's age- and gender-biased ad delivery algorithm to use age or gender to determine which users receive financial services advertisements and other types of advertisements without Facebook requiring its users to identify their age or gender.  Likewise, it would not be possible for Facebook's audience selections or Lookalike Audiences to exclude Facebook users based on their age or gender without Facebook requiring its users to identify their ages and genders.

96.     Upon information and belief, Facebook uses, and has used since at least three years prior to the filing of the original complaint through the present, an algorithm to determine which users within a particular audience selection will receive financial services advertisements, as well as other types of advertisements.  To determine which users with actually receive the advertisement, Facebook applies its "ad delivery algorithm."  That algorithm uses many types of data, including data on the past performance of certain types of ads and the ongoing performance of certain ads, to determine which users will receive any given advertisement, including financial services advertisements.

97.     Upon information and belief, Facebook's ad delivery algorithm directly relies upon both the age and gender of Facebook users to determine which users will actually receive any given ad, and Facebook uses both the age and gender of its users to determine who will actually receive ads *regardless* of whether the advertiser directs Facebook to limit the age or gender of its audience selection.

98.     Just as the explicit exclusions of Facebook users from receiving ads based on age and/or gender, Facebook's age- and gender-biased ad delivery algorithm relies upon, analyzes, and applies the age and gender information that Facebook mandates that its users provide to Facebook.  Likewise, the algorithm relies upon segregating, classifying, and discriminating against its users based on age and/or gender.  It would not be possible for Facebook's age- and gender-biased ad delivery algorithm to use age or gender to determine which users receive financial services ads and other types of ads without Facebook requiring its users to identify their ages or genders.  Likewise, it would not be possible for

Facebook's audience selections to exclude Facebook users based on their age or gender without Facebook requiring its users to identify their ages or genders.

99.     Upon information and belief, because of Facebook's discriminatory acts described above—including explicit exclusions based on age and gender and Facebook's age- and gender-biased ad delivery algorithm—Ms. Opiotennione and members of the proposed National or District of Columbia Class have each been denied solely based on their age and/or gender thousands of financial services advertisements on Facebook that they would have been interested in receiving in order to consider pursing such financial service opportunities and, in turn, pursue many of them—advertisements that Facebook and financial services companies provided to millions of similarly situated younger persons and men.

100.     Although the denial of *each* of these financial services advertisements due to Facebook's discrimination constituted a denial of the full and equal accommodations, advantages, facilities, and services of Facebook, Facebook's routine, ordinary, and standard pattern or practice of denying such financial services advertisements to Ms. Opiotennione and members of the proposed National or District of Columbia Class and classifying, segregating, and denying equal treatment to older persons and women in structuring and implementing its advertising platform has resulted in a widespread denial of the full and equal accommodations, advantages, facilities, and services of Facebook to older persons and women.

101.     Although each incident in which Ms. Opiotennione and the members of the proposed National or District of Columbia Class were denied financial services advertisements because of their age or gender constitutes a denial of the full and equal accommodations, advantages, facilities, and services of Facebook, upon information and belief this pattern or practice of denying financial services advertisements based on age and gender has caused older persons and women overall or on average to receive fewer and less valuable financial services advertisements on Facebook than similarly situated younger persons and men, respectively.  As a result, younger persons and men have received a greater number and more valuable financial services advertisements than similarly situated older persons and women.

102.     Upon information and belief, in the vast majority of cases, the age-restricted financial advertisements that Facebook denied to older persons were not part of a parallel advertising campaign in which Facebook delivered the same advertisement or a similar advertisement from the same advertiser to both older persons and younger persons, but instead Facebook completely denied the same or similar financial services advertisements to older persons.  Nor did the vast majority of these age-restricted financial services advertisements relate to a financial services opportunity in which age was legitimately relevant to the opportunity, such as an opportunity that could be lawfully provided only to persons of certain ages, whether younger or older.  Upon information and belief, Facebook has known that the age of users is not relevant in any way to the vast majority of age-restricted financial services advertisements that Facebook has published, and such distinctions made by Facebook in these instances are based on unfair, harmful, and arbitrary age-based stereotypes.

103.     Upon information and belief, in the vast majority of cases, the gender-restricted financial advertisements that Facebook denied to women were not part of a parallel advertising campaign in which Facebook delivered the same advertisement or a similar advertisement from the same advertiser to both men and women, but instead Facebook completely denied the same or similar financial services advertisements to women.  Nor did the vast majority of these gender-restricted financial services advertisements relate to a financial services opportunity in which gender was legitimately relevant to the opportunity, such as an opportunity that could be lawfully provided only to persons of a certain gender, whether male or female.  Upon information and belief, Facebook has known that the gender of users is not relevant in any way to the vast majority of gender-restricted financial services advertisements that Facebook has published, and such distinctions made by Facebook in those instances are based on unfair, harmful, and arbitrary gender stereotypes.

