ROSEMARIE T. RING (SBN 220769)
rose.ring@mto.com
JONATHAN H. BLAVIN (SBN 230269)
jonathan.blavin@mto.com
MARIANNA MAO (SBN 318070)
marianna.mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| NEUTAH OPIOTENNIONE,<br><br>          Plaintiff,<br><br>     vs.<br><br>FACEBOOK, INC.,<br><br>          Defendant. | Case No. 3:19-cv-07185-JSC<br><br>**DEFENDANT FACEBOOK, INC.'S NOTICE OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Judge:  Hon. Jacqueline S. Corley<br>Date:    July 16, 2020<br>Time:   9:00 AM<br>Crtrm.: E |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.    BACKGROUND .................................................................................................4

    A.    *Advertisers* Select Audiences Using Neutral, Self-Serve Tools ...............4

    B.    *Facebook* Delivers Ads Using An Algorithm .........................................6

    C.    Plaintiff Did Not Receive Certain Financial Services Ads In Her News Feed ..........7

III.    ARGUMENT .......................................................................................................7

    A.    Plaintiff Lacks Article III and Statutory Standing ....................................7

        1.    Plaintiff Does Not Have Standing to Pursue Claims Based On the LAL Tool Or Ad Delivery Algorithm ........................................8

        2.    Plaintiff Does Not Have Standing To Pursue Claims Based On Audience Selection Tools ....................................................9

    B.    Plaintiff's Claims Are Barred by Section 230 of the CDA .....................11

        1.    Facebook Is an Interactive Computer Service Provider .............................13

        2.    Plaintiff's Claims Treat Facebook As a Publisher Or Speaker ..................13

        3.    Plaintiff's Claims Are Based on Third-Party Content ...............................16

    C.    Plaintiff Fails to State a Claim Under the Unruh Act or § 51.5 .............19

        1.    The Unruh Act and § 51.5 Do Not Apply Extraterritorially ......................19

        2.    Plaintiff Does Not, And Cannot, Plead Any Intentional Discrimination By Facebook .......................................................20

        3.    Plaintiff Does Not, And Cannot, Plead That Facebook Engaged In Any Unlawful Conduct ..........................................................23

        4.    Plaintiff Does Not, And Cannot, Plead Any Aiding-And-Abetting Claim ..............................................................25

    D.    Plaintiff's D.C. Law Claims Should Be Dismissed Because Plaintiff Agreed That California Law Would Apply ................................................25

    E.    Plaintiff Fails to State a Claim Under D.C. Law......................................27

IV.    CONCLUSION ..................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ...................................................................................................18

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.,*
 571 U.S. 49 (2013) ....................................................................................................26

*Barnes v. Yahoo!, Inc.,*
 570 F.3d 1096 (9th Cir. 2009) ...................................................................................12

*Batzel v. Smith,*
 333 F.3d 1018 (9th Cir. 2003) ...................................................................................11

*Bennett v. Spear,*
 520 U.S. 154 (1997) ...................................................................................................10

*Bourbeau v. Jonathan Woodner Co.,*
 549 F. Supp. 2d 78 (D.D.C. 2008) ...............................................................................7

*Bradley, et al. v. T-Mobile US, Inc., et al.,*
 No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ..........8, 9, 10

*Caraccioli v. Facebook, Inc.,*
 167 F. Supp. 3d 1056 (N.D. Cal. 2016) .....................................................................12

*Carafano v. Metrosplash.com, Inc.,*
 339 F.3d 1119 (9th Cir. 2003).......................................................................11, 17, 18

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,*
 519 F.3d 666 (7th Cir. 2008)......................................................................................12

*Cullen v. Netflix, Inc.,*
 880 F. Supp. 2d 1017 (N.D. Cal. 2012) .....................................................................21

*Darnaa, LLC v. Google, Inc.,*
 No. 15-CV-03221-RMW, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016) ...................13

*Dyroff v. Ultimate Software Grp., Inc.,*
 934 F.3d 1093 (9th Cir. 2019)..................................................................3, 13, 14, 16

*Earll v. eBay Inc.,*
 2012 WL 3255605 (N.D. Cal. Aug. 8, 2012)..............................................................21

*Ebeid v. Facebook, Inc.,*
 2019 WL 2059662 (N.D. Cal. May 9, 2019) .....................................................5, 6, 19

*In re Facebook Biometric Info. Privacy Litig.,*
 185 F. Supp. 3d 1155 (N.D. Cal. 2016) .....................................................................26

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
 521 F.3d 1157 (9th Cir. 2008).......................................................................11, 15, 17, 18

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) .......................................................................... 12, passim

*Freedom Watch, Inc. v. Google, Inc.*,
    368 F. Supp. 3d 30 (D.D.C. 2019) ...................................................................26, 27

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) .....................................................11, 12, 17

*Gonzalez v. Google, Inc.*,
    282 F.Supp.3d 1150 (N.D. Cal. 2017) .................................................12, 15, 16, 18

*Gravquick A/S v. Trimble Navigation Int'l Ltd.*,
    323 F.3d 1219 (9th Cir. 2003).............................................................................19

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*,
    742 F.3d 414 (9th Cir. 2014)..........................................................................21, 23

*Herrick v. Grindr, LLC*,
    306 F. Supp. 3d 579 (S.D.N.Y. 2018), aff'd, 765 F. App'x 586 (2d Cir. 2019),
    cert. denied, 140 S. Ct. 221 (2019)..................................................................12, 13

*Jackson v. ASA Holdings*,
    751 F. Supp. 2d 91 (D.D.C. 2010) ........................................................................7

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014)................................................................................18

*Jurin v. Google Inc.*,
    695 F. Supp. 2d 1117 (E.D. Cal. 2010) ...............................................................18

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016)........................................................................12, 17

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ...........................................................................12

*La Park La Brea A LLC v. Airbnb, Inc.*,
    285 F. Supp. 3d 1097 (C.D. Cal. 2017)...............................................................18

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009)................................................................................10

*Long v. Playboy Enters. Int'l, Inc.*,
    565 F. App'x 646 (9th Cir. 2014)........................................................................19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .........................................................................................7, 10

*Morsa v. Facebook, Inc.*,
    77 F. Supp. 3d 1007 (2014)..................................................................................24

DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ............................................................................... 11

*O'Connor v. Uber Techs., Inc.*,
   58 F. Supp. 3d 989 (N.D. Cal. 2014) ............................................................. 19, 29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................. 28

*OpenTV, Inc. v. Netflix Inc.*,
   76 F. Supp. 3d 886 (N.D. Cal. 2014) ................................................................... 24

*Opperman v. Path, Inc.*,
   84 F. Supp. 3d 962 (N.D. Cal. 2015) ................................................................... 18

*Palomino v. Facebook, Inc.*,
   No. 16-CV-04230-HSG, 2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ................. 26, 27

*Pennie v. Twitter, Inc., et al.*,
   281 F. Supp. 3d 874 (N.D. Cal. 2017) ............................................................. 12, 15

*Ragin v. New York Times Co.*,
   923 F.2d 995 (2d Cir. 1991), cert. denied, 502 U.S. 821 (1991) ......................... 27

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ............................................................... 13

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ............................................................................... 7, 8, 10

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ................................................................................. 25

*Warner v. Tinder Inc.*,
   105 F. Supp. 3d 1083 (C.D. Cal. 2015) ................................................................ 19

*Williams v. Facebook, Inc.*,
   384 F. Supp. 3d 1043 (N.D. Cal. 2018) ................................................................ 27

**STATE CASES**

*Angelucci v. Century Supper Club*
   41 Cal. 4th 160 (2007) .................................................................................... 7, 10

*Archibald v. Cinerama Hawaiian Hotels, Inc.*,
   73 Cal.App.3d 152 (1977) ................................................................................... 18

*Belton v. Comcast Cable Holdings, LLC*,
   151 Cal. App. 4th 1224 (2007) ............................................................................ 21

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Bergstein v. Stroock & Stroock & Lavan LLP,*
  236 Cal. App. 4th 793 (2015)................................................................................25

*Casey v. U.S. Bank Nat'l Ass'n,*
  127 Cal. App. 4th 1138 (2005)..............................................................................25

*Cross v. Facebook, Inc.,*
  14 Cal. App. 5th 190, 206 (2017)..........................................................................12

*Emery v. Visa Int'l Serv. Ass'n,*
  95 Cal. App. 4th 952 (2002)..................................................................................25

*Grayson v. AT & T Corp.,*
  15 A.3d 219 (D.C. App. 2011)..........................................................................28, 29

*Harris v. Capital Growth Inv'rs XIV,*
  52 Cal. 3d 1142 (1991).........................................................................................24

*Hill v. StubHub, Inc.,*
  727 S.E.2d 550 (N.C. Ct. App. 2012) ....................................................................18

*Javorsky v. W. Athletic Clubs, Inc.,*
  242 Cal. App. 4th 1386 (2015)..........................................................................23, 24

*Koebke v. Bernardo Heights Country Club,*
  36 Cal. 4th 824 (2005)....................................................................19, 20, 21, 24

*Pearson v. Chung,*
  961 A.2d 1067 (D.C. 2008)...................................................................................28

