Jahan C. Sagafi (State Bar No. 224887)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com

Adam T. Klein*
Michael Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: atk@outtengolden.com
Email: mlitrownik@outtengolden.com

Pooja Shethji*
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Suite 200W
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: pshethji@outtengolden.com

* *pro hac vice*

Peter Romer-Friedman*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312,
Washington, DC 20036
Telephone: (202) 888-1741
Email: peter@guptawessler.com

Jason R. Flanders (State Bar No. 238007)
AQUA TERRA AERIS LAW GROUP
490 43rd Street
Oakland, CA 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Matthew K. Handley*
Rachel Nadas*
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2411
Email: mhandley@hfajustice.com
Email: rnadas@hfajustice.com

William Most (State Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com

*Attorneys for Plaintiff and Proposed Class Members*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

NEUHTAH OPIOTENNIONE, on behalf of herself and others similarly situated,

Plaintiff,

v.

FACEBOOK, INC.,

Defendant.

Case No. 3:19-cv-07185-JSC

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Judge: Hon. Jacqueline S. Corley
Date: July 16, 2020
Time: 9:00 AM
Courtroom: E

## TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 1

I. Facebook's Core Business Involves Segregating and Discriminating Against its Users .......... 1

II. Facebook's Three Key Tools for Determining Which Users Receive Financial Services Ads Expressly Rely on Age and Gender to Deny Such Ads to Older People and Women .......... 2

III. Facebook's Discrimination Has Denied Plaintiff and Others Equal Services .......... 4

STANDARD OF REVIEW .......... 4

ARGUMENT .......... 5

I. Plaintiff Has Standing to Pursue All of Her Claims .......... 5

A. Plaintiff Has Article III Standing .......... 5

1. Plaintiff Was Injured as She Personally Suffered the Denial of Equal Treatment .......... 5

2. Plaintiff Suffered Other Cognizable Injuries .......... 8

B. Plaintiff's Injuries Are Traceable to Facebook and Are Redressable .......... 9

C. Plaintiff Has Standing Under California and District of Columbia Law .......... 11

II. The Communications Decency Act Does Not Provide Facebook Any Immunity or Defense .......... 11

A. Facebook Lacks Immunity Because It Is an Information Content Provider .......... 13

1. Facebook Develops or Creates in Part the Exclusionary Audience Selections .......... 16

2. Facebook Develops or Creates in Whole or in Part "Lookalike Audiences." .......... 17

3. Facebook Develops or Creates in Whole the Ad Delivery Algorithm .......... 18

4. Facebook Creates in Whole the "Why Am I Seeing This Ad" Statements .......... 20

B. Facebook Lacks Immunity Because It Is Not Treated as a Publisher Here .......... 21

III. Plaintiff States Claims Under California Law, Which Applies to All the Relevant Conduct .......... 21

A. California Law Applies, Since the Discriminatory Conduct Occurred in California .......... 22

B. Plaintiff Adequately Pleads Intentional Discrimination .......... 23

C. Segregating and Discriminating Against Facebook Users in the Area of Financial Services Ads Is Unreasonable, Arbitrary, and Invidious .......... 25

D. Plaintiff Has Pleaded an Aiding and Abetting Claim .......... 25

IV. Plaintiff States a Plausible Claim Under District of Columbia Law, Which Must Apply if California Law Does Not Apply to Users Like Plaintiff Who Live Outside of California ........ 26

A. Plaintiff Cannot Be Left Without State Civil Rights Protections ........ 26

B. Plaintiff Has Stated a Claim Under the D.C. Human Rights Act ........ 28

1. The DCHRA Does Not Require a Physical Location in D.C ........ 29

2. Plaintiff Has Alleged That Facebook's Financial Services Ads Indicate That Customers of Certain Ages and Genders Are Unwelcome ........ 30

3. Plaintiff Has Alleged an Aiding and Abetting Claim Under the DCHRA 31

C. Plaintiff Has Adequately Alleged a Violation of the DC CPPA ........ 31

CONCLUSION ........ 32

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**


*Acosta v. Perez*,
No. 19 Civ. 1224, 2020 WL 2194001 (E.D. Cal. May 6, 2020) ........ 10

*Ades v. Omni Hotels Mgmt. Corp.*,
46 F. Supp. 3d 999 (C.D. Cal. 2014) ........ 23

*Anderson v. CRST Int'l, Inc.*,
685 F. App'x 524 (9th Cir. 2017) ........ 22

*Angelucci v. Century Supper Club*,
158 P.3d 718 (Cal. 2007) ........ 6

*Archibald v. Cinerama Hawaiian Hotels, Inc.*,
140 Cal. Rptr. 599 (Cal. Ct. App. 1977) ........ 23

*Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*,
556 A.2d 462 (D.C. 1989) ........ 31, 32

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........ 11, 12, 21

*BBX Capital v. Fed. Deposit Ins. Corp*,
956 F.3d 1304 (11th Cir. 2020) ........ 9

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 9

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998) ........ 12

*Brack v. Omni Loan Co.*,
80 Cal. Rptr. 3d 275 (Cal. Ct. App. 2008) ........ 27

*Bradley v. T-Mobile US, Inc.*,
No. 17 Civ. 7232, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ........ 7, 8, 9, 10

*Brinkerhoff v. L'Oreal USA, Inc.*,
417 F. Supp. 3d 1308 (S.D. Cal. 2019) ........ 4, 8

*Brown v. D.C. Dep't of Emp't Servs.*,
83 A.3d 739 (D.C. 2014) ........ 29

*In re C.P. Hall Co.*,
750 F.3d 659 (7th Cir. 2014) ........ 10

*Caraccioli v. Facebook, Inc.*,
167 F. Supp. 3d 1056 (N.D. Cal. 2016) .......... 12

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .......... 17

*Casey v. U.S. Bank Nat. Ass'n*,
26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005) .......... 26

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008) .......... 13

*Colo. Cross Disability Coal. v. Hermanson Fam. Ltd. P'ship*,
No. 96 Civ. 2490, 1997 WL 33471623 (D. Colo. Aug. 5, 1997) .......... 7

*Dist. Cablevision Ltd. P'shp. v. Bassin*,
828 A.2d 714 (D.C. 2003) .......... 32

*Dist. of Columbia v. Evolve*,
No. 2018 CA 8262 B, 2020 D.C. Super. LEXIS 6 (D.C. Sup. Feb. 25, 2020) .......... 32

*Doe v. Internet Brands*,
824 F.3d 846 (9th Cir. 2016) .......... 21

*Doe v. Virgin Am., Inc.*,
No. 18 Civ. 242, 2018 WL 5291987 (N.D. Cal. Oct. 22, 2018) .......... 22

*Doran v. 7-Eleven, Inc.*,
524 F.3d 1034 (9th Cir. 2008) .......... 6, 7

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) .......... 14, 18, 19

*EEOC v. Borden's, Inc.*,
724 F.2d 1390 (9th Cir. 1984) .......... 24

*Evenchik v. Rent A Car Sys., LLC*,
No. 12 Civ. 61, 2012 WL 4111382 (S.D. Cal. Sept. 17, 2012) .......... 24

*In re Facebook Biometric Info. Privacy Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) .......... 27, 28

*Fair Hous. Council v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .......... *passim*

*Fed. Trade Com'n v. Accusearch Inc.*,
570 F.3d 1187 (10th Cir. 2009) .......... 16

*Feldman v. Pro Football, Inc.*,
419 F. App'x 381 (4th Cir. 2011) .......... 6

*Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) ........ 9

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ........ 19, 20

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ........ 16, 18

*Freedom Watch Inc. v. Google*, *Inc.*,
368 F. Supp. 3d 30 (D.D.C. 2019) ........ 29, 30

*Goddard v. Google, Inc.*,
640 F. Supp. 2d 1193 (N.D. Cal. 2009) ........ 17

*Guevara v. UMH Props., Inc.*,
No. 11 Civ. 2339, 2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) ........ 31

*Homeaway.com v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ........ 12, 13, 20, 21

*Hous. Rights Ctr. v. Sterling*,
404 F. Supp. 2d 1179 (C.D. Cal. 2004) ........ 31

*Igbonwa v. Facebook, Inc.*,
No. 18 Civ. 2027, 2018 WL 4907632 (N.D. Cal. Oct. 9, 2018) ........ 12

*Iniestra v. Cliff Warren Invs., Inc.*,
886 F. Supp. 2d 1161 (C.D. Cal. 2012) ........ 24

*James v. Team Washington*,
No. 97 Civ. 378, 1997 WL 633323 (D.D.C. Oct. 7, 1997) ........ 29

*Jane Doe No. 1 v. Backpage.com LLC*,
817 F.3d 12 (1st Cir. 2016) ........ 11

*Javorsky v. W. Athletic Clubs, Inc.*,
195 Cal. Rptr. 3d 706 (Cal. Ct. App. 2015) ........ 25

*Jones v. Dirty World Entm't Recordings, LLC*,
755 F.3d 398 (6th Cir. 2014) ........ 11

*Kearney v. Salomon Smith Barney, Inc.*,
137 P.3d 914 (Cal. 2006) ........ 23

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) ........ 17

*Kirola v. City & Cty. of San Francisco*,
860 F.3d 1164 (9th Cir. 2017) ........ 6, 9, 10

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014) ........ 12

*Koire v. Metro Car Wash*,
707 P.2d 195 (Cal. 1985) ........ 6, 23

*Lane v. Landmark Theatre Corp.*,
No. 16 Civ. 6790, 2020 WL 1976420 (N.D. Cal. Apr. 24, 2020)........ 7

*Levine v. Vilsack*,
587 F.3d 986 (9th Cir. 2009)........ 10, 11

*Loving v. Princess Cruise Lines, Ltd.*,
No. 08 Civ. 2898, 2009 WL 7236419 (C.D. Cal. Mar. 5, 2009) ........ 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 9

*Martinez v. Optimus Props., LLC*,
Case No. 16 Civ. 8598, 2017 WL 1040743 (C.D. Cal. Mar. 14, 2017)........ 31

*Menzel v. Scholastic, Inc.*,
No. 17 Civ. 5499, 2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ........ 24

*Nat'l Fair Hous. Alliance v. Facebook, Inc.*,
No. 18 Civ. 2689 (S.D.N.Y. Aug. 17, 2018)........ 13, 16, 17

*Nat'l Fed'n of Blind v. Target Corp.*,
582 F. Supp. 2d 1185 (2007)........ 8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ........ 32

*Onuoha v. Facebook, Inc.*,
No. 16 Civ. 6440 (N.D. Cal. Nov. 16, 2018) ........ 13

*Osborne v. Capital City Mortg. Corp.*,
727 A.2d 322 (D.C. 1999)........ 32

*Parr v. Mashaallah Ebrahimian*,
774 F. Supp. 3d 234 (D.D.C. 2011) ........ 32

*People v. Bollaert*,
248 Cal. App. 4th 699 (Cal. Ct. App. 2016) ........ 15

*Perez v. Wells Fargo & Co.*,
No. 17 Civ. 454, 2017 WL 3314797 (N.D. Cal. Aug. 3, 2017) ........ 25

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1222 (N.D. Cal. 2014) ........ 16

*Reed v. CVS Pharmacy, Inc.*,
No. 17 Civ. 3877, 2017 WL 4457508 (C.D. Cal. Oct. 3, 2017) .......... 8

*Rios v. N.Y. & Co., Inc.*,
No. 17 Civ. 4676, 2017 WL 5564530 (C.D. Cal. Nov. 16, 2017) .......... 8

*San Diego Cty. Gun Rights Comm. v. Reno*,
98 F.3d 1121 (9th Cir. 1996) .......... 9

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
638 F.3d 1163 (9th Cir. 2011) .......... 9

