Jim Davy (Pa. #321631*)
2362 E. Harold St.
Philadelphia, PA 19125
Tel: 609-273-5008
Email: jimdavy@gmail.com

*pro hac vice forthcoming

Hannah Weinstein (CSB No. 301666)
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Ave.
Pasadena, CA 91101
Tel: (626) 796-7555
Fax: (626) 577-0124
Email: hweinstein@rsglabor.com

Attorneys for Amicus Curiae Upturn

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEUHTAH OPIOTENNIONE, on behalf of herself and others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>FACEBOOK, INC.,<br><br>　　　　　Defendant. | Case Number: 3:19-cv-07185-JSC<br><br>**UPTURN, INC.'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: July 16, 2020<br>Time: 9:00am<br>Judge: Hon. Jacqueline S. Corley<br>Courtroom: E |

BRIEF OF *AMICUS CURIAE* UPTURN ISO PLAINTIFFS' OPPOSITION TO FACEBOOK'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT – No. 3:19-CV-07185-JSC

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I. PRELIMINARY STATEMENT ....................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. By operating an algorithm that withholds financial services ads from people based on their gender and age, Facebook faces liability arising from its own conduct — not the content of third-party advertisers. ................... 2

    B. By creating Lookalike Audiences for housing advertisers based on its users' gender and age, Facebook creates and develops content that materially contributes to illegality. ....................................................................... 7

    C. Summary dismissal is especially inappropriate because courts routinely withhold Section 230 immunity in civil rights cases. ..................................... 11

III. CONCLUSION .............................................................................................................. 12

# TABLE OF AUTHORITIES

Page

**CASES**

*Airbnb, Inc. et al, v. City and County of San Francisco*,
   217 F.Supp.3d 1066 (N.D. Cal. Nov. 8, 2016) .................................................................. 5, 6

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ......................................................................................... 5, 6, 7

*Dyroff v. Ultimate Software Grp., Inc.*,
   943 F.3d 1093 (9th Cir. 2019) ............................................................................................. 5, 6

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ............................................................................................ passim

*Jane Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ................................................................................................. 6

*HomeAway.com v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ............................................................................................. 6, 11

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ............................................................................................... 1

*Marshall's Locksmith v. Google, LLC*,
   925 F.3d 1263 (D.C. Cir. 2019) ........................................................................................... 12

*Nemet Chevrolet v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ............................................................................................... 12

**STATUTES & REGULATIONS**

Cal. Civil Code § 51(b) ............................................................................................................ passim

47 U.S.C. § 230 ........................................................................................................................ passim

**OTHER AUTHORITIES**

Facebook, Advertiser Help Center, "Ad Delivery & Optimization." ........................................... 2

Facebook, Advertiser Help Center, "Ads Help - Desktop - Delivery," Retrieved from The
   Internet Archive. ...................................................................................................................... 2

Facebook Business, Advertiser Help, "About Lookalike Audiences." ........................................ 8

Piotr Sapiezynski, et al., *Algorithms that "Don't See Color": Comparing Biases in
   Lookalike and Special Ad Audiences*, arXiv:1912.07579 (2019) ................................... 8

<div style="text-align:center">**TABLE OF AUTHORITIES**
(continued)</div>

Page

Muhammad Ali, et al., *Discrimination through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proceedings of the ACM on Human-Computer Interaction No. 199, (Nov. 2019) ....................................................... 3

*National Fair Housing Alliance, et al., v. Facebook, Inc.*, Case No. 18-cv-02689-JGK (S.D.N.Y. Mar. 8, 2019) Doc. 67-2 (Settlement Agreement and Release, Exhibit A – Programmatic Relief). .................................................................. 4

## I. PRELIMINARY STATEMENT[1]

Facebook's Ad Platform, as currently designed and operated, perpetuates discrimination prohibited by California and D.C. law.

Amicus submits this brief to argue that Plaintiffs have pleaded ample facts to allow this Court to conclude that Facebook's Ad Platform is not fully immunized by 47 U.S.C. § 230 ("Section 230"). Section 230 is critical to people's ability to speak freely on the internet. At the same time, Section 230 need not — and should not — condone violations of civil rights solely because an entity is an interactive computer service.

