ROSEMARIE T. RING (SBN 220769)
rose.ring@mto.com
JONATHAN H. BLAVIN (SBN 230269)
jonathan.blavin@mto.com
MARIANNA MAO (SBN 318070)
marianna.mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendant Facebook, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| NEUTAH OPIOTENNIONE,<br><br>          Plaintiff,<br><br>     vs.<br><br>FACEBOOK, INC.,<br><br>          Defendant. | Case No. 3:19-cv-07185-JSC<br><br>**DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Judge:  Hon. Jacqueline S. Corley<br>Date:    August 6, 2020<br>Time:   9:00 AM<br>Crtrm.: E |

## TABLE OF CONTENTS

**Page**

I.   ARGUMENT ...................................................................................................... 2

    A.   Plaintiff Lacks Article III And Statutory Standing .................................... 2

        1.   Plaintiff's Generalized Claim Of "Unequal Treatment" Is Not An Injury ........................................................................................... 2

        2.   Plaintiff Fails To Plead Causation ................................................. 6

    B.   Plaintiff's Claims Are Barred By Section 230 Of The CDA .................... 7

        1.   Plaintiff's Claims Treat Facebook As A Publisher ....................... 8

        2.   Facebook Is Not A Creator Or Developer Of Third-Party Content ............ 10

            (a)   *Roommates.com* Is Inapposite ........................................ 10

            (b)   Controlling Precedent Shows That Facebook Is Not a Content Creator Or Developer ........................................ 13

        3.   Plaintiff Cannot Assert An Unruh Act Or Section 51.5 Claim .................... 15

        4.   Plaintiff Fails To Plead Intentional Discrimination Under California Law ............................................................................. 16

        5.   Plaintiff Fails To Plead Arbitrary Or Invidious Discrimination .................. 18

        6.   Plaintiff Fails To Plead Any Aiding Or Abetting Claim .............................. 18

    C.   Plaintiff Fails To State A Claim Under D.C. Law .................................... 19

    D.   The LCCR *Amicus* Brief Is Spurious And Factually Inaccurate ............................ 20

II.  CONCLUSION ................................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Allen v. Wright*,
    468 U.S. 737 (1984), abrogated on other grounds *by Lexmark Int'l, Inc. v. Static*
    *Control Components, Inc.*, 572 U.S. 118 (2014)..........................................................................4

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009)....................................................................................................8, 10

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................................................7

*Bradley v. T-Mobile US, Inc.*,
    2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ..............................................................................6

*Braunstein v. Ariz. Dep't of Transp.*,
    683 F.3d 1177 (9th Cir. 2012) .......................................................................................................3

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003).....................................................................................................14

*Carroll v. Nakatani*,
    342 F.3d 934 (9th Cir. 2003)....................................................................................................3, 16

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
    519 F.3d 666 (7th Cir. 2008).........................................................................................................8

*Clark v. W. Contra Costa Unified Sch. Dist.*,
    2000 WL 336382 (N.D. Cal. Mar. 15, 2000) .............................................................................21

*Colo. Cross Disability Coal. v. Hermanson Fam. Ltd. P'ship*,
    1997 WL 33471623 (D. Colo. Aug. 5, 1997) ..............................................................................5

*Delil v. El Torito Restaurants, Inc.*,
    1997 WL 714866 (N.D. Cal. June 24, 1997) ...............................................................................4

*Doe One v. CVS Pharmacy, Inc.*,
    348 F. Supp. 3d 967 (N.D. Cal. 2018) .......................................................................................17

*Doran v. 7-Eleven, Inc.*,
    524 F.3d 1034 (9th Cir. 2008)......................................................................................................4

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019)........................................................................................ 8, passim

*Evenchik v. Avis Rent A Car Sys., LLC*,
    2012 WL 4111382 (S.D. Cal. Sept. 17, 2012) ..........................................................................17

## **TABLE OF AUTHORITIES**
### (Continued)

**Page(s)**

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008)..................................................................................... 1, passim

*Force vs. Facebook*, 934 F.3d 53 (2d Cir. 2019) ........................................................9, 10, 14

*Freedom Watch, Inc. v. Google Inc.*,
   2020 WL 3096365 (D.C. Cir. May 27, 2020) .......................................................19

*Fyk v. Facebook, Inc.*,
   808 F. App'x 597 (9th Cir. 2020).............................................................................14

*Goddard v. Google, Inc.*,
   640 F. Supp.2d 1193 (N.D. Cal. 2009) ...................................................................14

*Gonzalez v. Google, Inc.*,
   335 F. Supp.3d 1156 (N.D. Cal. 2018) ...................................................................14

*Hajro v. U.S. Citizenship & Immigration Servs.*,
   811 F.3d 1086 (9th Cir. 2016)....................................................................................6

*Henderson v. United States*,
   339 U.S. 816 (1950) ..............................................................................................21, 22

*Hoepfl v. Barlow*,
   906 F. Supp. 317 (E.D. Va. 1995).............................................................................4

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019)..............................................................................9, 10

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014)....................................................................................15

*Kirola v. City & Cnty. of S.F.*,
   860 F.3d 1164 (9th Cir. 2017)....................................................................................4

*La Park La Brea A LLC v. Airbnb, Inc.*,
   285 F. Supp.3d 1097 (C.D. Cal. 2017).....................................................................15

*Lemmon v. Snap, Inc.*,
   2020 WL 913643 (C.D. Cal. Feb. 25, 2020)............................................................13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................................5

*Moss v. U.S. Secret Serv.*,
   711 F.3d 941 (9th Cir. 2013)......................................................................................6

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Palomino v. Facebook, Inc.*,
  2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ...................................................................19

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
  144 F. Supp.3d 1088 (N.D. Cal. 2015), aff'd sub nom. *Sikhs for Justice, Inc. v.
  Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017)..............................................8, 14

*Tat Tohumculuk, A.S. v. H.J. Heinz Co.*,
  2013 WL 6070483 (E.D. Cal. Nov. 14, 2013) ...........................................................16

*Whiting v. AARP*,
  701 F. Supp.2d 21 (D.D.C. 2010), aff'd, 637 F.3d 355 (D.C. Cir. 2011) ..................19

*Williams v. Twin Rivers Unified Sch. Dist.*,
  2018 WL 4735734 (E.D. Cal. Sept. 28, 2018) ...........................................................17

*Wilson v. Glenwood Intermountain Props., Inc.*,
  98 F.3d 590 (10th Cir. 1996)........................................................................................4

**STATE CASES**

*Gatto v. Cnty. of Sonoma*,
  98 Cal. App. 4th 744 (2002)........................................................................................18

*Harris v. Capital Growth Investors XIV*,
  52 Cal. 3d 1142 (1991)...............................................................................................21

*Koebke v. Bernardo Heights Country Club*,
  36 Cal. 4th 824 (2005)................................................................................................16

*Munson v. Del Taco, Inc.*,
  46 Cal. 4th 661 (2009)................................................................................................21

*Sullivan v. Oracle Corp.*,
  51 Cal. 4th 1191 (2011)..............................................................................................16

*U.S. Jaycees v. Bloomfield*,
  434 A.2d 1379 (D.C. 1981).........................................................................................19

**FEDERAL STATUTES**

42 U.S.C. § 3604(c)............................................................................................................11, 13

