UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEUHTAH OPIOTENNIONE,<br><br>  Plaintiff,<br><br>  v.<br><br>FACEBOOK, INC.,<br><br>  Defendant. | Case No. 19-cv-07185-JSC<br><br>**ORDER RE: MOTION TO DISMISS**<br><br>Re: Dkt. No. 35 |

Neuhtah Opiotennione challenges the lawfulness of allowing businesses to direct their advertising to consumers based on a potential customer's age or gender. In this case, she alleges that Facebook's advertising practices are unlawful because they led to her not having the opportunity to receive certain financial services advertisements in her Facebook Newsfeed based on her age and gender. Facebook moves to dismiss Plaintiff's complaint for lack of Article III and statutory standing and for failure to state a claim.[1] Having considered the parties' briefs and having had the benefit of oral argument on August 13, 2020, the Court GRANTS the motion to dismiss. Plaintiff's allegations fail to support a plausible inference that she suffered an injury-in-fact as a result of Facebook's advertising tools.

**FIRST AMENDED COMPLAINT ALLEGATIONS**

Ms. Opiotennione is a 54-year-old woman who lives in Washington, D.C. and regularly uses Facebook. (First Amended Complaint (FAC), Dkt. No. 30 at ¶ 15.[2]) "As part of her regular use of Facebook, she has been interested in receiving advertising and other information about

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 6 & 20.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

financial services opportunities in Facebook advertisements, and otherwise being treated equally to other Facebook users in all aspects of her use of the benefits she receives from Facebook." (*Id*.) However, she has been denied these advertisements and information due to her age and gender. (*Id*.) Plaintiff identifies examples of ads where "where Facebook and financial services companies selected and executed upon age- or gender-restricted audience selections that denied older persons and/or women, including Plaintiff, the full and equal accommodations, advantages, facilities, and services of Facebook and those companies." (*Id*. at ¶¶ 72-76.) She also identifies three specific ads that allegedly were not displayed in her News Feed because of her age and/or gender including an advertisement for a rewards-based debit card from Aspiration and two advertisements for bank accounts that she would have been interested in receiving in order to consider pursuing the opportunity. (*Id*. at ¶¶ 108-109.) Because she was denied the possibility of receiving these advertisements based on her age and gender, she was "denied the full and equal accommodations, advantages, facilities, and services of Facebook and the financial services companies that denied her valuable advertising and information." (*Id*.)

Facebook uses three "tools" to exclude women and older people from receiving advertisements, including financial advertisements:

> (1) audience selections that exclude Facebook users from receiving advertisements based on age or sex; (2) Lookalike Audiences in which Facebook determines the audience selection based on Facebook's analysis of a seed audience provided by the advertiser; and (3) Facebook's ad delivery algorithm that determines which users within an audience selection will actually receive the advertisement.

(*Id*. at ¶ 32.)

The audience selection tool requires advertisers to "specify the parameters of the target audience of Facebook users who will be eligible to receive the advertisement." (*Id*. at ¶ 33.) The advertiser "is required to make three selections that establish the basic parameters of the audience selection: (1) age; (2) gender; and (3) location. These audience selection tools are presented to advertisers through drop down menus that make clear to advertisers that they can include or exclude persons with certain ages and/or genders from their audience selections. These tools classify, categorize, and segregate Facebook users based on their age and/or gender." (*Id*. at ¶ 36.)

1   While the default is for individuals 18-65 plus and all genders, "Facebook strongly encourages" advertisers to narrow the age/gender range through among other things its "Facebook Blueprint" course, which describes "How to Find Your Customers on Facebook." (*Id*. at ¶¶ 39-40, 44.) "Any Facebook user who is not within the relevant audience selection will not have the opportunity to receive that specific paid ad[]." (*Id.* at ¶ 33.)

Under the Lookalike Audience tool, "advertisers provide Facebook with a list of Facebook users whom they believe are the type of customers they want to reach (*i.e*. the seed audience), and then Facebook applies its own analysis and algorithm to identify a larger audience that resembles the seed audience (*i.e*. the Lookalike Audience)." (*Id*. at ¶ 56.) The advertisement is then sent to the larger Lookalike Audience. (*Id.*) "Age and gender are two critical pieces of informations that Facebook uses to determine which Facebook users resemble the advertiser's seed audience and will, in turn, be included in the Lookalike Audience that Facebook creates based on its own analysis and algorithm." (*Id*.)

Facebook's algorithm tool "uses many types of data, including data on the past performance of certain types of advertisements and the ongoing performance of certain advertisements, to determine which users will receive any given advertisement, including financial services advertisements." (*Id*. at ¶ 64.) The algorithm "directly relies upon both the age and gender of Facebook users to determine which users will actually receive any given advertisement, and Facebook uses both the age and gender of its users to determine who will actually receive advertisements regardless of whether the advertiser directs Facebook to limit the age or gender of its audience selection." (*Id*. at ¶ 65.)