104.     Upon information and belief, Facebook's age- and gender-biased ad delivery algorithm has not take any action to balance discrimination against specific groups in one advertisement with discrimination in favor of that group in other advertisements (*i.e.*, Facebook's algorithm does not engage in parallel or balanced advertising for certain types of valuable advertisements like financial services).  Nor does Facebook's Lookalike Audiences take any such action to balance discrimination

against specific groups in one Lookalike Audience with discrimination in favor of that group in other advertisement.

105.    Ms. Opiotennione and members of the proposed National or District of Columbia Class have been harmed in numerous ways by Facebook's violations of California law and District of Columbia law, including due to Facebook's failure to provide them with the full and equal accommodations, advantages, facilities, and services of Facebook.  Their harm include economic or monetary harm based on the loss of valuable financial services opportunities, harm based on the denial of information that is one of the key benefits that Facebook provides to its customers, harm based on segregation and stigmatization, and harm based on making it harder for older persons and women to learn about and compete for financial services opportunities.

106.    Ms. Opiotennione and members of the proposed National or District of Columbia Class have suffered economic and/or monetary losses.  Had Plaintiff and the class members received equal services from Facebook, including non-discriminatory advertising of financial services opportunities, they would have clicked on advertisements for financial service opportunities and pursued those opportunities, leading to them obtaining cheaper, better, or more appropriate financial services than they otherwise did or otherwise supplementing the financial services that they had at that time.

107.    During the three year period prior to the date of the original complaint through the present, if Ms. Opiotennione had received financial services advertisements for mortgages, insurance (such as car insurance), personal loans, and bank accounts that were sent to similarly situated younger persons or men, she would have clicked on the ads, applied for such opportunities (for which she was qualified), and obtained cheaper, better, more appropriate, or supplemental financial services.  During the same period of time, Ms. Opiotennione has been denied such advertisements for mortgages, insurance (such as car insurance), personal loans, and bank accounts by Facebook and/or advertisers due to practices described in this complaint.

108.    During the same period of time, Ms. Opiotennione was denied the following advertisement for a rewards-based debit card from Aspiration that she would have been interested in receiving in order to consider pursuing the opportunity.  She was denied the advertisement because the advertisement was only sent to "people ages 25 to 44," and excluded people older than 44 from

receiving this advertisement.  Upon information and belief, this advertisement is only one example of numerous advertisements for debit cards and other financial services opportunities that were denied to Ms. Opiotennione because of her age.  This advertisement relied upon Facebook's age-and gender-biased ad delivery algorithm described above.




109.    During the same period of time, Ms. Opiotennione was denied the following two advertisements for bank accounts that she would have been interested in receiving in order to consider pursuing the opportunities.  She was denied the first advertisement because the advertisement was only sent to "males, ages 20 to 50," and excluded all women and people older than 50 from receiving this advertisement.  She was denied the second advertisement, because the advertisement was only sent to "people, ages 19 to 44," and excluded all people older than 44 from receiving the advertisement. Upon information and belief, these advertisements are only two examples of numerous advertisements for bank accounts and other financial services advertisements that were denied to Ms. Opiotennione because of her age and/or her gender.  These advertisements relied upon Facebook's age-and gender-biased ad delivery algorithm described above.

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC







110.   Ms. Opiotennione and members of the proposed National or District of Columbia Class have been harmed by virtue of being segregated, classified and treated in an unequal, stereotypical, and arbitrary manner by Defendant compared to younger persons and men, because of their age and/or gender. Facebook's discriminatory conduct towards Ms. Opiotennione and members of the proposed National or District of Columbia Class perpetuated archaic and stereotypic notions about the undesirability of older person and women, and stigmatized older persons and women as innately inferior and less worthy of providing accommodations and services, including financial services opportunities.  Ms. Opiotennione and members of the proposed National or District of Columbia Class have been harmed and continued to be harmed by knowing that in order to use Facebook's services they will be arbitrarily and stereotypically segregated and classified based on age and/or gender by

Facebook and denied equal opportunity in the area of financial services opportunities based on such discriminatory bases.

111. In fact, nearly five months after Ms. Opiotennione filed the original complaint demanding that Facebook stop segregating, classifying, stereotyping, discriminating against, and causing harm to older people and women based on age and/or gender, Facebook has continued require its users to tell Facebook their age and gender, has knowingly and purposefully profited from publishing thousands of financial services ads that expressly excluded older people and women, has not taken any action to eliminate age and gender from the Lookalike Audiences that Facebook creates (other than the changes to Lookalike that Facebook made for credit-related advertisements pursuant to the March 2019 settlement), and has not taken any action to eliminate age and gender from its biased ad delivery algorithm.