*Rose v. Wells Fargo Bank, N.A.,*
  73 A.3d 1047 (D.C. App. 2013).............................................................................29

*Sargoy v. Resolution Trust Corp.,*
  8 Cal. App. 4th 1039 (1982)..................................................................................23

*Schulz v. Neovi Data Corp.,*
  152 Cal. App. 4th 86 (2007)..................................................................................25

*Semler v. Gen. Elec. Capital Corp.,*
  196 Cal. App. 4th 1380 (2011)..............................................................................19

*Sullivan v. Oracle Corp.,*
  51 Cal. 4th 1191 (2011)........................................................................................26

*Sunrise Country Club Assn.,*
  190 Cal.App.3d at 380-81. ................................................................................23, 24

*Turner v. Ass'n of Am. Med. Colls.,*
  167 Cal. App. 4th 1401 (2008)..............................................................................21

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*U.S. Jaycees v. Bloomfield*,
  434 A.2d 1379 (D.C. 1981).............................................................................................27

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
  715 A.2d 873 (D.C. 1998).............................................................................................28

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ...............................19

**FEDERAL STATUTES**

47 U.S.C. § 230(b)(1)-(2)................................................................................................11

47 U.S.C. § 230(c)(1)......................................................................................................11

47 U.S.C. § 230(f)(2).......................................................................................................12

Communications Decency Act, 47 U.S.C. § 230 ...................................................... 3, passim

**STATE STATUTES**

Cal. Civil Code § 51(b) ................................................................................................. 7, passim

Cal. Civil Code § 51.5 .................................................................................................. 3, passim

California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940(d)...............................24

**STATUTES - OTHER**

D.C. Consumer Protections and Procedures Act................................................................ 3, passim

D.C. Human Rights Act ................................................................................................. 3, passim

DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    PLEASE TAKE NOTICE that on July 16, 2020, at 9:00 am, before the Honorable

2   Jacqueline Scott Corley, in Courtroom E on the 15th floor of the above-entitled Court, Defendant

3   Facebook, Inc. ("Facebook") will and does move to dismiss Plaintiff's First Amended Complaint

4   ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) based on the Notice

5   of Motion and Motion, the Memorandum of Points and Authorities, all pleadings and papers on

6   file, and such other matters as may be presented to this Court.

7   **I.    INTRODUCTION**

8    Defendant Facebook, Inc. ("Facebook") operates an online platform that enables people to

9   stay connected with friends and family, to discover what is going on in the world, and to share and

10  express what matters to them.  Facebook provides this service to users free of charge and

11  generates revenue from ads placed by third-party advertisers on the platform.

12   Advertising, whether through traditional or digital media, is about reaching people who are

13  interested in a product or service.  Advertisers must therefore make decisions about how to reach

14  the most interested audience across different media.  For example, women's clothing designers

15  might advertise in *Vogue*, during daytime talk shows, and on fashion blogs, but not in *Sports*

16  *Illustrated*, during Monday Night Football, or on fantasy football websites.  Manufacturers of

17  arthritis drugs might advertise in *AARP Magazine*, during the nightly news, and on golf websites,

18  but not in *Teen Vogue*, during cartoons, or on the Candy Crush app.

19   Advertising on Facebook is no different.  Facebook provides a general use platform that

20  advertisers can use to create ads for *all* types of products and services.  Audience selection tools

21  allow, but do not require, advertisers to select audiences for their ads based on user interests and

22  certain profile information.  Facebook then shows those ads to users within the advertisers'

23  selected audiences, using an algorithm that determines which of the millions of ads that could be

24  delivered to a particular user's News Feed are likely to be most interesting to that user.

25   Plaintiff claims, without any factual support, that she has "regularly" been denied the

26  opportunity to learn about and obtain *some* financial services because *some* advertisers placing ads

27  for financial services on Facebook have used audience selection tools to exclude women and/or

28  older people, and the ad delivery algorithm has not shown *some* financial services ads in her News

Feed because of her age and gender.  As an initial matter, Plaintiff identifies a handful of ads for financial services, none of which she alleges she was interested in pursuing, and no facts whatsoever showing that these ads allegedly were not shown in her News Feed because of the challenged practices.  And Plaintiff's claim that she was denied the opportunity to learn about, let alone obtain, these or other unidentified financial services because she did not receive ads for them on Facebook is implausible.  Facebook is only one of many types of media advertisers use in their campaigns, and Plaintiff does not allege that these or any other financial services were advertised only on Facebook.  In any event, Facebook posts *all* active ads in its Ad Library, which *any* user can access and search, regardless of whether the ads were shown in their News Feeds.

Plaintiff's claims also rely on a "but for" world that does not exist.  Plaintiff does not, and cannot, allege facts showing that she would have received *more* financial services ads in her News Feed if advertisers had not excluded her from their audience selections.  Space in News Feeds is limited because it depends on how often and how far users scroll.  At any given moment, there are millions of ads and other types of content, such as posts from friends and family, competing for this limited space, which means that only a fraction of all content, including ads, that *could* be shown in user News Feeds actually *is* shown.  As a result, there is no basis to conclude that more financial services ads, as opposed other content, would have been shown in Plaintiff's News Feed, even if financial services advertisers *had* included her in their audience selections.

With respect to the ad delivery algorithm, Plaintiff also does not, and cannot, allege facts showing that the algorithm discriminates against women and older people in delivering financial services ads or that she would have received more financial services ads if the ad delivery algorithm worked differently.  Indeed, her own allegations contradict these claims.  Plaintiff alleges that the purpose of the algorithm, as in all advertising, is to show ads to users based on determinations as which ads will be most interesting to them.  Taking Plaintiff's claim that she was interested in receiving *more* financial services ads at face value, the only plausible inference from these allegations is that the algorithm determined that *other ads* would be *more* interesting to Plaintiff—not that, despite her interest in financial services ads, those ads should not be shown in her News Feed.

1    At bottom, all of Plaintiff's claims attempt to impose liability on Facebook for harm

2    allegedly caused by discriminatory conduct, but Plaintiff does not allege any facts showing that

3    she actually suffered harm, let alone as a result of discriminatory conduct *by Facebook*.  Plaintiff's

4    claims should be dismissed on multiple independent grounds.

5    *First*, Plaintiff fails to establish Article III standing and standing to pursue state law claims

6    because she does not identify any financial services ad for which she alleges facts showing that the

7    ad was not shown in her News Feed because an advertiser excluded women and/or older people

8    from the audience or because of the ad delivery algorithm.  Even if Plaintiff could allege such

9    facts for any of the ads she does identify, which she cannot, she also does not allege that she was

10   interested in pursuing, let alone qualified to obtain, the advertised financial services.

11   *Second*, all of Plaintiff's claims are barred by the Communications Decency Act, 47 U.S.C.

12   § 230 ("CDA"), because they seek to impose liability on Facebook as a "publisher" of third-party

13   content.  Binding Ninth Circuit authority makes clear that Facebook's provision of neutral tools

14   does not render Facebook a developer of third-party content, and that a website that selects which

15   third-party content to display and when is "acting as a publisher" under the CDA.  *Dyroff v.*

16   *Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

17   *Third*, Plaintiff fails to state any claim under California law.  The Unruh Act and § 51.5

18   apply only in California.  Plaintiff is a D.C. resident, which alone requires dismissal of her claims.

19   Even if this Court were to be the first to apply these laws outside of California, Plaintiff does not,

20   and cannot, allege any facts showing any discriminatory intent or conduct by Facebook or any

21   basis for liability for aiding and abetting discriminatory intent or conduct by advertisers.

22   *Fourth*, Plaintiff fails to state any claim under D.C. law.  Plaintiff agreed that California

23   law would apply to any dispute she might have with Facebook, which alone requires dismissal of

24   her D.C. law claims.  Even if D.C. law could apply, Plaintiff fails to state a claim under D.C.'s

25   Human Rights Act ("DCHRA") because that law does not apply to companies outside of D.C. and

26   Plaintiff does not identify any ad that "indicates" an unlawful preference.  Plaintiff also fails to

27   state a claim under D.C.'s Consumer Protections and Procedures Act ("DCCPPA") because she

28   fails to establish any unfair trade practice or predicate violation of D.C. law by Facebook.

## II.   BACKGROUND

Facebook operates an online platform that "enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers," including through "News Feed, Stories, Marketplace, and Watch."  First Amended Complaint ("FAC") ¶ 18. Facebook generates revenue from "sell[ing] advertising to companies who pay Facebook to place their advertisements on users' News Feeds on Facebook, as well as on Instagram and Messenger." *Id*. ¶ 19.  Advertisers use Facebook's platform to create ads for all types of products and services, including "financial services, such as mortgages, personal loans, bank accounts, insurance, investment opportunities, and financial consulting services."  *Id*. ¶ 1.

Plaintiff alleges that she "was interested in receiving [financial services ads] on News Feed on Facebook," *id*. ¶ 91, and claims, without factual support, that she has "regularly" been denied such ads because some advertisers placing financial services ads on Facebook have used audience selection tools to exclude women and older people, *and* the ad delivery algorithm has not delivered some financial services ads in her News Feed because of her age and gender.