*Schulz v. Neovi Data Corp.*,
60 Cal. Rptr. 3d 810 (Cal. Ct. App. 2007) .......... 26

*Shoppers Food Warehouse v. Moreno*,
746 A.2d 320 (D.C. 2000) .......... 30

*Silvious v. Snapple Beverage Corp.*,
793 F. Supp. 2d 414 (D.D.C. 2011) .......... 11

*Smith v. City of Oakland*,
No. 19 Civ. 5398, 2020 WL 2517857 (N.D. Cal. Apr. 2, 2020) .......... 4

*Sullivan v. Oracle Corp.*,
254 P.3d 237 (Cal. 2011) .......... 22, 23

*B.K. ex rel. Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019) .......... 10

*U.S. Jaycees v. Bloomfield*,
434 A.2d 1379 (D.C. 1981) .......... 30

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
715 A.2d 873 (D.C. 1998) .......... 31

*Warner v. Tinder Inc.*,
105 F. Supp. 3d 1083 (C.D. Cal. 2015) .......... 23

*White v. Square, Inc.*,
7 Cal. 5th 1019 (2019) .......... 11

*White v. Square, Inc.*,
891 F.3d 1174 (9th Cir. 2018) .......... 6

**STATUTES**

California Civil Code Section 51 .......... *passim*

California Civil Code Section 51.5 .......... *passim*

Civil Rights Act of 2005, § 2, 2005 Cal. Legis. Serv. Ch. 420 .......... 21

Communications Decency Act of 1996, 47 U.S.C. § 230 .......... *passim*

D.C. Consumer Protections Procedures Act, Code §§ 28-3901 to -3913 .......... *passim*

D.C. Human Rights Act, D.C. Code §§ 2-1401.01 to -1404.04 .......... *passim*

**OTHER AUTHORITIES**

29 C.F.R. § 100.75 .......... 30

29 C.F.R. § 1604.5 .......... 30

29 C.F.R. § 1625.4 .......... 30

*Algorithm*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/algorithm (last visited June 12, 2020) .......... 20

## INTRODUCTION

In this case, Plaintiff Neuhtah Opiotennione challenges Facebook's systemic practice of denying women and older people equal treatment in its business by denying them a primary benefit of Facebook – valuable ads on financial services – based on users' gender and age. Facebook does this by requiring users to identify their gender and age and then applying tools that expressly rely on gender and age to exclude Facebook users from receiving ads. Plaintiff alleges that this practice violates state public accommodation laws that bar businesses from denying equal service to customers based on their protected statuses.

In its Motion to Dismiss, Facebook seeks to close the courthouse door on Plaintiff and millions of other women and older people whom Facebook has routinely denied equal services. Facebook argues that (1) Plaintiff is not injured by its discrimination, (2) federal law immunizes all actions that websites actively take to discriminate against their customers, (3) the choice-of-law provision in Facebook's terms of service means that no state civil rights law applies to Plaintiff and users outside of California, and (4) it is proper to facially discriminate against customers by denying them a primary benefit of Facebook. These radical and untenable claims are foreclosed by controlling law and must be rejected. To accept them will turn the internet into a civil rights free zone where websites are free to deny any of their services to people based on protected traits like gender, age, race, or religion. Thus, the Court should deny Facebook's motion.

## BACKGROUND

### I. Facebook's Core Business Involves Segregating and Discriminating Against its Users.

Advertising is integral to Facebook's business. Over 98% of its revenue comes from selling ads to marketers and showing them to Facebook users. ECF No. 30 (Am. Compl.) ("FAC"), ¶¶ 19, 87. Facebook is a valuable advertising platform because of the access that it offers marketers to over one billion Facebook users and the information it actively collects and organizes on those users. *Id.* ¶¶ 17, 21. For Facebook's users, "[o]ne of the primary benefits [they] receive from Facebook is the opportunity to receive advertising and information about economic opportunities, especially financial services," shown to users on their News Feeds and elsewhere on Facebook. *Id.* ¶ 87. As a business establishment and place of public accommodation, Facebook must offer all of its services and benefits in a non-discriminatory way. But when it comes to the primary benefit of financial services ads, Facebook intentionally and crudely discriminates against older people and women to maximize its profits. *Id.* ¶¶ 136-163.

"Discrimination based on age and gender is a central feature of Facebook's business model," as Facebook's advertising platform "heavily relie[s] on discriminating against users based on their age and/or gender" to determine which ads to show users, and "Facebook has knowingly and greatly profited from this discrimination." *Id.* ¶ 22. Facebook and its advertisers "believe[] that age and gender are two of the most important characteristics that determine whether an advertisement is 'relevant' to any specific Facebook user." *Id.* ¶ 23. As such, Facebook has made age and gender discrimination a central feature of the major tools that it applies to decide which users receive ads, including financial services ads. *Id.* ¶¶ 30-37. To accomplish this discrimination, Facebook requires users to provide information on their age and gender as a condition of joining and using Facebook, and users "cannot opt out of" doing so. *Id.* ¶¶ 28, 37. Facebook gathers and organizes this demographic information to segregate, classify, and discriminate against users in the ads that they receive. *Id.* ¶¶ 28-31. Facebook then deploys several discriminatory tools to exclude women and older people from receiving financial services ads. *Id.* ¶ 32.

## II. Facebook's Three Key Tools for Determining Which Users Receive Financial Services Ads Expressly Rely on Age and Gender to Deny Such Ads to Older People and Women.

Facebook applies three key tools that rely on users' age and gender to decide which users will receive financial services ads and information: (1) the audience selection tool; (2) the Lookalike Audience ("LAL") tool; and (3) the ad delivery algorithm. *Id.* ¶ 32. By eliciting and harnessing the age and gender of each Facebook user, these tools systematically discriminate against Facebook's users based on age and gender and deny them one of the key benefits of Facebook – valuable financial services ads.

**Audience Selection Tool:** When an advertiser creates a Facebook ad campaign, it "is required by Facebook to specify the parameters of the target audience of Facebook users who will be eligible to receive the advertisement," *i.e.*, the ad's "audience selection." *Id.* ¶ 33. "When an advertiser determines the audience selection, it is required to make three selections that establish the basic parameters of the audience selection: (1) age; (2) gender; and (3) location." *Id.* ¶ 36. Advertisers are "require[d]" to "select the age of the Facebook users who will receive the ad[]," such as 18 to 65+ or a narrower age range such as 18 to 40. *Id.* ¶¶ 39-41. They must also "select the gender of the Facebook users who will receive the ad[]," such as "Men," "Women," or "All." Furthermore, through Facebook's statements and materials, Facebook "strongly encourages advertisers to narrow" the age range and gender of the users in audience

selections to make the ads more effective. *Id.* ¶¶ 39-40; *see id.* ¶¶ 43-54 (describing "Facebook Blueprint" guidance on setting audience, the "audience meter," and real-time data on ad engagement).

Once an advertiser sets the audience selection, "Facebook sends the ad[] to the Facebook users within the audience selection that the advertiser chose," and "[a]ny Facebook user who is not within the relevant audience selection will not have the opportunity to receive that specific paid ad[]." *Id.* ¶ 33. When Facebook delivers each ad, Facebook informs the ad recipients how age or gender was used to decide that they would receive the ads in a portion of the ad called "Why am I seeing this ad." *Id.* ¶¶ 62, 78, 171. "For example, if the advertiser directed Facebook to apply an audience selection of men who are 18 to 40 years old, then the 'Why am I seeing this ad' portion of the ad[] will tell the [] user that the person has received the ad[] because the advertiser wants to reach men 18-40." *Id.* ¶ 171; *see, e.g.*, *id.* ¶¶ 73-78.

**Lookalike Audience Tool:** With the LAL tool, Facebook decides which users will be in the audience selection and eligible to receive ads by determining which Facebook users resemble an advertiser's smaller list of existing customers (*i.e.*, a "seed audience"). *Id.* ¶¶ 56-57; *see also id.* ¶¶ 58-62. When Facebook does its own analysis to decide which users in a larger LAL audience resemble "seed audience" users, Facebook directly relies on its users' age and gender. *Id.* ¶¶ 57-58. This often results in LAL audiences having a higher share of men and younger people than other Facebook users. *Id.* ¶ 58. Even more so than with the audience selection tool, Facebook does the bulk of the work to create LAL audiences and the resulting ad denial. All advertisers do is give Facebook their seed audiences, and "the rest of the work to create the [LAL] Audience[s] is done entirely by Facebook." *Id.* ¶ 59.

**Ad Delivery Algorithm:** "To determine which users will actually receive the ad[], Facebook applies its 'ad delivery algorithm,'" so that the ad reaches Facebook users who are more likely to engage it. *Id.* ¶ 64; *see id.* ¶¶ 63, 65-68. Facebook's ad delivery algorithm expressly relies on "the age and gender of Facebook users to determine which users will actually receive any given ad[]." *Id.* ¶ 65. As a result, the users who actually receive the ads are often more likely to be male or younger than other Facebook users. *Id.* ¶¶ 65-66. Facebook is wholly responsible for the operation and actions of its algorithm. "This means that even when advertisers do not want to discriminate based on age or gender in their ad delivery . . . Facebook itself decides to discriminate and does discriminate based on age and gender." *Id.* ¶ 65.

## III. Facebook's Discrimination Has Denied Plaintiff and Others Equal Services.

Ms. Opiotennione is a 54-year old woman who, for three years before this action, regularly used Facebook and searched for financial services opportunities. *Id.* ¶¶ 15, 91. She "was interested in receiving advertising and information about loans, insurance, bank accounts, and other financial services opportunities via ad[s] on her News Feed on Facebook," and she "would have clicked on ad[s] for" such opportunities "had she received such ad[s] on her News Feed." *Id.* ¶ 91. But like other women and older persons, she was regularly denied financial services ads, because Facebook and/or financial services companies routinely excluded her from such ads based on her gender or age by applying Facebook's audience selection tool, LAL tool, and/or ad delivery algorithm. *Id.* As a result, she personally suffered a "denial of the full and equal accommodations, advantages, facilities, and services of Facebook," as she was "denied financial services ad[s]," one of the primary benefits of Facebook, due to her age and gender. *Id.* ¶ 101; *see id.* ¶¶ 3, 8, 35, 87, 101, 105. She also suffered economic harm by being denied ads that would have led to her obtaining cheaper or better financial services. *Id.* ¶ 106. The same practices made it harder for her to learn about and compete for a range of financial services. *Id.* ¶¶ 72, 90, 106, 107, 114.

In this action, Plaintiff alleges that Facebook's discriminatory conduct denied her equal treatment in Facebook's services in violation of California's Unruh Civil Rights Act ("Unruh Act") and Section 51.5 of the California Civil Code ("Section 51.5"). *Id.* ¶¶ 136-152. If the Court holds that California law does not apply, she brings claims under the D.C. Human Rights Act ("DCHRA") and D.C. consumer law to challenge the same conduct as well as misleading, related statements Facebook has made. *Id.* ¶¶ 153-178.

## STANDARD OF REVIEW

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face," *i.e.*, "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Smith v. City of Oakland*, No. 19 Civ. 5398, 2020 WL 2517857, at *3 (N.D. Cal. Apr. 2, 2020) (citations and quotations omitted). In a Rule 12(b)(1) "facial attack" on standing, as here, a "court assumes that the complaint's allegations are true and draws all reasonable inferences in the plaintiff's favor," *id.* (citation omitted), and "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Brinkerhoff v. L'Oreal USA, Inc.*, 417 F. Supp. 3d 1308, 1312-13 (S.D. Cal. 2019) (citation and quotations omitted).