This is not the paradigmatic Section 230 case. At the heart of Section 230 is the principle that internet intermediaries should not absorb liability for unlawful content created entirely by another. "The prototypical service qualifying for [Section 230] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (internal quotations omitted).

This case is different for two important reasons. First, with respect to Facebook's ad delivery algorithm, third-party content is almost entirely irrelevant to the unlawful conduct alleged by the Plaintiffs. As a result, this Court should not treat Facebook as the publisher or speaker of third-party content. Second, with respect to Facebook's Lookalike Audience tool, Facebook itself creates and develops content that materially contributes to violation of state antidiscrimination law. Amicus supports both arguments with empirical research below.

This Court can analyze Facebook's Ad Platform as distinct from its social network, extending Section 230 immunity to certain aspects of Facebook's operations and not others. *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). Were this Court to deny Facebook's instant Motion to Dismiss, it would not jeopardize Facebook's broad and well-established immunity to host and moderate user-generated content.

Accordingly, Amicus asks the Court to deny Facebook's Motion to Dismiss.

---

[1] Amicus certifies that no person or entity, other than Amicus' own staff or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief, in whole or in part.

II.     ARGUMENT

    **A.     By operating an algorithm that withholds financial services ads from people based on their gender and age, Facebook faces liability arising from its own conduct — not the content of third-party advertisers.**

It is well understood that Facebook provides advertisers with a variety of ways to target their ads.  *See generally* Doc. 30.  What is less well understood is how Facebook plays a central role, *independent from the choices made by advertisers*, in deciding which of its users will ultimately see — and not see — a given ad.

Facebook makes ad delivery decisions using an algorithm that runs billions of automated "auctions" each day — one each time an ad is displayed — rapidly filling available ad space as users scroll through its site.  These auctions are not standard "highest bidder" auctions, decided neutrally on the basis of price.  Rather, Facebook seeks to "to show the right content to the right people" by making its own predictions about who "the right people" are for any given ad.[2]  These predictions are based on the content of a particular ad, Facebook's own knowledge of that user's characteristics and past behavior, the behavior of other users, and whether similar users have interacted with the ads competing in that auction.  Facebook does not share with advertisers the reasoning behind its ad delivery decisions.

Facebook's ad delivery decisions lead to significant demographic skews on the basis of gender, age, and other protected factors.  Facebook has said as much in its own technical documentation.  In explaining the ad delivery process to advertisers, Facebook says that if it detects a pattern of men interacting with a particular ad, it will automatically — and without instruction from or notification to the advertiser — steer that ad toward a higher proportion of other men in the future, to the exclusion of women.[3]

---

[2] Facebook, Advertiser Help Center, "Ad Delivery & Optimization," https://www.facebook.com/business/help/430291176997542.

[3] Facebook, Advertiser Help Center, "Ads Help - Desktop - Delivery," Retrieved from The Internet Archive, https://web.archive.org/web/20160930124257/https://www.facebook.com/business/help/934288416682198?helpref=faq_content. ("if there are more and lower-cost optimization events among men than women, then we'd automatically spend more of your budget on the men in the larger target audience . . . .").

Amicus has published peer-reviewed empirical research,[4] together with academic coauthors at Northeastern University and the University of Southern California,[5] that demonstrates significant bias in Facebook's ad delivery decisions on the basis of gender, age, and other protected characteristics. *See* Doc. 30 at ¶ 70. This bias occurs *even when an advertiser chooses to target their ad towards all gender and age groups*.

In one experiment,[6] Amicus examined how Facebook perpetuates gender bias, by delivering two ads targeted broadly toward all Facebook users over the age of 18 in the United States. Amicus created one ad focused on bodybuilding and another on cosmetics. Amicus ran each of these ads at the same time and with the same bidding strategy and budget. Facebook delivered these ads to dramatically gender-skewed audiences: It delivered the ad for bodybuilding to over 75% men on average, while the cosmetics ad was delivered to over 90% women on average.