47 U.S.C. § 230, Communications Decency Act .................................................................2, passim

## TABLE OF AUTHORITIES
(Continued)

Page(s)

STATE STATUTES

Cal. Civ. Code § 51(b) ............................................................................................ 2, passim

D.C. Consumer Protection Procedures Act ...........................................................................2

D.C. Human Rights Act .........................................................................................................2, 19

OTHER AUTHORITIES

*Big Data: A Tool for Inclusion or Exclusion?*, FTC (Jan. 2016) .......................................22

*Big Data: Seizing Opportunities, Preserving Values*, The White House (May 2014)....................22

1    In opposing Facebook's motion, Plaintiff and *amici* go to extreme lengths to distract from the

2    fundamental flaws in Plaintiff's claims, arguing that Facebook uses stereotypes to deliver fewer

3    financial services ads to women and older people and accusing Facebook of advocating for a rule

4    that would allow "separate but equal" online services.  While inflammatory, these arguments are not

5    supported by anything Plaintiff alleges, or could allege, about Facebook's advertising platform, and

6    do nothing to address the fatal defects requiring dismissal of Plaintiff's claims.

7    Plaintiff's core theory of liability is that Facebook denies "equal services" to women and

8    older people because advertisers are allowed to use tools to target financial services ads in ways she

9    claims are discriminatory, and Facebook delivers financial services ads to user News Feeds through

10   an algorithm she claims results in women and older people receiving fewer financial services ads.

11   In her opposition, Plaintiff attempts to make this case fit the facts of *Roommates.com* by arguing that

12   Facebook requires advertisers to use the tools in allegedly discriminatory ways and that the

13   algorithm delivers ads based on stereotypes about what women and older people want.  There is no

14   basis for these arguments in the complaint or reality.  To the contrary, the complaint makes clear that

15   the tools and delivery algorithm apply to *all users* and *all types of ads*, that any allegedly

16   discriminatory targeting occurs *only if* advertisers change default settings for the tools from *all ages*

17   and *all genders* or use "seed audiences" with more men and younger people, and that the algorithm

18   delivers ads by trying to predict which ads are most likely to interest and engage users based on

19   many types of data, including age and gender, *not* based on stereotypes.  Accordingly, nothing in

20   Plaintiff's opposition changes the fact that her claims should be dismissed on multiple independent

21   grounds as explained in Facebook's motion.

22   *First*, Plaintiff fails to establish Article III and statutory standing.  Plaintiff concedes that she

23   has not identified any ads for financial services that she would have been qualified for and pursued,

24   but did not receive the ads because of the tools and/or algorithm.  She argues this does not matter

25   because general allegations that the tools and algorithm result in fewer financial services ads going

26   to women and older people show "unequal treatment in a place of public accommodation" and are

27   therefore sufficient to establish standing.  But binding precedent is clear that Plaintiff cannot sue to

28   vindicate such a generalized interest.  She must allege a particular injury, which she has not done.

*Second*, all of Plaintiff's claims are barred by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, because they seek to impose liability on Facebook as the publisher of third-party content.  Plaintiff argues that her claims challenge Facebook's failure to provide women and older people "equal services."  But the alleged "service" is Facebook's publication of ads, and the alleged inequality results entirely from protected publisher functions—the provision of neutral tools that allow, but do not require, advertisers to target ads, and use of a content-neutral algorithm to publish those ads.  These claims are barred under binding Ninth Circuit precedent.

*Third*, Plaintiff fails to state a claim under either California or D.C. law.  Plaintiff cannot assert Unruh Act or Section 51.5 claims because she is not a California resident, and does not allege facts showing that Facebook is not providing "equal services" to users because of protected classes or that any inequality is intentional.  Nor can Plaintiff state a claim under D.C. law.  Plaintiff agreed that California law would apply to any dispute she might have with Facebook.  And even if D.C. law could apply, the D.C. Human Rights Act does not apply to websites without a physical presence in D.C., and Plaintiff has not alleged any statement of material fact that would mislead a reasonable consumer under the D.C. Consumer Protection Procedures Act.

# I.     ARGUMENT

## A.     Plaintiff Lacks Article III And Statutory Standing

Plaintiff concedes that she has not identified any financial services ads that she would have been qualified for and pursued, but did not receive because of the tools and/or delivery algorithm, and that it is advertisers, not Facebook, who cause any injury through their alleged discriminatory use of the tools.  As Facebook explains in its Motion, this precludes Plaintiff from establishing Article III standing and standing to pursue her state law claims.  Mot. at 8–11.  Aware of this defect, the Opposition retreats to arguing that Plaintiff was "injured" by being subjected to "unequal treatment in a place of public accommodation," Opp. at 6, 8, but the FAC does not, and cannot, allege any facts supporting such an injury.

### 1.     Plaintiff's Generalized Claim Of "Unequal Treatment" Is Not An Injury

Plaintiff argues that she suffered an "injury" by using an online service where the probability of receiving a financial services ad was allegedly impacted by her age or sex, regardless of whether

she *actually* was denied any such ad or would have been qualified for or pursued any such service. The Ninth Circuit has rejected such purely speculative injuries as a basis for Article III standing. "The existence of the classification alone is not sufficient to recognize standing," because it amounts to "only a generalized grievance." *Carroll v. Nakatani*, 342 F.3d 934, 947 (9th Cir. 2003). The law is clear that "[t]he existence of a racial or gender barrier is not enough to establish standing, without a plaintiff's showing that she has been … subjected to such a barrier." *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1186 (9th Cir. 2012). It is not enough simply to allege that women and older people receive fewer financial services ads on Facebook. Rather, Plaintiff "must establish standing through showing a particularized denial of equal treatment." *Carroll,* 342 F.3d at 947.

Plaintiff does not meet this standard. She alleges a "generalized grievance" that all types of ads, including financial services ads, may be targeted by advertisers in allegedly discriminatory ways and are delivered using an algorithm that considers many types of data, including age and gender, to predict which ads are most likely to interest and engage users. But she does not allege any "particularized denial" of equal treatment. The facts in *Carroll* are analogous. There, the Ninth Circuit considered a plaintiff's equal protection challenge to the Office of Hawaiian Affairs' allocation of certain benefits to native Hawaiians. *Id.* The court held that the plaintiff's generalized grievance regarding racial classifications did not establish an injury in fact:

> [Carroll] acknowledged that he has never identified any particular OHA program that he would like to participate in, and that he has never applied for any OHA program. Instead, Carroll offers only the general assertion that OHA discriminates against him on the basis of race … Carroll does not provide any evidence of an injury from the OHA programs other than the classification itself. He offers no evidence that he is "able and ready" to compete for, or receive, an OHA benefit. He has not even identified a program that he would be interested in receiving.

*Id.* at 947. The same is true here. Plaintiff does not identify any financial services that she would have been qualified for and pursued, but did not receive because of the tools or algorithm. Her general allegation of unequal treatment is not the "particularized injury" that Article III requires.