**PROCEDURAL BACKGROUND**

Plaintiff filed this action in October 2019 alleging two claims for relief under California law: (1) age and sex discrimination in violation of the Unruh Civil Rights Act, California Civil Code §§ 51, 52(a); and (2) age and sex discrimination in violation of California Civil Code §§ 51.5, 52(a). Facebook thereafter filed a motion to dismiss and Plaintiffs filed the now operative First Amended Complaint which added claims for age and sex discrimination under the D.C. Human Rights Act, D.C. Code §§ 2-1402.31 (third claim) and the D.C. Consumer Protections and

Procedures Act, D.C. Code §§ 2-1402.31 (fourth claim).  Facebook responded by filing the now pending motion to dismiss.  (Dkt. No. 35.)  The motion is fully briefed and Upturn, Inc., and the Lawyers' Committee for Civil Rights under Law, Inc., have filed separate motions for leave to file a brief of amicus curie in support of Plaintiff's opposition brief.  (Dkt. Nos. 39, 44, 46, 62.)

## SUBJECT MATTER JURISDICTION

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Plaintiff alleges and the Court finds that it has subject matter jurisdiction of this action under 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act (CAFA).  (FAC at ¶ 10.)  CAFA vests federal courts with original jurisdiction over class actions in which: (1) the amount in controversy exceeds $5,000,000; (2) diversity of citizenship exists between at least one plaintiff and one defendant; and (3) the number of plaintiffs in the class is at least one hundred.  28 U.S.C. § 1332(d)(2), (5), (6).

## STANDING

"Standing is a necessary element of federal-court jurisdiction" and a "threshold question in every federal case." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Article III standing consists of three "irreducible constitutional minimum" requirements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  These elements are often referred to as injury in fact, causation, and redressability.  *See, e.g.*, *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).  Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the existence of Article III standing and, at the pleading stage, "must clearly [] allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks and citation omitted); *see also Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983) ("The facts to show standing must be clearly apparent on the face of the complaint.").

An injury in fact is "an invasion of a legally protected interest" that is (1) "concrete," (2)

"particularized," and (3) "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To be "particularized," an injury "must affect the plaintiff in a personal and individual way," while "concreteness" requires an injury to be "'de facto'; that is, it must actually exist." *Id*. at 1548 (internal citation omitted). The requirement that an injury be "actual or imminent" "ensure[s] that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Further, there must be a sufficient "causal connection between the injury and the conduct complained of." *United States v. Hays*, 515 U.S. 737, 743 (1995). Standing theories that depend on a "speculative chain of possibilities"—such as those that turn on "the decisions of independent actors"—lack the necessary causal connection. *Clapper*, 568 U.S. at 414; *see also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447 (9th Cir. 1994) ("[W]hen standing hinges on choices made by a third party, plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.") (quoting *Lujan*, 504 U.S. at 562).

      Plaintiff has not met her burden of alleging facts sufficient to support an inference of injury in fact. She contends that because she identified advertisements that could not appear in her News Feed because of her age or gender she has suffered an injury in fact, namely, being subject to discrimination. (Dkt. No. 39 at 14-15.) These allegations, however, are merely a generalized claim of "unequal treatment" that does not rise to the level of an Article III injury in fact. In *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), for example, the plaintiff non-native Hawaiian brought an equal protection challenge to Hawaii Constitution provisions which created agencies providing special benefits to natives. The Ninth Circuit concluded that the plaintiff lacked Article III standing because "the existence of the classification [favoring natives over non-natives] is not sufficient to recognize standing" and instead, "presents only a generalized grievance." *Id*. at 947; *see also id*. at 940 ("The Supreme Court has repeatedly refused to recognize a generalized grievance against allegedly illegal government conduct as sufficient to confer standing.") (citing *Hays*, 515 U.S. at 743). The *Carroll* plaintiff's claim failed because he did not "provide any evidence of an injury . . . other than the classification itself"; for example, "[h]e offer[ed] no

evidence that he is 'able and ready' to compete for, or receive, an OHA benefit" or "even identified a program that he would be interested in receiving." *Carroll*, 342 F.3d at 947. In the absence of such allegations he had not shown that he was hurt by the claimed wrongs. *Id.* at 947.

The same is true here. Plaintiff contends she has plausibly raised an inference of an injury in fact because the FAC gives examples of financial advertisements that Facebook actually denied her. (Dkt. No. 39 at 14 (citing FAC ¶¶ 73-74.)) That is no different, however, from the *Carroll* plaintiff merely identifying programs limited to native Hawaiians. For example, one of the advertisements Plaintiff identifies is by a military organization advertising loans available to military officers Ranks E-5 Through O-4. (FAC ¶ 76; Dkt. No. 69 at 5:16-25.) The only injury Plaintiff—who does not allege to be in the military, let alone an officer with an eligible rank—can have suffered because of being denied the possibility of having that advertisement appear in her News Feed is the existence of the age-specific restriction. Under Plaintiff's theory, *any* person who was excluded from the possibility of receiving that advertisement because of her age would have standing. Not so.