112. Moreover, both before and after the filing of the complaint, Facebook has made millions of discriminatory statements in the "Why am I seeing this ad" portion of financial services advertisements that informed Facebook users that financial services companies and Facebook had sent them such advertisements because of their age or gender, conveying a stereotype to millions of Facebook users that men and younger people are more desirable customers for financial services opportunities and that women and older people are less desirable for such opportunities.

113. And in responding to the complaint in this action, Facebook doubled down on its view that it is not only appropriate but *desirable* to classify, segregate, stereotype, and discriminate against its female and older users based on age and gender, including in denying financial services advertisements to older people and women.  Facebook's approval of age and gender stereotyping and its sustained, purposeful discrimination against Ms. Opiotennione and millions of other Facebook users due to their age and gender has stigmatized and otherwise caused non-economic harm to Ms. Opiotennione and millions of other Facebook users.

114. Ms. Opiotennione and members of the proposed National or District of Columbia Class have been harmed, because Facebook's discrimination made it harder for older persons and women to compete for and obtain financial services opportunities and thereby secure the economic and non-economic benefits and security of such financial services opportunities.  When Facebook purposefully

directs financial services advertisements to men to the exclusion of women, and when Facebook purposefully directs financial services advertisements to younger people to the exclusion of older people, it gives men and/or younger people an advantage over women and/or older people in learning about, pursuing, and obtaining the financial services opportunities associated with those advertisements. In many cases, there are limited opportunities for people to apply for and secure financial services opportunities, and by providing information about those opportunities only to men and/or younger people in Facebook advertisements, it makes it harder for women and/or older people, including Ms. Opiotennione, to learn about and compete for those opportunities. Likewise, in many cases the financial services opportunities will change or no longer be available to anyone if a person does not take immediate action to apply for and secure the opportunity, and by providing information about those opportunities only to men and/or younger people in Facebook advertisements, it makes it harder for women and/or older people, including Ms. Opiotennione, to learn about and compete for those opportunities in a timely manner. In many cases, Ms. Opiotennione and other members of the proposed National or District of Columbia Class would not hear about such opportunities other than by receiving a paid advertisement via Facebook. If Ms. Opiotennione other members of the proposed National or District of Columbia Class had been able to fairly compete with men and younger people, they would have had a much greater chance of securing cheaper, better, or more appropriate financial services than they otherwise did from three years prior to the date of the original complaint through the present.

115. To the extent that standing beyond Article III of the Constitution is required in this action, Ms. Opiotennione and members of the proposed National or District of Columbia Class have statutory standing under the Unruh Act and section 51.5 of the California Civil Code, and the DCHRA and DC CPPA, because they are consumers whom these statutes confer rights and causes of action and they were actually subjected to Facebook's discriminatory practice of denying them the full and equal accommodations, advantages, facilities, and services of Facebook, including by classifying and segregating Plaintiff and other members of the proposed National or District of Columbia Class based on their age and/or gender, providing information on the age and/or gender of Plaintiff and other members of the proposed National or District of Columbia Class to advertisers for the explicit purpose

and goal of discriminating against them, and denying Plaintiff and other members of the proposed National or District of Columbia Class at least thousands of financial services ads that Facebook and its advertisers provided to similarly situated younger and male Facebook users.

116.    Facebook aided and abetted numerous financial services companies, including the companies that paid Facebook to publish the advertisements identified in this Complaint, such as Webull, Partbnb, Ladder, AAFMAA, and Chime ("the Companies"), in denying older persons and/or women the full and equal accommodations, advantages, facilities, and services of their business establishments based on age or gender, and in discriminating against, boycotting, and refusing to provide services to older persons and women based on age or gender, in violation of the Unruh Act and section 51.5 of the California Civil Code, and in violation of the DCHRA and/or the DC CPPA.

117.    By sending the age-restricted and/or gender-restricted financial services advertisements identified in this Complaint and other similar advertisements, the Companies violated the Unruh Act and section 51.5 of the California Civil Code, and the DCHRA and/or the DC CPPA by denying older persons and women the full and equal accommodations, advantages, facilities, and services of their own business establishments based on age or gender.  These companies' business establishments include their own web sites and/or Facebook pages from which the companies purchased discriminatory age-restricted or gender-restricted advertisements about their business establishments and to which those advertisements directed Facebook users in a discriminatory manner.