### A.   *Advertisers* Select Audiences Using Neutral, Self-Serve Tools

Advertisers on Facebook select audiences for their ads using self-serve tools.  Among the tools that advertisers may, but are not required to, use in selecting audiences are age and gender tools and the Lookalike Audience tool ("LAL").  Plaintiff alleges that these advertiser selections "target [a group] of Facebook users who will be eligible to receive the [ad] ('audience selection')." FAC ¶ 33.  As Plaintiff alleges, age and gender tools have default settings of *all ages* and *all genders*, respectively, which only change if advertisers select different options using drop-down menus or buttons.  *Id*. ¶¶ 39, 40.  For LAL, Plaintiff alleges that "advertisers provide Facebook with a list of Facebook users whom they believe are the type of customers they want to reach (*i.e.*, the seed audience), and then Facebook applies its own analysis and algorithm to identify a larger audience that resembles the seed audience (*i.e.*, the Lookalike Audience)."  *Id.* ¶ 56.  According to Plaintiff, "when *an advertiser* provides a seed audience that is disproportionately male or younger, [] the Lookalike Audience that Facebook creates to determine the audience selection will *likewise* be disproportionately male or younger.  *Id*. ¶ 58 (emphasis added).

Plaintiff claims, without factual support, that advertisers placing ads for financial services on Facebook have "routinely" used these audience selection tools to exclude women and older people which have "regularly denied" her the opportunity to receive such ads.  *Id.* ¶ 91.  But Plaintiff also admits that these tools are available to *all* advertisers placing ads for *all* types of products and services, which means that these same tools are used to advertise women's handbags to women, men's athletics shoes to men, arthritis drugs to older people, and video games to younger people.  As such, these tools are "neutral tools," and, as Plaintiff admits, it is *advertisers*, not Facebook, who decide whether and how to use them.  *Id.* ¶¶ 39, 40, 58.

Still, Plaintiff attempts to attribute any allegedly discriminatory use of audience selection tools by third-party advertisers to *Facebook* by claiming that Facebook "strongly encourages advertisers" to exclude women and/or older people from audience selections based on misleading quotes from Facebook's website.  *Id.* ¶¶ 35, 37, 40.  As explained below, these quotes provide no support for Plaintiff's baseless and illogical claim that Facebook encourages advertisers to misuse audience selection tools in violation of its own antidiscrimination policies.

Facebook provides guidelines about what type of ad content is allowed on its ad platform and makes clear that discrimination, including through use of audience selection tools, is strictly prohibited.  Declaration of Rosemarie T. Ring ("Ring Decl."), Exhibits A and B (advertising policies).[1]  Last year, Facebook also made industry-leading changes to its ad platform to help prevent the potential misuse of audience selection tools by advertisers placing certain types of ads—housing, employment, and credit ("HEC")—as part of the settlement of another action brought in this District by Plaintiff's counsel.

In that action, Plaintiff's counsel argued that, simply by providing tools on its platform that *some* HEC advertisers might use to create some HEC ads in ways they claim are discriminatory, Facebook is liable for any such third-party conduct, even though the tools are available to *all* advertisers placing ads for *all* types of products and services.  Judge Davila issued an order staying discovery in the action, after Facebook filed a motion to dismiss asserting the same defenses it

---

[1] The exhibits attached to the Ring Decl. may be considered for the reasons explained in Facebook's Request for Incorporation by Reference, filed concurrently herewith.

DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1   does here.  The parties settled the case last year with Facebook agreeing to, among other things,

2   create a separate flow on its general use platform for HEC ads that restricts the use of certain

3   audience selection tools, including the age and gender tools at issue here.  *Id.* ¶¶ 36, 56.

4        In this new action, Plaintiff's counsel is pursuing the same theory of liability with respect

5   to audience selection tools, except they have shifted their focus from HEC ads to ads for financial

6   services which they define to include mortgages and personal loans, even though they know those

7   and other credit-related financial services were included in the changes Facebook made last year.

8   Those changes have already been implemented, so the age and gender tools are no longer available

9   for use with those ads.

10       **B.**      ***Facebook* Delivers Ads Using An Algorithm**

11       Plaintiff alleges that Facebook uses "an [ad delivery] algorithm to determine which users

12  within a particular audience selection will receive advertisements, including financial services

13  advertisements."  *Id.* ¶ 64.  Plaintiff further alleges that the algorithm "uses many types of data,"

14  *id.*, including, upon information and belief, "the age and gender of Facebook users," *id.* ¶ 65.

15  According to Plaintiff, "[t]he purpose of [the] algorithm is to optimize an [ad's] audience and the

16  advertiser's goals by showing the [ad] preferentially to the users Facebook believes will maximize

17  Awareness, Consideration, or Conversion scores for the advertisement."  *Id.* ¶ 64.  Plaintiff

18  explains that maximizing Awareness, Consideration, or Conversion means showing ads to users

19  who will, respectively, view them, click and engage with them, or purchase the product or service

20  being advertised.  *Id.*  In other words, Plaintiff alleges that Facebook's ad delivery algorithm

21  shows ads to Facebook users that are most likely to be interested in them.

22       According to Plaintiff, Facebook "causes, knows that, wants, and intends for the

23  advertisements only to be sent disproportionately to persons who fall into the age and gender

24  demographic profile that Facebook's algorithm believes is the most relevant audience for the

25  advertisement."  *Id.* ¶ 68.  But Plaintiff does not allege that Facebook's algorithm "believes"

26  (much less, intentionally determines) that the "most relevant audience" for a financial services ad

27  is made up of men and younger people, as opposed to users who are interested in the ad.  *Id.* ¶ 64.

28  Plaintiff does not make that allegation because she cannot.

### C.   Plaintiff Did Not Receive Certain Financial Services Ads In Her News Feed

Plaintiff identifies seven financial services ads that she claims were not shown in her News Feed on Facebook.  *Id*. ¶¶ 73-76; ¶¶ 108-109.  She does not allege that she did not, or was unable to, view these ads through other Facebook features (*e.g.*, Pages, Marketplace, Ad Library where users can access and search *all* active ads on Facebook), other Facebook products (*e.g.*, Instagram, Messenger), or other advertising media (*e.g.*, Google, television, magazines).  As discussed below, Plaintiff admits that neither the LAL tool nor the ad delivery algorithm could have played any role in these ads not being shown in her News Feed.  And with respect to audience selection tools, she does not, and cannot, allege facts showing that any of these ads were not shown in her News Feed because advertisers used them in ways she claims are discriminatory.

Based on these neutral audience selection tools and ad delivery algorithm, Plaintiff asserts claims against Facebook under California's Unruh Act and § 51.5, and, alternatively, the District of Columbia's Human Rights Act ("DCHRA") and the District of Columbia's Consumer Protections and Procedures Act ("DCCPPA").

### III.   ARGUMENT

### A.   Plaintiff Lacks Article III and Statutory Standing

To establish Article III standing, Plaintiff must "clearly … allege facts demonstrating each [of the following] element[s]": (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  For both the Unruh Act and § 51.5, Plaintiff must allege facts showing that she "actually suffer[ed] the discriminatory conduct" being challenged.  *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 165 (2007).  With respect to Plaintiff's D.C. law claims, "standing under the DCHRA is co-extensive with Article III standing," *Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 84 (D.D.C. 2008), and, under the DCCPPA, Plaintiff must allege facts showing that she "has suffered damage as a result of the unlawful trade practice" to establish standing.  *Jackson v. ASA Holdings*, 751 F. Supp. 2d 91, 99 (D.D.C. 2010).

Plaintiff lacks Article III standing and standing to pursue her state law claims because her allegations establish that neither the LAL tool nor ad delivery algorithm played in any role in the financial services ads she identifies not being shown in her News Feed, and does not allege any facts showing that any of those ads would have been shown in her News Feed if advertisers had not used neutral audience selection tools in ways she claims are discriminatory.

### 1.     Plaintiff Does Not Have Standing to Pursue Claims Based On the LAL Tool Or Ad Delivery Algorithm

Plaintiff identifies seven financial services ads which she alleges (1) *advertisers* targeted to exclude women and/or older people using the age and gender tools, and (2) were not shown in her News Feed.  *See* FAC ¶ 73 ("Webull sent [ad] … only to 'men ages 20 and older'"); *id.* ¶ 74 ("Partbnb sent [ad] … only to 'men ages 30 to 50'"); *id.* ¶ 75 ("Ladder sent [ad]… only to 'people ages 25 to 45'"); *id.* ¶ 76 ("AAFMAA sent [ad] … only to 'people ages 24 to 40'"); *id.* ¶ 108 ("the [ad] was only sent to 'people ages 25 to 44'"); *id.* ¶ 109 ([ads] were "only sent to 'males, ages 20 to 50,' … and 'people, ages 19 to 44'").  Even assuming these ads were not shown in Plaintiff's News Feed, Plaintiff's allegations establish that neither the LAL tool nor the ad delivery algorithm could have been the reason.  Plaintiff admits that the LAL tool is subject to audience selections made using the age and gender tools, *id.* ¶ 61, and that the algorithm only makes delivery decisions *within audience selections* of advertisers and *cannot* show ads outside of those selections, *id.* ¶ 66 ("If an advertiser excludes all women from its audience selection, the ad delivery algorithm cannot compound the level of gender discrimination, because all women will automatically be excluded from receiving that ad."); *see also id*. ¶¶ 30, 33, 96 (Facebook's algorithm "determine[s] which users within a particular audience selection" receive ads).  Accordingly, Plaintiff does not allege facts showing any injury in fact that is fairly traceable to the LAL tool or ad delivery algorithm, or that she has actually suffered any injury caused by the LAL tool or ad delivery algorithm, and therefore lacks Article III standing and standing to pursue any state law claim based on the LAL tool or ad delivery algorithm.