## ARGUMENT

**I. Plaintiff Has Standing to Pursue All of Her Claims.**

**A. Plaintiff Has Article III Standing.**

Plaintiff has amply alleged facts to satisfy Article III's injury, causation, and redressability requirements, because she alleges she has routinely suffered discrimination in Facebook's services, she was harmed by Facebook's discrimination, and an injunction will redress her harm.

**1. Plaintiff Was Injured as She Personally Suffered the Denial of Equal Treatment.**

Plaintiff's central claim and injury are that she has been routinely "denied the full and equal accommodations, advantages, facilities, and services of Facebook's business establishment in violation of" California and D.C. law due to her sex and age, FAC ¶ 1; *see id*. ¶¶ 3, 26, 35, 72, 80, 88, 91, 100, 101, 110, 143, as Facebook denied her "[o]ne of the primary benefits that Facebook users receive from Facebook" – "the opportunity to receive advertising and information about . . . financial services," *id.* ¶ 87; *see id.* ¶¶ 88, 143, 161. Plaintiff has used Facebook and was "interested in receiving advertising and other information about financial services opportunities in Facebook ad[s], and otherwise being treated equally to other Facebook users in all aspects of her use of . . . Facebook." *Id.* ¶ 15. Facebook denied Plaintiff and other women and older people equal benefits and services by: (1) requiring users to identify their sex and age to join and use Facebook, *id.* ¶ 28; (2) segregating and classifying users based on sex and age, *id.* ¶¶ 4, 29-30, 32, 36, 100, 105, 110, 115, 129, 143; (3) creating and applying biased audience selection tools that expressly exclude older people and women from receiving financial services ads, *id.* ¶¶ 2, 32, 34-37, 43, 83, 118; and (4) applying the discriminatory LAL tool and ad delivery algorithm to further exclude such people from getting financial services ads. *Id.* ¶¶ 62, 65, 66, 91, 93-96, 99, 143.

The FAC identifies many "examples" of financial services ads that Facebook *actually* denied to Plaintiff due to her age or gender, *id.* ¶¶ 73-77, including three examples of ads for "debit cards," "bank accounts and other financial services" she "would have been interested in receiving [] to consider pursuing," *id.* ¶¶ 108-109. Facebook has "continued" these practices, and Plaintiff "seeks an injunction to stop Facebook from continuing . . . such violations." *Id.* ¶ 9; *see id.* at 49 (Prayer for Relief § (e)).

These allegations collectively allege that: (1) Plaintiff has an interest in using Facebook's services free of discrimination; (2) when using Facebook, she has personally and routinely experienced the denial

of benefits by Facebook based on her sex and age; and (3) the challenged practices will continue to harm her without an injunction. Plaintiff also alleges that such practices caused her non-economic, stigmatic harm. *Id.* ¶¶ 105, 110, 111, 113. These allegations amply plead Article III injury, because Plaintiff is only required to plead that she personally suffered discrimination in Facebook's business establishment.

"The Supreme Court has instructed [courts] to take a broad view of constitutional standing in civil rights cases." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008). Therefore, in public accommodation cases like the instant case, when a plaintiff alleges that she "personally suffered discrimination as a result of the barriers" of a business, she alleges an actual, concrete, and particularized Article III injury. *Id.* at 1040-42; *accord Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017) (injury where discrimination "prevented her from benefitting from the same degree" as others); *id.* at 1175 n.3 (the same standing test applies to all public accommodations laws).

A person suffers an Article III injury when she is subjected to unequal treatment in a place of public accommodation, since everyone has a cognizable interest in being free of discrimination in a public business. *Doran*, 524 F.3d at 1040 (citing *Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1079 (D. Haw. 2000) ("Plaintiff's desire to patronize Defendant's restaurant free from discrimination is clearly a cognizable interest for the purposes of standing.")). In an Unruh Act case about a website's bias, the Ninth Circuit held that a person like Plaintiff, who is denied equal treatment by a business establishment, meets "Article III requirements for a concrete and particularized injury," since "discrimination itself . . . can cause serious non-economic injuries to those persons who are denied equal treatment." *White v. Square, Inc.*, 891 F.3d 1174, 1177 (9th Cir. 2018) (quoting *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984)).

An injurious denial of full and equal accommodations can occur when a person is given inferior services or benefits due to a protected status, as here. *Angelucci v. Century Supper Club*, 158 P.3d 718, 722-23 (Cal. 2007) (injury for being "restricted to a segregated or otherwise substandard area"); *see Feldman v. Pro Football, Inc.*, 419 F. App'x 381, 391 (4th Cir. 2011) ("advertisements" are "services and privileges" a public accommodation must offer equally, including for deaf fans at football games). A *complete* denial of access is not required to establish a violation or an injury, because public accommodation laws guarantee not only "access to business establishments," but also "equal treatment of patrons in all aspects of the business." *Koire v. Metro Car Wash*, 707 P.2d 195, 197 (Cal. 1985).

Plaintiff easily satisfies the standard for Article III standing in a public accommodations case. She alleges she personally suffered discrimination in Facebook's public accommodations when she was denied a primary benefit or service of Facebook – financial services advertising and information – based on age and gender, causing her stigmatic harm. No more is required to plead Article III standing. *Supra* at 5-6.

Facebook fails to address how Article III standing is analyzed in public accommodations cases, such as this, and its standing arguments should be denied on this basis alone. Instead, Facebook relies almost exclusively on *Bradley v. T-Mobile US, Inc*., No. 17 Civ. 7232, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020), which is not a public accommodations case.[1] In *Bradley*, plaintiffs alleged that T-Mobile denied them job ads due to their age in violation of a federal law that requires employers to *hire* workers in a non-discriminatory manner. *Id.* at *8-10. The Court held that because the law's focus was protecting job *applicants* from bias, only workers "effectively deterred" from applying for *specific* jobs could claim injury, which the plaintiffs had not alleged. *Id.* at *8-9. In contrast, here the public accommodations laws demand equal "access to business establishments" and "treatment of patrons," *Angelucci*, 158 P.3d at 726, and the cognizable interest is the right to be free of bias in such establishments. *Doran*, 524 F.3d at 1040. Facebook violated that interest when it denied Plaintiff financial services ads, a primary benefit of Facebook. *Id.* As she was actually and "personally denied equal treatment by the challenged discriminatory conduct," she suffered injury. *Bradley*, 2020 WL 1233924, at *11 (quoting *Allen v. Wright*, 468 U.S. 737, 755-56 (1984)), just like a worker who applies for a job and is denied due to her age.

Contrary to Facebook's argument, whether Plaintiff would have ultimately clicked on a specific ad on Facebook (that she did not receive) and then applied for a specific financial service has no bearing on the denial of equal treatment Plaintiff suffered in Facebook's business by being denied ads due to her sex and age. Courts routinely find Article III injury where a discrimination makes it harder for certain people to obtain information about products on a website, regardless of whether they allege they would have purchased specific products. *Colo. Cross Disability Coal. v. Hermanson Fam. Ltd. P'ship*, No. 96 Civ. 2490, 1997 WL 33471623, at *4, *6 (D. Colo. Aug. 5, 1997) (there is "no requirement . . . that a

---

[1] Indeed, in a different public accommodations case, Judge Freeman, who decided *Bradley*, correctly applied the rule that an Article III injury occurs when a person is personally denied equal treatment in a place of public accommodation. *See Lane v. Landmark Theatre Corp.*, No. 16 Civ. 6790, 2020 WL 1976420, at *9 (N.D. Cal. Apr. 24, 2020).

person" "has a specific desire to make a purchase at that particular business" to have standing for unequal treatment).[2] Even if greater specificity may ultimately be needed to *prove* standing, such as identifying specific ads that would have led Plaintiff to apply for specific financial services, at the pleading stage a "Court must defer to the plaintiff's factual allegations and must 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Brinkerhoff*, 417 F. Supp. 3d at 1312-13 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). If the Court concludes that to establish standing at this stage Plaintiff must identify specific ads that she would have clicked on to pursue specific opportunities, it should authorize Plaintiff to take jurisdictional discovery because "such information is not within Plaintiff['s] possession and is difficult to obtain." *Bradley*, 2020 WL 1233924, at *16.

Furthermore, the discrimination in Facebook's services that Plaintiff personally suffered also includes the denial of ads caused by the LAL tool and ad delivery algorithm. Although the seven financial services ads the FAC identifies as "examples" were not denied *to Plaintiff* because of the LAL tool or the algorithm (since the age and gender exclusions in those ads already excluded her), Plaintiff's claims are not based solely on the denial of just seven ads (which the FAC identifies as "examples"). FAC ¶¶ 72-77, 108-109. Instead, they are based on allegations of Facebook's pattern or practice of routinely applying the LAL tool and algorithm to deny her and the class members financial services ads based on age or gender.[3]

**2. Plaintiff Suffered Other Cognizable Injuries.**

Plaintiff suffered other types of injury that satisfy Article III. First, she suffered economic injury as she was routinely steered away from specific financial services ads that Facebook instead sent to men and younger people, such as mortgage, insurance, personal loan, and bank account ads. *Id.* ¶¶ 72, 90, 106, 107, 114. This made it "harder" for her to "learn about and compete for" those specific financial services, and if Facebook had not denied her ads, she would have "[s]ecure[d] cheaper, better, or more appropriate

[2] *Accord Nat'l Fed'n of Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1192 (2007) (blind customer who could not effectively browse website had Article III standing); *Reed v. CVS Pharmacy, Inc.*, No. 17 Civ. 3877, 2017 WL 4457508, at *1-4 (C.D. Cal. Oct. 3, 2017) (blind customer who could not find products through website store locator had Article III standing); *Rios v. N.Y. & Co., Inc.*, No. 17 Civ. 4676, 2017 WL 5564530, at *1-4 (C.D. Cal. Nov. 16, 2017) (same).

[3] Indeed, the FAC alleges that Facebook's LAL tool and ad delivery algorithm caused her to be denied ads based on her age and/or gender, *including* ads that were not restricted by age or gender – such that *only* the LAL tool or the ad delivery algorithm caused the denial. FAC ¶¶ 62, 65, 66, 91, 93-96, 99, 143. The FAC is not required to offer an image of a specific ad denied in this way. The Court must assume these general allegations include necessary specific facts. *Brinkerhoff*, 417 F. Supp. 3d at 1312-13.

financial services than [she] otherwise did." *Id.* ¶ 114. Such "[e]conomic injury is clearly a sufficient basis for standing." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996).

Second, Plaintiff alleges "the denial of an opportunity to obtain a benefit," another "well-established" type of "injury in fact." *Bradley*, 2020 WL 1233924, at *8. Specifically, "Facebook's discrimination made it harder for older persons and women" like her "to compete for and obtain financial services opportunities and thereby secure" those services. FAC ¶ 114. She also pleads that she "would have clicked on ad[s] for financial services opportunities," such as loans and insurance, and she would have "pursued those opportunities," if the ads had been sent to her. *Id.* ¶¶ 106-07; *see id.* ¶ 91. Her injury stems from "the inability to compete on an equal footing," not from losing an actual opportunity, and she "need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Even so, she *does* plead she would have obtained them in the absence of discrimination. FAC ¶¶ 106, 107.