---

[4] Muhammad Ali, et al., *Discrimination through Optimization: How Facebook's Ad Delivery Can Lead to Biased Outcomes*, 3 Proceedings of the ACM on Human-Computer Interaction No. 199.

[5] In describing this and other research, for ease of readability, this brief will refer to "Amicus' research …." Of course, this work could not have happened without the indispensable contributions of Amicus' collaborators and co-authors.

[6] The examples and images below are adapted from *Discrimination through Optimization, supra* note 4.

BRIEF OF *AMICUS CURIAE* UPTURN ISO PLAINTIFFS' OPPOSITION TO FACEBOOK'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT – No. 3:19-CV-07185-JSC          3

*Above: Two ads used by Amicus and researchers to test Facebook's ad delivery algorithm.*



*Delivery pattern showing how Facebook skewed the delivery of neutrally targeted ads by gender.*

Amicus observed skewed delivery immediately upon placing ads, indicating that Facebook is not reacting to user responses in real-time, but rather acting on its own "prebaked" predictions about who "the right people" were for the ads. Again, these delivery patterns reflect Facebook's independent judgment, *not* the targeting parameters selected for these ads.

In a separate experiment, Amicus and researchers also measured demographic skews in job ads. For example, given neutrally targeted ads, Facebook delivered lumber industry job ads to over 90% men, and janitor ads to 65% women.

Facebook itself has acknowledged the potential for discriminatory effects arising from its ad delivery decisions. In a previous settlement with Plaintiffs' counsel and civil rights organizations,[7] Facebook committed to "engage academics, researchers, civil society experts, and privacy and civil rights/liberties advocates to study the potential for unintended biases in

---

[7] *National Fair Housing Alliance, et al., v. Facebook, Inc.*, Case No. 18-cv-02689-JGK (S.D.N.Y. Mar. 8, 2019) Doc. 67-2 (Settlement Agreement and Release, Exhibit A - Programmatic Relief).

algorithmic modeling."[8]  However, the company did not commit to any substantive relief.  These issues with Facebook's ad delivery algorithm remain unresolved.

These facts help show why Facebook should not be presumed immune under Section 230 for the design and operation of its ad delivery algorithm.  Section 230 confers immunity when a plaintiff's claims "inherently require the court to treat [an interactive computer service] as the publisher or speaker of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).  Plaintiffs "cannot plead around Section 230 immunity by framing [features and functions, including algorithms] as content." *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).  Facebook relies on this language to argue that its "use of an algorithm to make decisions about which third-party content to show to which user is a protected function under the CDA."  Doc. 35 at 15.

However, unlike *Dyroff* and many similar cases, the ad delivery allegations in this case do not arise from harmful or unlawful third-party content.  The claims in *Dyroff* were based on Ultimate Software's recommendation of drug related content. *Dyroff*, 934 F.3d at 1094-95.  The Court in *Dyroff* held that an intermediary does not "[become] an information content provider by facilitating communication . . ." of third-party content " . . . through content-neutral website functions like group recommendations and post notifications." *Id.* at 1097.  Here, the third-party content in question is the underlying financial service ads, many of which are not only unobjectionable, but which a Plaintiff explicitly *wanted* to see.  Doc. 30 at 5, ¶ 15.

By contrast, Facebook's ad delivery algorithm is Facebook's "own conduct," *Airbnb, Inc. et al., v. City and County of San Francisco*, 217 F.Supp.3d 1066, 1073 (N.D. Cal. Nov. 8, 2016).  Running an ad business that excludes protected groups from accessing all of its accommodations, facilities, advantages, and services is "something the law prohibits" in its own right.

---

[8] *Id.* at 22.  ("Facebook will engage academics, researchers, civil society experts, and privacy and civil rights/liberties advocates to study the potential for unintended bias in algorithmic modeling.  Facebook will share the status of its efforts to investigate and understand this issue in meetings between the Parties provided for in the Agreement, provide the Parties with an opportunity to respond and make recommendations, and consider those recommendations and whether to implement any feasible reforms as part of its ongoing commitment to nondiscrimination in advertising on its platform.")