Plaintiff argues that her failure to identify any financial services ad that she would have been qualified for and pursued, but did not receive because of the tools or algorithm, does not matter because she suffers "stigmatic harm" simply by using a service that provides tools and uses algorithms that consider age and gender. Opp. at 7. But courts have repeatedly held that stigmatic

injury also "requires identification of some *concrete* interest with respect to which respondents are *personally* subject to discriminatory treatment." *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see also Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) (rejecting "stigmatic injury" standing based on "mere receipt" of "discriminatory advertisements" regardless of whether plaintiff "had any interest in living in the advertised housing" or qualified for it).

As a result, Plaintiff's attempts to analogize this case to discrimination cases involving brick-and-mortar establishments, such as segregated restaurants and inaccessible retail stores, are unavailing.  *See* Opp. at 6–8.  Plaintiff implies that Article III standing requirements are more lax in these cases, but that is wrong.  *See Hoepfl v. Barlow*, 906 F. Supp. 317, 324 (E.D. Va. 1995) (the ADA "did not intend to alter traditional rules governing when a plaintiff has standing to pursue her claim").  While individuals have a cognizable interest in equal access to places of public accommodation, *see, e.g.*, *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1040 (9th Cir. 2008), that interest is not enough, by itself, to confer Article III standing.  A disabled person only suffers a concrete injury when he *in fact encounters* accessibility barriers that "deter his patronage of or otherwise interfere with his access to a place of public accommodation."  *Id.* at 1042 n.5; *see also Kirola v. City & Cnty. of S.F.*, 860 F.3d 1164, 1175 (9th Cir. 2017) (injury in fact exists only when plaintiff "encountered at least one barrier that interfered with her access" to the public facility).

Plaintiff does not allege facts identifying anything akin to an accessibility barrier which deprived her of equal access to Facebook's services.  Indeed, Plaintiff does not even allege facts showing that she received "inferior services or benefits due to a protected status."  Opp. at 6.  Just as a disabled individual cannot bring suit "to vindicate the rights of disabled persons generally," Plaintiff cannot bring suit to vindicate a generalized interest in challenging the alleged targeting on Facebook of financial services ads away from women and older people. *Delil v. El Torito Restaurants, Inc.*, 1997 WL 714866, at *5 (N.D. Cal. June 24, 1997); *see also Wilson.*, 98 F.3d at 596 (persons who see a discriminatory advertisement but are not interested in the advertised service are "bystanders" who lack standing).

1    Plaintiff argues she does not need to plead her interest in specific financial services because

2    courts find Article III injury "where discrimination makes it harder for certain people to obtain

3    information about products," "regardless of whether they allege they would have purchased specific

4    products."  Opp. at 7 (citing *Colo. Cross Disability Coal. v. Hermanson Fam. Ltd. P'ship*, 1997 WL

5    33471623 (D. Colo. Aug. 5, 1997)).  But in the case of stores, courts have held that a person who

6    encounters an accessibility barrier in attempting to shop is injured even if he or she did not

7    specifically intend to make a purchase, because the privileges and benefits of brick-and-mortar stores

8    go beyond commercial transactions.  *See, e.g.*, *Colo. Cross*, 1997 WL 33471623, at *4 (plaintiff

9    deterred from "brows[ing] in shops" has suffered an injury).  Here, by contrast, the benefit to which

10   Plaintiff claims she was denied access to is the "right" to receive the same ads in her News Feed as

11   other users, regardless of whether those ads of interest to her.  But Plaintiff alleges nothing to

12   suggest that is an inherent privilege of using Facebook's platform—nor could she, given the ubiquity

13   of targeted advertising on the contemporary Internet.

14   Plaintiff's "public accommodation" theory of injury, requiring Plaintiff to allege only that

15   discrimination occurs and providing some "examples," would stretch Article III to the breaking

16   point.  In Plaintiff's view, *all* targeted advertising based on trying to match content with user

17   interests would be *per se* injurious, because users are entitled to "equal treatment" regardless of their

18   individualized interest in particular ads.  Opp. at 6.  Plaintiff's argument would imply that *any* time

19   different users have different probabilities of seeing a particular ad in light of their demographic

20   characteristics, they suffer actionable "stigmatic harm."  Article III demands more than this

21   "conjectural," probabilistic harm.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

22   Plaintiff's remaining arguments that she was injured because she would have obtained

23   "cheaper, better, or more appropriate" financial services had she received more financial services ads

24   on Facebook, and was denied the opportunity to "obtain a benefit" as a result, also fail to show any

25   cognizable injury.  Opp. at 8–10.  The FAC does not allege any facts about financial services

26   Plaintiff has contracted for the in past or how they compare to alleged "cheaper, better, or more

27   appropriate" financial services she claims we would have obtained had she received more financial

28   services ads on Facebook—much less facts showing that she would have been qualified for and

pursued any such services to suggest she was actually denied any benefit.  Opp. at 8–9.  *Cf. Bradley v. T-Mobile US, Inc.*, 2020 WL 1233924, at *8 (N.D. Cal. Mar. 13, 2020) (rejecting identical economic harm theory).  Plaintiff's reliance on *San Diego Cnty. Gun Rights Committee v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) is misplaced because the plaintiffs alleged a concrete economic harm—the challenged legislated would increase the price of assault weapons "from 40% to 100%."

### 2.      Plaintiff Fails To Plead Causation

As Facebook explained in its motion, the LAL tool and the algorithm *could not* have caused the seven financial services ads identified in the FAC to be excluded from Plaintiff's News Feed. *See* Mot. at 8.  Plaintiff's Opposition admits as much, conceding that "the seven financial services ads the FAC identifies as 'examples' were not denied *to Plaintiff* because of the LAL tool or the algorithm."  Opp. at 8.  That is fatal to her claim for relief as to those tools.

Plaintiff argues that, notwithstanding the fact that she concededly was *not* injured by the LAL tool or delivery algorithm, it is sufficient that the FAC alleges a "pattern or practice of routinely applying the LAL tool and algorithm to deny" Facebook users financial services ads based on age or gender.  Opp. at 8.  But without allegations that she was "personally harmed by the alleged pattern or practice," pattern-or-practice allegations do not establish standing.  *Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1104 (9th Cir. 2016).  Nor does Plaintiff allege any facts to support her conclusory assertion that Facebook has a "pattern or practice of routinely applying the LAL tool and algorithm to deny her and the class members financial services ads." Opp. at 8.  The "pattern and practice" allegations that Plaintiff cites to plead only that the LAL tool and delivery algorithm use age and gender as inputs to an algorithm that applies equally to all types of ads—not to deny financial services ads to women and older users.  *See Moss v. U.S. Secret Serv.*, 711 F.3d 941, 961 (9th Cir. 2013) (without "factual content to bolster it," a pattern and practice allegation is "just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate")

With respect to audience selection tools, Plaintiff also concedes that *advertisers* "select[] age or gender exclusions."  Opp. at 9.  That concession means that she can only establish standing to pursue claims against Facebook by alleging facts showing that Facebook engaged in conduct that had a "determinative or coercive effect" on any advertiser who allegedly used these tools in ways

DEFENDANT FACEBOOK, INC.'S REPLY ISO MOTION TO DISMISS PLAINTIFF'S FAC

Plaintiff claims are discriminatory.  *Bennett v. Spear*, 520 U.S. 154, 169 (1997).  Plaintiff does not, and cannot, allege any such conduct by Facebook.  Instead, without any supporting authority, Plaintiff argues that *Bennett*'s "determinative or coercive effect" standard does not apply "where a defendant contributes to the harm through its own actions."  Opp. at 9 n.4.  Plaintiff is wrong, and, in any event, does not allege facts suggesting any contribution by Facebook.