Plaintiff does identify three advertisements which she generally alleges she "would have been interested in receiving in order to consider pursuing the opportunity" (FAC at ¶¶ 108-109); however, she does not allege that she was qualified for and interested in actually applying for the product offered. *See Carroll,* 342 F.3d at 947 (holding that the plaintiff who offered no "evidence that he is 'able and ready' to compete for, or receive, an OHA benefit" did not suffer an injury); *see also Bradley v. T-Mobile US, Inc*., No. 17-CV-07232-BLF, 2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020) (concluding that plaintiffs challenging same Facebook advertising practices that allowed companies to restrict job applications based on age had to "show they were qualified for and interested in *the particular jobs* subject to Defendants' allegedly discriminatory practices" to establish injury in fact); *compare with White v. Square, Inc*., 891 F.3d 1174, 1176–77 (9th Cir. 2018) (holding that the plaintiff "sought to use Square's services, but was unable to do so because of its discriminatory policy against bankruptcy attorneys").

Plaintiff's reliance on Unruh Act disability access cases is unpersuasive. In *Doran v. 7-Eleven, Inc*., 524 F.3d 1034 (9th Cir. 2008), for example, the court concluded that the plaintiff

6

wheel chair user had sufficiently shown an injury in fact by alleging that he had personally visited a 7-11 store and encountered architectural barriers and that the existence of those barriers deterred him from continuing to visit the store. *Id.* at 1040-41; *see also Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017) ("The standard for injury in fact is whether Kirola has encountered at least one barrier that interfered with her access to the particular public facility and whether she intends to return or is deterred from returning to that facility."). The discriminatory act—the architectural barriers—prevented the plaintiffs from visiting the stores. Under Plaintiff's theory, being denied the possibility of having advertisements for products in which you have no interest or eligibility appear in one's Facebook News Feed is tantamount to being denied the ability to visit a store that one actually wants to visit. That theory is untethered from the law.

Finally, while the California Supreme Court in *Angelucci v. Century Supper Club*, 41 Cal. 4th 160 (2007), noted that the Unruh Act "renders 'arbitrary sex discrimination by businesses ... per se injurious,'" it still required allegations of injury. *Id.* at 174 (quoting *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 33 (1985)). The plaintiffs alleged that they were "subjected to, and paid, defendant's gender-based price differential." *Angelucci*, 41 Cal. 4th at 175–76 ("a plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct."). Likewise, in *Koire*, the "plaintiff was adversely affected by the price discounts. His female peers were admitted to the bar free, while he had to pay. On the days he visited the car washes, he had to pay more than any woman customer, based solely on his sex." *Koire*, 40 Cal. 3d at 34.

The Court thus concludes that Plaintiff's general grievance about being denied "full and equal access" without alleging facts that support an inference that she was personally injured by that denial fails to demonstrate an injury in fact sufficient to confer Article III standing.

Plaintiff's second alleged injury—stigmatic harm—fares no better. Plaintiff alleges "she personally suffered discrimination in Facebook's public accommodations when she was denied a primary benefit or service of Facebook—financial services advertising and information—based on age and gender, causing her stigmatic harm." (Dkt. No. 39 at 16:2-4.) However, stigmatic harm, whereby members of the disfavored group are stigmatized "as innately inferior and therefore as

7

less worthy participants in the political community," *Heckler v. Mathews*, 465 U.S. 728, 739 (1984) (internal citation and quotation marks omitted), "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct," *Allen v. Wright*, 468 U.S. 737, 755 (1984) (internal citation and quotation marks omitted). That is, it still requires a personal denial of equal treatment, which as discussed *supra*, Plaintiff has not alleged. *See Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) ("mere receipt by plaintiffs of the discriminatory advertisements in this case could cause only the kind of 'abstract stigmatic injury' held insufficient to establish standing in *Allen*.").

Plaintiff's third alleged injury is that she was economically harmed because the discrimination "made it harder for older persons and women to compete for and obtain financial services opportunities" including "cheaper, better, or more appropriate financial services." (FAC at ¶ 114.) However, standing based on a denial of the opportunity to compete requires a demonstration that the plaintiff was "able and ready" to do so, *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003), and as discussed, *supra*, Plaintiff has not alleged facts that support such an inference.

Finally, Plaintiff generally alleges injury based on the denial of the opportunity to obtain a benefit. (FAC ¶ 114.) While "the denial of an opportunity to obtain a benefit is itself an injury in fact," standing for such a claim likewise requires at a minimum that the plaintiff plausibly allege that she is able and ready to apply for the benefit. *Bradley*, 2020 WL 1233924, at *8; *see also id.* at *10 (collecting cases). Plaintiff has not done so.

## CONCLUSION

Having concluded that Plaintiff has not alleged facts that support a finding that she suffered an injury in fact, Facebook's motion to dismiss for lack of standing must be granted. While Facebook argues that there are myriad other reasons why her claims fail, including additional standing problems, the Court declines to address them given its conclusion that Plaintiff has not even made it past the first step. The motions for leave to file amicus briefs are denied as moot since they relate to the Rule 12(b)(6) motion to dismiss.

Plaintiff's amended complaint, if any, is due within 30 days of this order.

8

This Order disposes of Docket Nos. 35, 44, and 46.

**IT IS SO ORDERED.**

Dated:  October 2, 2020

                                                                          _____
                                                                          JACQUELINE SCOTT CORLEY
                                                                          United States Magistrate Judge