118.    Each time that Facebook and a company excluded older persons or women from receiving financial services advertisements and information on Facebook, Facebook:  (1) knew the identity of the violating company, including the Companies; (2) knew that the company was violating the Unruh Act, section 51.5 of the California Civil Code, the DCHRA and/or the DC CPPA by classifying, categorizing, segregating, stereotyping and discriminating its customers based on age or gender and/or by excluding persons based on age and gender from their business establishments located in and outside of Facebook's domain; (3) assisted the companies in their violations by providing discriminatory tools for the segregation, classification, and exclusion to occur, expressly approving of the age or gender exclusion, and publishing the financial services advertisements with the express goal of excluding older persons and women; and (4) encouraged each company to use such age

and gender exclusions, including through its educational materials on how to advertise to the right audience and its audience meter.

119.    All of the National Class Members experienced harm in the states where they reside and/or have used Facebook and felt the effects of Facebook's discrimination in the states where they reside and/or have used Facebook, including Plaintiff Opiotennione who experienced harm and felt the effects of Facebook's discrimination in the District of Columbia where she resides.

120.    However, nearly all of the actions challenged, and the most significant actions, in this complaint occurred in California at Facebook's headquarters and servers in Menlo Park, California, and the conduct that gave rise to facial violations of the Unruh Act and section 51.5 of the California Civil Code occurred in California.

121.    Upon information and belief, Facebook's California-based executives and personnel made, developed, and implemented at *its California headquarters* and on its California-based servers and web site(s) (1) Facebook's policy for requiring all users to provide age and gender information as a condition of using Facebook and its services, (2) Facebook's policy for segregating and classifying users based on age and gender, (3) Facebook's policy for giving advertisers the age and gender information and the ability to use that information to exclude women and older people from receiving advertisements, including financial services advertisements, (3) Facebook's materials that encourage and instruct advertisers on how to exclude users from advertisements based on age and gender, (4) Facebook's policies on Lookalike Audiences, including the use of age and gender in creating such Lookalike Audiences, and (5) Facebook's policies on its biased ad delivery algorithm, including the use of age and gender in determining which advertisements are sent to specific users.

122.    In addition, upon information and belief, Facebook (1) has received payment for all advertisements, including financial services advertisements, at its headquarters and servers in California, (2) has received, approved, and implemented the directions of advertisers to exclude women and older persons from receiving advertisements, including financial services advertisements, at its headquarters in California, and (3) withheld from women and older persons advertisements, including financial services, advertisements, that Facebook sent from its California headquarters and servers to Facebook users in California and throughout the nation.

123.    The classification, segregation, and discrimination that violated the rights of Plaintiff and the proposed National Class members has occurred in California before any advertisements were ever sent from Facebook's California-based headquarters and servers to users in California and other states and the District of Columbia.  Even before discriminatory financial services advertisements have been created or sent to a user, Facebook has collected and stored age and gender data on its customers in California, has classified and segregated its users based on age and gender in its own databases and ad platforms that were developed and operate in California, has approved, created, and received payment for age-restricted and gender-restricted advertisements in California, has created the Lookalike Audiences in California, and has decided in California which users will actually receive each advertisement by applying its ad delivery algorithm that is based in California.

## CLASS ALLEGATIONS

124.    Plaintiff Opiotennione brings each of her claims set forth herein pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed National Class:

> All Facebook users in the United States who on or after October 31, 2016 through the date of judgment in this action (1) were women of any age or people who were at least 40 years old on or after October 31, 2016; (2) did not inform Facebook that they were uninterested in receiving advertisements about financial services opportunities; and (3) were excluded or will be excluded due to their age or gender from the audience selection of one or more advertisements related to financial services opportunities, including bank accounts, insurance, financial services consulting, investments, and credit.

125.    Not included in the National Class are the following individuals and/or entities: Facebook's officers and directors and all judges assigned to hear any aspect of this litigation, as well as their staffs and immediate family members.

126.    If the Court holds that the Unruh Act and section 51.5 of the California Civil Code do not apply to Plaintiff and other non-California residents, the class definition shall be limited to the following proposed District of Columbia Class:

> All Facebook users in the District of Columbia who on or after October 31, 2016 through the date of judgment in this action (1) were women of any age or people who were at least 40 years old on or after October 31, 2016; (2) did not inform Facebook that they were uninterested in receiving advertisements about financial services opportunities; and (3) were excluded or will be excluded due to their age or gender from the audience

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

selection of one or more advertisements related to financial services opportunities, including bank accounts, insurance, financial services consulting, investments, and credit.

127.    Not included in the District of Columbia Class are the following individuals and/or entities: Facebook's officers and directors and all judges assigned to hear any aspect of this litigation, as well as their staffs and immediate family members.

128.    **Numerosity.** The National or District of Columbia Class is so numerous that joinder of all members is impracticable.  The exact size of the class is not known.  Upon information and belief, the National Class consists of millions of Facebook users, and those users are geographically dispersed throughout the United States.  The District of Columbia Class consists of tens of thousands or more Facebook users.