### 2. Plaintiff Does Not Have Standing To Pursue Claims Based On Audience Selection Tools

With respect to her remaining claims based on Facebook's provision of age and gender audience selection tools, Plaintiff does not allege facts showing any injury in fact that is traceable to Facebook to demonstrate Article III standing, or that she has *actually suffered* any injury caused by these tools to have standing to pursue any of her state law claims.

To show Article III injury, a plaintiff must allege facts showing that, as a result of the challenged conduct, she has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548. Judge Freeman of this Court recently dismissed age discrimination claims based on the same age tool and theories of harm at issue here. *See Bradley, et al. v. T-Mobile US, Inc., et al.*, No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020). In *Bradley*, the plaintiffs (who are also represented by Plaintiff's counsel) alleged that the defendants, T-Mobile and Amazon, used the age tool at issue in this case to "routinely exclude older individuals from viewing the employment ads they post on Facebook," in violation of state and federal laws, including the Unruh Act. *Id.* at *1.

The *Bradley* plaintiffs alleged that they "were qualified to perform one or more jobs at each of the Defendants that was offered during the time period at issue, [] that they would have pursued those specific job opportunities. . . [and] that the Facebook ads for these jobs were subject to age restrictions and that, as a result, the [plaintiffs] did not receive the ads and did not learn about the jobs." *Id.* at *10 (internal quotations omitted). They also identified a handful of specific ads for jobs they alleged they "would have pursued" had they received those ads. *Id.* Based on these allegations, Plaintiffs asserted four theories of harm, all of which Judge Freeman rejected as insufficient to establish Article III standing for reasons that dictate the same result here.

***Economic Harm***. The *Bradley* court rejected the plaintiffs' theory of economic harm based on "lost wages due to losing out on jobs 'they would have pursued and obtained' had they seen the age-restricted ads," because, even though they claimed that they "would have pursued" some of the advertised jobs, they did not allege facts showing "they would have applied for and received the jobs if they had seen the ads in question." *Id.* at *8. Here, Plaintiff fails to allege any

economic harm because she does not even allege that she "would have pursued" any specific financial services, let alone that she would have applied for and received such services.

**Denial of Information**.  The *Bradley* court rejected the theory that the plaintiffs had been denied "information about jobs that the law requires them to receive on an equal basis," because the plaintiffs "did not seek employment information from Defendants." *Id*.  Here, Plaintiff likewise does not allege that she requested financial services ads from Facebook.  Further, as noted above, Facebook has made all active ads available to review through the Ads Library.

**Lost Opportunities**.  The *Bradley* court rejected the theory that the plaintiffs had been denied "the opportunity to apply for jobs because of their age" because the plaintiffs had "not adequately alleged that they personally have experienced such injuries." *Id*. at *8-9.  Judge Freeman held that, to establish Article III standing, the plaintiffs had to identify ads for specific jobs and allege that they were qualified for those jobs, that they would have pursued those jobs, that the ads were subject to age restrictions and that, as a result of those age restrictions, the plaintiffs did not receive the ads and did not learn about the jobs. *Id*. at *10.  The "fatal failing" of the complaint in *Bradley* was that it relied on general allegations of lost job opportunities and did "not identify—even by way of example—a single job for which these allegations are true." *Id*.

Here, the FAC suffers from the same "fatal" flaws.  Plaintiff identifies seven specific ads for financial services, but does not come close to showing that she has "personally [] experienced" harm sufficient to establish Article III standing, which requires her to allege facts showing that she was qualified for the financial services being advertised, that she would have pursued them, that she was excluded from the selected audience for the ads, and that, as a result, she "did not receive the ads and did not learn about the [financial services]." *Id*.  Plaintiff alleges only that she "would have been interested in receiving [the ad] in order *to consider* pursuing the opportunity," and only for three of the seven ads.  FAC ¶¶ 108-109 (emphasis added).  That is not sufficient.

**Stigmatic Injury**.  Finally, the *Bradley* court rejected the theory that the plaintiffs suffered "stigmatic injury," holding that it is derivative of the lost opportunity theory and therefore plaintiffs could "only establish stigmatic injury to the extent [they could] establish the denial of the opportunity." 2020 WL 1233924, at *11.  The court concluded that, "[h]aving failed to show

that the [plaintiffs] were denied the opportunity to apply for jobs in which they were interested and for which they were qualified, [p]laintiffs also have not shown that they were stigmatized by that denial." *Id*. The same reasoning and conclusion apply here.

As in *Bradley*, Plaintiff fails to allege facts sufficient to show any injury-in-fact necessary to establish Article III standing or that she "actually suffer[ed] the discriminatory conduct" as required to have standing under the Unruh Act and § 51.5. *Angelucci,* 41 Cal. 4th at 165.

Plaintiff also does not allege any injury that is "fairly traceable" to conduct *by Facebook*. *Spokeo*, 136 S. Ct. at 1547. To establish traceability, a plaintiff must allege facts showing that her injury results from "the challenged action of the defendant," *Lujan*, 504 U.S. at 560, or, if based on third-party conduct, facts showing that the defendant's actions had a "determinative or coercive effect" on the third party's actions, *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009). *First*, Plaintiff's allegations that advertisers changed the *all ages* and *all genders* default settings to exclude her from the audience for financial services ads is not conduct traceable *to Facebook*. *See, e.g.*, FAC ¶¶ 73-76 (citing examples of ads where advertisers "sent" them only to men or to younger people). And nothing in the materials Plaintiff selectively and misleadingly quotes from Facebook's website come close to having a "determinative or coercive effect" on that alleged conduct *by advertisers*.

*Second*, Plaintiff does not allege facts supporting a plausible inference that, if advertisers had not used the age and gender tools to exclude her from the audience for the seven financial services ads she identifies, she would have received the ads in her News Feed. Given the millions of active ads that compete to be delivered to the News Feeds of Facebook's 2.5 billion active monthly users, the overwhelming likelihood is that she would not have received any of these ads, even if the advertisers had not excluded her from the selected audiences. She therefore does not, and cannot, allege facts supporting a plausible inference to the contrary.

### B.   Plaintiff's Claims Are Barred by Section 230 of the CDA

Plaintiff's claims are barred by Section 230 of the Communications Decency Act because they seek to hold Facebook liable as a "publisher" of third-party content. All of Plaintiff's claims seek to impose liability on Facebook for its decisions about where (user News Feeds) and to

whom (users in audience selections made by advertisers) to deliver financial services ads created by third-party advertisers. Specifically, Plaintiff challenges Facebook's decisions about where and to whom it will show ads created by third-party advertisers and provision of neutral tools used by these third-party advertisers. Under well-settled Ninth Circuit and other precedent, Plaintiff's claims are barred by the CDA because a website's editorial decisions regarding the publication of third-party content and provision of neutral tools are protected functions under the statute.

Under § 230 of the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The law bars liability "under any State or local law that is inconsistent with this section," *id.* § 230(e)(3). Through § 230, Congress sought to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see* 47 U.S.C. § 230(b)(1)-(2). Accordingly, the "CDA has been interpreted to provide a 'robust' immunity" for "websites." *Goddard v. Google, Inc.,* 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)). The CDA is intended to protect websites "not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)). Thus, courts routinely apply the CDA to dismiss claims at the pleading stage.[2]

CDA immunity attaches when (1) the defendant is "a provider or user of an interactive computer service," (2) "whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker," (3) "of information provided by another information content provider."

---

[2] *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting plaintiff's "effort to circumvent the CDA's protections through 'creative' pleading"); *Goddard*, 640 F. Supp. 2d at 1202; *Gonzalez v. Google, Inc.*, 282 F.Supp.3d 1150 (N.D. Cal. 2017) (granting motion to dismiss on CDA grounds); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 586-87 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 221 (2019); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) (affirming dismissal based on CDA immunity).

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  Applying this standard, courts regularly dismiss claims, no matter how artfully pled, that seek to hold Facebook liable as the publisher of third-party content.[3]  The same result is warranted here.

### 1.    Facebook Is an Interactive Computer Service Provider

It is beyond dispute that Facebook, a social networking platform and website, is a provider of an interactive computer service.  *See, e.g.*, *Klayman*, 753 F.3d at 1357 ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access … to a computer server,' 47 U.S.C. § 230(f)(2)"); *Caraccioli*, 167 F. Supp. 3d at 1065 (same).  Plaintiff does not allege otherwise.