**B. Plaintiff's Injuries Are Traceable to Facebook and Are Redressable.**

Plaintiff's injuries are "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61. She alleges Facebook creates, maintains, and implements the tools that deny equal treatment to her and others. FAC ¶¶ 22-68, 121, 122; *see Kirola*, 860 F.3d at 1175 (finding traceability where defendant was "responsible for construction, alteration, and maintenance of the facilities" at issue). While advertisers play some part in the audience selection tool – by selecting age or gender exclusions – Facebook is still directly responsible for causing unequal treatment.[4] Facebook created these biased tools and has the "complete right, discretion, and ability to not approve or send the ad[] that includes age- or sex-based restrictions." FAC ¶ 35; *infra* § II (detailing Facebook's development of content). Facebook knowingly approves and

[4] Facebook wrongly claims that *Bennett v. Spear*, 520 U.S. 154, 169 (1997), requires a plaintiff to show that a defendant had a "determinative or coercive effect" on a third party's actions *anytime* a third party plays some role in the harm. That test only applies where the actual injury is the product of an "*independent* action of some third party not before the court," not where a defendant contributes to the harm through its own actions (as Facebook did here). *Id.* (allowing suit against wildlife service, as its opinion would have a "powerful coercive effect" on another agency's independent action over listing species as threatened); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1170 (9th Cir. 2011). Indeed, "standing is not defeated merely because the complained of injury can be fairly traced to multiple parties." *BBX Capital v. Fed. Deposit Ins. Corp*, 956 F.3d 1304, 1312 (11th Cir. 2020).

implements biased selections, *id.* ¶¶ 35, 43, 66, 83, 122, 123, to increase its profits. *Id.* ¶¶ 22, 24, 111. If Facebook did not create and require advertisers to use such biased tools (including for financial services ads), it would not be possible to apply such exclusions. If Facebook can defeat causation because it follows its advertisers' biased preferences, a Black customer refused entry or service by a restaurant that follows its White customers' preferences to dine without Black people would also lack standing.[5] That cannot be.

Furthermore, to defeat causation, Facebook argues that Plaintiff "does not allege facts supporting a *plausible inference*" that she would have received certain financial services ads if advertisers had not excluded her based on her age or gender, as billions of ads are sent to Facebook users each month and she had a small chance of getting any particular ad. Mot. Dismiss at 11. But it does not matter if *Facebook* doubts that Plaintiff would have received financial services ads. Plaintiff's allegations must be taken as true on a Rule 12(b)(1) motion. *Acosta v. Perez*, No. 19 Civ. 1224, 2020 WL 2194001, at *5 (E.D. Cal. May 6, 2020). And Plaintiff *does* allege she was denied "thousands of financial services ad[s]" "solely based on" her "age and/or gender," FAC ¶ 99, and that Facebook's discrimination *directly caused* her and millions of women and older people to be routinely denied a primary benefit of Facebook. *Id.* ¶¶ 3, 26, 80, 99. Even if the chance of Plaintiff getting any specific ad is small, Facebook's age and gender exclusions caused that chance to fall to 0% when it excluded her from audience selections. *Id.* ¶¶ 33, 43. "[P]robabilistic harm suffices for Article III standing even when the probability that the harm will actually occur is small." *In re C.P. Hall Co.*, 750 F.3d 659, 660 (7th Cir. 2014) (collecting cases).

Redressability is easily satisfied here, since an injunction requiring Facebook to stop offering or applying its biased tools to financial services ads will redress Plaintiff's harm of unequal treatment. *Kirola*, 860 F.3d at 1175 (redressability satisfied by "a properly framed injunction . . . can ensure that the City alters or removes the access barriers"); *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 967, 974 (9th Cir. 2019) (redressability satisfied "by an injunction ordering the [defendants] to abate the policies"). It also will remove a barrier to Plaintiff competing for financial services. *Bradley*, 2020 WL 1233924, at *9 (ending age restrictions on job ads on Facebook will redress injuries by giving older people a greater chance to compete for jobs). Facebook relies on *Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009), but *Levine* undermines its argument. There, the Ninth Circuit rejected redressability (not causation), as it was

speculative whether the desired ruling against the Agriculture Secretary would cause his agency to adopt new regulations and, in turn, cause third-party chicken processers to stop *their own* unsafe practices that were directly harming the poultry worker plaintiffs. *Id.* at 991-95. In contrast, here it is 100% certain that an injunction against Facebook will stop the practice that is currently harming Plaintiff and many others.

### C. Plaintiff Has Standing Under California and District of Columbia Law.

A person who personally experienced discrimination in a business establishment (including a website) has standing under the Unruh Act. *White v. Square, Inc.*, 7 Cal. 5th 1019, 1032-33 (2019). Because Plaintiff was personally denied equal services by Facebook, *supra* at 5-6, she clearly has standing under the Unruh Act. Plaintiff also has standing under D.C. law. The DCHRA does not require anything beyond Article III standing, *see* Mot. Dismiss at 7, which Plaintiff has already satisfied. *Supra* at 5-10. Nor does the DCCPPA. *See Silvious v. Snapple Beverage Corp.*, 793 F. Supp. 2d 414, 417 (D.D.C. 2011). Also, Facebook offers no argument why Plaintiff lacks standing under the DCHRA or the DCCPPA.

## II. The Communications Decency Act Does Not Provide Facebook Any Immunity or Defense.

The Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230, is a vehicle for websites to avoid liability for hosting illegal or offensive content created 100% by their users.[6] But here Facebook improperly invokes the CDA to seek immunity for *its own* unlawful discriminatory acts – Facebook's denial of financial services ads to women and older people – even when Facebook is solely or partly responsible for developing or creating the content and directly contributes to its illegality.

To grant Facebook immunity, this Court must disregard a Ninth Circuit decision that held websites lack immunity when they require users to disclose protected statuses and then require other users to select from a menu of protected statuses to decide which users to send information on economic opportunities. *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). But that is exactly what Facebook does. Its audience selection tool requires all users to disclose their age and sex to use Facebook and requires all advertisers to choose the age and sex of the users who will receive their ads. Moreover, in defending its LAL tool and ad delivery algorithm, Facebook asks the Court to adopt a rule

---

[6] *E.g.*, *Jane Doe No. 1 v. Backpage.com LLC*, 817 F.3d 12 (1st Cir. 2016) (website that featured ads for sex with child sex trafficking victims); *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398 (6th Cir. 2014) (website that hid the identities of people posting illegal content); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) (website that hosted revenge porn).

– again, in contravention of Ninth Circuit law – that even when advertisers do not express discriminatory preferences, Facebook can apply *its own* discriminatory preferences to deny ads to users based on age or sex and still enjoy immunity. That would leave users without any recourse for Facebook's *own* biased actions, morphing the CDA into an absolute immunity for websites' own illegal or biased acts.

But that is not the law. CDA immunity only applies to "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information [exclusively] provided by another information content provider." *Barnes*, 570 F.3d at 1100-01 (citing 47 U.S.C. § 230(c)). Websites lack immunity when they are "information content provider[s]," *i.e.*, when they are "responsible, in whole or in part, for the creation or development of information," as opposed to merely hosting content created solely by others. 47 U.S.C. § 230(f)(3); *see Roommates.com*, 521 F.3d at 1163. They also lack immunity when they are not treated as "the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), which only occurs when a law imposes a "duty" that "necessarily require[s] an internet company to monitor third-party content." *Homeaway.com v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019).

Traditional cases granting CDA immunity involve a user posting a defamatory, inappropriate, or illegal post or statement on the defendant's website that the plaintiff does not want published. In those cases, the website has immunity because it plays *no role* in creating or developing the posts and does not contribute to the illegality.[7] This is not a traditional case. Here, the words in the financial services ads are not illegal. In fact, Plaintiff *wants* them to be published – *to her*. Instead, the illegality arises because *Facebook* structures its platform to deny the ads to its users based on their age or sex. Thus, just as in *Roommates.com*, Facebook's active and "aggressive" role in denying content to users based on protected statuses "contributes materially to the alleged illegality of the content" and means that Facebook develops or creates the content *in whole or in part*, which defeats immunity. 521 F.3d at 1168-69, 1172. Facebook

---

7 *E.g.*, *Barnes*, 570 F.3d 1096 (nude photographs of plaintiff posted in a public profile on defendant website); *Igbonwa v. Facebook, Inc.*, No. 18 Civ. 2027, 2018 WL 4907632, at *6-7 (N.D. Cal. Oct. 9, 2018) (plaintiff objected to posts "by other Facebook users and does not allege that Facebook had any role in creating the content of the posts"), *aff'd*, 786 F. App'x 104 (9th Cir. 2019); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356-57 (D.C. Cir. 2014) (person objected to an anti-Semitic page of Facebook user); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065-66 (N.D. Cal. 2016) (unknown person published private photos of another person on their Facebook page); *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) (defamatory article appeared on website of defendant AOL).

lacks immunity for a second reason: because it can comply with the laws at issue here without actively monitoring users' content (by disabling its biased tools), Facebook is not treated as a publisher of others' content. *Homeaway.com*, 918 F.3d at 682. Plaintiff's CDA arguments not only rely on controlling law. They are backed by the United States, which filed briefs in two similar civil rights cases about Facebook's bias in housing, credit, and job ads, and explained that Facebook lacks CDA immunity for its audience selection tools that unlawfully rely on users' protected statuses to deny them such ads.[8]

**A. Facebook Lacks Immunity Because It Is an Information Content Provider.**

Two leading cases show how the CDA's creation or development standard applies to cases on the internet and biased advertising: *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008), and the Ninth Circuit's *Roommates.com* opinion. In *Craigslist*, a site published classified ads whose words – written in free form statements like "No children" – indicated biased preferences in violation of the Fair Housing Act. 519 F.3d at 668-71. Since users were wholly responsible for the posts' content, Craigslist did not create or develop them and had immunity. *Id.*

In comparison, *Roommates.com* held that a roommate-finding site *was* an information content provider that lacked immunity, because it facilitated housing discrimination against its users – other than the free-form comments users posted in their profiles. 521 F.3d at 1164-76. There, the website matched people looking for roommates to live with. *Id.* at 1161. The website required users to state their own sex, sexuality, and familial statuses and also their preferences for their desired roommates based on the same protected statuses. Roommates.com acquired this information by requiring users to fill out "drop-down menus" that allowed users to select discriminatory preferences (*e.g.*, "only with 'Straight'") or non-discriminatory ones (*e.g.*, "'Straight or gay'"). It then applied users' statuses and preferences to decide which users' profiles would be shared with other users. *Id.* at 1161-62. It also allowed users to "search the profiles of others" and "designed its search system so it would steer users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose." *Id.* at 1162, 1167.

For these features, the Ninth Circuit held that Roommates.com was an information content

[8] Statement of Interest of the United States at 17-24, *Nat'l Fair Hous. Alliance v. Facebook, Inc.*, No. 18 Civ. 2689 (S.D.N.Y. Aug. 17, 2018), ECF No. 48 ("United States SOI I") (Ex. A); Statement of Interest of the United States at 1-7, *Onuoha v. Facebook, Inc.*, No. 16 Civ. 6440 (N.D. Cal. Nov. 16, 2018), ECF No. 77 ("United States SOI II") (Ex. B). Facebook settled the cases before a CDA decision.

provider, because it elicited information on its users' protected traits and facilitated the use of that information to deny users content. *Id.* at 1167-72. A website that "contributes materially to the alleged illegality of the content" in this way "helps to develop unlawful content." *Id*. at 1167-68. "Roommate's connection to the discriminatory filtering process [was] direct and palpable," as it "designed its search" and profile distribution systems to "limit the listings available to subscribers based on" protected statuses that it "selected" and required "users to specify." *Id.* at 1169. "Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism . . . directly related to the alleged illegality of the site," and thus materially contributed to the illegality, since the federal law "prohibit[ed] steering clients in accordance with discriminatory preferences." *Id.* at 1169-70. Thus, where a law prohibits using certain criteria to steer, match, or deny information to people, a website that requires users "to divulge protected characteristics and discriminatory preferences" to take any of those illegal actions is not the type of "neutral tool[]" the CDA was designed to protect. *Id.* at 1172, 1175.