*Roommates.com*, 521 F.3d at 1167; *see also* California Unruh Civil Rights Act, Cal. Civ. Code § 51(b) ("Unruh Act").

The Ninth Circuit made this distinction in *Dyroff*, where harmful content was the source of liability, and *HomeAway.com*, in which the Ninth Circuit held that the city of Santa Monica could prohibit vacation rental platforms from facilitating unlicensed vacation rentals. *See Homeaway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019):

> We found that HomeAway.com and Airbnb did not meet the second prong of the *Barnes* test because the Santa Monica ordinance did not "proscribe, mandate, or even discuss the content of the [website] listings" and required only that the website's transactions involve licensed properties. In other words, the vacation rental platforms did not face liability for the content of their listings; rather liability arose from facilitating unlicensed booking transactions.

*Dyroff*, 934 F.3d at 1098 (internal citations omitted).

Just so here: The laws underlying Plaintiffs' claims do not "proscribe, mandate, or even discuss the content of the [website] listings." *Id.* (quoting *Homeaway.com*, 918 F.3d at 683). Rather, they only require businesses to provide full and equal accommodations, advantages, facilities, privileges, and services to all people. Cal. Civ. Code § 51(b). In other words, Facebook does not face liability for the *content* of the advertisements it runs; rather, liability arises from the *conduct* of discriminatory delivery that Facebook itself causes. Facebook could modify its conduct without having to remove, filter, or edit any third-party content. *HomeAway.com*, 918 F.3d at 683.

Of course, Facebook's ad delivery algorithm does not operate in complete isolation from third-party advertising content. However, the link between that third-party content and the illegality alleged in this case is tenuous at best. Section 230 "does not provide a general immunity against all claims derived from third-party content." *Jane Doe v. Internet Brands, Inc.,* 824 F.3d 846, 853 (9th Cir. 2016). Such a broad sweep would "exceed the scope of the immunity provided by Congress." *Id.* (citing *Roommates.com*, 521 F.3d at 1164 n.15). Accordingly, the Ninth Circuit has repeatedly "rejected the use of a 'but-for' test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content." *HomeAway.com*, 918 F.3d at 682; *see also Internet*

*Brands*, 824 F.3d 846. Facebook has made a business decision to derive gender and age stereotypes from third-party content, and uses those stereotypes to segregate its users. The third-party content is not to blame.

Facebook appears to argue that any time it uses algorithms to analyze or process content, it *necessarily* acts as a publisher, and is thus fully immunized by Section 230. However, as Plaintiffs correctly note in their Opposition Brief, an algorithm is just a "step-by-step procedure for . . . accomplishing some end." Doc. 39 at 29 (quoting Merriam-Webster Online). Everything an interactive computer service does — whether innocuous or abhorrent — is effectuated by algorithms. An ad delivery business could choose to deliver all financial services ads to male users, completely withholding such ads from women, simply by altering a few characters of computer code. Such conduct should not be afforded immunity merely because it is codified in an algorithm. "To 'provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute].'" *Barnes*, 570 F.3d at 1100 (quoting *Roommates.com*, 521 F.3d at 1171) (brackets in original).

> **B.     By creating Lookalike Audiences for housing advertisers based on its users' gender and age, Facebook creates and develops content that materially contributes to illegality.**

Plaintiffs' allegations related to Facebook's Lookalike Audiences tool, *see, e.g.*, Doc. 30 at 16-18, provide a second reason Section 230 immunity does not apply. As explained below, Facebook itself creates target audiences for advertisers that are biased on the basis of gender and age. Thus, Facebook itself develops content that materially contributes to violations of state antidiscrimination law.

To create a Lookalike Audience, Facebook starts by soliciting from an advertiser a "source audience" of phone numbers, e-mail addresses, or other personal identifiers. Once it has this source list, Facebook takes several steps to create a new, custom-built target audience (the "Lookalike Audience") for the advertiser. First, Facebook locates user accounts that match the identifiers contained in the source audience. Second, Facebook uses proprietary algorithms and personal data to extract "common qualities" of those users based on their demographics, interests, online behaviors, and other information. (Virtually none of this data is available to the

advertiser.)  Finally, Facebook creates a targeting list of new users, who were not included in the source audience but who share common qualities found in the source audience.  Facebook describes this new target audience as comprising people who "are similar to (or 'look like')" people in the source audience.[9]  As described in Section II.A, Facebook then delivers ads to members of this new Lookalike Audience with no additional input or action from the advertiser.