Plaintiff's tortured analogy to "a Black customer refused entry or service by a restaurant that follows its White customers' preference to dine without Black people" only underscores why there is no causal link between any alleged injury caused by audience selection tools and Facebook.  Opp. at 10.  A restaurant that wanted to enforce discriminatory preferences of its white customers would have to take direct action by banning Black diners.  By contrast, the tools at issue here apply to *all users* and are available for use with ads for *all types of products and services*, have overwhelmingly lawful uses, and are subject to Facebook's advertising policy prohibiting advertisers from using them in discriminatory ways.  *See* ECF No. 36 (Declaration of Rosemarie T. Ring) Exs. A & B.  Unlike Plaintiff's hypothetical discriminatory restaurateur, here it is *advertisers*, not Facebook, who caused any alleged injury by allegedly choosing to use these neutral tools in allegedly discriminatory ways.

### B.       Plaintiff's Claims Are Barred By Section 230 Of The CDA

Plaintiff argues that "Facebook improperly invokes the CDA to seek immunity for *its own* unlawful discriminatory acts—Facebook's *denial of financial services ads* to women and older people—even when Facebook is solely or partly responsible for developing or creating the content and directly contributes to its illegality."  Opp. at 11 (emphasis added).  But any "denial of financial services ads" occurs, under Plaintiff's theory, because Facebook *publishes financial services ads* that advertisers have allegedly targeted in discriminatory ways and/or using an algorithm that considers many types of data, including age and gender, to predict which ads are most likely to interest and engage users.  In other words, any alleged denial occurs because a financial services ad is published to one user and not published to another user.  Because Plaintiff's claims challenge Facebook's editorial decisions regarding the publication of third-party content, they are barred by the CDA.

Plaintiff does not, and cannot, allege that Facebook creates or develops the content of financial services ads, and admits that she is not challenging that content as unlawful.  Opp. at 12.

Instead, Plaintiff argues that, because Facebook created tools and an algorithm that allegedly result in the discriminatory publication of financial services ads, Facebook has "contribute[d] materially" to the alleged illegality in this case. *Id*. 17–19.  But the material contribution test applies to determine whether a website has contributed *to creating third-party content* that is allegedly illegal, not whether it has *published* third-party content in a way that is allegedly illegal.  *See e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098-99 (9th Cir. 2019) (holding plaintiff was "unable to allege that [defendant] materially contributed *to the content posted* on [website]," and that website's publication tools, including algorithms, "are not content in and of themselves").  Plaintiff admits that her claims fall into the latter category because they "seek[] to told Facebook liable under state laws that impose a legal duty not to deny financial services ads to customers based on age and gender," and any such denial is the result of publishing financial services ads to some users and not others.  Opp. 11.  As the Ninth Circuit has explained, CDA immunity applies where, as here, "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'"  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

As Facebook explained in its Motion, CDA immunity can and should be resolved on the pleadings.  Contrary to *amicus* Upturn's suggestion (Upturn Br. at 11–12), that rule applies regardless of the nature of the claims at issue.  Indeed, courts frequently dismiss civil rights claims on the pleadings under the CDA.  *E.g., Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) (affirming dismissal of FHA claim on pleadings); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1090 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526 (9th Cir. 2017) (dismissing Unruh Act claim on pleadings under CDA).

### 1.    Plaintiff's Claims Treat Facebook As A Publisher

Plaintiff does not respond to Facebook's argument that tools allowing advertisers to target ads are traditional publisher functions protected by the CDA.  *See* Mot. at 15–16.  With respect to the delivery algorithm, Plaintiff ignores precedent, including binding Ninth Circuit precedent, holding that claims challenging a website's use of algorithms to publish third-party content based on user interests treat the website as a publisher or speaker of that third-party content.  *See Dyroff*, 934 F.3d at 1098 (holding that claims challenging "features and functions, including algorithms," used

DEFENDANT FACEBOOK, INC.'S REPLY ISO MOTION TO DISMISS PLAINTIFF'S FAC

by a website to publish third-party content based on user interests treat the website as a publisher or speaker of that third-party content); *Force vs. Facebook*, 934 F.3d 53, 66 (2d Cir. 2019) (holding that "algorithms [] designed to match [third-party content] with a consumer's interests" reflect "editorial decisions regarding third-party content that [websites] have made since the early days of the Internet," including "to whom" third-party content should be shown).

In both *Dyroff* and *Force*, the plaintiffs challenged publishing decisions by the defendant websites as violating legal duties.  In *Dyroff*, the plaintiff alleged that the website violated its duty of care to her son by publishing third-party content about drugs to him, through which he connected with a drug dealer who sold him heroin laced with fentanyl that led to his death.  934 F.3d at 1099.  Likewise, in *Force*, the plaintiffs alleged that Facebook violated laws that prohibit aiding and abetting terrorist groups by publishing content about Hamas and Hamas terrorist attacks that "actively [brought] Hamas' message to interested parties."  934 F.3d at 65.  In both cases, the alleged harms resulted from decisions regarding the *publication* of third-party content, and therefore treated the websites as the publisher or speaker of that third-party content.  The same is true here.  All of Plaintiff's claims are based on the theory that the tools and delivery algorithm published certain content to certain users in ways Plaintiff claims are discriminatory, and therefore derive from Facebook's status or conduct as the publisher or speaker of third-party content.

Plaintiff ignores *Dyroff* and *Force*, and instead relies on *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) to argue that her claims do not treat Facebook as a publisher or speaker of third-party content.  But that case is inapposite.  In *HomeAway*, vacation rental websites challenged a local ordinance prohibiting them "from completing any booking transaction for properties not licensed and listed on the City's registry."  918 F.3d at 680.  The court denied CDA immunity because the ordinance required only that *transactions* on the websites involve licensed properties.  *Id*. (emphasis added).

Plaintiff argues that, under *HomeAway*, CDA immunity applies only if "the duty [asserted by a plaintiff] would necessarily require an internet company to monitor third-party content," and that here it does not because "Facebook can simply disable the tools that Plaintiff challenges without monitoring a single word in the ads."  Opp. 21.  Even if that statement were true—which it is not

DEFENDANT FACEBOOK, INC.'S REPLY ISO MOTION TO DISMISS PLAINTIFF'S FAC

1   because Facebook is a general-use platform and therefore, as Plaintiff admits, does not know what

2   type of ad is being placed unless it monitors *all ads* using "classifiers" designed to identify particular

3   types of ads—it is irrelevant.  "Monitoring" is only *one* type of protected publisher function.  As the

4   Ninth Circuit explained in *HomeAway*, "we have defined 'publication' in this context to 'involve[ ]

5   reviewing, editing, *and* deciding whether to publish or to withdraw from publication third-party

6   content.'"  *Id.* at 681 (emphasis added).

7          Here, Plaintiff argues that the "'alleged illegality is in excluding certain groups from viewing

8   [the] content, and not in the content of the ads themselves.'"  Opp. at 21.  But "excluding" *certain*

9   groups from viewing *certain* third-party content simply means publishing that content to some users

10  and not others, and therefore claims challenging such "exclusions" are based on a "duty [that] …

11  derives from [Facebook's] status or conduct as a 'publisher or speaker' of [financial services ads]."