129.    **Commonality.**  There are numerous questions of law or fact that are common to the National or District of Columbia Class members.  Upon information and belief, the class members were subjected to and injured by the same pattern, practice, or policy of denying older persons and/or women the full and equal accommodations, advantages, facilities, and services by Facebook and by Facebook's aiding and abetting financial services companies in doing the same with respect to their businesses, including by classifying, categorizing, and segregating them based on age and/or sex for the purpose of denying them equal opportunities and/or denying older persons and women advertisements and information about financial services opportunities based on their age and/or sex.

130.    The questions of law or fact that are common to the National or District of Columbia Class members include:

a.      Did Facebook on a nationwide basis require users to identify their ages and genders, and allow advertisers to exclude persons from their audience selections based on age or gender?

b.      Were Plaintiff and other members of the National Class classified, categorized, stereotyped, and segregated by Facebook based on their age or gender?

c.      Did Plaintiff and other members of the National Class inform Facebook that they were uninterested in receiving advertisements about financial services opportunities?

d.      Were Plaintiff and other members of the National Class excluded from receiving advertising and information about financial services opportunities because of their age or gender and

denied the right to the full and equal accommodations, advantages, facilities, and services of Facebook in violation of the Unruh Act and section 51.5 of the California Civil Code?

e.      Did Facebook aid and abet financial services companies in denying Plaintiff and the members of the National Class their right to full and equal accommodations, advantages, facilities, and services of those companies in violation of the Unruh Act and section 51.5 of the California Civil Code?

f.      With respect to the District of Columbia Class, did the same pattern, practice, and/or policy violate the District of Columbia Human Rights Act ("DCHRA") and the District of Columbia Consumer Protection and Procedures Act ("DC CPPA"), and did Facebook's statements constitute a violation of the DC CPPA?

g.      What types of injunctive and/or declaratory relief should be ordered with respect to Facebook's past and ongoing pattern, practice, and/or policy, and what damages or penalties should be awarded to Plaintiff and the members of the National or District of Columbia Class?

131.    **Typicality.**  The claims of the Named Plaintiff are typical of the claims of the National or District of Columbia Class members whom she seeks to represent.  The claims of the Named Plaintiff arise from the same pattern, practice, and/or policy and rely upon the same legal theories that the challenged pattern, practice, and/or policy violates California's Unruh Civil Rights Act, section 51.5 of the California Civil Code, the DCHRA, and the DC CPPA.

132.    **Adequacy.**  The Named Plaintiff will adequately represent the members of the National or District of Columbia Class, does not have any conflicts with the other members of the National of District of Columbia Class, and is represented by experienced counsel who have substantial experience in civil rights and class action litigation and who will vigorously prosecute the action on behalf of the class members.

133.    **Predominance.**  The questions of law and fact common to the members of the National or District of Columbia Class predominate over questions affecting individual class members, and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

134.   **Superiority.**  By resolving the common issues described above in a single class proceeding, each member of the proposed National or District of Columbia Class will receive a determination of whether Facebook engaged in a pattern, practice, or policy of denying older persons and women the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment based on their age and/or gender and whether Facebook aided and abetted financial services companies in doing the same with respect to their business establishments.

135.   Concentration of the litigation in this forum is desirable, as this action challenges a company-wide practice, it will benefit the class members to have all of the class members' claims adjudicated in a single proceeding, and Facebook's Terms of Service require all Facebook users to file suit in this District and bring all of their state law claims under California law.  This class action can be managed without undue difficulty.

## COUNTS

### FIRST CLAIM FOR RELIEF
### Age and Sex Discrimination
### (Unruh Civil Rights Act, Cal. Civil Code §§ 51, 52(a))
### On Behalf of Plaintiff and the National Plaintiff Class

136.   Plaintiff realleges and incorporates by reference all other paragraphs as alleged above.

137.   The California Unruh Civil Rights Act provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).

138.   The list of protected classes in the Unruh Act is not exclusive and extends beyond the protected classes enumerated in the law.  Accordingly, California appellate courts have held that "the Unruh Act proscribes arbitrary discrimination based on an individual's age—a personal characteristic similar to the classifications enumerated in the Act." *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1145 (Ct. App. 2018).

139.   "The purpose of the [Unruh] Act is to create and preserve a nondiscriminatory environment in California business establishments by banishing or eradicating the arbitrary, invidious discrimination by such establishments. The Act stands as a bulwark protecting each person's inherent right to full and equal access to all business establishments.  In enforcing the act, courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses. The act must be construed liberally in order to carry out its purpose." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1025 (2019).

140.   Facebook is a business establishment under the Unruh Act, because it has a fixed location of business in California; it has an online place of business that sells good and services to consumers throughout California; its primary purpose and goal in operating Facebook is to conduct business, generate revenue, and earn profit; and it earns billions of dollars in revenues from its business activities in California.