### 2.    Plaintiff's Claims Treat Facebook As a Publisher Or Speaker

As the Ninth Circuit has held, "publication" involves "deciding *whether* to publish or to withdraw from publication third-party content."  *Barnes*, 570 F.3d at 1102 (emphasis added).  "A provider of information services might get sued for violating anti-discrimination laws …. [W]hat matters is not the name of the cause of action," but "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'"  *Id.* at 1101-02; *see also Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008) (CDA barred claim for publishing allegedly discriminatory housing ads); *accord Herrick*, 306 F. Supp. 3d at 590 ("[c]ourts have interpreted 'publication' capaciously to reach claims that, although pleaded to avoid the CDA, 'implicitly require recourse to that [third-party] content to establish liability or implicate a defendant's role.'").

Applying these principles, the Ninth Circuit and other courts have made clear that a website's decisions to suggest or match third-party content to users reflect editorial decisions that are protected publisher functions under the CDA.  *See, e.g.*, *Dyroff*, 934 F.3d at 1098; *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019).  Courts have determined that the CDA applies even if

---

[3] *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065-66 (N.D. Cal. 2016); *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 206 (2017); *Pennie v. Twitter, Inc., et al.*, 281 F. Supp. 3d 874, 891-92 (N.D. Cal. 2017).

those decisions are challenged as discriminatory, as Plaintiff does without basis here.  *See Sikhs for Justice "SFJ", Inc. v. Facebook, Inc*., 144 F. Supp. 3d 1088, 1090, 1095 (N.D. Cal. 2015) (CDA applied to claims predicated on content removal even though Facebook allegedly "was motivated solely by unlawful discrimination"; "[T]he act that Defendant allegedly conducted in a discriminatory manner is the removal of the SFJ Page in India," and "removing content is something publishers do"); *Darnaa, LLC v. Google, Inc*., No. 15-CV-03221-RMW, 2016 WL 6540452, at *8 (N.D. Cal. Nov. 2, 2016) (CDA barred claim based on content removal as such claim "seeks to hold defendants liable for 'an action that is quintessentially that of a publisher,' regardless of defendants' alleged motive").

Here, Plaintiff alleges that third-party advertisers create financial services ads and select audiences for the ads, and that, within those audience selections, Facebook uses an algorithm to deliver ads by determining which ads are most likely to be interesting to those users.  According to Plaintiff, the algorithm allegedly results in financial services ads being shown *only* to men and younger people or to *more* men and younger people than to women and older people.  All of Plaintiff's claims therefore turn on Facebook's decisions about which third-party content is shown to which users, within the audiences selected by advertisers, which binding precedent makes clear is conduct protected by the CDA.

***Ad Delivery Algorithm.***  There is no question that Plaintiff's claims based on Facebook's ad delivery algorithm treat Facebook as a "publisher" of third-party content.  As the Ninth Circuit has held, a website that uses "features and functions, including algorithms," to analyze user interests and "recommend[]" third-party content based on those interests, is "acting as a publisher of others' content" under the CDA.  *Dyroff*, 934 F.3d at 1098.

In *Dyroff*, the plaintiff brought claims against a social networking website that allowed users to join groups and interact with each other on a variety of topics.  *Id.* at 1094–95.  The website "recommended groups for users to join, based on the content of their posts and other attributes, using machine-learning algorithms," and sent "email notification[s]" to users when other users posted content to a group.  *Id.* at 1095.  In "a heroin-related group," the plaintiff's son posted asking where he could purchase heroin, received "email notification" of a response to his

post, and "connected off the site" to purchase heroin that caused his death.  *Id.*  The mother sued, claiming that the website was responsible for her son's death because it "facilitated illegal drug sales" by, among other things, "steer[ing] users to additional groups dedicated to the sale and use of narcotics" and "sen[ding] users alerts to posts within groups that were dedicated to the sale and use of narcotics."  *Id.* at 1095–98.  The Ninth Circuit affirmed dismissal of the claims, holding that the website's use of "features and functions, including algorithms," to analyze user interests and recommend third-party content based on those interests, are protected "publisher" functions.  *Id.*

The Second Circuit, in *Force v. Facebook*, reached the same conclusion in rejecting similar claims challenging Facebook's use of algorithms to recommend third-party content based on user interests, which the plaintiffs argued meant Facebook had assisted Hamas in terrorist attacks by recommending Hamas-related content to users.  The *Force* court found "no basis in the ordinary meaning of 'publisher,' the other text of Section 230, or decisions interpreting Section 230, for concluding that an interactive computer service is not the 'publisher' of third-party information *when it uses tools such as algorithms that are designed to match that information with a consumer's interests*."  934 F.3d at 66 (emphasis added).  The court held that such algorithms reflect "editorial decisions regarding third-party content that interactive computer services have made since the early days of the Internet," including "*where* on their sites [] particular third-party content should reside and *to whom* it should be shown."  *Id.* (emphasis added).

This case is no different.  Facebook's use of an algorithm to make decisions about which third-party content to show to which users is a protected function under the CDA.

***Audience Selection Tools.***  There is also no question that Plaintiff's claims based on Facebook's provision of audience selection tools, which Plaintiff admits need not be used at all, and, if they are used, can be used with *all* ads and not just financial services ads, is also a protected function.  Courts consistently have held that a website's provision of tools allowing advertisers to target their ads to particular audiences is a traditional publisher function protected by the CDA, including with respect to Facebook.  *See, e.g.*, *Force*, 934 F.3d at 65–66 (holding that Facebook's "allow[ing] advertisers to target ads to its users who are likely most interested in those ads" is a protected publisher function under CDA); *Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 891 (N.D.

Cal. 2017) ("provision of neutral tools, including targeted advertising" CDA protected); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1167 (N.D. Cal. 2017) (same); *Roommates*, 521 F.3d at 1169 (tools allowing users "to specify whether they will or will not receive emails" from others "by means of *user-defined* criteria" would be protected, even though such tools "might help some users exclude email from other users of a particular race or sex") (emphasis added).

### 3.     Plaintiff's Claims Are Based on Third-Party Content

All of Plaintiff's claims seek to hold Facebook liable for editorial decisions about where and to whom financial services ads created by third-parties should be shown on Facebook. Binding precedent dictates that neither the ad delivery algorithm nor the audience selection tools transforms Facebook into a creator or developer of third-party content for CDA purposes.

***Ad Delivery Algorithm.***  Facebook's ad delivery algorithm does not render Facebook a creator or developer of allegedly discriminatory third-party financial services ads under the CDA because, as Plaintiff admits, the algorithm applies to *all* ads, not just financial services ads, and is designed to match those ads with users who are interested in them.  See FAC ¶ 34 (describing algorithm as applying to ads, "including but not limited to advertisements for financial services"); *id.* ¶ 64 ("The purpose of this algorithm is to optimize an advertisement's audience and the advertiser's goals by showing the advertisement preferentially to the users Facebook believes will maximize [] advertisement views; [] clicks and engagement with the ads; and [] sales generated by clicks on the advertisement.").  The algorithm does not contribute to or modify the content in any way and Plaintiffs do not allege otherwise.  Its use does not make Facebook a content creator.

Any argument by Plaintiff to the contrary is foreclosed by binding precedent.  In *Dyroff*, the Ninth Circuit held that a website's use of "features and functions, including algorithms," to recommend content based on user "posts and other attributes" were publisher functions, not "content in and of themselves," and thus did not transform the website into a creator or developer of third-party content it recommended to users through algorithms.  *Dyroff*, 934 F.3d at 1095, 1097–98 (defendant website "recommended groups for users to join, based on the content of their posts and other attributes, using machine-learning algorithms").

Likewise, the Second Circuit in *Force* rejected the plaintiffs' argument that "Facebook's

algorithms 'develop' Hamas's content by directing such content to users who are most interested in Hamas and its terrorist activities." *Force*, 934 F.3d at 68.  The court held that Facebook's "algorithms take the information provided by Facebook users and 'match' it to other users—again, materially unaltered—based on objective factors applicable to any content, whether it concerns soccer, Picasso, or plumbers.  Merely arranging and displaying other's content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content."  *Id.* at 70; *accord Gonzalez,* 335 F. Supp. 3d at 1173 ("Google's use of an algorithm that aggregates user and video data to make content recommendations across YouTube [] does not turn Google into an 'information content provider' with respect to the videos themselves").

The same is true here.  Facebook's ad delivery algorithm makes decisions about which third-party ads to show to which users based on objective factors applicable to all types of ads, and therefore does not render Facebook a creator or developer of that third-party content.

***Audience Selection Tools.***  Facebook's audience selection tools likewise do not render Facebook a creator or developer of allegedly discriminatory third-party financial services ads because, as Plaintiff admits, these tools apply to *all* ads, not just financial services ads, have lawful purposes, and are only used for unlawful purposes, according to Plaintiff, if *advertisers* change the default settings of the age and gender tools or use an LAL seed audience that intentionally skews "disproportionately male or younger."  FAC ¶¶ 39-40 (describing age/gender tools); *id.* ¶ 58 (describing LAL).

These are exactly the type of "neutral tool[]" protected by the CDA.  *Roommates*, 521 F.3d at 1171.  Courts uniformly have held that the use of such neutral tools by third parties does not transform a publisher into a creator or developer of content created by those third parties.  *Id.* at 1168, 1172.  This is true "even if the users committed their misconduct using" such "tools."  *Id.* at 1169 n.24; *see Kimzey*, 836 F.3d at 1270 (a "'neutral tool' operating on 'voluntary inputs' ... [does] not amount to content development or creation").