Roommates.com also had an "Additional Comments" section of users' profiles, where users could write whatever they wanted in an "open-ended essay" within a "blank text box." *Id.* at 1161, 1173. It "publishe[d] these comments as written" and did "not provide any specific guidance as to what the essay should contain" or "urge subscribers to input discriminatory preferences." *Id.* at 1173-74. Nor did it "encourage or enhance any discriminatory content created by users" in their comments. *Id.* at 1174. As a result, it did not develop "in whole or in part" the content, which came "entirely from subscribers and [wa]s passively displayed by Roommate." *Id.* at 1174. Thus, *Roommates.com* drew a critical distinction that a website develops information by using "drop-down menus" to "affirmatively require users to disclose information related to protected classes" and preferences and by using that information to deny content to users, but it does not develop content by publishing or organizing content from users' comments from "blank text box[es]." *Dyroff v. Ultimate Software Grp., Inc*., 934 F.3d 1093, 1098-99 (9th Cir. 2019).

Applying *Roommates.com* here, Facebook is plainly an information content provider for *all* of the tools and content at issue, including: (1) the audience selection tool; (2) the LAL tool; and (3) the ad delivery algorithm.[9] Each tool restricts the content that users receive from other users based on the age

[9] Each tool must be analyzed separately as "a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content," depending on its role. *Roommates.com*, 521 F.3d at 1162-63 (denying immunity for all content besides Additional Comments).

and gender information that Facebook requires users to disclose. FAC ¶¶ 28-30. For the audience selection tool, Facebook requires advertisers to express their preferences on which users will receive their advertising content, just like Roommates.com. For the LAL tool and ad delivery algorithm, Facebook plays an even more aggressive role than Roommates.com did to deny content, as Facebook makes its own decisions based on age and gender about which users to deny ads. *Id.* ¶ 33. Thus, for each tool, Facebook develops in whole or in part the content and "contributes materially to the alleged illegality of the content," because state law prohibits denying financial services ads to users based on sex or age. *Roommates.com*, 521 F.3d at 1167-70.

Central to Facebook's responsibility for all of the tools are key facts that line up squarely with *Roommates.com*: (1) "Facebook requires all users to tell Facebook their birth date and gender as a condition of joining" and "us[ing]" Facebook, FAC ¶ 28; (2) Facebook applies this data "to segregate, classify, and discriminate against users based on age and gender" and for the "primary purpose" of "discriminating against users," *id.* ¶¶ 29, 31, (3) Facebook's "tools rely upon segregating, classifying, and discriminating against users . . . based on age or sex," *id.* ¶ 32, and (4) "Facebook users cannot opt out of telling their age or gender to Facebook" or being excluded from ads based on age or gender. *Id.* ¶ 37.

Facebook, just like Roommates.com, "forces users to answer certain [demographic] questions" "and thereby provide information that other clients" and Facebook itself "can use to discriminate unlawfully." 521 F.3d at 1166 n.19; *see id.* at 1169-70 & n.26. "When [Facebook] extracts such information from potential customers as a condition of accepting them as clients, . . . [Facebook] is responsible, at least in part, for developing that information," *id.* at 1166; *see People v. Bollaert*, 248 Cal. App. 4th 699, 721 (Cal. Ct. App. 2016) (website "developed in part the content" by "forc[ing] users to answer a series of questions with the damaging content" that gave rise to liability). Facebook "elicits the allegedly illegal content" and "makes aggressive use of it" in each tool. *Roommates.com*, 521 F.3d. at 1172. And just like Roommates.com, Facebook's "discrimination . . . is a central feature of [its] business model and has helped Facebook to dominate the market for paid advertising," "the source of nearly all of its revenue," FAC ¶ 22. As such, Facebook can be held responsible for its own discriminatory actions.

Although *Roommates.com* is controlling in this civil rights case, other cases involving Facebook and similar platforms have routinely held that platforms are information content providers and lack CDA

immunity when they play some role in developing the content, including advertisements.[10]

**1. Facebook Develops or Creates in Part the Exclusionary Audience Selections.**

Facebook is responsible for its audience selection tool that expressly excludes users from getting financial services ads based on age or sex. FAC ¶¶ 32-39. This tool relies on age- and sex-based data that users must provide to use Facebook by excluding users from being eligible to receive ads based on their own age or sex. *Id.* ¶¶ 32-37. Facebook develops this information in part, as it "requires advertisers to select the age" and "the gender of the Facebook users who will receive the ad[]." *Id.* ¶¶ 39-40; *Roomates.com*, 591 F.3d at 1165, 1169-70 & n.26. Advertisers are only "required to make three selections that establish the basic parameters of the audience selection," but *two of the three* are "age" and "gender." FAC ¶ 36. The demographic choices advertisers must select from are "presented to advertisers through drop down menus" that include both discriminatory and non-discriminatory options (such as "Men," "Women," or "All" genders; "Age 18 - 65+" or other age ranges such as "18-40."). *Id.* ¶¶ 36-41. This is identical to Roommates.com, which required users to select among discriminatory and non-discriminatory choices (such as 18-99, Male and Female, or straight or gay). 519 F.3d at 1165 & n.9 (site applied non-biased choices for users who did not select biased ones). Just as Roommates.com, Facebook applies advertisers' preferences so that users who do not match the preferences are denied ads. FAC ¶ 33. As a result, "Facebook and the advertiser are co-developers of each targeted ad." United States SOI I at 22.

Contrary to Facebook's view that it offers neutral tools that are protected by the CDA, *Roommates.com* expressly held that requiring users to select among discriminatory *and* non-discriminatory preferences – when using such preferences could be unlawful – is not a "neutral tool[]." 591 F.3d at 1172, 1175; *see* United States SOI I at 22 (distinguishing "Facebook's dropdown menus" that "ask unlawful questions, and offer [] advertisers options that are inherently unlawful, to preclude users from seeing [] ads based on protected characteristics" from questions that "are not intrinsically offensive

---

10 *See Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 802 (N.D. Cal. 2011) (Facebook developed or created in part content in ads that made it appear a user's friend recommended a product or service, though the user had not done so); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1225, 1247-48 (N.D. Cal. 2014) (no defense where LinkedIn "harvested" email addresses of potential users from current users' contact lists and histories and used that information on its platform); *Fed. Trade Com'n v. Accusearch Inc.*, 570 F.3d 1187, 1199-1200 (10th Cir. 2009) (website selling phone records and other personal data was "information content provider" as it "affirmatively solicit[s]" others to create the prohibited content).

or unlawful"). Nor is Facebook immune simply because advertisers choose in part which users to deny ads. *Roommates.com*, 521 F.3d at 1165 (holding the CDA does not grant immunity "for inducing third parties to express illegal preferences"); *see* United States SOI I at 22 (calling this same claim "specious").

This case does not resemble *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1124 (9th Cir. 2003), where a person created a fake dating profile for a celebrity on an online dating site by filling out the site's questionnaire and selecting "sexually suggestive" answers. 339 F.3d at 1121. There, "the allegedly libelous content" – the false implication that the plaintiff was unchaste – "was created and developed entirely by the malevolent user, without prompting or help from the website operator." *Roommates.com*, 521 F.3d at 1171. In *Roommmates.com*, the Ninth Circuit distinguished *Carafano* as a case where "the website's classifications of user characteristics did absolutely nothing to enhance the defamatory sting of the message, to encourage defamation or to make defamation easier[.]"[11]

"By sharp contrast, Roommate's website [wa]s designed to force subscribers to divulge protected characteristics and discriminatory preferences, and to match those who have rooms with those who are looking for rooms based on criteria that appear to be prohibited by the FHA." *Id.* It thus encouraged and made the discrimination easier. *Id.* Facebook does too. It requires users to state their age and gender and biased preferences for discriminatory purposes, and it applies that data to engage in illegal discrimination. It easily satisfies *Roommates.com*'s "material contribution" test that denies immunity when a website bears "responsibility for what makes the displayed content illegal," such as soliciting user content that contributes to illegality. *Kimzey v. Yelp! Inc*., 836 F.3d 1263, 1269 (9th Cir. 2016) (quotations omitted).

Although Plaintiff alleges in detail how Facebook strongly encourages advertisers to use its tools in a biased way via its statements and materials, FAC ¶¶ 39-46, 52-54, such allegations are not needed to show Facebook developed the content; Facebook's actions suffice to establish its role as a developer or creator of content. *Roommates.com*, 521 F.3d at 1172. Facebook agrees. *See* Mot. Dismiss at 18-19.

**2. Facebook Develops or Creates in Whole or in Part "Lookalike Audiences."**

Under the LAL tool, "Facebook determines which users will be in the audience section for the ad[]" by identifying a larger group of Facebook users who "resemble[] the [smaller] seed audience" of

[11] The same was true in *Goddard v. Google, Inc*., 640 F. Supp. 2d 1193 (N.D. Cal. 2009), where Google did not materially contribute to any illegality by suggesting that advertisers use certain phrases like "free ringtones," since there is "no law against advertising free ringtones." United States SOI II at 6.

users the advertiser gives Facebook. FAC ¶¶ 56; *see id.* ¶¶ 30-31, 37, 57, 59-62, 74-75, 93. To build the larger LAL audience, Facebook "applies its own analysis and algorithm" that expressly relies on the "[a]ge and gender" of "users to determine which [] users resemble" each other. *Id.* ¶ 58. The only role that advertisers play in creating LAL audiences is "providing Facebook with a list of the [] users in its seed audience," and "the rest of the work to create the [LAL] Audience is done entirely by Facebook." *Id.* ¶ 59.

Facebook plainly develops or creates in part the LAL audiences and the resulting denial of ads to women and older people, as *Facebook* makes *its own* discriminatory decisions based on age and gender about which users will be in the LAL audiences and thus eligible to get ads. In creating and applying LAL audiences, Facebook does far more to actively discriminate against its users than Roommates.com, which was an information content provider merely by requiring *users* to express *their own* biased preferences. Because here "it is very clear that [Facebook] directly participates in developing the alleged illegality," "immunity will be lost." *Dyroff*, 934 F.3d at 1099. Also, by transforming advertisers' list of customers into a larger *new list* of users that Facebook determines to be similar, Facebook creates or develops this *new* content for which it is responsible. *See Fraley*, 830 F. Supp. 2d at 802 (rejecting CDA defense where Facebook "use[d] information" given by its users "to create new content" when publishing ads).

**3. Facebook Develops or Creates in Whole the Ad Delivery Algorithm.**

Facebook is solely responsible for developing its ad delivery algorithm and the resulting denial of ads to women and older people. For every financial services ad, "Facebook's ad delivery algorithm . . . determines which users within an audience selection will actually receive the ad," and makes those determinations "based on age or sex," FAC ¶ 32, causing older people and women to be denied ads based on the age and gender data they are required to provide Facebook. *Id.* ¶¶ 64-67, 94-97. This algorithm always uses *Facebook's own* age and gender preferences to make these decisions, "regardless of whether the advertiser directs Facebook to limit the age or gender of its audience selection," and "even when advertisers do not want to discriminate." *Id.* ¶ 65. Thus, Facebook *forces* all advertisers to discriminate or compounds their biased preferences. *Id.* ¶¶ 65-66. By using "*its own* internal data and analysis" of age and gender to decide which users receive ads, Facebook's "algorithm makes substantive edits, changes, and modifications to the audience selections that advertisers select." *Id.* ¶ 67; *see id.* ¶¶ 63-70, 74-76, 94-98. By applying *its own preferences* to deny ads to users based on age and gender, Facebook does far

more than *Roommates.com* did to actively "steer users based on the preferences and personal characteristics that Roommate itself force[d] subscribers to disclose." 521 F.3d at 1162, 1167. By doing so, Facebook indisputably is responsible for developing the content" and "directly participates in . . . the alleged illegality." *Dryoff*, 934 F.3d at 1099; *cf.* United States SOI II at 7 (Facebook lacks immunity because it "ultimately decides for each ad which users will see it and which users will not").