Recent research by Amicus and academics at Northeastern University show that Facebook will reproduce protected class characteristics of source audiences — including gender and age — by creating Lookalike Audiences with similar demographic compositions.[10]  For example, in one experiment, Amicus and researchers compiled source audiences based on New York voter records.  Each source audience contained 10,000 individuals, with varying fractions of men (0-100%).  Amicus and researchers then ran ads to the resulting Lookalike Audiences created by Facebook, and compared demographic results reported by Facebook's advertiser interface.  The results made crystal clear that Facebook reproduced the underlying demographics of the source audiences: The Lookalike Audience derived from a male-only source audience delivered to over 99% men, and female-only source audience delivered to over 97% women.  A similar experiment for age groups revealed essentially the same pattern.

---

[9] *See* Facebook Business, Advertiser Help, "About Lookalike Audiences," available at https://www.facebook.com/business/help/164749007013531 (" . . . we identify the common qualities of the people in it (ex: demographic information or interests).")

[10] Piotr Sapiezynski, et al., *Algorithms that "Don't See Color": Comparing Biases in Lookalike and Special Ad Audiences*, arXiv:1912.07579 (2019).

BRIEF OF *AMICUS CURIAE* UPTURN ISO PLAINTIFFS' OPPOSITION TO FACEBOOK'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT – No. 3:19-CV-07185-JSC            8



*Results showing that source audiences comprised of varying fractions of male users yielded Lookalike Audiences that deliver to similar fractions of male users.*



*Results showing that source audiences comprised of younger users yielded Lookalike Audiences that deliver to similar fractions of younger users (and vice-versa for older users).*

These results might seem unsurprising or inconsequential. However, it is important to remember that advertisers often have no knowledge about the people in their source audience. An advertiser's source audience may contain only phone numbers or opaque identifiers that offer no indication as to demographics. The resulting Lookalike Audience is created by Facebook, which has the sole power to leverage its users' data to find and reproduce demographic similarities. Facebook chooses each member of the Lookalike Audience, reaching beyond the source audience provided by the advertiser. When a Lookalike Audience happens to be exclusionary or otherwise discriminatory on protected status grounds, it is Facebook — not the advertiser — that develops the exclusionary target audience.

To simulate a "real-world" scenario, Amicus ran employment ads targeted with a version of the Lookalike Audience tool called Special Ad Audiences. Amicus and researchers created two Special Ad audiences: one derived from a source audience of randomly generated American phone numbers (intended as a "baseline audience") and the other derived from email addresses with the domain "fb.com" (intended to be a proxy for Facebook employees). Amicus then delivered the same job ads to each Special Ad audience. The results were telling: The Special Ad audience based on Facebook employees delivered to 88% men, compared to 54% in the generic case. Further, the Special Ad audience based on Facebook employees delivered to 48% men aged between 25-34, compared to 15% for the baseline audience. Finally, 47% of all deliveries to the Special Ad audience of Facebook employees were to users in California, compared to 2% in the baseline audience.



*Results showing a Special Ad Audience created with Facebook email addresses delivered to a significantly younger and more male audience than a random sample of users.*

To summarize, Facebook's Lookalike Audience tool reproduces and can even amplify gender and age biases present in the source audience in ways likely to cause real-world discriminatory effects.

Facebook cannot claim Section 230 immunity when its Lookalike Audience tool materially contributes to alleged illegality. *Roommates.com*, 521 F.3d 1157, at 1167 (9th Cir.

2008). By creating Lookalike Audiences, Facebook has clearly created or developed content — *i.e.,* the resulting list of users in the target audience. These target audiences can exclude users from full and equal accommodations, advantages, facilities, privileges, and services because of their membership in protected classes. Cal. Civ. Code § 51(b).