12  *Barnes*, 570 F.3d at 1102.  Here, as in *Dyroff* and *Force*, Plaintiff's claims challenge Facebook's

13  decisions regarding the publication of third-party content and therefore treat Facebook as the

14  publisher or speaker of that content.

15                **2.      Facebook Is Not A Creator Or Developer Of Third-Party Content**

16         Plaintiff spends the majority of her opposition to CDA immunity trying to convince the Court

17  that this case is controlled by *Roommates.com*.  Opp. 16–19.  According to Plaintiff, as well as

18  *amicus* Upturn, this case is "just like *Roommates.com,*" because Facebook "forces users to answer

19  certain [demographic] questions and thereby provide *information* that other clients and Facebook

20  itself can use to discriminate unlawfully," making Facebook "responsible … for developing that

21  *information*."  Opp. 15; Upturn Br. at 11 (emphasis added).  But there is no analogy in this case to

22  the information that users in *Roommates.com* were forced to provide, and therefore no basis to find

23  that Facebook creates or develops content relevant to CDA immunity.

24                **(a)      *Roommates.com* Is Inapposite**

25         In *Roommates.com*, the defendant was an online housing service "designed to match people

26  renting out spare rooms with people looking for a place to live."  *Fair Hous. Council of San*

27  *Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1161 (9th Cir. 2008).  As a condition of

28  using the service, Roommates required potential subscribers to answer questions identifying their

own protected characteristics and protected characteristics they would accept in a roommate using drop-down menus. *Id.* For example, "Roommate require[d] subscribers listing housing to disclose whether there are 'Children present' or 'Children not present' and require[d] housing seekers to say 'I will live with children' or 'I will not live with children.'" *Id.* at 1165. These forced answers were then used in display, matching, and search functions on the website. The plaintiffs challenged the questions, answers, and related functionality as violating Section 3604(c) of the FHA, which makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that *indicates any preference*, limitation, or discrimination based on [protected characteristics], or *an intention to make any such preference*, limitation, or discrimination." 42 U.S.C. § 3604(c) (emphasis added). Specifically, plaintiffs asserted FHA violations based on (1) questions they alleged were discriminatory because they "indicate[] an intent to discriminate" in housing, *Roommates*, 521 F.3d at 1164; (2) requiring users to answer those discriminatory questions because they forced users to express *unlawful preferences* in housing, *id.* at 1165, and use of those *unlawful preferences* to display, match, and search housing ads, *id.* at 1162.

The Ninth Circuit held there was no CDA immunity for these alleged FHA violations. Asking *discriminatory questions* and requiring subscribers to indicate *unlawful preferences* in housing in their profiles were Roommates' "own acts," and therefore not protected by the CDA. *Id.* With respect to the display of the unlawful preferences in user profiles, the court held that, "by *requiring* subscribers to provide the information as a condition of accessing its services and by providing a limited set of pre-populated answers, Roommate becomes … the developer, at least in part, of *that information.*" *Id.* at 1166 (emphases added). The court made clear that its holding applied only where a website *requires* users to create allegedly unlawful content—it is not enough to "provide a framework that could be utilized for proper or improper purposes." *Id.* at 1172. The court also denied CDA immunity for use of the compelled unlawful preferences to match and search housing ads because "[i]f Roommate[s] has no immunity for asking the discriminatory questions, [] it can certainly have no immunity for using the answer to the unlawful questions to limit access to housing." *Id.* 1167.

Thus, the "content" that was relevant to the CDA analysis in *Roommates.com*, and upon which the court based its holding that Roommates "materially contributed" to the development of unlawful content, was unlawful preferences that Roommates *forced* users to create by requiring them to answer discriminatory questions in violation of the FHA.  Because Roommates was an online housing service where all users were people offering or searching for housing, requiring them to answer questions about their protected characteristics and the protected characteristics they would accept in a roommate was, in each and every instance, forcing them to express an unlawful preference in violation of the FHA.

Plaintiff's position that *Roommates.com* is controlling, and that this Court must disregard it to grant Facebook immunity in this case, is wrong because Facebook is nothing like Roommates. Facebook is a general-use service that people use to post *all types of content*, including ads for *all types of products and services*—a distinction that was "material[]" to the *Roommates.com* holding. *See id.*  There is nothing unlawful about a general-use service such as Facebook, requiring users to provide age and gender at signup, nor is that even the basis for Plaintiff's claims.  Plaintiff's arguments regarding Facebook's collection and use of age and gender data, and repeated suggestion that practice is somehow inherently unlawful, finds no support in *Roommates.com*.

Nor is there any support in *Roommates.com* for Plaintiff's arguments analogizing Facebook's audience selection tools to the discriminatory questions and drop-down menus that Roommates required subscribers to use.  Opp. at 15.  As Plaintiff admits, in stark contrast to *Roommates.com*, Facebook's tools are available for use with *all types of ads* and therefore have many lawful uses, and Facebook does not *require* advertisers to use the tools in allegedly discriminatory ways.  In other words, there is only discrimination under Plaintiff's theory if an advertiser creates a financial services ad and decides to target that ad by changing default settings of *all ages* and *all genders* and/or uses the LAL tool with a "seed audience" with more men and younger people.  As the *Roommates.com* court explained in distinguishing tools for which CDA immunity applies, while an "anonymous dastard" may choose use the tools in allegedly discriminatory ways, any such decision is made "entirely by the malevolent user."  *Roommates*, 521 F.3d at 1171.  That is precisely the case with respect to Facebook's audience selection tools.

1    Finally, *Roommates.com* does not support Plaintiff's arguments analogizing Facebook's ad

2  delivery algorithm to the matching and search functions used by Roommates.  According to

3  Plaintiff, the delivery algorithm "does far more" than Roommates did to "steer users based on the

4  preference and personal characteristics that Roommate itself force[d] subscribers to disclose."

5  Opp. at 19.  But, as explained above, there is no analogous "forced" unlawful *content* here.

6  Roommates was a housing service that forced users to indicate unlawful preferences in violation

7  of the FHA and then used that unlawful content to display, match, and search for housing ads.  By

8  contrast, Facebook's delivery algorithm is not itself unlawful content under the CDA, nor does it

9  utilize any unlawful data.

10           **(b)    Controlling Precedent Shows That Facebook Is Not a Content
                      Creator Or Developer**

11

12    While Plaintiff's reliance on *Roommates.com* is misplaced, she is right that controlling

13  precedent exists on these issues.  For the **ad delivery algorithm**, as Facebook explains in its

14  motion, Mot. at 14–15, the Ninth Circuit's holding in *Dyroff*, that claims based on a website's use

15  of "features and functions, including algorithms" to publish third-party content based on user

16  interests are barred by the CDA, forecloses Plaintiff's arguments. 934 F.3d at 1098.  The Ninth

17  Circuit made clear that the website's algorithms "are not content in and of themselves" and thus

18  are irrelevant for the content provider prong.  *Id.* at 1098–99.  *Dyroff* also rejected the same

19  arguments Plaintiff makes here trying to analogize the delivery algorithm to *Roommates.com*.  *Id.*

20  at 1099 (distinguishing *Roommates.com* as involving a website that used "*required discriminatory*

21  *criteria*" to publish housing ads, unlike the website in *Dyroff* where users were "not required to

22  disclose" any particular type of content) (emphasis added).  The Second Circuit reached the same

23  conclusion in *Force* and distinguished *Roommates.com* on the same grounds.  934 F.3d at 70

24  (distinguishing *Roommates.com* as involving a website "requiring users to select from 'a limited

25  set of pre-populated answers' to respond to particular 'discriminatory questions' [that] had a

26  content-development effect that was actionable in the context of the Fair Housing Act").