141.   The Unruh Act applies to business transactions and services that are conducted via the internet, as well as internet-related conduct that is related to the activities of traditional brick-and-mortar establishments that have fixed, traditional presences.

142.   Plaintiff and the putative National Class members, older and female Facebook users located throughout the United States, bring this claim under the Unruh Act, because Facebook's Terms of Service require all of them to enforce any disputes related to Facebook's products under California law, including the Unruh Act, in this federal district court.

143.   As described above, Facebook has intentionally, knowingly, and purposefully engaged in a number of discriminatory practices that deny older persons and women the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment, including but not limited to classifying, categorizing, and segregating its users by age and gender; encouraging and enabling Facebook's advertisements to exclude older persons and women from receiving advertisements and information about valuable financial services opportunities; and excluding older persons and women from receiving such advertisements and information by acting upon the requests of its advertisers, by Facebook's Lookalike Audiences that use age and gender to create the audience selection, by using Facebook's age- and gender-biased ad delivery algorithm to decide which users

will actually receive advertisements and information, and by making discriminatory statements in financial services advertisements on the desirability of Facebook's users based on age and gender that encourage men and younger persons to pursue financial services opportunities and discourage women and older persons from doing the same.

144.   In addition, as described above, Facebook has aided and abetted financial services companies in violating section 51(b) of the California Civil Code.  Facebook's advertisers have themselves violated the Unruh Act by intentionally, knowingly, and purposefully excluding older persons and women from receiving their advertisements and information about valuable financial services opportunities.  Facebook has aided, abetted, and incited such violations.  Thus, Facebook is liable for the violations alleged in this Complaint for discrimination in its own business services, and Facebook is liable for aiding, abetting, and inciting the violations of financial services companies, pursuant to section 52(a) of the California Civil Code.

145.   Facebook is liable to Plaintiff and the members of the National Class for statutory damages pursuant to section 52(a) of the California Civil Code for each and every offense, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

146.   Plaintiff is further entitled to all other legal and equitable relief available, including injunctive relief on behalf of herself and the Plaintiff Class.

**SECOND CLAIM FOR RELIEF**
**Age and Sex Discrimination**
**(Cal. Civil Code §§ 51.5, 52(a))**
**On Behalf of Plaintiff and the National Plaintiff Class**

147.   Plaintiff realleges and incorporates by reference all other paragraphs as alleged above.

148.   Section 51.5 of the California Civil Code provides that "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or € of Section 51 . . . because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."

149.    Through the numerous discriminatory actions and practices described above, Facebook has intentionally discriminated against, boycotted, and/or refused to provide services to older persons and women based on their age and/or sex, including by denying older persons and women advertisements and information about financial services opportunities.

150.    In addition, through the actions described above, Facebook has aided and abetted financial services companies in violating section 51.5 of the California Civil Code.  Thus, Facebook is liable for the violations alleged in this Complaint for discrimination in its own business services, and Facebook is liable for aiding and abetting the violations of financial services companies, pursuant to section 52(a) of the California Civil Code.

151.    Facebook is liable to Plaintiff and the members of the Plaintiff Class for statutory damages pursuant to section 52(a) of the California Civil Code for each and every offense, as well as attorneys' fees, costs, and expenses incurred in bringing this action.

152.    Plaintiff is further entitled to all other legal and equitable relief available, including injunctive relief on behalf of herself and the Plaintiff Class.

### THIRD CLAIM FOR RELIEF
### Age and Sex Discrimination
### (D.C. Human Rights Act, D.C. Code §§ 2-1402.31)
### On Behalf of Plaintiff and the District of Columbia Plaintiff Class

153.    Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

154.    This Count is brought in the alternative to Counts I and II, should the Court hold that California's Unruh Act and section 51.5 of the California Civil Code do not apply to Plaintiff and other non-California residents.

155.    The DCHRA makes it an "unlawful discriminatory practice" to "print, circulate, post, or mail, or otherwise cause, directly or indirectly, to be published a statement, advertisement, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation will be unlawfully refused, withheld from or denied an individual; or that an individual's patronage of, or presence at, a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable . . . based on the actual or perceived  . . . sex [or] age . . . of [such] individual." D.C. Code § 2-1402.31(a)(2).

156.   The DCHRA also makes it an "unlawful discriminatory practice" to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations . . . based on the actual or perceived . . . sex [or] age . . . of [such] individual."  D.C. Code § 2-1402.31(a)(1).

157.   Facebook and the financial institutions that advertise on Facebook (and the websites of both Facebook and the financial institutions that advertise on Facebook) are places of public accommodation under the DCHRA.  D.C. Code § 2-1402.02(24).