For example, in *Carafano*, a dating website provided users with a "detailed questionnaire" that included multiple-choice questions where "members select[ed] answers ... from menus

1   providing between four and nineteen options" in creating their profiles.  339 F.3d at 1121.  The

2   plaintiff argued that these menus included "sexually suggestive" phrases that facilitated the

3   creation of a defamatory impersonated profile.  *Id.*  The Ninth Circuit held that "[d]oubtless, the

4   questionnaire facilitated the expression of information by individual users," but the "selection of

5   the content was left exclusively to the user" and thus it was a neutral tool protected by the CDA.

6   *Id.* at 1124.

7          Similarly, in *Goddard*, the plaintiff challenged Google's provision of a "Keyword Tool"

8   that "suggest[ed] the phrase 'free ringtone'" to advertisers, claiming that "the suggestion of the

9   word 'free,' when combined with Google's knowledge 'of the mobile content industry's

10  unauthorized charge problems,' makes the Keyword Tool 'neither innocuous nor neutral.'"  640 F.

11  Supp. 2d at 1197.  The court rejected this argument, holding that "[l]ike the menus in *Carafano*,

12  Google's Keyword Tool is a neutral tool.  It does nothing more than provide options that

13  advertisers may adopt or reject at their discretion."  *Id*. at 1198.[4]

14         The same principle applies here.  Facebook's provision of neutral tools available for use

15  with *all* types of ads does not render Facebook a creator or developer of content if those tools are

16  used by advertisers to target financial services ads in ways Plaintiff claims are discriminatory.

17         Finally, Plaintiff alleges that Facebook "encourages" advertisers to use audience selection

18  tools in a discriminatory manner.  *See, e.g.*, FAC ¶ 43.  As discussed below, *infra* at 20-23, these

19  allegations are based on misleading quotes taken out of context from materials on Facebook's

20  website and should not be credited.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But even if

21  Plaintiff could allege facts showing that Facebook encouraged advertisers to use audience

22  selection tools in ways Plaintiff claims are discriminatory, which it did not, that would not defeat

23  CDA immunity.  *See La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1107 (C.D.

24  Cal. 2017) (holding that website "must have done more than merely encourage[d] the creation of

25

---

26  [4] *See also, e.g.*, *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (same);
    *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1168 (N.D. Cal. 2017) (holding that "Google's

27  targeted ad algorithm" was protected by the CDA as a "neutral tool[]"); *Hill v. StubHub, Inc.*, 727

28  S.E.2d 550, 562 (N.C. Ct. App. 2012) (pricing tool for tickets that suggested prices above that
    allowed by law was "a prototypically 'neutral tool'").

the challenged conduct" to lose CDA immunity); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 414 (6th Cir. 2014) (citing *Roommates* and expressly declining to adopt "encouragement test of immunity under the CDA").  Instead, Plaintiff would have to allege that Facebook *required* advertisers to engage in such alleged discrimination.  *See Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 986-87 (N.D. Cal. 2015) (recognizing that *Jones* "adopted the Ninth Circuit's reasoning in *Roommates.com*" that to forfeit CDA immunity, a website "must have *required* another to create that content" (emphasis added)); *Airbnb*, 285 F. Supp. 3d at 1107 (same).  Plaintiff does not, and cannot, allege any such thing here.

### C.   Plaintiff Fails to State a Claim Under the Unruh Act or § 51.5

#### 1.   The Unruh Act and § 51.5 Do Not Apply Extraterritorially

The plain text of the Unruh Act and § 51.5 limits their geographical scope.  *See* Cal. Civ. Code §§ 51(b), 51.5; *Archibald v. Cinerama Hawaiian Hotels, Inc.*, 73 Cal.App.3d 152, 159 (1977) ("[The Unruh Act] by its express language applies only within California."); *Loving v. Princess Cruise Lines, Ltd.*, No. CV 08-2898 JFW AJWX, 2009 WL 7236419, at *8 (C.D. Cal. Mar. 5, 2009) ("It is well-settled that the Unruh Act applies only within California.").  For this reason, courts routinely dismiss Unruh Act claims against websites, including Facebook, by plaintiffs outside of California.  *See, e.g.*, *Ebeid v. Facebook, Inc.*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *7 (N.D. Cal. May 9, 2019) (dismissing Arizona plaintiff's Unruh Act claim); *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) (dismissing Florida plaintiff's Unruh Act claim).  Plaintiff alleges that she lives in Washington, D.C. and therefore cannot state a claim under the Unruh Act and § 51.5.

The California choice of law clause in Facebook's Terms of Service does not change that result.  *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1223 (9th Cir. 2003) ("When a law contains geographical limitations on its application… courts will not apply it to parties falling outside those limitations, even if the parties stipulate that the law should apply."); *see also, e.g.*, *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1005–07 (N.D. Cal. 2014); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *35 (N.D. Cal. Aug. 30, 2017).

**2.    Plaintiff Does Not, And Cannot, Plead Any Intentional Discrimination By Facebook**

"[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination." *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 854 (2005).  Section 51.5 claims likewise require intentional discrimination.  *Long v. Playboy Enters. Int'l, Inc.*, 565 F. App'x 646, 647-48 (9th Cir. 2014).[5]  To demonstrate discriminatory intent, Plaintiff must plead (and ultimately prove) that Facebook "adopted [an allegedly discriminatory practice] to accomplish discrimination on the basis of [a protected characteristic]."  *Koebke*, 36 Cal. 4th at 854; *id.* at 853 (statutory damages provisions "reveal[] a desire to punish intentional and morally offensive conduct").  Plaintiff alleges no facts whatsoever, nor could she, showing any intentional discrimination by Facebook against users.

*Ad Delivery Algorithm*.  Plaintiff's own allegations show that Facebook has no incentive, let alone intent, to discriminate against women or older persons in ad delivery.  Plaintiff alleges that the purpose of the ad delivery algorithm is to deliver ads to users who want to view, click on and engage with, or purchase the product or service being advertised.  FAC ¶ 64 ("[t]he purpose of [the] algorithm is to optimize an advertisement's audience and the advertiser's goals by showing the advertisement preferentially to the users Facebook believes will maximize Awareness [user views], Consideration [user clicks and engagement], or Conversion [user purchases]").  Plaintiff further alleges that "Facebook wants advertisements to be as 'relevant' as possible to its users so that users will spend more time on Facebook and allow Facebook to sell and place more paid advertisements on Facebook."  *Id.* ¶ 43.  The only plausible inference to draw from these allegations is that Facebook's intent is to show ads to users who will find them relevant and who will view, click/engage, and purchase the products and services being advertised—regardless of their age and gender.

Moreover, while Plaintiff claims, without any factual support, that the algorithm causes

---

[5] Although § 51.5 is not formally a part of the Unruh Act, California courts have held that the liability analysis is the same.  *See Semler v. Gen. Elec. Capital Corp.*, 196 Cal. App. 4th 1380, 1404 (2011) ("[T]he analysis under Civil Code section 51.5 is the same as the analysis we have already set forth for purposes of the [Unruh Civil Rights] Act.").

financial services ads to be delivered "disproportionately to persons who fall into *the age and gender demographic profile* that Facebook's algorithm believes is *the most relevant audience* for the advertisement," *id*. ¶ 68 (emphasis added), Plaintiff does not, and cannot, allege that "the age and gender demographic profile" that the algorithm believes is "the most relevant audience" for financial services ads is male and younger persons.  In other words, Plaintiff does not allege any facts whatsoever to support an inference that Facebook intends the algorithm to show financial services ads to more men than women, or to more younger people than older people, or even that the algorithm has such an effect.

Even if Plaintiff were able to allege that the algorithm has such effect, which she cannot, this would amount to, at most, a disparate impact theory of liability which is not cognizable under the Unruh Act or § 51.5.  *Turner v. Ass'n of Am. Med. Colls.*, 167 Cal. App. 4th 1401, 1408-10 (2008) ("the Unruh Act does not extend to practices and policies that apply equally to all persons"); *see also Koebke*, 36 Cal. 4th at 854 ("[a] disparate impact analysis or test does not apply to Unruh Act claims"); *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 426 (9th Cir. 2014) (dismissing Unruh Act claim by hearing-impaired plaintiffs based on "policy of displaying online video programming without closed captioning [which] applied equally to all CNN.com visitors"); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1024 (N.D. Cal. 2012) (Unruh Act "claim cannot be based solely on the disparate impact of Netflix's policies on hearing-impaired individuals"); *Earll v. eBay Inc.*, 2012 WL 3255605, at *5 (N.D. Cal. Aug. 8, 2012) (dismissing Unruh Act claim based on "a facially neutral verification process with a disparate impact on the deaf community"); *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1237 (2007) (dismissing Unruh Act claim that practice "disproportionately and adversely impacts blind people").