Despite Facebook's claim to the contrary, a rule that websites cannot develop or create content so long as they apply algorithms (including their own) to decide which users receive content – even when algorithms contain illegal inputs like protected statuses – is not the law, let alone "binding precedent." Mot. Dismiss at 16. Rather, such a rule violates *Roommates.com* by giving a site immunity for denying content to users based on the site's *own* preferences. And this rule finds no support in *Dyroff*.

*Dyroff*'s holding is not that all algorithmic decisions are immune, but that one must analyze what user data an algorithm relies on, how the data is obtained, and whether an algorithm's use of such data contributes to an illegal action. In *Dyroff*, the website's algorithm recommended user content based *solely on* free-form comments that users posted about their personal experiences in blank boxes. The site did *not* require users to respond to questions, post specific content, or state preferences on what to show other users. 934 F.3d at 1094, 1099; *id.* at 1098-99 (distinguishing the site's algorithmic matching of users' free-form comments from Roommates.com's affirmative requirement that users disclose "information related to protected classes through discriminatory questions and answer choices" in "dropdown menus"). Instead, it "resemble[d] the 'Additional Comments' features in *Roommates.com* in that [the site's] users . . . were not required to disclose that they were looking for" specific things like "heroin or other illegal drugs." *Id.* at 1099. Because the site did not "require[] users to post specific content" "or contribute[] to making unlawful or objectionable user posts," it did not develop the content. *Id.* In contrast, Facebook's algorithm matches content based on users' protected traits acquired via "dropdown menus" and Facebook "directly participate[s] in . . . the alleged illegality" by denying content due to users' traits. *Id.*

Facebook's actions set this case apart from *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), where a plaintiff claimed that Facebook's algorithm amplified Hamas' offensive content. *Id.* at 70. The Second Circuit held that Facebook did not develop the content as its algorithm recommended content to users based on "objective factors" that did not contribute to illegality, unlike discriminatory information

acquired from "a limited set of pre-populated answers" to "discriminatory questions." *Id.* at 70 (quoting and distinguishing *Roommates.com*, 521 F.3d at 1166). Thus, under *Force*, there is no immunity when an algorithm relies on information a website requires users to provide and materially contributes to illegality.

Facebook's all-algorithms-are-immune rule violates the Ninth Circuit's warnings that "[p]roviding immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part," *Roommates.com*, 521 F.3d at 1171 (citing 47 U.S.C. § 230(f)(3)), and that courts must "eschew[] an expansive reading of the statute that would render unlawful conduct 'magically . . . lawful when [conducted] online,'" *Homeaway.com*, 918 F.3d at 682 (quoting *Roommates.com*, 521 F.3d at 1164-65 & n.15). But it also would lead to absurd, unfathomable results. An algorithm is just a "step-by-step procedure for . . . accomplishing some end." *Algorithm*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/algorithm (last visited June 12, 2020). For example, Facebook's ad delivery algorithm could be written to say: "send 90% of truck driver job ads to men, 75% of loan ads to people under 30, and all housing ads to Whites." In Facebook's view, Facebook would enjoy immunity for that algorithm and the millions of people denied equal opportunity by Facebook will have no recourse.

**4. Facebook Creates in Whole the "Why Am I Seeing This Ad" Statements.**

Notably, Facebook does not claim immunity for the millions of "Why am I seeing this ad" statements *Facebook* made *entirely on its own* to tell users that they have received ads "because of their age or gender, conveying a stereotype . . . that men are younger people are more desirable customers for financial services," FAC ¶¶ 62, 78, 112, 171. Thus, it has waived the right to seek such immunity. In any event, Facebook wholly creates these statements, as it exercises total control over "whether to make . . . the statement and on the relevant content and images in the statement." *Id.* ¶ 78. And while these statements refer to advertisers' age and gender preferences, those preferences were elicited and applied in the same way as the audience selection tool, making Facebook a developer of the information.[12]

[12] Likewise, Facebook advances no argument that it did not develop or create the statements Plaintiff challenges as misrepresentations under D.C. law, such as its statements that there is no place for discrimination on Facebook or that California law governs disputes. FAC ¶¶ 174-177. Nor could it. Facebook made these statements itself without any input from their users.

### B. Facebook Lacks Immunity Because It Is Not Treated as a Publisher Here.

The CDA only offers immunity where a plaintiff brings claims that treat a website as the "publisher or speaker" of third-party content. *Barnes*, 570 F.3d at 1100-01. "[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102. No "but-for" test applies to websites; they do not have immunity for all claims that involve the publishing of third-party content. *Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016).

CDA immunity does not "attach[] any time a legal duty might lead a company to respond with monitoring or other publication activities." *Homeaway.com*, 918 F.3d at 682. Instead, to determine whether a website acts as a publisher in the context of a legal duty, one looks to "whether the duty would necessarily require an internet company to monitor third-party content." *Id.* In *Homeaway.com*, for example, the website was not rendered a publisher or speaker where the local ordinance required companies to ensure that the hosts of rental properties were registered, because complying with the law did not require platforms to "review the content provided by the hosts of listings on their websites." *Id.* Rather, the platform could satisfy the law's "underlying duty" of verifying the registration of properties "without changes to content posted by the website's users," even if removal of unregistered listings "would be the best option" for the platform to comply. *Id.* (quoting *Internet Brands*, 824 F.3d at 851).

Here, Plaintiff seeks to hold Facebook liable under state laws that impose a legal duty not to deny financial services ads to customers based on age or gender. FAC ¶¶ 136-163. "[T]he alleged illegality is in excluding certain groups from viewing [the] content," and not in the content of the ads themselves. United States SOI II at 7. Complying with this legal duty, therefore, does not require Facebook to monitor third-party content, since Facebook can simply disable the tools that Plaintiff challenges without monitoring a single word in the ads. *See id.* ("Plaintiffs' theory of liability . . . would not impose a duty on Facebook to police the content of an ad[] to determine whether it is illegal.").

## III. Plaintiff States Claims Under California Law, Which Applies to All the Relevant Conduct.

Plaintiff has amply alleged that Facebook intentionally denied its older and female users the full and equal accommodations, advantages, and services of Facebook in violation of California law and the state's "longstanding and compelling" interest in barring "arbitrary discrimination by business establishments." Civil Rights Act of 2005, § 2, 2005 Cal. Legis. Serv. Ch. 420. Because Facebook

developed and implemented all of the relevant tools and policies from its California headquarters – including the collection of age and gender data; the audience selection tool, the LAL tool, and the ad delivery algorithm; the receipt of ad payments; and the withholding of ads to users – it is not only proper to apply California law, but it is also important that Facebook be held accountable under California law.

**A. California Law Applies, Since the Discriminatory Conduct Occurred in California.**

Although Facebook's own terms of service state that California law governs users' claims against Facebook, FAC ¶ 142, Facebook argues the Unruh Act and Section 51.5 cannot be applied to Plaintiff (a D.C. resident) and other out-of-state class members, because it would require an extraterritorial application of California law. Mot. Dismiss at 19. But California law *does* govern here, because Plaintiff's claims do not require an extraterritorial application of the Unruh Act or Section 51.5.

To determine whether applying California law to out-of-state residents is impermissibly extraterritorial, the analysis focuses on where the conduct occurred. *See Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011) ("we presume the Legislature did not intend a statute to be '"operative, with respect to *occurrences* outside the state, . . . unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history'" (emphasis added) (internal citation and quotation omitted)). In *Sullivan*, for example, the California Supreme Court declined to apply the Unfair Competition Law to overtime claims of nonresident plaintiffs who worked in other states, where the actual unlawful conduct occurred. *Id.* at 248. By contrast, application of California law is justified where "*the unlawful conduct* that formed the basis of the out-of-state plaintiffs' claims . . . occurred in California." *Id.* at 249 n.10 (emphasis added); *see Anderson v. CRST Int'l, Inc.*, 685 F. App'x 524, 526 (9th Cir. 2017) (dismissing out-of-state plaintiff's claims under Fair Employment and Housing Act "because they are based on *conduct* that occurred outside the state" (emphasis added)); *Doe v. Virgin Am., Inc.*, No. 18 Civ. 242, 2018 WL 5291987, at *6 (N.D. Cal. Oct. 22, 2018) (dismissing Unruh claim with leave to amend where, "as currently pleaded, the complaint does not allege any specific *conduct* by [defendants] that took place in California" (emphasis added)); *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 931 (Cal. 2006) (distinguishing between extraterritorial application of California law and "an instance of applying the statute to a multistate event in which a crucial element . . . occurred in California").

The limited bar on extraterritorial application of California law that the California Supreme Court has adopted is consistent with cases that dismissed Unruh Act claims where plaintiffs did not allege that any unlawful conduct occurred in California.[13] Moreover, there is no binding California Supreme Court or Ninth Circuit case law barring out of state plaintiffs from bringing claims under the Unruh Act or Section 51.5 for conduct that indisputably occurred within the state – as Plaintiff alleges occurred here.[14]

Here, virtually all of the unlawful conduct occurred in California, making it proper to apply California law. Plaintiff alleges that Facebook is headquartered in California, where "nearly all of the actions challenged, and the most significant actions, in this complaint occurred," namely "the conduct that gave rise to facial violations of the Unruh Act and section 51.5," FAC ¶¶ 16, 120-23. Facebook developed facially unlawful policies in California on the collection of its users' age and gender, the segregation and classification of users, the audience selection tool, the LAL tool, the ad delivery algorithm, and related materials for advertisers. And it implemented those policies in California, received payments for biased audience selections, executed on those orders in California, and failed to send ads to women and older users from California. *Id.* ¶¶ 122-23. This systemic and facially unlawful conduct in California stands in contrast to cases where no conduct occurred in California, and cases like *Sullivan*, where there was nothing inherently unlawful about the policy the defendant adopted in California. 254 P.3d at 248.

**B. Plaintiff Adequately Pleads Intentional Discrimination.**

Contrary to Facebook's claim, Plaintiff pleads intentional discrimination, not a disparate impact claim. *See* Mot. Dismiss at 20-21. Plaintiff alleges that Facebook crafted its advertising tools to expressly

---

13 *Archibald v. Cinerama Hawaiian Hotels, Inc.*, 140 Cal. Rptr. 599 (Cal. Ct. App. 1977) (refusing to apply the Unruh Act to claims by a California resident concerning non-resident rates charged by hotels in Hawaii), *disapproved of on other grounds by Koire v. Metro Car Wash*, 707 P.2d 195 (Cal. 1985); *Loving v. Princess Cruise Lines, Ltd.*, No. 08 Civ. 2898, 2009 WL 7236419, at *8 (C.D. Cal. Mar. 5, 2009) ("[T]he Court concludes that the Unruh Act . . . [does] not apply to claims of nonresidents of California injured *by conduct occurring beyond California's borders.*" (emphasis added)); *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) (dismissing non-resident plaintiff's Unruh claim where "complaint [does] not allege that [the discrimination against plaintiff] took place in California").