In *Roommates.com*, the Ninth Circuit held that Roommates.com was "not entitled to [Section 230] immunity for the operation of its search system . . . which directs emails to subscribers according to discriminatory criteria." *Roommates.com*, 521 F.3d at 1167 (emphasis added) (also finding that Roommates "steer[s] users based on the preferences and personal characteristics that Roommates itself forces subscribers to disclose.") *Id*. This was enough to determine that Roommates "developed" content that contributed materially to unlawfulness under the Fair Housing Act. *Id*. Here, Facebook goes even further than Roomates.com by *independently* creating demographically skewed audiences that it then uses to exclude protected groups from important economic opportunities.

### C. Summary dismissal is especially inappropriate because courts routinely withhold Section 230 immunity in civil rights cases.

Facebook argues that "courts routinely apply the CDA to dismiss claims at the pleading stage." Doc. 35 at 12. True enough. But this is not a routine Section 230 case, and "the CDA does not provide internet companies with a one-size-fits-all body of law." *HomeAway.com*, 918 F.3d 676, at 683.

Courts have routinely withheld Section 230 immunity in civil rights cases, and for good reason: Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Roommates.com*, 531 F3d at 1164. The internet's "vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability." *Id.*; *see also HomeAway.com*, 918 F.3d at 683 ("allowing internet companies to claim CDA immunity" from a duty that "could have been satisfied without changes in content posted by the website's users," "would risk exempting them from most local regulations").

Immunity is an affirmative defense only suitable at the motion to dismiss stage when "the statute's barrier to suit is evident from the face of the complaint." *Marshall's Locksmith v. Google, LLC,* 925 F.3d 1263, 1267 (D.C. Cir. 2019). "Section 230 immunity . . . is generally accorded effect at the *first logical point* in the litigation process." *Nemet Chevrolet v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254 (4th Cir. 2009) (emphasis added). Given the significant questions regarding Facebook's technology and conduct in this case, that logical point has not yet arrived.

Here, Plaintiffs press civil rights discrimination claims about Facebook's own conduct and creation of content. Development of the facts alleged in the operative complaint would involve queries about the design and operation of Facebook's ad delivery algorithm, and the working of its Lookalike Audience tool, not broad searches of third-party speech on Facebook's social networking platform. Denying Facebook's Motion to Dismiss would not place an undue burden on Facebook, and would allow for factual development of clearly sufficient pleadings.

### III.   CONCLUSION

More than twenty years ago, the Ninth Circuit observed that the internet was "no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations." *Roommates.com*, 521 F.3d. at 1164 n.15. Since *Roommates.com* was decided, the internet has grown to encompass ever greater shares of our lives. Much of it is algorithmically driven. Civil rights laws must apply to Facebook as much as any other business. Section 230 immunity, though broad, must not fully eclipse those laws.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Given the significant legal and factual questions still unresolved in this case, this Court should not grant Facebook's Motion to Dismiss. In light of those questions, the Plaintiffs' own arguments, and the foregoing reasons, Amicus Upturn asks this Court to DENY Defendant Facebook's Motion to Dismiss.

Dated: June 26, 2020              Respectfully submitted,

                                  JIM DAVY (*pro hac vice forthcoming*)

                                  _____/s/ Jim Davy_____
                                  Jim Davy

                                  HANNAH WEINSTEIN
                                  ROTHNER, SEGALL & GREENSTONE

                                  _____/s/ Hannah Weinstein_____
                                  Hannah Weinstein

                                  *Attorneys for Amicus Curiae Upturn*


## ATTESTATION

I, Hannah Weinstein, attest that in conformance with Local Rule 5-1(i)(3), concurrence in the filing of this document has been obtained from each of the other Signatories.


                                  By___/s/ Hannah Weinstein_____
                                       Hannah Weinstein

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on June 26, 2020. I further certify that counsel of record for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June, 2020.

/s/Hannah Weinstein
Hannah Weinstein (CSB No. 301666)
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, CA 91101
Telephone: (626) 796-7555
Facsimile: (626) 577-0124
E-mail: hweinstein@rsglabor.com