27    This is true regardless of whether, as *amicus* Upturn argues (Upturn Br. at 5–6), the "ad

28  delivery allegations in this case … arise from harmful or unlawful third-party content," *Lemmon v.*

*Snap, Inc.*, 2020 WL 913643, at *8 (C.D. Cal. Feb. 25, 2020) (rejecting as "not determinative"

under the CDA that the "harm here was not caused by any user content" (collecting cases)), or

allegations that publication decisions related to third-party content are discriminatory, *Fyk v.*

*Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020*)* ("nothing in § 230(c)(1) turns on the

alleged motives underlying the editorial decisions of the provider of an interactive computer

service"); *Sikhs for Justice*, 144 F. Supp. 3d at 1090 (holding that CDA immunity applied to

publishing decision even though it allegedly "was motivated solely by unlawful discrimination").

Here, as in *Dyroff* and *Force*, Plaintiff is challenging an algorithm used to publish third-party

content that Plaintiff admits applies to *all users* and *all types of ads* on Facebook and therefore is

content neutral.  FAC ¶ 63 (alleging that Facebook uses "an algorithm to determine which users

within a particular audience selection will receive advertisements, including financial services

advertisements"); *Dyroff*, 934 F.3d at 1097 ("No binding legal authority supports Plaintiff's

contention that [defendant website] los[es] its Section 230 immunity, by facilitating communication

[] through content-neutral website functions"); *Force*, 934 F.3d at 70 (noting that Facebook's

algorithm applies "to any content, whether it concerns soccer, Picasso, or plumbers"); *see also*

*Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1173 (N.D. Cal. 2018) (finding that Google's

"targeted ad algorithm" is "content neutral" because it "applies broadly across YouTube … whether

the recommended content is an ISIS video or a cat video").

For **audience selection tools**, as Facebook explains in its motion, Mot at 12–13, Plaintiff's

arguments are foreclosed by Ninth Circuit and other precedent, holding that when websites provide

tools that allow, but do not require, users to take certain actions, CDA immunity applies as long as

the choice of action to take is "left exclusively to the user."  *Carafano v. Metrosplash.com, Inc.*, 339

F.3d 1119, 1124 (9th Cir. 2003); *see also Goddard v. Google, Inc.*, 640 F.Supp.2d 1193, 1198 (N.D.

Cal. 2009) (holding that CDA immunity applies because, "[l]ike the menus in *Carafano*, Google's

Keyword Tool is a neutral tool.  It does nothing more than provide options that advertisers may

adopt or reject at their discretion").  Plaintiff admits that the audience selection tools apply to *all*

*types of ads*, not just financial services ads, and that no advertiser is required to change default

settings of *all ages* and *all genders* or when using the LAL tools to submit "seed audiences" that

have more men and younger people.  FAC ¶ 63 (alleging that Facebook uses "an algorithm to determine which users [] receive advertisements, including financial services advertisements"); *id.* ¶¶ 39, 40 (alleging default settings of all age and all genders, and that advertisers may change those default settings using drop-down menus or buttons).  Plaintiff argues that Facebook "strongly encourages" advertisers to use audience selection tools in a discriminatory way.  Opp. at 17.  As Facebook explains in its motion and accompanying request for judicial notice, this argument is based entirely on misleading and out-of-context quotations from Facebook's website and is implausible on its face given Facebook's policy prohibiting discrimination, including through the use of audience selection tools.  Perhaps not having realized these facts, Plaintiff retreats from these allegations and attempts to prevent the Court from considering them in context, arguing that her claims "do[] not necessarily rely on [these materials]," RJN Opp. (ECF No. 41) at 6; Opp. at 17.  But the FAC does incorporate those materials, and they leave no doubt that Facebook does not "encourage" advertisers to use audience selection tools in ways Plaintiff claims are discriminatory.

In any event, even if Plaintiff could allege that Facebook somehow "encourages" advertisers to provide unlawful preferences—which she cannot—under *Roommates.com*, "[t]he fact that [a website] encourages subscribers to provide something in response to the prompt is not enough to make it a 'develop[er]' of the information."  521 F.3d at 1174.  Rather, the website must "requir[e] subscribers to provide the [unlawful] information."  *Id.* at 1166 (emphasis added); *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 416 (6th Cir. 2014) (applying CDA immunity because, "[u]nlike in *Roommates*, the website [] did not require users to post illegal or actionable content as a condition of use."); *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1107 (C.D. Cal. 2017) (if alleged content provider is not a creator of the challenged content, "*it must have done more than merely 'encourage[d]'* the creation of the challenged conduct; the alleged provider must have *required* another to create that content").  Plaintiff has not alleged that Facebook *requires* advertisers to discriminate.  *See supra* at 13–15.

### 3.   Plaintiff Cannot Assert An Unruh Act Or Section 51.5 Claim

Plaintiff argues that her claims under California law "do not require an extraterritorial application of the Unruh Act or Section 51.5," because some of Facebook's relevant conduct

DEFENDANT FACEBOOK, INC.'S REPLY ISO MOTION TO DISMISS PLAINTIFF'S FAC

1   allegedly took place in California.  Opp. at 22.  But what matters is where *Plaintiff* is: the Unruh Act

2   applies to "[a]ll persons within the jurisdiction of this state," Civ. Code § 51(b), and Section 51.5

3   applies to "any person in this state."  Plaintiff is a Washington, D.C. resident.  *See* FAC ¶ 15.

4          Plaintiff cites *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) for the proposition that

5   extraterritoriality analysis "focuses on where the conduct occurred."  Opp. at 22.  *Sullivan*, however,

6   addressed the scope of the *presumption* against extraterritorial application, 51 Cal. 4th at 1207,

7   which by definition applies only when a statute is *silent* on its extraterritorial application.  Here, the

8   statutory text is not silent; it provides that only *California* plaintiffs may sue.  Multiple district courts

9   have rejected Plaintiff's argument that Section 51.5 and the Unruh Act may be applied

10  extraterritorially to non-resident plaintiffs.  *See, e.g.*, *Tat Tohumculuk, A.S. v. H.J. Heinz Co.*, 2013

11  WL 6070483, at *7 (E.D. Cal. Nov. 14, 2013) (non-Californian could not state Unruh Act claim

12  based an allegation that the "discrimination was approved by defendants' officers in California");

13  Mot. at 19 (collecting cases).  The Opposition fails to identify a single example of a court defying

14  the text of the statute by extending it to an out-of-state plaintiff—a silence that speaks volumes.

15         **4.     Plaintiff Fails To Plead Intentional Discrimination Under California Law**

16         Plaintiff admits that a disparate-impact theory is not cognizable under the Unruh Act, but

17  claims that she pleads "intentional discrimination" "because the tools are not facially neutral."  Opp.