158.   Ms. Opiotennione is a person within the meaning of the DCHRA.  D.C. Code § 2-1401.02(21).

159.   As described above, Facebook has intentionally, knowingly, and purposefully printed, circulated, posted or otherwise caused to be published statements or advertisements that indicate that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation will be unlawfully refused, withheld from or denied to Plaintiff and members of the District of Columbia Plaintiff Class, and/or that Plaintiff's and the District of Columbia Plaintiff Class's patronage of, or presence at, a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable based on their actual or perceived sex or age.

160.   Such statements or advertisements result from a number of discriminatory practices in which Facebook has engaged, including but not limited to Facebook telling its users that they are receiving advertisements because of their age or gender; classifying, categorizing, stereotyping, and segregating its users by age and gender; publicly encouraging and enabling Facebook's advertisers to exclude older persons and women from receiving advertisements and information about valuable financial services opportunities; excluding older persons and women from receiving such advertisements and information by acting upon the requests of its advertisers and through Facebook's Lookalike Audiences, and by using Facebook's age- and gender-biased ad delivery algorithm to decide to whom such advertisements and information are sent.  All of these actions indicate to an ordinary reader of the statements and advertisements that older persons and/or women will not be provided equal public accommodations by Facebook and/or the places of public accommodation of the

advertisers of financial services on Facebook and that older persons and/or women are objectionable, unwelcome, unacceptable, or undesirable by such places of public accommodation.

161.    As described above, Facebook's actions have also denied, directly or indirectly, Plaintiff and similarly situated persons the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Facebook, a place of public accommodations, based on the actual or perceived sex or age of Plaintiff and similarly situated persons. Such denial results from a number of discriminatory practices in which Facebook has engaged, including but not limited to telling Facebook users that they are receiving advertisements because of their age or gender; classifying, categorizing, stereotyping, and segregating its users by age and gender; publicly encouraging and enabling Facebook's advertisers to exclude older persons and women from receiving advertisements and information about valuable financial services opportunities; excluding older persons and women from receiving such advertisements and information by acting upon the requests of its advertisers and through Facebook's Lookalike Audiences; and by using Facebook's age- and gender-biased ad delivery algorithm to decide to whom such advertisements and information are sent.

162.    In addition, as described above, Facebook has aided and abetted financial services companies in violating the DCHRA in the same manner as Facebook. Facebook's advertisers have violated the DCHRA by intentionally, knowingly, and purposefully excluding older persons and women from receiving their advertisements and information about valuable financial services opportunities and by making it harder and less likely for older persons and women to access the advertisers' places of public accommodation. Facebook has aided, abetted, and incited such violations. Thus, Facebook is liable for the violations alleged in this Complaint for discrimination in its own business services, and Facebook is liable for aiding and abetting the public accommodations violations of financial services companies.

163.    Facebook is liable to Plaintiff and the members of the District of Columbia Plaintiff Class for damages, as well as attorneys' fees, costs, and expenses incurred in bringing this action. Plaintiff is further entitled to all other legal and equitable relief available, including injunctive relief on behalf of herself and the District of Columbia Plaintiff Class.

**FOURTH CLAIM FOR RELIEF**
**(D.C. Consumer Protections and Procedures Act, D.C. Code §§ 2-1402.31)**
**On Behalf of Plaintiff and the District of Columbia Plaintiff Class**

164.   Plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

165.   This Count is brought in the alternative to Counts I and II, should the Court hold that California's Unruh Act and section 51.5 of the California Civil Code do not apply to Plaintiff and other non-California residents.

166.   Plaintiff brings this count against Facebook for violations of the District of Columbia Consumer Protection Procedures Act ("DC CPPA"), D.C. Code § 28-3901, *et. seq.*

167.   Facebook is a "person" within the meaning of section 28-3901(a)(1) of the D.C. Code, is a "merchant" under section 28-3901(3), and provides "goods and services" within the meaning of section 28-3901(a)(7).

168.   Plaintiff is a "person" and a "consumer" within the meaning of D.C. Code section 28-3901(1) and (2).

169.   The facts, as described above and set forth in this count, demonstrate that Facebook has violated section 28-3904 of the D.C. Code, which makes it an "unlawful trade practice" to, *inter alia*, "misrepresent as to a material fact which has a tendency to mislead," *id*. § 28-3904(e), "[r]epresent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," *id*. § 28-3904(e)(1), and to violate other laws, such as the DCHRA.

170.   The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived, or damaged thereby."  D.C. Code § 28-3904.

171.   When Facebook displays an advertisement on a Facebook user's News Feed or other page on behalf of an advertiser, Facebook informs the Facebook user why the person has been selected to receive that particular advertisement, in a portion of the advertisement called "Why am I seeing this ad."  For example, if the advertiser directed Facebook to apply an audience selection of men who are 18 to 40 years old, then the "Why am I seeing this ad" portion of the advertisement will tell the Facebook user that the person has received the advertisement because the advertiser wants to reach men 18-40.  Such statements would lead a reasonable reader to believe that it is lawful to show such a preference, when, as described in Count III, it is unlawful under the DCHRA to make such age- or

gender-based statements with respect to places of public accommodation. Accordingly, such a practice has a tendency to mislead Facebook consumers and violates the DC CPPA.