***Audience Selection Tools***.  Plaintiff acknowledges, as she must, that audience selection tools are available for use with *all* ads, not just financial services ads, and, according to Plaintiff, result in discrimination *only if* third-party advertisers change default settings on the age and gender tools or use certain types of customer lists for the LAL tool.  FAC ¶¶ 75, 39-40, 58.  That some advertisers may use these neutral tools in ways Plaintiff claims are discriminatory, in violation of

Facebook's antidiscrimination policy which expressly prohibits discrimination on its platform including through use of audience selection tools, does not come close to showing any intent *by Facebook* to discriminate against users.  *See e.g., Turner*, 167 Cal. App. 4th at 1408-1410 ("Unruh Act does not extend to practices and policies that apply equally to all persons."); *Earll,* 2012 WL 3255605, at *5 (dismissing Unruh Act claim where "allegations describe a facially neutral policy" and thus did not "demonstrate intentional discrimination"); Ring Decl., Exhibits A & B (Facebook's antidiscrimination policy).

Plaintiff's claim that Facebook "encourages" advertisers to use the age and gender tools in discriminatory ways is based on selective and misleading quotations from materials on Facebook's website that simply describe how these neutral, self-serve tools can be used in a variety of contexts.  For example, Plaintiff quotes "Blueprint" materials that explain to advertisers:  "*If you want, you can choose* to reach out to only men or only women," for products like bridal dress shops and beard grooming businesses.  FAC ¶ 45 (emphasis added).  Those materials also state that a winemaker might use age targeting because "there might be a minimum age for people you reach out to."  Ring Decl., Exhibit C at 21.  Likewise, Plaintiff quotes language from the video entitled "How to Choose an Audience for Your Facebook Ad," *id*., at 16-19, asking advertisers if their customers are "often of a certain age or gender."  In fact, the majority of this video focuses on two different examples of targeting,[6] neither of which involves age or gender targeting, much less targeting of ads for "non-credit-related financial services."  FAC ¶ 85; Ring Decl., Exhibit C at 18.  Likewise, none of the general "tips" in the help-center material "4 Tips for Selecting Your Ad Audience" says anything about excluding users based on age or gender for "non-credit-related financial services."  Ring Decl., Exhibit C at 23.

Plaintiff also points to an "audience meter" that changes from red to yellow to green as an audience becomes more targeted, and alleges that the meter may change from yellow to green if an advertiser "eliminates persons who are older than 40 from the audience" or "eliminates women."

---

[6] The first example suggests that a fruit market may want to advertise to an audience interested in health, fitness, and cooking. The second example suggests that a surf shop would want to advertise to people who live nearby, who have active hobbies, or who name surfing as an interest.

FAC ¶ 52.  But the meter simply reflects an estimate of an audience's size and reach, *not* whether users in the selected audience are interested in the ad.  Ring Decl., Exhibit C at 23-24.  As a result, the meter might also turn from yellow to green if an advertiser eliminates users in California or users who are interested in dogs.  The audience meter, on its face, simply does not reflect the kind of information that Plaintiff claims it does; it is entirely irrelevant to the claims here.

Plaintiff also perversely asserts that Facebook's efforts to combat discrimination through its recent development of "classifiers" designed to identify ads that are "likely to be credit, housing, or employment related" means that Facebook "has specifically known every time" an advertiser might have created a credit-related ad.  FAC ¶¶ 82-83.  Plaintiff further asserts, with no factual basis, that Facebook "knew" how these ads were targeted and "took no action to stop this practice in spite of its knowledge that these ads might violat[e] various … laws." *Id.*  These conclusory assertions do not demonstrate that Facebook "knew" that allegedly discriminatory advertising was occurring, and certainly do not demonstrate that Facebook intended for advertisers to engage in any discriminatory advertising.  Facebook's implementation of additional technical measures that attempt to prevent the misuse of audience selection tools in connection with housing, employment, and credit ads does not demonstrate that Facebook intends for advertisers to use those tools to unlawfully discriminate with respect to all other types of ads.  Indeed, Plaintiff's baseless assertions boil down to an argument that Facebook should have also included financial services ads in the new ad creation flow, and that Facebook's "failure" to do so somehow demonstrates intent.  But as the Ninth Circuit has held, "knowledge" that unlawful conduct is "substantially likely" to occur "and a failure to act upon that knowledge" is insufficient to demonstrate intentional discrimination as a matter of law.  *Cable News Network*, 742 F.3d at 427.

### 3. Plaintiff Does Not, And Cannot, Plead That Facebook Engaged In Any Unlawful Conduct

The Unruh Act and § 51.5 "prohibit[] only unreasonable, arbitrary, or invidious discrimination, not differential treatment based on actual characteristic differences or differences in needs of users." *Sunrise Country Club Ass'n v. Proud*, 190 Cal. App. 3d 377, 380-81 (1987).  "Invidious discrimination is the treatment of individuals in a manner that is malicious, hostile, or

1    damaging." *Javorsky v. W. Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386, 1404 (2015).  The

2    "fundamental purpose of the [Unruh Act] is the elimination of anti-social discriminatory

3    practices—not the elimination of socially beneficial ones."  *Sargoy v. Resolution Trust Corp.*, 8

4    Cal. App. 4th 1039, 1049 (1982).

5         There is nothing "unreasonable, arbitrary, or invidious" or "malicious, hostile, or

6    damaging" about using an algorithm to deliver ads based on user interests or providing tools that

7    allow them to select audiences based on their own market experience.  As discussed above,

8    Plaintiff does not allege any facts showing that the ad delivery algorithm shows financial services

9    ads to more men than women and/or to more younger people than older people because of the age

10   and gender of users.  And Plaintiff admits that the audience selection tools are available for use

11   with *all* types of ads, not just financial services ads, and allegedly result in discrimination *only if*

12   *advertisers, not Facebook*, chose to use them in allegedly discriminatory ways.

13        Moreover, although Plaintiff's claim here is limited to financial services ads, Plaintiff's

14   underlying legal theory sweeps far more broadly.  Plaintiff would have the Unruh Act and § 51.5

15   prohibit any and all advertising on the basis on any protected characteristic.  Advertisers could be

16   sued for choosing to place ads for retirement communities in AARP or women's exercise apparel

17   in Women's Health, even though neither type of conduct can be said to rest on unreasonable,

18   arbitrary, or invidious discrimination.  Neither the text nor the purpose of the Unruh Act or § 51.5

19   support Plaintiff's overbroad theory.  *Cf. Javorsky*, 242 Cal. App. 4th at 1395 (differential

20   treatment "may be reasonable, and not arbitrary, in light of the nature of the enterprise or its

21   facilities, legitimate business interests … and public policy"); *Morsa v. Facebook, Inc.*, 77 F.

22   Supp. 3d 1007, 1013 (2014) ("targeted advertising" "has been practiced as long as markets have

23   been in operation"); *see also OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal.

24   2014) ("The concept of gathering information about one's intended market and attempting to

25   customize the information then provided is as old as the saying, 'know your audience.'").

26        Unlike comparable statutory schemes where the California legislature explicitly addressed

27   advertising and the potential for discrimination in advertising—*e.g.*, the California Fair

28   Employment and Housing Act, Cal. Gov't Code §§ 12940(d) (employment "publication[s]") &

12955(c) (housing "advertisements")—the Unruh Act and § 51.5 have no comparable provisions. Instead, both laws prohibit only "unreasonable, arbitrary, or invidious discrimination" that is intentional and "morally offensive." *See Koebke*, 36 Cal. 4th at 853 (quoting *Harris v. Capital Growth Inv'rs XIV*, 52 Cal. 3d 1142, 1172 (1991)). It cannot be the case that the Unruh Act and § 51.5 would allow businesses to have policies and practices "based on actual characteristic differences or differences in needs of users," but prohibit advertising based on those same differences. *See Sunrise*, 190 Cal. App. 3d at 380-81.

### 4. Plaintiff Does Not, And Cannot, Plead Any Aiding-And-Abetting Claim

Plaintiff's aiding-and-abetting claims based on audience selection tools also fail. As an initial matter, Plaintiff has not alleged an independent primary violation by any third-party advertiser. *See, e.g.*, *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) ("failure to allege an independent, primary" violation "moots" claims for "aiding and abetting"). In addition, to prevail on an aiding-and-abetting theory, a plaintiff must show that a defendant gave "substantial assistance or encouragement" to the primary violator, and also that the defendant "acted *with the intent of facilitating the commission of that tort*." *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144, 1146 (2005) (emphasis added); *see also Bergstein v. Stroock & Stroock & Lavan LLP*, 236 Cal. App. 4th 793, 810 (2015) (same). Plaintiff does not, and cannot, come close to meeting that standard. Facebook has "do[ne] no more than provid[e its] usual, legitimate service" to advertisers. That some advertisers may misuse the service does not amount to substantial assistance or encouragement. *Schulz v. Neovi Data Corp.,* 152 Cal. App. 4th 86, 94 (2007); *see also Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 963-966 (2002).

### D. Plaintiff's D.C. Law Claims Should Be Dismissed Because Plaintiff Agreed That California Law Would Apply

Plaintiff has an active Facebook account. FAC ¶ 15; Declaration of Nicholas Wong ("Wong Decl.") ¶¶ 2, 11. When creating her Facebook account, Plaintiff agreed to Facebook's Terms of Use, then referred to as the Statement of Rights and Responsibilities ("SRRs"), a binding contract that governs the relationship between Plaintiffs and Facebook. Wong Decl. ¶¶ 2-6. Plaintiff could not have signed up for a Facebook account without agreeing to the Terms of Use.