14 Additionally, applying California law in this case does not implicate any federal commerce clause concerns because of the California-based conduct of a California defendant. *See Ades v. Omni Hotels Mgmt. Corp.*, 46 F. Supp. 3d 999, 1013 (C.D. Cal. 2014) ("The Ninth Circuit has also distinguished invalid regulations that 'directly regulate the actions of parties located in other states' from valid regulations of 'relationships in which at least one party is located in California.'" (quoting *Gravquick A/S v. Trimble Navigation Int'l. Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003))).

rely on users' age and gender to exclude them from receiving financial services ads and applied those tools in that way; that is, these tools facially excluded women and older users from receiving ads *because of* their age and/or gender. FAC ¶¶ 26, 93, 97; *see, e.g.*, *id.* ¶¶ 73-76. This is not a disparate impact theory because the tools are not facially neutral. The audience selection tool, LAL tool, and ad delivery algorithm all expressly determine which Facebook users will be eligible to receive or actually receive ads based on the age and/or gender of those users. Thus, the tools are a "facially discriminatory method of" determining which users receive financial services ads, and "facially discriminatory" policies or practices are "not permissible under the Unruh Act." *Evenchik v. Rent A Car Sys., LLC*, No. 12 Civ. 61, 2012 WL 4111382, at *5 (S.D. Cal. Sept. 17, 2012) (denying motion to dismiss where plaintiff alleged under Unruh Act that "[g]ay and lesbian renters were given discounts because of their sexual orientation" while "[p]laintiff was not given a discount because she was (or was perceived to be) of a different sexual orientation"). "[F]acially discriminatory policies are intentional discrimination" "regardless of subjective motivation." *EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1393 (9th Cir. 1984); *see Evenchik*, 2012 WL 4111382, at *5; *Iniestra v. Cliff Warren Invs., Inc.*, 886 F. Supp. 2d 1161, 1163-64 (C.D. Cal. 2012) (policies that were "facially discriminatory against families with children" violated the Unruh Act).

Although alleging a facially discriminatory policy alone suffices to state an Unruh Act claim, *Evenchik*, 2012 WL 4111382, at *5, Plaintiff alleges even greater detail on Facebook's specific intent to discriminate, stating that "[e]very time Facebook's" tools "excluded older persons or women from receiving" financial services ads, Facebook "knew, intended, and wanted those persons to be excluded from or discriminated against in Facebook's business establishment," and "knew, intended, and wanted" them "to receive inferior treatment vis-à-vis younger persons and men." FAC ¶ 80. Facebook does not appear to take issue with this allegation. Instead, it asks the Court to disregard an even more specific allegation that Facebook "knowingly and intentionally approved, sold, and sent thousands of credit-related ad[s] in which older persons and women were excluded," as it had actively monitored which ads are credit-related since 2017 and could easily tell which credit-related ads were exclusionary. *Id.* ¶¶ 82-83. Although this specific allegation is not needed to state a claim, it must be accepted as true at the pleading stage, especially since such information is "peculiarly within the possession and control of the defendant,'" *Menzel v. Scholastic, Inc.*, No. 17 Civ. 5499, 2018 WL 1400386, at *2 (N.D. Cal. Mar. 19, 2018).

### C. Segregating and Discriminating Against Facebook Users in the Area of Financial Services Ads Is Unreasonable, Arbitrary, and Invidious.

Facebook argues that segregating, classifying, and discriminating against users based on age and gender when determining who receives the benefit of financial services ads is reasonable. Mot. Dismiss at 23-24. At the pleading stage, however, Facebook's purported justification or defense for such discrimination is premature. *See Perez v. Wells Fargo & Co.*, No. 17 Civ. 454, 2017 WL 3314797, at *6 (N.D. Cal. Aug. 3, 2017) (declining to consider at the Rule 12(b)(6) stage defendant's social policy defense to an Unruh Act claim). Even so, under the Unruh Act "[d]iscrimination may" only be "reasonable, and not arbitrary, in light of the nature of the enterprise or its facilities, legitimate business interests (maintaining order, complying with legal requirements, and protecting business reputation or investment), and public policy supporting the disparate treatment." *Javorsky v. W. Athletic Clubs, Inc.*, 195 Cal. Rptr. 3d 706, 712-13 (Cal. Ct. App. 2015). None of these considerations applies here. Public policy weighs strongly against discriminating against tens of millions of people in Facebook's services and denying them financial services information based on stereotypes on what services women or older people desire. Nor are there any business interests that are remotely "legitimate." And Facebook's biased tools are not as innocent as Facebook claims. They expressly rely on age and gender to exclude users from ads on key opportunities, they require users to divulge protected traits and to express biased preferences, and they discriminate against users even when advertisers do not want to do so. *Supra* at 2-3.

Recognizing the weakness and tone-deafness of its argument as applied to financial services ads, *the only category of ads at issue here*, Facebook builds a strawman argument about other types of ads where the user's age or gender could be relevant to the product, like women's apparel. *Id.* at 24. But it fails to explain the rationale for promoting and sending age- or gender-restricted ads in the financial services area. None of the categories or examples of ads in the FAC is the type of product for which age or gender would be relevant, such as bank accounts, loans, or car insurance. FAC ¶¶ 72-77, 91, 124-26.

### D. Plaintiff Has Pleaded an Aiding and Abetting Claim.

Facebook is liable for aiding and abetting advertisers of financial services under the Unruh Act and Section 51.5. Aiding and abetting liability applies where a defendant "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act *or* (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct,

separately considered, constitutes a breach of duty to the third person." *Casey v. U.S. Bank Nat. Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005) (emphasis added). The FAC alleges that Facebook did both of these things. It "intentionally, knowingly, and purposefully discriminate[d] against older persons and women . . . , including by making it possible and easy for advertisers . . . to target . . . financial services ad[s] and other types of ad[s] to Facebook users based on their age or gender." FAC ¶ 31. When approving, sending, and publishing age- or gender-restricted ads, "Facebook is intentionally, knowingly, and purposefully sending or publishing an ad[s] that discriminate[] based on age or gender." *Id.* ¶ 35. And although Facebook has known "for years" that it was publishing "discriminatory" financial services ads, *id.* ¶ 81, the substantial revenue from such discrimination caused Facebook to continue providing substantial assistance to advertisers and executing this conduct. *Id.* ¶¶ 22, 24, 111; *see Schulz v. Neovi Data Corp.*, 60 Cal. Rptr. 3d 810, 817 (Cal. Ct. App. 2007) (knowledge requirement satisfied where plaintiff alleged defendant recognized illegality of the practice "but also realized that it generated substantial revenue and could be very profitable for [them]"). Even if Facebook's "usual, legitimate [advertising] service" could in other scenarios constitute "useful services to consumers," "this does not give them license to aid and abet illegal activity." *Id.* These and similar allegations in the FAC that detail the tools Facebook that offers to advertisers readily satisfy the aiding and abetting requirements. Also, despite Facebook's contrary claim, Plaintiff has alleged and identified examples of particular violations of third-party advertisers that Facebook aided and abetted, even though Plaintiff has limited access to other such ads because that she was personally *denied* these very ads. *See* FAC ¶¶ 73-76, 108-109.

## IV. Plaintiff States a Plausible Claim Under District of Columbia Law, Which Must Apply if California Law Does Not Apply to Users Like Plaintiff Who Live Outside of California.

### A. Plaintiff Cannot Be Left Without State Civil Rights Protections.

Facebook unfathomably argues that *no* state civil rights laws apply to Plaintiff's claims. It claims both that Facebook's California-choice-of-law clause bars application of D.C. law, and yet California law does not apply to Plaintiff's claims, because such application is allegedly extraterritorial. Mot. Dismiss at 19, 25-26. That outcome is unconscionable and untethers Facebook from any state civil rights law for anyone except those in California. Facebook's position is also contrary to the law. The California-choice-of-law clause cannot be enforced if it would result in neither California *nor* D.C. law applying to Plaintiff.

Under California law, a contractual choice-of-law clause cannot be enforced "[i]f the chosen law is contrary to a fundamental policy of the state law alternative to the contractual choice, and . . . the other state has a materially greater interest in the determination of the matter." *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1168 (N.D. Cal. 2016). Here, the Court must decide: (1) whether the California choice-of-law clause is contrary to a fundamental policy of D.C., and (2) if so, whether D.C. has a greater interest in determining this matter. *Id.* If – as Facebook claims – Plaintiff is not protected by California's Unruh Act and section 51.5, then the answer to both questions must be "yes."

The DCHRA and DCCPPA embody fundamental D.C. policies. "To be fundamental within the meaning of Restatement section 187, a policy must be a substantial one." *Brack v. Omni Loan Co.*, 80 Cal. Rptr. 3d 275, 282 (Cal. Ct. App. 2008). By their express terms, these two laws describe D.C.'s substantial policies of protecting its residents from discrimination and related deceptive trade practices. DC Code § 2-1401.01 (DCHRA's intent is "secur[ing] an end in the District of Columbia to discrimination for any reason other than that of individual merit")[15]; DC Code § 28-3901 (DCCPPA's purposes, which must be applied liberally, are to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," to promote fair business practices, and to educate "consumers to demand high standards and seek proper redress of grievances").

Facebook's reading of the California choice-of-law provision would violate these fundamental policies. It would leave Facebook users in D.C. with no protection against age discrimination by Facebook, while that protection exists for users in California. In *In re Facebook Biometric Info Privacy Litigation*, Facebook argued that it was not subject to an Illinois privacy law due to its California choice-of-law clause. The court disagreed, explaining that if Facebook's view applied, Illinois protections "would be written out of existence." 185 F. Supp. 3d at 1168. Much like the privacy interests at stake in that case, if Facebook's view of California law is applied, then D.C.'s interests in protecting its residents from age discrimination (and the resulting deceptive trade practices from such bias) would be erased. "That is the essence of a choice-of-law conflict." *Id.* (citing *Ruiz*, 667 F.3d at 1324 (declining to enforce Georgia

---

[15] *See* DC Code § 2-1402.01 ("Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of [D.C.] and ***to have an equal opportunity to participate in all aspects of life***, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing[.]" (emphasis added)).

choice of law that conflicted with "a fundamental California policy that seeks to protect its workers"), and *In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1088 (C.D. Cal. 2010) (declining to enforce choice-of-law provisions for several states since those states lacked consumer protection laws comparable to California law)). Facebook's argument that "this is not a case where applying California law would conflict with another state's public policy," Mot. Dismiss at 26, defies logic. Applying California law the way in which Facebook suggests would not just conflict with D.C.'s public policy of protecting against bias and deceptive trade practices, but it also would *eliminate* any means to enforce such policy.[16]

D.C.'s greater interest in the outcome of this dispute is also readily apparent. *See Facebook Biometric*, 185 F. Supp. 3d at 1169 (considering "which state . . . will suffer greater impairment of its policies if the other state's law is applied"). D.C. will "suffer a complete negation of its" protections against discrimination and deceptive trade practices for D.C. residents if California law is applied in the way that Facebook espouses. *Id.* In contrast, "California law and policy will suffer little, if anything at all" if D.C. law is applied. *Id*. Thus, if the Court accepts Facebook's view that California law does not apply, it should decline to enforce the California choice-of-law clause as to Plaintiff and apply D.C. law.

**B. Plaintiff Has Stated a Claim Under the D.C. Human Rights Act.**

Plaintiff alleges that Facebook violated the DCHRA in three ways: (1) by causing "to be published a statement, advertisement, or sign which indicates that the full enjoyment of the goods, services, facilities, privileges, advantages and accommodations of a place of public accommodation will be unlawfully refused, withheld from or denied an individual; or that an individual's patronage of, or presence at, a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable" based on the person's actual or perceived sex and/or age, FAC ¶ 155; (2) by its denial of "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations . . . based on actual or perceived . . . sex [or age]," *id.* ¶ 156; and (3) by aiding and abetting financial services companies in violating the DCHRA.

Plaintiff states a claim under the DCHRA for each of these violations.

---

[16] Facebook suggests that D.C. law cannot apply because the policies of neither California nor D.C. "regulate conduct that occurs outside [their] borders," such that there is no true conflict. Mot. Dismiss at 26. This defies reality, because the discrimination at issue here must occur in *some state*. And it also ignores the actual policies at issue, namely those barring discrimination and related deceptive trade practices.