18  at 24.  But all that Plaintiff has alleged is that the tools at issue *consider* gender and age.  Merely

19  considering gender and age, without more, is not enough to establish "intentional" discrimination for

20  purposes of the Unruh Act.  *See, e.g.*, *Carroll*, 342 F.3d at 946 ("[W]e do not find[] any authority

21  supporting the proposition that racial classification alone amounts to a showing of individualized

22  harm.").  Many businesses employ practices that on their face consider protected status, from gyms

23  offering women's-only swim lessons to community colleges offering remedial math lessons for adult

24  learners.  None of these practices amounts to "intentional" discrimination under the Unruh Act or

25  Section 51.5 absent evidence that they are intended to accomplish discrimination on the basis of age

26  and gender in an "intentional and morally offensive" manner.  *See* Mot. at 20 (citing *Koebke v.*

27  *Bernardo Heights Country Club*, 36 Cal. 4th 824, 853–54 (2005)).

28         ***Ad delivery algorithm.***  Plaintiff has no response to Facebook's position that it has no

incentive, let alone intent, to discriminate against women or older persons in ad delivery, or that Plaintiff's own allegations show only a "purpose" to "optimize an advertisement's audience and the advertiser's goals by showing the advertisement preferentially to the users Facebook believes will maximize [] advertisement views; [] clicks and engagement with the ads; and [] sales generated by clicks on the advertisement"—not any discriminatory motive.  *See* FAC ¶¶ 34, 64.  Plaintiff argues that the algorithm "intentionally" discriminates simply because in considering likely relevance to users, the algorithm considers factors including age and gender.  For the reasons described above, however, the algorithm's *consideration* of age and gender does not imply that Facebook *intends* the algorithm to discriminate based on age and gender.

Plaintiff argues that the algorithm is a "facially discriminatory policy" that constitutes intentional discrimination regardless of Facebook's subjective intent.  Opp. at 24.  But plainly it is not: a facially discriminatory policy requires discrimination on the basis of a protected classification as a matter of policy.  The principal case on which Plaintiff relies, *Evenchik v. Avis Rent A Car Sys., LLC*, 2012 WL 4111382, at *5 (S.D. Cal. Sept. 17, 2012), exemplifies the point.  *Evenchik* involved Avis's policy of offering discounts to gay and lesbian customers, which the Court held was facially discriminatory because it conditioned a specific discount on an "arbitrary class-based generalization." *Id.*  Facebook's algorithm, by contrast, does not facially discriminate: all Facebook users receive algorithmic delivery of interesting ads based on a variety of data points, including but not limited to age and gender.

***Audience Selection Tools.***  Plaintiff now expressly disclaims reliance on the FAC's allegations that Facebook encouraged advertisers to discriminate using audience selection tools.  *See* RJN Opp. at 6.  She argues that she sufficiently alleges "specific intent" relying solely on the allegations in the FAC that Facebook "knew, intended, and wanted" older persons and women to be excluded from receiving financial services ads.  Opp. at 24.  These allegations are entirely conclusory, however, and "[a] plaintiff bringing an Unruh Act violation claim cannot allege intentional discrimination in a conclusory fashion."  *Williams v. Twin Rivers Unified Sch. Dist.*, 2018 WL 4735734, at *2 (E.D. Cal. Sept. 28, 2018) (collecting cases); *Doe One v. CVS Pharmacy, Inc.*, 348 F. Supp. 3d 967, 989 (N.D. Cal. 2018) (finding allegation that defendants "specifically and

1   intentionally targeted individuals on the basis of a particular disability" to be "conclusory").

2       Plaintiff's conclusory allegations are further contradicted by her allegations and admissions

3   that Facebook has previously sought to *eliminate* the possibility of discriminatory targeting for

4   housing, employment, and credit advertisements.  *See* FAC ¶¶ 82, 84.

5       Furthermore, as shown in Facebook's Reply in Support of Request for Judicial Notice,

6   Facebook's policies have banned discrimination by advertisers for the entire relevant time period.[1]

7   In April 2017, after Plaintiff's counsel filed a similar lawsuit against Facebook for alleged

8   discrimination in housing, employment, and credit ads, Facebook then, as now, filed a request for

9   judicial notice attaching Facebook's anti-discrimination advertising policies at the time.  Plaintiff's

10  counsel never objected to the authenticity of those advertising policies then.

11          **5.      Plaintiff Fails To Plead Arbitrary Or Invidious Discrimination**

12      Plaintiff argues that Facebook does not provide a "rationale for promoting and sending age-

13  or gender-restricted ads in the financial services area."  Opp. at 25.  But Facebook is a general-use

14  platform that publishes ads for *all types of products and services*, so the relevant inquiry under the

15  Act is whether Plaintiff has alleged facts showing that Facebook's publication of ads using audience

16  selection tools and the delivery algorithm, which apply to *all types of ads* and *all users*, constitutes

17  arbitrary or invidious discrimination because those tools and the algorithm are sometimes used in

18  connection with financial services ads.  Plaintiff has not, and cannot, allege such facts.  If general-

19  use online services, like Facebook, were subject to Unruh Act liability based on tools that apply to

20  all types of content and all users, which a plaintiff claims are "arbitrary and invidious" when applied

21  only to certain types of content, that would be the end of general-use online services.

22          **6.      Plaintiff Fails To Plead Any Aiding Or Abetting Claim**

23      As discussed above, Plaintiff's allegations that Facebook "intentionally, knowingly, and

24  purposefully" discriminated against her are conclusory and self-contradictory.  Plaintiff's aiding and

25  abetting claims are predicated on these same conclusory and uncreditable allegations, Opp. at 25–26,

26  as Plaintiff disclaims any reliance on Facebook's statements to advertisers.  *See* RJN Opp. at 6.  The

27

28  [1] Plaintiff initiated this lawsuit on October 31, 2019, and the Unruh Act's statute of limitations is two years.  *See Gatto v. Cnty. of Sonoma*, 98 Cal. App. 4th 744, 756, 760 (2002).

1   Court should dismiss the aiding and abetting claims because Plaintiff fails to allege any facts

2   supporting the inference that Facebook has given "substantial assistance or encouragement" to

3   advertisers who have targeted ads in allegedly discriminatory ways.  Mot. at 25.

4         **C.**       **Plaintiff Fails To State A Claim Under D.C. Law**

5         Plaintiff argues that, if the Unruh Act and Section 51.5 are territorially limited in the way that

6   Facebook has argued, then she should be allowed to assert claims under D.C. law—even though she

7   does not dispute that she is subject to the California choice-of-law provision in Facebook's terms of

8   service.  *See* Opp. at 26–27.  This Court has routinely the Facebook choice-of-law provision.  *See,*

9   *e.g.*, *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *2 (N.D. Cal. Jan. 9, 2017).

10         Even absent the California choice-of-law provision, Plaintiff would have no claim under the

11   DCHRA.  Since Facebook filed its motion to dismiss, the D.C. Circuit has affirmed that "'places of

12   public accommodation' under the D.C. Human Rights Act must operate from a 'particular place.'"