172.    Facebook maintains policies and practices with respect to advertising that violate the anti-discrimination provisions of the DCHRA, as described in Count III above, which are therefore "unfair or deceptive trade practices" prohibited by the CPPA, because Facebook violated a District of Columbia statute in the context of a consumer transaction.  D.C. Code § 28-3904.

173.    Defendants' failure to disclose to consumers that their policies and practices with respect to advertising violate the DCHRA are material facts, the omission of which tended to mislead consumers and are unfair and deceptive trade practices that violate the DC CPPA.  D.C. Code § 28-3904(f).

174.    Facebook has further repeatedly and misleadingly told the media and the general public, including Facebook's users, that "There is no place for discrimination on Facebook," while simultaneously, previously, and subsequently engaging in millions of discrete acts of discrimination in which Facebook denied its older and female users the full and equal accommodations, advantages, facilities, and services of Facebook solely because of their age and/or gender, including the thousands (and possibly hundreds of thousands or millions) of financial services advertisements that Facebook intentionally, knowingly, and purposefully denied to older and female users of Facebook.

175.    Facebook's statements that "There is no place for discrimination on Facebook" are also unfair and deceptive trade practices, because they are untrue and tend to mislead consumers.

176.    In its Terms of Service on its website, Facebook further states that "For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that *the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions*." (emphasis added).

177.    Facebook's statement in its Terms of Service that "the laws of the State of California will govern these Terms and any claim" is also an unfair deceptive trade practice, because Facebook

now asserts that California law does not apply to Plaintiff and the claims of the District of Columbia Class and that the Terms of Service do not give such out-of-state residents any claims, rights, or remedies under California law, namely with respect to any claim for public accommodations discrimination. *See* Def.'s Mot. Dismiss Compl. at 7-8, ECF No. 26.  Such statement is a misrepresentation as to a material fact which has a tendency to mislead and represents that the client/consumer relationship with Facebook confers or involves rights, remedies, or obligations that it does not have or involve.

178.    As a direct and proximate result of Facebook's conduct, Plaintiff and the District of Columbia Plaintiff Class have suffered injuries and monetary damages, including treble damages, or $1,500 per violation, whichever is greater, for violations of the DC CPPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Facebook on all claims and respectfully request that this Court award the following relief:

(a)    Certify the case as a class action on behalf of the proposed National Class, or in the alternative, the proposed District of Columbia Class;

(b)    Designate Plaintiff as representative of the National Class, or in the alternative the District of Columbia Class;

(c)    Designate Plaintiff's counsel of record as Class Counsel;

(d)    Declare that the practices complained of herein are unlawful;

(e)    Enter an order permanently enjoining Facebook and its partners, officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from continuing to engage in acts that violate the Unruh Act and section 51.5 of the California Civil Code, or in the alternative the DCHRA and DC CPPA;

(f)    Require Facebook to pay Plaintiff and members of the Plaintiff Class any disgorgement of Facebook's profits from its unlawful and/or unfair business practices, restitution, penalties, liquidated damages, exemplary damages, punitive damages, and pre-judgment and post-judgment interest as provided by law, that may be owed;

(g)    Require Facebook to pay Plaintiff's attorneys' fees and costs;

AMENDED COMPLAINT
CASE NO. 3:19-CV-07185-JSC

(h)     Appoint a monitor to ensure that Facebook complies with the injunction provisions of any decree that the Court orders;

(i)     Enter an order retaining jurisdiction over this action to ensure that Facebook complies with such a decree; and

(j)     Grant such other and further relief as the Court deems proper, appropriate, just, or equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

March 31, 2020                                             Respectfully Submitted,

Jahan C. Sagafi (State Bar No. 224887)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com

Adam T. Klein*
Michael Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: atk@outtengolden.com
Email: mlitrownik@outtengolden.com

Pooja Shethji*
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Suite 200W
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: pshethji@outtengolden.com

* pro hac vice

/s / Peter Romer-Friedman
Peter Romer-Friedman*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
Telephone: (202) 888-1741
Email: peter@guptawessler.com

Jason R. Flanders (State Bar No. 238007)
AQUA TERRA AERIS LAW GROUP
490 43rd Street
Oakland CA 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Matthew K. Handley*
Rachel Nadas*
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2411
Email: mhandley@hfajustice.com
Email: rnadas@hfajustice.com

William Most (State Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com