Plaintiff also agreed to be bound by updates to the Terms of Use.  *See* Wong Decl. ¶ 4.

Facebook's Terms of Use contain a clause providing that California law will govern any claims

arising out of or related to the Terms of Use or Facebook, without regard to conflict of law

provisions.  Wong Decl. ¶ 10; FAC ¶ 13, ¶ 135.  Plaintiff therefore has agreed to bring any claim

against Facebook under California law.  Indeed, Plaintiff alleges that "Facebook's Terms of

Service require all [putative class members] to enforce any disputes related to Facebook's

products under California law, including the Unruh Act."  FAC ¶ 142.

Facebook's California choice of law clause is enforceable and requires dismissal of

Plaintiff's D.C. law claims.  In a diversity case like this, California law governs whether this

choice of law clause is enforceable.  *See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of

Tex.*, 571 U.S. 49, 64 (2013).  In California, a choice of law clause "'generally will be enforced

unless' the party asserting the law of an alternate state 'can establish both that the chosen law is

contrary to a fundamental policy' of the alternate state and that the alternate state 'has a materially

greater interest in the determination of the particular issue.'"  *Palomino v. Facebook, Inc.*, No. 16-

CV-04230-HSG, 2017 WL 76901, at *3 (N.D. Cal. Jan. 9, 2017) (enforcing choice of law clause

in Facebook Terms of Service).

Plaintiff cannot meet that burden because Plaintiff does not identify any conflict between

California and D.C. law, and there is none.  Like the Unruh Act, the D.C. Human Rights Act

("DCHRA") has territorial limitations—it applies only to public accommodations physically

located in the District of Columbia.  *See Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30,

39–40 (D.D.C. 2019) (dismissing DCHRA claim against Facebook).  So this is not a case where

applying California law would conflict with another state's public policy on the grounds that

"California has no law or policy equivalent" to the other state's law.  *Compare In re Facebook

Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016).  Rather, California

and D.C. law reflect the same policy: neither jurisdiction has chosen to regulate conduct that

occurs outside its borders.  *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1203–04 (2011) (states

whose employment law did not apply extraterritorially had no interest in having law apply to work

in California).

1    Nor is there any conflict between the DCCPPA and California law.  "California's

2  consumer protection laws have been recognized as 'among the strongest in the country.'"

3  *Palomino*, 2017 WL 76901, at *4.  To the extent that California consumer protection law "affords

4  different rights and remedies" than D.C. law, several courts in this District have held that this does

5  not create a fundamental public policy conflict and have dismissed consumer protection claims

6  against Facebook under the laws of other states.  *See Williams v. Facebook, Inc.*, 384 F. Supp. 3d

7  1043, 1055–57 (N.D. Cal. 2018) (dismissing New York consumer protection claim because

8  "[d]ifferences in the particulars of the consumer statutes [of California and New York] are not

9  enough, however, and do not represent a fundamentally different policy"); *Palomino*, 2017 WL

10  76901, at *4 (rejecting conflict with New Jersey consumer protection law and enforcing clause in

11  Facebook Terms of Service).  This Court should do the same.

12        **E.        Plaintiff Fails to State a Claim Under D.C. Law**

13    Even assuming D.C. law could apply, Plaintiff fails to state any claim under the DCHRA

14  for multiple independent reasons.  *First*, the DCHRA applies only to a "place of public

15  accommodation" with a physical location in the District of Columbia.  *See U.S. Jaycees v.*

16  *Bloomfield*, 434 A.2d 1379, 1381 (D.C. 1981).  In *Jaycees*, the D.C. Court of Appeals held that a

17  defendant organization was not a "place of public accommodation" subject to the DCHRA

18  because the organization itself "[did] not operate from any particular place within the District of

19  Columbia."  *Id.*  Other courts have applied this ruling in dismissing DCHRA claims against

20  Facebook.  *Freedom Watch*, 368 F. Supp. 3d at 39.  This Court should do the same because

21  Plaintiff does not and cannot allege that Facebook, or any of the third-party advertisers, operate

22  from any particular location within D.C.

23    *Second*, Plaintiff has not alleged any ad "which indicates that the full and equal enjoyment

24  . . . of a place of public accommodation will be unlawfully refused" or "that an individual's

25  patronage of, or presence at, a place of public accommodation is objectionable, unwelcome,

26  unacceptable, or undesirable" based on age or gender.  D.C. Code § 2-1402.31(a)(2).  Plaintiff has

27  not identified any financial services ad "indicating" that the financial services being advertised

28  would be unlawfully denied to anyone or that customers of a certain age or gender are unwelcome.

*Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991), *cert. denied*, 502 U.S. 821 (1991) (interpreting "indicates" for purpose of FHA).  None of the ads that Plaintiff cites says anything about denying services, let alone based on age or gender.  Nor do the "Why am I seeing this ad?" statements say anything about denying anyone financial services.

*Third*, for the reasons set forth above, *supra* at 20-23, Plaintiff has failed to allege facts showing that Facebook provided neutral audience selection tools with the intent that advertisers would use them "wholly or partially for a discriminatory reason."  D.C. Code § 2-1402.31.  Plaintiff's derivative aiding and abetting claims fail for the same reason.  Under D.C. law, a defendant aids or abets the DCHRA violations of a third-party only if the defendant "associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his action to make it succeed."  *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998) (quotation omitted).  Plaintiff has not, and cannot, allege any such thing here.

Plaintiff also fails to state any claim under the DCCPPA.  D.C. Code § 28-3904(e) and (f).  To state a claim under these provisions, Plaintiff must allege a "misrepresentation as to a material fact which has a tendency to mislead and failure to state a material fact if such failure tends to mislead."  *Grayson v. AT & T Corp.*, 15 A.3d 219, 251 (D.C. App. 2011) (quotation omitted).  "[A] claim of an unfair trade practice [under the DCCPPA] is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer."  *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008).  Plaintiff points to three alleged misrepresentations by Facebook, none of which comes close to meeting this standard.

*First*, Plaintiff claims that "Why am I seeing this ad" statements (WAIST) mislead consumers into believing that discriminatory conduct is lawful.  *See, e.g.*, FAC ¶ 171.  But no reasonable consumer would read these statements, which provide information to users about why *they* are seeing a particular financial services ad, as endorsing discrimination against *other* users.  This is especially true given that Plaintiff simultaneously alleges that these same statements express an unlawful preference for purposes of their DCHRA claims.  In fact, the WAIST statements support neither allegation, but in any event, Plaintiffs cannot have it both ways.

*Second*, Plaintiff claims that Facebook misled consumers by stating "There is no place for

discrimination on Facebook."  FAC ¶ 174.  A company's statement that it does not violate the law is not misleading merely because a plaintiff alleges that the company is violating the law.  *E.g.*, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (as a matter of law, company's statement that "we believe we are obeying the law" cannot be misleading merely because plaintiff alleges that "belief turned out to be wrong" because it "was in fact violating" the law).  Facebook's Terms of Service also clearly disclosed its practices.[7] Whether those practices are discriminatory is being litigated in this Court.

*Third*, Plaintiff claims that Facebook's choice of law clause is deceptive.  FAC ¶¶ 176-177. This argument conflates the distinct legal concepts of what law applies to a dispute and whether that law provides a particular plaintiff with a particular cause of action in that dispute.  Simply put, the geographical limits on the Unruh Act and § 51.5 do not make it false or misleading for Facebook to say in its Terms that California law "will govern" any disputes, simply because Plaintiff's counsel wants to assert claims under those California laws.  *O'Connor*, 58 F. Supp. 3d at 1005 ("a contractual choice of law provision that incorporates California law presumably incorporates all of California law—including California's presumption against extraterritorial application of its law").

Finally, even assuming Plaintiff's passing reference to the DCCPPA making it unlawful to "violate other laws, such as the DCHRA" could pass as a "clear articulat[ion] [of] D.C. Code § 28-3905(k)(1) as an independent basis for a claim," *Rose v. Wells Fargo Bank, N.A.*, 73 A.3d 1047, 1054 n.11 (D.C. App. 2013), Plaintiff also cannot state a DCCPPA claim on this basis.  As explained above, Plaintiff fails to plead a violation of the DCHRA or any other predicate violation of D.C. law.  *See Grayson*, 15 A.3d at 250-51 (dismissing where plaintiff failed to allege any "legally viable claims" under sections 28–3904(a), (e), (f), (h), (r)(2) and (r)(5) of the DCCPPA).

---

[7] "We allow advertisers to tell us things like their business goal, and the kind of audience they want to see their ads (for example, people between the age of 18-35 who like cycling)… [W]e provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience."  Wong Decl. Ex. D at 19 (Terms of Service).

DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1

## IV.    <u>CONCLUSION</u>

2

The Court should dismiss Plaintiff's First Amended Complaint with prejudice.

3

DATED:  May 8, 2020                        MUNGER, TOLLES & OLSON LLP

4

5

By:    _/s/ Rosemarie T. Ring_

6

ROSEMARIE T. RING
Attorneys for Defendant Facebook, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28