**1. The DCHRA Does Not Require a Physical Location in D.C.**

Facebook's argument that the DCHRA only applies to a place of public accommodation with a physical location in D.C. rests on wrongly decided case law. Mot. Dismiss at 27. The decision in *Freedom Watch Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 39-40 (D.D.C. 2019), *aff'd* No. 19-7030, 2020 WL 3096365 (D.C. Cir. May 27, 2020), is an incorrect and non-binding interpretation of D.C. law.[17] Indeed, there the D.C. Attorney General, among others, submitted an amicus brief urging the D.C. Circuit to hold that the DCHRA does not require a physical location (or alternatively to certify the question to the D.C. Court of Appeals). *See generally* Final Brief for the District of Columbia as *Amicus Curiae* in Support of Neither Party ("Brief of D.C.") (Ex. C). As the D.C. Attorney General made clear, the DCHRA's plain text and history have never required a place of public accommodation to have a physical location in D.C. Brief of D.C. at 4-12. Plaintiff encourages the Court to review the D.C. Attorney General's brief, which provides a compelling argument on the text, legislative history, and caselaw that show that a place of public accommodation does not require a physical location in D.C.

Moreover, the D.C. Commission on Human Rights ("D.C. Commission"), which is the adjudicatory agency that administers the DCHRA, has found that there is no such physical location requirement. *See id.* at 14-15 (citing *Pool & Geller v. Boy Scouts of America*, Nos. 93-030-(PA) & 93-031-(PA) (D.C. Comm'n on Human Rights June 18, 2001)).[18] The D.C. Commission's interpretation of the DCHRA should be followed, as it is entitled to deference and would be binding if the question were presented to the D.C. Court of Appeals. *Brown*, 83 A.3d at 746 & n.21 (explaining an agency's interpretation of the law it administers is binding on the D.C. Court of Appeals unless it conflicts with the law's plain meaning or legislative history). This view is also consistent with *James v. Team Washington*, No. 97 Civ. 378, 1997 WL 633323 (D.D.C. Oct. 7, 1997), which held a Maryland-based pizzeria violated the DCHRA when it delivered a pizza in a predominantly black neighborhood in D.C. and refused to accept payment by check due to the delivery location. *Id.* at *1-2. The D.C. Court of Appeals has also

---

[17] As the D.C. Circuit acknowledged in *Freedom Watch*, the ultimate interpreter of the DCHRA is the D.C. Court of Appeals, and not the federal courts. 2020 WL 3096365. at *2.

[18] The D.C. Court of Appeals defers to reasonable interpretations of statutes by D.C. agencies. *See Brown v. D.C. Dep't of Emp't Servs.*, 83 A.3d 739, 746 & n.21 (D.C. 2014) ("[O]ur review is subject to well-established doctrines mandating deference to an administrative agency's interpretation of its own rules and regulations and of the statute it is charged with implementing.").

made clear that out-of-state businesses that specifically target D.C. residents with advertising subject themselves to D.C. law and personal jurisdiction. *See Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 335-36 (D.C. 2000) (en banc) (D.C. courts have personal jurisdiction over Maryland corporation with no stores in D.C. as it solicited D.C. customers through advertising). Here too, Facebook and financial services advertisers specifically sought out D.C. area consumers via their advertising. Companies that engage in and facilitate targeted advertising to D.C. area residents should not be able to escape critical civil rights protections that D.C. affords its residents simply because those companies are not physically located in D.C.[19]

All the entities at issue here, Facebook and financial services advertisers, are places of public accommodation under the DCHRA and subject to its bar on biased conduct against D.C. residents.[20]

**2. Plaintiff Has Alleged That Facebook's Financial Services Ads Indicate That Customers of Certain Ages and Genders Are Unwelcome.**

Plaintiff has identified a number of ads that indicate that financial services would be unlawfully denied or that customers of certain ages and genders are unwelcome. The FAC includes multiple examples of ads that state that the user received the ad due to their age and/or gender. FAC ¶ 73 (Webull stock trading ad targeting "men ages 20 and older"); *id.* ¶ 74 (Partbnb ad on investment in Airbnb properties to "men ages 30 to 50"); *id.* ¶ 75 (Ladder ad for life insurance targeting "people ages 25 to 45"); *id.* ¶ 76 (AAFMAA ad for personal loans for "people ages 24 to 40"); *id.* ¶¶ 108-109. These examples constitute the unlawful publication of discriminatory statements, as they suggest men and/or younger Facebook users are preferred or encouraged to respond or participate, while women and/or older Facebook users may be unlawfully denied services or are unwelcome. Courts, regulations, and the United States all interpret nearly identical statutory provisions on discriminatory advertising to find that ads that refer to protected status or exclude people from receiving ads based on protected statuses indicate an unlawful preference.[21]

---

[19] Facebook's reliance on *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379 (D.C. 1981), is misplaced. As the D.C. Attorney General explained in its amicus brief, the D.C. Court of Appeals made no finding on the merits. Brief of D.C. at 17-19. The D.C. Circuit also acknowledged the tentative nature of *Jaycees* in its opinion in *Freedom Watch*, 2020 WL 3096365, at *2.

[20] If this Court determines that a physical location is required for DCHRA protections, however, Plaintiff requests leave to amend to include such an allegation.

[21] *See, e.g.*, 29 C.F.R. § 100.75(c)(3)-(4) (interpreting the Fair Housing Act); 29 C.F.R. § 1604.5 (interpreting Title VII); 29 C.F.R. § 1625.4 (interpreting Age Discrimination in Employment Act); U.S.

### 3. Plaintiff Has Alleged an Aiding and Abetting Claim Under the DCHRA.

The DCHRA prohibits "aid[ing], abet[ting], invit[ing], compel[ling], or coerc[ing] the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so." DC Code § 2-1402.62. An aider or abettor "is one who in some sort associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his action to make it succeed." *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998). Someone aids or abets if he "participated in the discrimination and sought to make it succeed." *Id.* Plaintiff has alleged that the financial service advertisers themselves violated the DCHRA, and describes in detail how Facebook aids, abets, invites, and/or compels these advertisers to discriminate based on age and gender in multiple ways. First, Facebook provides audience selection tools that exclude users based on age or gender; second, it applies LAL audiences for advertisers' ad campaigns; and third, it applies its ad delivery algorithm to advertisers' ad campaigns. FAC ¶¶ 32-71. Facebook has associated with a discriminatory venture, participated in it, and wishes it to succeed, because its financial success depends on its successful, biased ad campaigns. *See id.* ¶¶ 22, 24, 111. By making such tools available to financial services advertisers, requiring their use, and profiting extensively from them, Facebook has aided, abetted, and/or invited unlawful discrimination.

## C. Plaintiff Has Adequately Alleged a Violation of the DC CPPA.

The DC CPPA is "a comprehensive statute" in place to "remedy all improper trade practices." *Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*, 556 A.2d 462, 465 (D.C. 1989). Under the DC CPPA, it is an unlawful trade practice to "misrepresent as to a material fact which has a tendency to mislead" or "[r]epresent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," and to violate other laws. D.C. Code § 28-3904. To that end, the D.C. Court of Appeals has held that violating another D.C. statute (including the

---

SOI I at 9-12 ("unlawful discrimination can occur through the choice of who receives an ad, regardless of whether the content of the ad itself is facially discriminatory."); *Hous. Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1193 (C.D. Cal. 2004) ("notices and banners written only in Korean would suggest to the ordinary reader a racial preference for Korean tenants."); *Guevara v. UMH Props., Inc.*, No. 11 Civ. 2339, 2014 WL 5488918, at *5 (W.D. Tenn. Oct. 29, 2014) ("allegation that Defendant only advertised in Spanish language media outlets is sufficient to state a claim because it . . . it denies non-Spanish speaking segments of the housing market, who are overwhelmingly non-Hispanic, information about housing opportunities."); *Martinez v. Optimus Props., LLC*, Case No. 16 Civ. 8598, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) (selective advertising denying indicates a discriminatory preference).

DCHRA) in the context of a consumer transaction constitutes a *per se* violation of the DC CPPA. *Dist. of Columbia v. Evolve*, No. 2018 CA 8262 B, 2020 D.C. Super. LEXIS 6, *13 (D.C. Sup. Feb. 25, 2020) (finding a violation of DCHRA in the context of a consumer transaction – leasing a property – was a violation of the DC CPPA); *see also Dist. Cablevision Ltd. P'shp. v. Bassin*, 828 A.2d 714, 722-23 (D.C. 2003) ("Trade practices that violate other laws . . . also fall within the purview of the CPPA."); *Atwater*, 556 A.2d at 466 ("The remainder of [the DC CPPA] obviously contemplates that procedures and sanctions provided by the [DC CPPA] will be used to enforce trade practices made unlawful by other statutes."); *Osborne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325 (D.C. 1999) ("The [DCCPPA] protects consumers from those 'unlawful trade practices enumerated in [D.C. Code] § 28-3904, as well as practices prohibited by other statutes and common law."). Here, Facebook's DCHRA violation, which arises in the context of a proposed consumer transaction, violates the DC CPPA's bar on unlawful trade practices.

In addition to violating the DC CPPA due to its DCHRA violations, Facebook's statement that "there is no place for discrimination at Facebook" is a further violation of the DC CPPA. FAC ¶¶ 27, 174; *see Parr v. Mashaallah Ebrahimian*, 774 F. Supp. 3d 234, 242-43 (D.D.C. 2011) (plaintiff stated a claim under DCCPA as she alleged defendant falsely stated a condominium "had been inspected by appropriate officials and complied with applicable statutes and regulations"). This statement does not merely express Facebook's *opinion* that it is complying with anti-discrimination law. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (describing as opinion statements prefaced with "we believe"). Instead, it is an assertion that would lead a reasonable consumer to believe that Facebook actually is complying with anti-discrimination laws. Because it is not doing so, this violates the DC CPPA.[22] In any event, it is not appropriate to adjudicate this factual question at the motion to dismiss stage. For all of these reasons, Plaintiff sufficiently pleads a DC CPPA claim.

**CONCLUSION**

For the reasons stated above, the Court should deny Defendant's Motion to Dismiss.

---

[22] Facebook's statement that "the laws of the State of California will govern these Terms and any claim" is also a violation of the DC CPPA, because it would tend to make a reasonable consumer believe that California's civil rights protections extend to Plaintiff, and it represents that transactions on Facebook involve rights and remedies which Facebook now argues do not exist. *See* D.C. Code § 28-3904. Indeed, until Facebook filed its initial motion to dismiss, Plaintiff reasonably believed that the protections of California law extended to her, which is why she filed in accordance with Facebook's terms of service.

Dated: June 12, 2020

Respectfully Submitted,

/s/ Pooja Shethji
Pooja Shethji*
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW
Suite 200W
Washington, DC 20001
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: pshethji@outtengolden.com

Jahan C. Sagafi (State Bar No. 224887)
OUTTEN & GOLDEN LLP
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com

Adam T. Klein*
Michael Litrownik*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
Email: atk@outtengolden.com
Email: mlitrownik@outtengolden.com

* *pro hac vice*

Peter Romer-Friedman*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
Telephone: (202) 888-1741
Email: peter@guptawessler.com

Jason R. Flanders (State Bar No. 238007)
AQUA TERRA AERIS LAW GROUP
490 43rd Street
Oakland CA 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Matthew K. Handley*
Rachel Nadas*
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2411
Email: mhandley@hfajustice.com
Email: rnadas@hfajustice.com

William Most (State Bar No. 279100)
LAW OFFICE OF WILLIAM MOST
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com