13   *Freedom Watch, Inc. v. Google Inc.*, 2020 WL 3096365, at *2 (D.C. Cir. May 27, 2020) (citing *U.S.*

14   *Jaycees v. Bloomfield*, 434 A.2d 1379 (D.C. 1981)).   Nor can Plaintiff state a claim under the

15   DCCPPA.  Plaintiff's DCCPPA claim is predicated on (1) Facebook's choice of law provision and

16   (2) Facebook's statement that "there is no place for discrimination at Facebook."  Opp. at 32 & n.22.

17   As to (1), Plaintiff cannot plausibly blame Facebook's choice of law for confusing her into

18   mistakenly believing that the Unruh Act or Section 51.5 apply to her when she is self-evidently not

19   "in California."  As to (2), Plaintiff argues that Facebook's statement that "there is no place for

20   discrimination at Facebook" is not a statement of opinion because it is not prefaced with "We

21   believe."  Opp. at 32.  But no case holds that statements of opinion must be prefaced with magic

22   words.  Because Plaintiff does not provide any context for Facebook's alleged statement, Plaintiff

23   fails to plausibly allege that a reasonable consumer would interpret this lone statement to suggest

24   Facebook complies with every conceivable antidiscrimination law.  *See Whiting v. AARP,* 701 F.

25   Supp. 2d 21, 29 (D.D.C. 2010), *aff'd*, 637 F.3d 355 (D.C. Cir. 2011) (dismissing DCCPPA claims

26   because the "language, especially when viewed in context," would not have been misleading).

27

28

DEFENDANT FACEBOOK, INC.'S REPLY ISO MOTION TO DISMISS PLAINTIFF'S FAC

**D.** **The LCCR *Amicus* Brief Is Spurious and Factually Inaccurate**

The *amicus curiae* brief filed by the Lawyers' Committee for Civil Rights Under Law ("LCCR") urges the Court to deny Facebook's motion to dismiss on the ground that Facebook "engages in online segregation." The LCCR Brief argues from a set of assumptions about how Facebook's advertising platform works that are radically different from reality or what is *alleged* in the FAC, draws false analogies to some of the most invidious examples of discrimination in American history, and relies on secondary sources with no relationship to the facts at issue in this case. The Court should disregard it.

*First*, the LCCR Brief, like Plaintiff's Opposition, argues from the baseless assertion that Facebook delivers ads based on "demographic stereotype[s]." LCCR Br. at 2. The essence of stereotyping is the ascription of *group*-level characteristics to individuals based on the assumption that every member of a group is the same. But both the LCCR Brief and the FAC concede that Facebook's delivery of ads is user-specific and individualized, not based on stereotypes: Facebook draws on a wide variety of individualized data to predict the user's interest in a given ad, including, notably, "a user's activity and interactions" on the Facebook platform itself, LCCR Br. at 5, as well as actual past and ongoing performance data regarding particular advertisements, *see* FAC ¶ 64. There are no allegations in the FAC to even suggest that Facebook engages in the sort of "crude" stereotyping attacked in the LCCR Brief. That type of stereotyping, of course, is at the heart of contextual advertising endorsed by the LCCR Brief (*see* LCCR Br. at 12–13). In the absence of any *individualized* data about the actual interests of prospective viewers, contextual advertisers fall back on stereotypes—*e.g.*, advertising baldness treatments in *Golf Digest* on the assumption that men are more interested in golf than women. Facebook, by contrast, does not need to, and does not, rely on such stereotypes, but instead delivers ads to users by analyzing many types of data, including age and gender, to predict which ads are most likely to interest them as revealed by their "activity and interactions" on Facebook and other websites. LCCR Br. at 5.

Moreover, nothing in the LCCR Brief shows—just as nothing in the FAC even plausibly suggests—that Facebook *intentionally* discriminates against women or older people, as an Unruh Act claim requires. *See Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1175 (1991).

The LCCR Brief complains that much of the individualized data that Facebook collects and uses to deliver ads, "when aggregated into a mosaic, function[s] as proxies for race and other protected characteristics." LCCR Br. at 6, 11. But the truism that interests expressed by users through their online activities are impacted by the political, social, and economic realities in which they are formed and expressed does not mean that an algorithm that considers those activities is *intentionally* discriminating against anyone. Even assuming *arguendo* that the delivery algorithm "export discriminatory outcomes" because user activities are informed by group membership (LCCR Br. at 12), that would constitute, at most, disparate impact, which is not actionable under the Unruh Act. *See, e.g.*, *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668 (2009). Indeed, LCCR's own characterization of the alleged misconduct—that the delivery algorithm "***mistake[s]*** the consequences of" societal inequality for user interests—belies any claim that Facebook has done anything to intentionally discriminate against users. Facebook has done no such thing. LCCR Br. at 12 (emphasis added). *See Clark v. W. Contra Costa Unified Sch. Dist.*, 2000 WL 336382, at *11 (N.D. Cal. Mar. 15, 2000) (Unruh Act claim fails where it is based on "subjective beliefs of race discrimination" without evidence of "intentional discrimination").

*Second*, LCCR's attempt to analogize this case to the history of *de jure* segregation in the United States is spurious. LCCR compares Facebook's use of the delivery algorithm to acts of discrimination against African-Americans intended to maintain white supremacy through "separation of the races" in *Plessy v. Ferguson*, *Shelley v. Kraemer*, and *Henderson v. United States*. *See, e.g.*, LCCR Br. at 16 (quoting *Henderson v. United States*, 339 U.S. 816 (1950), Southern Railway Br., 1949 WL 50329, at *26. There simply is no comparison. Plaintiff admits, as she must, that the "purpose" of the delivery algorithm is to "maximize ad[] views; [] clicks and engagement with the ads; and [] sales generated by clicks on the ad[s]"—not to separate users or to maintain age or gender-based hierarchies. *See* FAC ¶ 64.

*Third*, LCCR cites secondary sources that provide no support for its claims that Facebook is engaging in intentional and invidious discrimination through its advertising platform. For example, LCCR accuses Facebook of engaging in "digital redlining," citing a White House report from 2014 and an FTC report from 2016. LCCR Br. at 6. But neither report concerns Facebook's

ad platform, and both recognize that the potential for *unintended* algorithmic bias is offset by substantial benefits.  *See, e.g.*, *Big Data: Seizing Opportunities, Preserving Values*, The White House (May 2014) at 45 ("Powerful algorithms can unlock value in the vast troves of information available to businesses, and can help empower consumers."); *Big Data: A Tool for Inclusion or Exclusion?*, FTC (Jan. 2016) at 5–6 ("employing big data algorithms on data of sufficient quality can provide numerous opportunities for improvements in society," including by "creat[ing] opportunities for low income and underserved communities").  LCCR's reliance on these sources reinforces what is apparent from the FAC: Plaintiff does not seek to redress any concrete injury she allegedly suffered as a result of Facebook's ad platform, but to vindicate her generalized and factually unsupported view that the use of algorithms may result in unintended bias.

## II.     CONCLUSION

The Court should dismiss Plaintiff's First Amended Complaint with prejudice.

DATED:  July 24, 2020                     MUNGER, TOLLES & OLSON LLP


By:      */s/ Rosemarie T. Ring*
ROSEMARIE T. RING
Attorneys for Defendant Facebook, Inc.

DEFENDANT FACEBOOK, INC.'S REPLY ISO MOTION TO DISMISS PLAINTIFF'S FAC